UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x

IRA NATHEL and SHELDON NATHEL,

                    Plaintiffs,

            - against -

RICHARD SIEGAL, GEORGE COLEMAN,
HARVEY JOSEPHSON, ROBERT A. TREVISANI,
PAUL HOWARD, RICHARD S. GURALNICK,
SCHAIN LEIFER GURALNICK, BISTATE OIL
MANAGEMENT CORPORATION, SS&T
HOLDING CO., LLC, PALACE EXPLORATORY
COMPANY, TAH DRILLING CO., INC., TAQ
DRILLING CO., INC., OIL AN GAS TITLE
HOLDING CORPORATION, JOHN DOES 1-20,
JOHN DOE CORPORATIONS 1-20, JOHN DOE
LLCs 1-20, AND JOHN DOE LLPs 1-20,

                    Defendants.

------------------------------------------------------------- x

:    ECF case

:    07-CIV-10956 (LBS) (HPB)

:

:    **AFFIDAVIT**

STATE OF NEW YORK    )
                        ss.:
COUNTY OF NEW YORK  )

    **DANIEL L. CARROLL,** being duly sworn, deposes and says:

    1.     I am a member of Ingram Yuzek Gainen Carroll & Bertolotti, LLP, counsel for

defendant Harvey Josephson.

    2.     I respectfully submit this affidavit in support of the instant motion, under Rules

12(b)(6) and 12(b)(1) of the Federal Rules of Civil Procedure, for an order dismissing all claims

in plaintiffs' first amended complaint, dated December 13, 2007, asserted against defendant

Harvey Josephson.

    3.     In particular, I submit this affidavit to place before the Court, as Exhibit 1

annexed to this affidavit, the first amended complaint on which this motion is based.

WHEREFORE, for the reasons set forth in the accompanying memorandum of law, I respectfully request that the Court grant this motion in all respects.

DANIEL L. CARROLL

Sworn to before me this
27th day of February, 2008

Notary Public

JOSEPHINE CABAN-ODIOT
Notary Public, State of New York
No. 01CA4705166
Qualified in Westchester County
Commission Expires Dec. 31, 2009

270428_1/02818-002

2

1

STORCH AMINI & MUNVES PC
Two Grand Central Tower, 25th Floor
140 East 45th Street
New York, New York 10017
Tel. (212) 490-4100
Steven G. Storch (SS-5241)
Kathleen E. Wright (KW-5439)
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

RECEIVED
DEC 1 3 2007
U.S.D.C. S.D.N.Y.
CASHIERS

------------------------------------------------------------
IRA NATHEL and SHELDON NATHEL,

                         Plaintiffs,

         -against-                                          07 CIV. 10956

RICHARD SIEGAL, GEORGE COLEMAN, HARVEY
JOSEPHSON, ROBERT A. TREVISANI,
PAUL HOWARD, RICHARD S. GURALNICK;                          FIRST
SCHAIN LEIFER GURALNICK; BISTATE OIL                        AMENDED
MANAGEMENT CORPORATION,                                     COMPLAINT
SS&T HOLDING CO., LLC, PALACE EXPLORATION
COMPANY, TAH DRILLING CO., INC.
TAQ DRILLING CO., INC., OIL AND GAS TITLE,
HOLDING CORPORATION, JOHN DOES 1-20;
JOHN DOE CORPORATIONS 1-20;
JOHN DOE LLCs 1-20; and JOHN DOE LLPs 1-20

                         Defendants.
------------------------------------------------------------x

Plaintiffs Ira Nathel and Sheldon Nathel, by their attorneys, Storch Amini & Munves PC,

as and for their complaint against Richard Siegal ("Siegal"), George Coleman

("Coleman"), Harvey Josephson ("Josephson"), Robert A. Trevisani ("Trevisani"), Paul

Howard ("Howard"), Richard S. Guralnick ("Guralnick"), Schain Leifer Guralnick

("SLG"), Bistate Oil Management Corporation ("Bistate"), Palace Exploration Company

("Palace"), SS&T Drilling Co, LLC ("SS&T"), TAQ Drilling Co., Inc.("TAQ"), TAH

Drilling Co., Inc.("TAH"), Oil and Gas Title Holding Corporation ("Oil & Gas"), John

Does 1-20 ("Individual Does"), John Doe Corporations 1-20 ("Corporate Does"), John Doe LLCs 1-20 ("LLC Does"), and John Doe LLPs 1-20 ("LLP Does") allege as follows:

## PRELIMINARY STATEMENT

1.   The claims set forth herein arise from Defendants' misconduct, intentional material misrepresentations, omissions and false promises, through which Plaintiffs were fraudulently induced to invest large sums of money in partnerships formed purportedly to invest in oil and gas well drilling and production interests which investments Defendants' promised were legitimately tax deductible and would produce a return on the cash invested.  Defendants' representations were false and made knowingly with the intention of taking Plaintiffs' money for themselves for their own enrichment.

2.   Defendants represented to Plaintiffs verbally and in writing including in Investment Proposals for each partnership, that, through certain partnership investment structures Plaintiffs could invest pre-tax dollars in oil and gas drilling interests and not only legitimately take tax deductions of more than twice the amount invested as intangible drilling costs ("IDC"), but also receive a substantial return on the cash invested.

3.   Defendants represented that Plaintiffs would be able to deduct as IDC costs more that $2.00 for every dollar invested in the Partnerships.  Defendants represented to Plaintiffs that the partnership structure to take advantage of available tax deductions was proper and consistent with federal and state tax laws and regulations.  Defendants represented that the structure had been approved by taxing authorities and had been successfully subjected to audits.  According to Defendants, the United States

government sanctioned the IDC deductions in order to encourage investment in domestic oil and gas exploration to diminish dependence on foreign imports.

4.   As a further inducement to invest in their schemes, Defendants promised that Plaintiffs would receive a minimum quarterly return of 2% on cash invested.  Defendants also represented that the quarterly distributions they would receive, and payments to pay down the drilling costs, would be generated from the revenues from producing oil and gas wells drilled for the partnerships.

5.   Defendants also represented to Plaintiffs that, due to the economic viability of the oil and gas wells, they would never be required to pay the principal due on the promissory notes they would execute to fund oil and drilling costs and that, after the first year, they would not be liable for the interest on the notes.  Defendants represented that the principal and interest would be paid down by receipts for sales of oil and gas from successfully drilled wells.

6.   Defendants also promised that, if Plaintiffs assigned a portion of their distributions from the partnerships to the drilling companies, those monies would be used to purchase marketable securities that would also eventually be used to pay promissory notes executed to fund partnership investments and activities.

7.   Plaintiffs had no experience in the oil and gas industry and relied on Defendants' statements that they had  decades of experience in the oil and gas industry and had successfully created numerous similar investments structures from which investing partners had received valuable tax deductions and substantial returns.  Plaintiffs

3

reasonably relied on Defendants' representations and entrusted substantial amounts of money to Defendants and invested in eight partnerships ("the Siegal Partnerships").[1]

8.  Plaintiffs also had no expertise in accounting, the creation of tax shelters or tax rules and regulations.  The partnerships retained Defendants Guralnick, a certified public accountant and his firm SLG to provide such expertise and Plaintiffs relied on them to adhere to the standards of practice of their profession, provide accurate information and advice and to prepare tax return documents that did not deviate from the rules of the IRS and other taxing authorities governing tax deductions.

9.  Notwithstanding how the partnerships were styled, Plaintiffs were de facto limited partners in the Siegal Partnerships.  Each partnership agreement expressly granted all the power to act to the Managing Partner, who was either Defendant Coleman or Defendant Trevisani, and specifically excluded all investing partners from any power or any participation in the partnerships' activities or decisions.

10. Plaintiffs placed their trust in Siegal, Coleman, Josephson, Trevisani, Howard, Guralnick and SLG and invested money in the partnerships with the expectation of deriving financial benefits and realizing profits from the efforts of Defendants.

11. Not only have Plaintiffs discovered that substantially all of these representations and promises were false but also that Defendants omitted to inform Plaintiffs of facts that would have made a material difference to their investment decisions.  These omissions include the failure to disclose that, the partnerships should have been registered with the IRS as tax shelters and that, if the IRS scrutinized the structures it would find them improper and disallow the IDC deductions.

---

[1] Specifically the partnerships are named:  NF Drilling Co., High Island Drilling Co., Bateman Drilling Co., Stagecoach Drilling Co., Pebble Bay Drilling Co., Hurricane Drilling Co., Indian Village Drilling Co. and Condor Drilling Co.

12. In November 2006, Plaintiffs were, for the first time, alerted to problems with the Partnerships. They were informed by the Internal Revenue Service ("IRS") that their tax returns were to be audited with specific focus on deductions for the Indian Village Drilling Co. ("Indian Village") partnership investment. Plaintiffs subsequently learned that a partner in one of Siegal's programs had been audited and the tax deduction was not only largely disallowed but that the partner had incurred an accuracy related penalty. Plaintiffs were also informed that substantially all of Defendant Bistate's drilling programs were being audited by the IRS.

13. During a telephone conversation with an IRS revenue agent seeking clarification, the Plaintiffs were advised that the Siegal Partnerships were aggressive tax shelters taking improper tax deductions and that Plaintiffs could be liable for stiff penalties and back taxes. The agent requested that Plaintiffs forward to him any offering memoranda or marketing materials they had regarding the Siegal Partnerships.

14. During a discussion of this request with Defendant Howard, Bistate's controller and Plaintiffs' contact at the Siegal entities, Howard advised Plaintiffs not to send any Investment Proposals to the IRS and, if they did, to remove the initial pages with the narrative proposal and representations. When asked why, Howard responded that the IRS would not like what was in the pages. Plaintiffs' representative provided to the IRS the complete Investment Proposal of the Indian Village partnership and later learned that Defendants Guralnick and SLG had represented to the IRS that there were no such proposals for any of the partnerships.

15. Plaintiffs discovered that the representations Defendants made regarding the tax deductibility of their investments, upon which Plaintiffs had relied,

were false, that Defendants knew they were false or were made with reckless disregard for the truth, and they now faced substantial monetary losses due to unanticipated tax payments, interest and penalties.

16. Plaintiffs repeatedly requested Bistate to provide partnership documents and materials to which, as partners, they were entitled. Bistate ignored, rebuffed or simply failed to produce any materials and documents. Plaintiffs had to resort to legal action in New York State court to force Bistate to provide documents. Plaintiffs learned in September, 2007 when Bistate finally produced documents that some of the oil and gas wells purportedly drilled at the request of some of the Partnerships had in fact been drilled before the Partnerships were created and, in some instances, had been abandoned prior to Plaintiffs' investment.

17. Defendants knew, at the time they induced Plaintiffs into the investments, with representations to the contrary, that Plaintiffs could not take advantage of IDC tax deductions for intangible drilling costs incurred on wells drilled before Plaintiffs acquired their partnership interests.

18. Records produced by Bistate also show that distributions to the partners from the partnerships were often made from "advances" and not from oil and gas revenues. Upon information and belief, these advances were made from Siegal, the companies he controlled and/or cash received from investments made by other partners in unrelated partnerships promoted by Siegal.

19. There was no provision in the Partnerships' agreements for such "advances" to the Partnerships and no documentation has been provided to Plaintiffs demonstrating the source or repayment terms.

6

20. According to Defendants' representations, all distributions would be made from cash flow produced from receipts for the sale of oil and gas produced form successfully drilled wells.

21. Accordingly, Plaintiffs now realized that they had been fraudulently induced into a giant Ponzi scheme with false promises of legitimate tax deductions and substantial investment returns. The IDC tax deductions were unsupported by legitimate drilling costs and the "returns" were made in large part from recycled cash from other duped investors or were diverted to Defendants for their own purposes.

22. The balance of this complaint will set forth in detail the facts and circumstances of defendants' fraudulent activities, failure to meet their duties of trust and professional care and breaches of the agreements entered into with Plaintiffs leading to the claims for relief herein.

## JURISDICTION AND VENUE

23. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 as the claims involve issues of substantive federal taxation law and Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78aa. Claims asserted herein arise under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. The investments at issue in the claims herein are investment contracts which constitute securities as defined in 15 U.S.C. § 77b(a)(1) and applicable case law. Under 28 U.S.C. § 1367 this Court also has supplemental jurisdiction over plaintiffs' claims arising under state law.

24. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims herein occurred in

this district and many of the documents, records and witnesses related to this action are located in this district.

25. In connection with the acts, transactions and conduct alleged herein, Defendants directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and interstate telephone communications.

## PARTIES

26. Plaintiffs Ira Nathel and Sheldon Nathel are individuals residing in the State of New York.

27. Individual Defendants Siegal and Howard are individuals residing in the State of New York.

28. Individual Defendant Josephson is a certified public accountant residing in the State of New York.

29. Defendant Coleman is an individual residing in the State of New York who, upon information and belief, is engaged in the teaching profession.

30. Individual Defendant Guralnick is a certified public accountant residing in the State of New York.

31. Upon information and belief, Defendant Trevisani is an attorney admitted to the practice of law in the States of New York and Massachusetts and residing in the State of Massachusetts.

32. Defendant SLG is a firm of certified public accountants with its offices in New York, New York.

33. Upon information and belief, Defendant Bistate is a corporation formed and existing under the laws of the State of New York with its principal place of business in New York, New York.

34. Upon information and belief, Defendant Palace is a corporation formed under the laws of the State of Oklahoma.

35. Upon information and belief, Defendant Oil & Gas is a corporation formed and existing under the laws of the State of Texas with its principal place of business in New York, New York.

36. Upon information and belief, defendant, SS&T is a limited liability corporation formed and existing under the laws of the State of New York with its principal place of business in New York.

37. Upon information and belief, defendant TAH is a corporation formed and existing under the laws of State of Delaware with its principal place of business in New York, New York.

38. Upon information and belief, Defendant TAQ is a corporation formed and existing under the laws of the State of Delaware with its principal place of business in New York, New York.

39. Upon information and belief Defendants Bistate, Palace, Oil & Gas, SS&T, TAH and TAQ (collectively "the Siegal Companies") are all 100% owned and controlled by Siegal and his family. Siegal, Coleman, Trevisani, Josephson and Howard, committed the tortious acts and breaches described herein through these corporate Defendants.

40. Upon information and belief Defendants John Does 1-20 are persons, yet to be identified, who also committed tortious acts and breaches described herein.

41. Upon information and belief Defendants John Does Corporations 1-20 are corporate entities, yet to be identified, who also committed the tortious acts and breaches described herein.

42. Upon information and belief Defendants John Doe LLCs 1-20 are limited liability companies, and professional partnerships, yet to be identified, who also committed the tortious acts and breaches described herein.

43. Upon information and belief Defendants John Doe LLPs 1-20 are law firms, accounting firms and other professionals, yet to be identified, who also committed tortious acts and breaches described herein.

## FACTS RELEVANT TO ALL CLAIMS FOR RELIEF

### Background

44. According to Investment Proposals prepared by Siegal to offer investors participations in the partnerships he devised, Defendant Siegal is an attorney and an accountant who has been engaged in the oil and gas exploration and development industry since the 1970s.

45. This activity has largely been conducted through the formation of partnerships Siegal promoted purportedly to acquire leases for oil and gas interests and sites and retain third party companies to drill for oil and gas ("the Siegal Partnerships").

46. Plaintiffs are engaged in the wholesale fruit and vegetable business and have no expertise or experience in the oil and gas industry, accounting or tax sheltering.

10

47. In or about the end of 2000, Plaintiffs retained Harvey Josephson, a certified public accountant, to provide professional accounting services including assistance with tax reporting. In or about November 2001, after providing Plaintiffs with professional accounting services for about a year and seeing that Plaintiffs' business was thriving, Josephson approached Plaintiff's corporate controller, Richard Byllott ("Byllott"), with a proposal to invest in a Siegal partnership.

48. Josephson told Byllott that, instead of making four quarterly estimated tax payments, Plaintiffs could make only three and invest the fourth payment, together with an executed promissory note, in a Siegal partnership which would use the money and Notes to pay a related entity, namely Defendants SS&T, TAQ or TAH for a turnkey oil and gas drilling contract. Plaintiffs could then take a tax deduction or an amount equal to the combined amount of cash and promissory notes on IDC and the purported tax savings would equal or exceed the cash investments.

49. If a sufficient number of the drilled wells struck oil or gas, as was guaranteed according to Josephson, Plaintiffs would have the added benefit of earning a return on their investment from revenues generated by the sale of the oil and gas.

50. Josephson assured Byllott and Plaintiffs that he had been putting his clients in similar Siegal partnerships for years and that his clients had taken the IDC tax deductions without any problems with the Internal Revenue Service ("IRS") or any other taxing authorities. He informed Byllott and Plaintiffs that his clients had also received substantial cash on cash profits from their investments as oil and gas had been found in abundance.

11

51. In order to confirm Josephson's assessment of the propriety of the tax deductibility of the proposed investment, in or about January 2002 Byllott spoke to Siegal by telephone and asked if the IRS had approved the tax aspects of the investment structures. Siegal informed Byllott that his partnerships "had never lost an audit". At or about the same time, Siegal and Josephson also assured Plaintiffs that Congress had made the tax deductions available to encourage investment in the oil and gas industry because the United States government was anxious to promote oil and gas exploration internally to reduce the country' dependency on foreign imports.

52. Upon information and belief, Josephson had a financial interest in the Siegal Companies and other Siegal Partnerships and was compensated by Siegal and/or the Siegal Companies for securing Plaintiffs agreement to invest in the Siegal Partnerships and hand over money to Siegal and/or the Siegal Companies.

**The Structure of the Siegal Partnerships**

53. Each partnership followed the same format.[2] Siegal provided Plaintiffs with an offering memorandum styled an "Investment Proposal" which made the following promises and representations of present fact:

    (a) Investors can redeploy their upper bracket tax dollars into certain investments and create income and cash flow rather than pay those dollars to federal, state and municipal governments.

    (b) Rates of return can unquestionably be earned on monies which would otherwise be paid to taxing authorities.

    (c) The partners will be afforded a substantial active tax loss under Section 263C of the Internal Revenue Code which allows taxpayers to expense the intangible drilling costs incurred in drilling oil and gas wells.

---

[2] For the sake of brevity the Complaint will specifically reference the materials relating to the Indian Village Drilling Company partnership purportedly dated March 1, 2003, but in which Plaintiffs invested on July 15, 2003

(d) The Partnership can expect an average annual cash flow of approximately 10-15% and often greater of the cash funds invested.

(e) It is reasonable to expect the cash flow to continue for 10-12 years.

(f) A $100,000 cash investment will result in a deduction of 2.25 times that amount. An investor in the 50% tax bracket will save $112,500. That is the investor will have channeled $100,000 of his tax dollars into an active investment and put another $12,500 in his pocket. The investment should also yield 10% per annum of which approximately 25% will be tax free.

(g) The Partnership will be formed with a minimum of five (5) units for capitalization and would contract with a specific drilling company to drill a minimum number of wells at a turnkey price, on sites purchased from Palace.

(h) The drill sites will be carefully chosen by the Managing Partner of the Partnership.

(i) To the extent that during the drilling of a site the results lead to the condemnation of any additional drill site, the Partnership will have the right to exchange the undrilled site for another undrilled site controlled by Palace in the same area.

(j) The turnkey drilling costs will be paid partially in cash and partially with a Turnkey Note issued by the Partnership and secured by Subscription Notes executed by the investing partners.

(k) Each investor will purchase a unit in the partnership with a certain sum in cash, for example $100,000, and with the execution of a Subscription Note in the amount of 1.25 times the cash investment. The $100,000 cash investment will create a tax deduction of $225,000.

(l) The interest payable on the Subscription Note would be 8% per annum paid quarterly and fully tax deductible. The investor would only be required to pay the interest during the first year of the Partnership with future interest to be paid out of the Partnership's cash flow generated from oil and gas revenues or the interest would accrue and be payable at the maturity of the Subscription Note.

(m) Oil and Gas Title, as nominee, holds all the titles to the properties and wells for the investors' benefit.

(n) Bistate collects all the monies from the sale of oil and gas, pays all the lease expenses to non-related third party vendors and distributes cash flow payments to investors.

(o) Distributions to the partners are quarterly and accompanied with a report of all sales of oil and gas by month and by well and a schedule of expenses paid on the owned wells and leases.

(p) The Turnkey Note holder will subordinate its right to collect the 8% interest from the Partnership on the Turnkey Note to a quarterly cash on cash 2.0% return to the investing partners.

54. The Indian Village Investment Proposal also represented that, in lieu of receiving the quarterly distributions in full, the partners could elect to assign to the Partnership, for no more than five years, 67% percentage of their future distributions with which the Partnership would purchase marketable securities which would increase in value and ultimately be used to pay off the Turnkey Note.[3]

55. The Investment Proposal also represented that Siegal's companies "have always maintained the highest level of fiduciary integrity servicing investors with informative reporting and on time distributions" and that Defendant Palace had over 1500 producing wells in the lower 48 states.

56. The Investment Proposal included draft agreements as follows:

(a) A Partnership Agreement and Certificate of Partnership ("Partnership Agreement") to be executed by the Managing Partner and each investing partner;[4]

(b) A Prospect Agreement between the Partnership, Palace, Oil and Gas and Bistate through which Palace assigned oil and gas interests to Oil and Gas as nominee for the benefit of the Partnership and Bistate is named the Designated Distributor of oil and gas production;

(c) A Turnkey Drilling Contract between the Partnership and the proposed drilling company, which was TAQ, TAH or SS&T;

---

[3] The percentage withholding varied with each Partnership between 67% and 75%.
[4] Defendant Coleman was the Managing Partner for seven of the Partnerships in which Plaintiffs invested. The Managing Partner for the eighth, Hurricane Drilling Co., was Defendant Trevisani.

(d) A Turnkey Note, bearing interest at 8% per annum, issued by the Partnership to the drilling company to finance in part the drilling costs;

(e) A Subscription Agreement by which the partner subscribes to a partnership unit which subscription must be accepted by the Managing Partner;

(f) A Subscription Note, bears interest at 8% per annum, executed by the partner for the balance of the payment for the partnership unit and applied as collateral securing the Turnkey Note; and

(g) An Assumption Agreement executed by the investing partner assuming the partner's pro rata share of the Turnkey Note and pledging the partner's Subscription Note to secure that share.

57. As with all the Siegal Partnership documents, none of the signatures on any of the above agreements relating to Indian Village are dated. Only the Partnership Agreements contain dates, in the opening paragraphs, as of which the Partnerships were purportedly formed. The Indian Village Partnership Agreement is purportedly dated March 1, 2003. However, Plaintiffs, who were the first participants, did not invest until July 15, 2003. The minimum number of five (5) units for capitalization of Indian Village were not sold until September 5, 2003 and the last investor joined in December 2003.

58. To the best of Plaintiffs' knowledge, no allocations were made between partners based upon the date of the acquisition of his or her Partnership interest.

**The Partnership Terms**

59. All the Partnerships were formed under the laws of the State of New York. Although styled as general partnerships, the Partnership Agreements unequivocally place all control and power in the hands of the Managing Partner only. The Managing Partners have full and exclusive power and authority to manage, control, administer and operate the business affairs of the Partnerships and take all decisions:

15

"The scope of such power and authority shall encompass all matters in any way connected with such business or incidental thereto."

60. The Partnership Agreements and Certificates of Partnership expressly exclude the investing partners from any involvement in the Partnerships' business or decision making and preclude them from removing the Managing Partner.

61. Plaintiffs had no prior experience, let alone expertise, in the oil and gas industry, well drilling or investing in oil and gas exploration and were excluded from any decision making related to the Partnerships. Accordingly, they were entirely dependent on the expertise and efforts of others to provide the promised financial and tax benefits from the investments. The Partnerships were investment contracts structured as investments of money in a common enterprise with the expectation of profits derived from the efforts of the promoter Siegal, the Managing Partners and/or the Siegal Companies or other third parties including Defendants Guralnick and SLG.

**Representations Regarding**
**the Subscription Notes and Partnership Distributions**

62. As part of the inducement to enter into the Partnerships, Josephson and Siegal represented to Plaintiffs that, as a practical matter due to the economics of the transaction, Plaintiffs would not be required to pay the 8% interest on the Subscription Note after the first year. All future payments due would be paid from cash flow from revenue generated by the sale of gas and oil from successfully drilled wells which, in turn, would pay down the Turnkey Notes. Josephson assured Plaintiffs that none of the similar promissory notes financing Siegal's partnership structures had ever been exercised and that "no one ever sees them."

16

63. Josephson and other yet to be identified defendants assured Plaintiffs that funds generated by the oil and gas sales in excess of the amounts due quarterly on the Turnkey Note would be distributed to the Partnership and then to the partners except for any portion of the distributions the partners had assigned to the Partnerships to purchase marketable securities. These securities were assumed to increase in value to the point where they would eventually be equal to the value of the Turnkey Notes and could be used to pay off those Notes.

64. Defendants further induced Plaintiffs into the Partnerships with a promise of a guaranteed quarterly return on their cash invested The Investment Proposal expressly states that the Turnkey Note holder will subordinate its right to collect interest on the Note to a cash on cash 2% quarterly return to the investing partners. That is, the partners were guaranteed a quarterly payment of 2% on the cash they invested.

65. Defendants intentionally did not disclose to Plaintiffs that the Partnership structures should have been registered with the IRS as tax shelters and that, if the IRS reviewed the structures closely it would find the tax aspects improper and disallow the IDC deductions.

**Plaintiffs Invested in the Partnerships**
**In Reliance on Defendants' Representations**

66. Relying on Defendants representations and the representations in the Investment Proposal, and without knowledge of material facts that Defendants did not disclose, Plaintiffs invested as limited partners in the Partnerships. The designated dates of the commencement of the Partnerships set forth in the Partnerships agreements were invariably months before Plaintiffs actually invested in the Partnerships as follows:

17

| Name | Date on Agreement | Date Plaintiffs Invested | Amount |
|---|---|---|---|
| NF Drilling | August, 2001[5] | December 12, 2001 | $200,000 |
| High Island Drilling | March 1, 2001 | August, 23, 2001 | $ 50,000 |
| Stagecoach Drilling | March 1, 2002 | July, 23, 2002 | $100,000 |
| Bateman Drilling | September 1, 2002 | December, 2002[6] | $250,000 |
| Indian Village Drilling | March 1, 2003 | July 15, 2003 | $150,000 |
| Condor Drilling | September 1, 2003 | December 12, 2003 | $250,000 |
| Hurricane Drilling | August 1, 2004 | December 9, 2004 | $300,000 |
| Pebble Bay Drilling | August 1, 2005 | December 12, 2005 | $400,000 |

67. Upon information and belief, each year the Partnership tax returns and schedules were prepared by Defendants Guralnick, SLG and personnel controlled by Defendants. Schedule K-1 were provided to Plaintiffs detailing the IDC deductions to be used in preparation of their tax returns.

68. Plaintiffs received quarterly written communications from each Partnership which included distribution checks and purported production reports for the wells owned by each Partnership. Many of the distribution checks were reduced by what was reported as a "transfer for the purchase of securities".

69. These communications never included a description of the "securities" or any evidence that they had been purchased, their value or where they were being held.

**The Fraud Is Revealed**

70. In or about November 2006, Plaintiffs' corporate controller, Richard Byllott, received a written notice from Jeffrey Bacon, an IRS revenue agent in Texas requesting that Plaintiffs extend the limitations period on an audit. Seeking clarification, Byllott shortly thereafter spoke to Patrick Villarreal, an IRS revenue agent in Texas, who informed Bylott that Plaintiffs' investments in the Siegal Partnerships were being audited

---

[5] Upon information and belief the date on the Partnership Agreement is in or about August 2001.
[6] On or about December 12, 2002.

and that the Siegal Partnerships were aggressive tax shelters taking illicit tax deductions and that Plaintiffs were facing trouble.

71. Revenue agent asked Byllott to forward to him any promotional materials for the Partnerships that he or Plaintiffs had received. Byllott said he would consult his tax accountant and get back to revenue agent Villarreal.

72. In or about the middle of December, 2006, Byllott telephoned Paul Howard, who, upon information and belief, is the controller for Bistate and was Byllott's contact at the Siegal Partnerships and Bistate. In that conversation, Byllott discussed with Howard the fact that Plaintiffs were being audited. Howard tried to assure Byllott that the audits were routine and would not lead to any problems.

73. When Byllott told Howard that the IRS had asked him to forward promotional materials, Howard's demeanor changed. He told Byllott he should not send the Partnership Investment Proposals to the IRS and that, if he did so, he should remove the first five pages. Byllott asked him why he should remove the pages and Howard answered in substance that, in those pages, "the IRS is going to see something they don't like."

74. Howard's statement understandably caused alarm and Plaintiffs, through a representative, forwarded to Mr. Villarreal the complete Investment Proposal for the Indian Village Partnership without removing any pages.

75. By letter dated March 12, 2007, Defendant Coleman, signing himself as "tax matters partner", informed Plaintiffs that the Condor Partnership was under IRS audit for the taxable year 2003. In a letter of the same date, Defendant Trevisani, signing himself also as "tax matters partner", informed Plaintiffs that the Hurricane Partnership

19

was also under IRS audit for the taxable year 2004. The letters advised Plaintiffs that the Partnerships were responding to IRS document requests and otherwise cooperating fully with the audit.

76. The March 12, 2007 letters also informed Plaintiffs that an IRS audit report to a partner in a similar partnership structure proposed to disallow a large percentage of the IDC deductions taken by the partner and to impose an accuracy-related penalty.

77. Plaintiffs learned in September 2007, that Defendants were not cooperating fully with the IRS and were not acting in the interests of Plaintiffs in their dealings with the IRS. In written responses to IRS information requests dated October 17, 2006 and January 29, 2007, on SLG letterhead, Defendant Guralnick told the IRS that there "is no promotional or marketing material, offering memorandum or prospectus used to solicit partners or investors." In other words, Guralnick told the IRS that the Investment Proposals, which were designed solely to sell the Partnership interests, did not exist.

78. Guralnick had also advised the IRS, in a letter dated October 16, 2006, also on SLG letterhead, that there was no "legal opinion or prospectus describing the material tax issues for the [Hurricane] partnership agreement or the deductibility of the IDC amounts." As set forth above, the Investment Proposals laid out in detail the tax issues and the deductibility of the IDC and represented that the Partnerships and their tax aspects were proper.

20

79. On or about July 17, 2007, the New York State Department of Taxation informed Plaintiff, Ira Nathel, that his tax returns were to be reviewed and his investment in Indian Village subject to audit.

80. In the meantime an attorney for Plaintiffs inquired of IRS revenue agent Villarreal whether the IRS would allow a tax deduction for IDC costs to the extent of Plaintiffs' investments. Revenue agent Villarreal responded that, based on documents provided by the Partnerships, the IRS deemed that the Partnerships did not own a working interest in any wells. Agent Villarreal also indicated that proceeds received from the Partnerships may not have been from revenues from wells drilled by the Partnerships in which Plaintiffs had invested.

81. Alarmed by the state of affairs and facing a significant accuracy-related penalty, Plaintiffs wished to assess the possibility of taking action against those potentially liable for misconduct towards them. Not knowing who all the likely miscreants were, Plaintiffs made certain requests for Partnership documents, to which they are entitled, from Bistate and Siegal. However, the requests were ignored, rebuffed or promised documents never materialized.

82. In August 9, 2007, Plaintiffs commenced an action in New York State Court to force the pre-action production of documents that would enable them to identify the wrongdoing entities and individuals and the extent of the misconduct. Bistate ultimately entered into a stipulation, dated August 21, 2007, and agreed to produce documents.

83. Bistate subsequently produced documents relating to the Condor, Hurricane and Indian Village Partnerships. Those documents confirm that

21

representations made by Defendants verbally, and in writing in the Investment Proposals, in the quarterly distributions, and in correspondence with the IRS, were false. Plaintiffs also learned that Defendants had withheld material facts from them regarding, among other things, the nature of the Partnership interests, the propriety of deducting the IDC costs from Plaintiffs' taxes and the return on the Plaintiffs investments.

84. Plaintiffs also learned that Defendant Coleman is a teacher and Defendant Trevisani is an attorney. Accordingly, they have no professional background to qualify them to act as plenipotentiary Managing Partners in oil and gas exploration Partnerships and to protect those Partnerships' interests. In particular, they would have no expertise to choose "carefully" the oil and gas drill sites as the Investment Proposals represented they would. Defendants falsely represented that Coleman and Trevisani's had the requisite expertise and Plaintiff relied on those representations to their detriment.

85. Plaintiffs do not currently have access to Bistate's documents pertaining to all the Partnerships but believe that all the allegations herein apply with equal validity to all eight Partnerships in which they were induced to invest.

**Defendants Misrepresented the Indian Village IDC Deduction**

86. According to the Investment Proposal, the Partnership would be comprised of a minimum of 5 units for a mimimum capitalization of $1,250,000. There would also be a minimum of 25 sites drilled. The Investment Proposal also states that dry sites will be substituted for other undrilled sites owned by Palace.

87. The Partnership Agreement purports to date from March 1, 2003. However, from the Partnership General Ledger information provided by Bistate, the first three units of the Partnership were purchased by Plaintiffs on July 21, 2003. The

22

minimum of 5 units was not reached until September 5, 2003.  Thus, unbeknownst to

Plaintiffs, the Partnership did not, by its own terms, exist until September 5, 2003.

Additional contributions were made as late as December 22, 2003.  Nevertheless, the

Partnership tax return for 2003 treats all partners as having commenced their

participations on the same date of March 1, 2003.

     88. Bistate has admitted that the Partnership Agreement dates are

inaccurate in affidavits provided to the IRS by Maria Scibelli, who describes herself as

Secretary of Bistate.  In those affidavits she purports to explain the lack of dates for the

signatures for all the related agreements by merely stating the she received or viewed the

executed agreements "substantially contemporaneously" with receipts for the partners'

investments.

     89. The Prospect Agreement provided to Plaintiffs before they bought

their Partnership units named 31 drill sites to be assigned to the Partnership.  In other

words the Indian Village drill sites were purportedly assigned before any partners had

acquired their interest and, more importantly, before any cash or Notes were contributed

to the Partnership.  Accordingly, it would have been impossible as of March 1, 2003 to

determine what the terms of the Turnkey Drilling Contract would be as it was unknown

how much would be contributed to the Partnership in cash and Subscription Notes.

     90. Furthermore, the drilling reports for the sites listed in Exhibit A to the

Prospect Agreement demonstrate that at least 16 of the 31 sites had been drilled, not only

before 5 Partnership units had been sold, but before a single Partnership unit had been

purchased.  All of the wells were drilled before the final Partnership investment was

made in December 2003.  Indeed, at least 2 had been drilled and abandoned before

September 5, 2003 which was the first date the Partnership could have been constituted and a third was abandoned before the final partner invested.

91. Accordingly, Defendants knew at the time they solicited Plaintiffs participation in Indian Village that the Partnership and partners were not entitled to take deductions for IDC for most of the purported drill sites and knowingly misrepresented to Plaintiffs that the deduction was legitimately available.

**Defendants Misrepresented the**
**Return on Plaintiffs' Indian Village Investment**

92. The Investment Proposal promised that, after the first year, interest payable on the Subscription Notes would be paid from the Partnership cash flow from sales of oil and gas from successfully drilled wells. That interest would in turn pay the interest due on the Turnkey Note. However, also as promised in the Investment Proposal, the Turnkey Noteholder, Defendant TAQ, would subordinate its right to collect interest on the Turnkey Note to a quarterly cash on cash 2% return to the investing partners. In other words, the proceeds of sales of oil and gas, collected buy Bistate, were guaranteed to be sufficient to pay Plaintiffs a quarterly 2% return on the cash they invested.

93. Bistate's documents show that distributions were made quarterly by Bistate to the Indian Village Partnership. However, in order to make those distributions in April, July and October of 2006 the distribution reports note that "advances" were made to the Partnership from an unnamed source. On July, 30, 2007 a distribution was made to the Partnership of less than half of the guaranteed 2% payment. Six days later a "supplemental distribution" was made of $10,000 funded entirely by another "advance" from an unknown source. Whatever the source, these distributions were not made, as Defendants promised, from oil and gas revenues.

94. Moreover, nowhere in the Investment Proposal or Partnership related documents is there any statement that Bistate contemplated borrowing to pay the quarterly 2% payment. Defendants withheld all information regarding such borrowing from Plaintiffs. There are no promissory notes to memorialize such advances. Bistate was circulating cash from other partnership investments to pay Indian Village and keep the partners from: (a) discovering that no oil and gas sales were insufficient to fund the promised return on investment; and (b) to pay down the Turnkey Note for drilling that Plaintiffs now know never took place or was completed and abandoned before the Partnership was constituted.

95. The Investment Proposal also represented that Plaintiffs could agree to assign 67% of their future distributions to the Partnerships, for a period of not more than five years. The Partnerships would use the withheld distributions to purchase marketable securities which would provide additional collateral and eventually be used to pay off the Turnkey Notes.

96. From July 28, 2005 onwards all the distribution checks to the Plaintiffs from the Partnership reflected this assignment and the withholding of most of the distribution as "transfer for purchase of securities". However, despite express and repeated requests, Bistate has failed to provide any documents that would identify the specific securities purportedly purchased or where and by whom they are being held. The only conclusion to draw from this refusal to provide documents relating securities which should belong to Plaintiffs is that the securities do not, and never did, exist.

97. Defendants withheld from Plaintiffs the fact that there were insufficient, or no, oil and gas receipts to fund Partnership distributions let alone pay off

what turned out to be bogus Turnkey and Subscription Notes. By the artifice of making advances and withholding promised distributions to purchase nonexistent "securities" Defendants hoped to keep the house of cards standing for twenty-five years. At that time Defendants planned to represent that the Turnkey Note and Subscription Notes had all been paid off by oil and gas receipts and from the sale of the "securities" which would have increased in value over the twenty-five years sufficiently to equal the value of the Notes. The Turnkey and Subscription Notes are bogus and there are no securities to back them and the purported distributions were made largely from cash received from other investors who had been duped into turning over money to Defendants for interests in similar partnerships.

## Condor Partnership Misrepresentations

98. The Condor Partnership is identical in structure to, and was promoted with the same misrepresentations as Indian Village but for the facts alleged below.

99. The Condor Investment Proposal represented that a minimum of five units would be required for the Partnership to be constituted. Whereas the minimum capitalization for Indian Village was $1,250,000; for Condor it was $1,400,000. Also, the Turnkey Drilling Contract was with Siegal's company Defendant TAH instead of Defendant TAQ. The Partnership Agreement is dated September 1, 2003 but Plaintiffs did not purchase their units until December 12, 2003. From Bistates's records it appears that the minimum of five units was not reached until December 26, 2003 and investments continued until December 31, 2003.

100. According to the Condor Prospect Agreement, 139 drill sites were purportedly to be assigned to the Condor Partnership. Again these supposed drill sites

26

were assigned before the Partnership could have been constituted pursuant to its own terms and it would have been impossible to determine the terms of the Turnkey Agreement before the Partnership had been fully constituted.

101.    Moreover, according to the drilling reports produced by Bistate for the Condor wells, at least twenty-two (22) of those sites were drilled before September 1, 2003, the date of the Partnership Agreement and before a single partner had invested, let alone the sale of the 5 units necessary to constitute the Partnership.  In addition, at least 7 of the sites had been drilled and abandoned before the Partnership was constituted with the minimum 5 units in December, 2003.

102.    Still, the Partnership tax return for 2003 deducts the IDC as if the Partnership had been fully constituted on September 1, 2003 and drilling had begun after that date.  Defendants knew that much of the IDC costs so deducted, if indeed any, could not be legitimately tax deductible.  Yet they had misrepresented to Plaintiffs that their investment would be substantially tax deductible as IDC.  SLG and Guralnick prepared and signed tax returns they knew, or should have known, were fraudulent or prepared with reckless disregard for their truthfulness.

103.    Bistate's records also show that of the of 12 quarterly distributions to the Condor Partnership, which Defendants promised would be generated from sales of oil and gas, 10 were in large part financed by "advances" to the Partnership from unknown sources.  As with the Indian Village Partnership, there is no provision in the Investment Proposal or the Partnership documents for the distributions to be supported by borrowing of any kind.  Again information that many distributions were not made from oil and gas revenues but from "advances" was withheld from Plaintiffs.

27

104.    Also, from July 28, 2006 onwards all the distribution checks to the Plaintiffs from the Partnership, as with Indian Village, reflected a withholding of most of the distribution due to Plaintiffs as "transfer for purchase of securities". However, despite express and repeated requests, Bistate has failed to provide any documents that would identify the securities purportedly purchased or where and by whom they are being held. The securities do not exist.

105.    Defendants withheld from Plaintiffs the fact that there were insufficient, or no, oil and gas revenues to fund Partnership distributions let alone pay off what turned out to be bogus Turnkey and Subscription Notes.  By the same artifice of making advances and withholding promised distributions to purchase nonexistent "securities" they used in Indian Village, Defendants hoped to keep the house of cards standing for twenty-five years.  At that time they planned to represent that the Turnkey Note and Subscription Notes had all been paid off by oil and gas receipts and from the sale of the "securities" which would have increased in value over the twenty-five years sufficiently to equal the value of the Notes.  In fact, the Turnkey and Subscription Notes are bogus and there were no security purchases to back them and the purported distributions must have been made largely from cash received from other investors who had been duped into turning over money to Defendants for interests in other partnerships.

**Hurricane Partnership Misrepresentations**

106.    The Hurricane Partnership is identical in structure to, and was promoted with the same misrepresentations, as Indian Village but for the facts alleged below.

107.    The Partnership Agreement is dated August 1, 2004 but Plaintiffs did not invest until December 9, 2004. The minimum number of units to constitute the Partnership was 5 for a minimum capitalization of $1,400,000. According the Bistate's documents, that minimum capitalization was not met until December 2004. The Turnkey Drilling Contract was also with TAH. Instead of Coleman, the Managing Partner was Defendant Trevisani.

108.    Bistates documents show that of the 93 sites assigned to the Partnership in the Prospect Agreement, at least 2 had been drilled before the date of the Partnership Agreement and at least 24 had been drilled before Plaintiffs invested on December 9, 2004. Furthermore, at least 1 site had been drilled and abandoned before any partners had invested.

109.    From on or about April 30, 2007, most of the distribution to Plaintiffs from the Hurricane Partnership was withheld for the "transfer for purchase of securities." Again, despite express and repeated requests, Bistate has failed to provide any documents that would identify the securities purportedly purchased or where and by whom they are being held. The securities do not exist.

110.    Defendants withheld from Plaintiffs the fact that there were insufficient, or no, oil and gas revenues to fund Partnership distributions let alone pay off what turned out to be bogus Turnkey and Subscription Notes. By the same artifice of making advances and withholding promised distributions to purchase nonexistent "securities" they used in Indian Village, Defendants hoped to keep the house of cards standing for twenty-five years. At that time they planned to represent that the Turnkey Note and Subscription Notes had all been paid off by oil and gas receipts and from the

29

sale of the "securities" which would have increased in value over the twenty-five years

sufficiently to equal the value of the Notes. In fact, the Turnkey and Subscription Notes

are bogus and there were no security purchases to back them and the purported

distributions must have been made largely from cash received from other investors who

had been duped into turning over money to Defendants for interests in other partnerships.

### FIRST CLAIM FOR RELIEF

**Violation of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder Against
Siegal, Josephson, Coleman, Trevisani, Howard, Guralnick,
SLG, The Individual, Corporate, LLC and LLP Does**

111. Plaintiffs repeat and reallege paragraphs 1 to 110 above as if fully
set forth herein.

112. As fully set forth above, the Partnership interests constitute
securities as defined by the Exchange Act because Plaintiffs invested money in them with
the expectation of deriving financial benefits and realizing profits solely from the efforts
of Defendants.

113. As fully described above, Defendants, in connection with the sale
of the Partnership interests, employed devices, schemes or artifices to defraud; made
untrue statements of material fact verbally and in writing and omitted to disclose material
facts necessary in order to make the statements made not misleading, in the light of the
circumstances under which they were made; and engaged in acts, practices or a course of
business which operated as a fraud and deceit upon Plaintiffs as purchasers of securities,
all in violation of Section 10(b) of the Exchange Act and Rule 10(b)-5 promulgated
thereunder.

114.    Defendants knew and intended that Plaintiff, would rely upon Defendants' misrepresentations and omissions in making investment decisions in purchasing the Partnership interests.

115.    In purchasing the Partnership interests, Plaintiffs justifiably relied on the above described misrepresentations and acted without knowledge of the above described omissions.

116.    As a direct and proximate result of the aforesaid misconduct, Plaintiffs sustained damages in excess of $3,400,000 in connection with the purchase of the Partnership interests and are therefore entitled to recover damages they have suffered from Defendants due to Defendants' violations of the Exchange Act and Rule 10(b)-5.

## SECOND CLAIM FOR RELIEF

### Common Law Fraud/Fraudulent Inducement Against All Defendants

117.    Plaintiffs repeat and reallege paragraphs 1 to 116 above as if fully set for the herein.

118.    To induce Plaintiffs to invest in the Partnerships, Defendants made to Plaintiffs misrepresentations of present material facts, specifically set forth above, both verbally and in the Siegel Partnership documents and Investment Proposals including, but not limited to: (a) that the investments were tax deductible on at least a 2 to 1 basis as intangible drilling costs; (b) that the tax deductions had been approved by the IRS and other taxing authorities; (c) that oil and gas leases would be acquired for the benefit of the Partnerships; (d) that he Managing Partners had the requisite expertise to manage the Partnerships' business and protect their interests; (e) that oil and gas sites be drilled after the Partnerships were constituted; (f) that the drilling costs incurred by the

Partnerships would be paid from cash flow generated from producing oil and gas wells; (g) that distributions to Partnerships would be paid from cash flow generated from producing oil and gas wells; (h) that the Turnkey and Subscriptions Notes would be paid off from cash flow generated from producing oil and gas wells; and (i) that marketable securities would be purchased with cash distributions Plaintiffs assigned for the purchases and which would increase in value and pay down the drilling costs.

119.    Defendants made these misrepresentations knowing that they were false, without any reasonable basis and with reckless disregard for their truth or falsity, with the intention of inducing Plaintiffs to rely on the misrepresentations and turn over substantial sums of money to Defendant.

120.    Defendants' conduct, as alleged herein, was intentional and deliberate, and was undertaken with fraudulent, wanton or evil motive in conscious disregard of the rights of Plaintiffs and the public at large.

121.    Plaintiffs justifiably relied on Defendants' misrepresentations and, to their detriment, turned over substantial sums of money to Defendants.

122.    As a direct and proximate result of the aforesaid misconduct, Plaintiffs sustained damages in excess of $3,400,000 in connection with the purchase of the Partnership interests and are therefore entitled to recover damages they have suffered from Defendants due to the misrepresentations.

## THIRD CLAIM FOR RELIEF

### Fraudulent Non-disclosure Against All Defendants

123.    Plaintiffs repeat and reallege paragraphs 1 to 122 above as if fully set for the herein.

124. Defendants failed to disclose material facts to Plaintiffs regarding the Partnerships, the IDC, the oil and gas drilling sites and return on their investments. The material facts withheld specifically set forth above include, but are not limited to: (a) the Partnership structures were tax shelters subject to registration with the IRS; (b) the Partnership structures would not support the promised IDC deductions; (c) Josephson had a financial interest in Siegal entities and was compensated for inducing Plaintiffs to invest in the Siegal Partnerships; (d) many of the drill sites had already been drilled and/or abandoned before the Partnerships were created; (e) rights to drill sites and oil and gas interests were not transferred to the Partnerships; (f) the Managing Partners had no expertise to manage the business of the Partnerships; (g) distributions to the Partnerships would be made through loans from unknown sources; (h) the Turnkey and Subscription Notes would not be paid off with receipts from sales of oil and gas from successfully drilled wells; and (i) no securities were purchased with distributions withheld from the partners purportedly for that purpose.

125. Defendants failed to disclose these material facts knowingly, deliberately and with the express intention of inducing Plaintiffs to invest in the Siegal Partnerships and to defraud Plaintiffs of their money.

126. Defendants' conduct, as alleged herein, was intentional and deliberate, and was undertaken with fraudulent, wanton or evil motive in conscious disregard of the rights of Plaintiffs and the public at large.

127. Plaintiffs relied on Defendants to disclose all material facts regarding the Partnerships and the propriety of the IDC tax deductions.

33

128.    Had Defendants informed Plaintiffs of these material facts, Plaintiffs would not have invested in the Siegal Partnerships and would not have taken the IDC deductions they were lead to believe were legitimate.

129.    As a direct and proximate result of Defendants aforesaid material omissions, Plaintiffs sustained damages in excess of $3,400,000 in connection with the purchase of the Partnership interests and are therefore entitled to recover damages

## FOURTH CLAIM FOR RELIEF

### Negligent Misrepresentation Against All Defendants

130.    Plaintiffs repeat paragraphs 1 to 129 above as if fully set for the herein.

131.    As fully set forth above, to induce Plaintiffs to invest in the Partnerships, Defendants made multiple misrepresentations of present material facts to Plaintiffs including, but limited to, that: (a) the investments were tax deductible on at least a 2.5 to 1 basis as IDC; (b) the tax deductions had been approved by the IRS and other taxing authorities; (c) that working oil and gas interests would be acquired for the benefit of the Partnerships; (d) that the Managing Partners had the requisite expertise to manage the Partnerships' business and protect their interests; (e) oil and gas sites would not be drilled before Partnerships were constituted; (f) that the drilling costs incurred by the Partnerships would be paid from cash flow generated from producing oil and gas wells; (g) that distributions to Partnerships would be paid from cash flow generated from producing oil and gas wells; (h) that the Turnkey and Subscriptions Notes would be paid off from cash flow generated from producing oil and gas wells; and (i) that marketable

34

securities would be purchased with cash distributions Plaintiffs assigned for the purchases and which would increase in value and pay down the drilling costs.

132. Defendants made these misrepresentations negligently, without any reasonable basis for believing they were true and with the intention of inducing Plaintiffs to rely on the misrepresentations and turn over substantial sums of money to Defendant.

133. Plaintiffs relied on Defendants' negligent misrepresentations and, to their detriment, turned over substantial sums of money to Defendants.

134. As a direct and proximate result of the aforesaid misconduct, Plaintiffs sustained damages in excess of $3,400,000 in connection with the purchase of the Partnership interests and are therefore entitled to recover damages they have suffered from Defendants due to Defendants' misrepresentations.

### FIFTH CLAIM FOR RELIEF

**Breach of Fiduciary Duty**
**Against Siegal, Josephson, Coleman, Trevisani, Guralnick**
**SLG, and The Individual, Corporate, LLC and LLP Does**

135. Plaintiffs repeat paragraphs 1 to 134 above as if fully set for the herein.

136. Siegal, Coleman and Trevisani were partners and fiduciaries of Plaintiffs pursuant to executed Partnership Agreements.

137. Josephson, Guralnick and SLG were agents, and professional advisors placed in a positions of trust by Plaintiffs.

138. All the Defendants named in this Fifth Claim owed a fiduciary duty to Plaintiffs as partners and/or as a result of their providing professional investment,

accounting and tax advice to Plaintiffs in connection with the Partnerships and/or relating to the preparation of the Partnership tax returns.

139. Defendants knew that Plaintiffs were relying on Defendants' superior knowledge in these areas in connection with Plaintiffs' decision to invest in the Partnerships and in the preparation of their tax returns.

140. Defendants owed a duty of care to Plaintiffs in connection with providing tax advice and information and advice on the Partnership structures and in steering and advising Plaintiffs to take tax positions based on the Partnership structures.

141. Defendants breached their fiduciary duty to Plaintiffs as partners through numerous acts and omissions including, but not limited to, the following: (a) fraudulently or with gross negligence or without due care, steering Plaintiffs into an illegal tax shelter, and by organizing, promoting, and implementing the illegal tax shelter; (b) misrepresenting the tax deductibility of Plaintiffs' investments; (c) mismanaging the Partnerships' oil and gas interests; (d) mismanaging the Partnerships' investment monies and using them for purposes other than oil and gas interest development; (e) failing to disclose to Plaintiffs informed of material facts relating to the Partnership structure and its tax aspects; (f) failing to inform Plaintiffs there were insufficient revenues from status the oil and gas exploration; (g) failing to keep adequate Partnership records, conduct audits and report to Plaintiffs ; (h) preparing tax returns and Schedules K-1 with improper IDC deductions; and (i) misrepresenting Partnership activities.

142. Defendants' conduct, as alleged herein, was intentional and deliberate, and was undertaken with fraudulent, wanton or evil motive in conscious disregard of the rights of Plaintiffs and the public at large.

36

143.    As a direct and proximate result of the aforesaid breaches of fiduciary duty, Plaintiffs sustained damages in excess of $3,400,000 and are therefore entitled to recover damages they have suffered from Defendants due to Defendants' acts.

## SIXTH CLAIM FOR RELIEF

### Breach of Contract Against Coleman, Trevisani, The Siegal Companies and Corporate Does

144.    Plaintiffs repeat paragraphs 1 to 143 above as if fully set for the herein.

145.    Plaintiffs, individually and as partners in the Siegal Partnerships entered into the contracts described fully above, namely: (a) Partnership Agreements; (b) Prospect Agreements; (c) Turnkey Drilling Contracts; (d) Subscription Agreements; (e) Assumption Agreements; and (f) Additional Collateral Agreements.

146.    Plaintiffs performed all their obligations as individuals and partners under those contracts.

147.    Coleman, Trevisani and the Siegal Companies, breached their contractual obligations under the agreements by, among other things: (a) failure to ensure performance of Partnership related contracts; (b) failure to acquire working interests in oil and gas wells; (c) failure to establish adequate Partnership operational reserves; (d) failure to maintain adequate Partnership books and records; (e) failure to assign appropriate drill sites after the constitution of the Partnerships and to drill those sites to the Partnership so as to qualify for the promised IDC tax deductions; (f) failure to provide alternative drill sites; (g) failure to make 2% cash on cash quarterly distributions; (h) taking unauthorized advances to pay Partnership distributions; and (i) failure to purchase

37

securities with distribution withheld from Plaintiffs for additional Turnkey Note collateral.

148.    As a direct and proximate result of the aforesaid breaches of contract, Plaintiffs sustained damages in excess of $3,400,000 and are therefore entitled to recover damages they have suffered from Defendants due to Defendants' breaches.

## SEVENTH CLAIM FOR RELIEF

### Professional Malpractice Against Guralnick, SLG, Trevisani, Individual Does, LLC Does and LLP Does

149.    Plaintiffs repeat paragraphs 1 to 148 above as if fully set for th herein.

150.    Defendants Guralnick and SLG, the Individual Does and the accounting professional LLC and LLP Does (collectively "the Accounting Defendants") were engaged specifically to render full accounting and tax services and advice to the Partnerships.  The services included preparing tax returns and Schedules K-1 which reported Plaintiffs' share of the Partnerships' income and expenses.

151.    Also as part of the professional services for which they were retained, Guralnick and SLG responded to information requests from the IRS regarding the Partnerships' activities, structures and tax aspects.

152.    Guralnick and SLG transmitted the tax returns they prepared to the Partnerships and were necessarily aware that Plaintiffs received the tax documents, particularly the Schedules K-1 to file with their Federal and State tax returns.

153.    Guralnick, and SLG owed a duty to Plaintiffs to exercise due care in the performance of their professional services.  The had a duty to adhere at a minimum

38

to: (a) generally accepted accounting principles; (b) generally accepted auditing standards; and (c) the rules and regulations of taxing authorities including the IRS.

154.    Upon information and belief, Trevisani, Individual Does and legal professional LLC and LLP Does (collectively "the Legal Defendants") were retained to provide legal services and advice regarding the Partnerships' activities, structures and tax aspects.

155.    The Legal Defendants owed a duty to Plaintiffs to exercise due care in providing those legal services and advice.

156.    As more fully alleged above, the Accounting Defendants and Legal Defendants failed to exercise the required due care through their negligent and fraudulent conduct towards the Partnerships and Plaintiffs. Such conduct includes, but is not limited to: (a) providing erroneous advice and failing to disclose material facts regarding the legal and tax aspects of the Partnerships, the partnership interests and the deductibility of the IDC; (b) preparing tax returns and Schedules K-1 which improperly provided for tax deductions for IDC; (c) failing to prepare, maintain and audit adequate books and records and financial statements for the Partnerships; (d) deviating from the recognized and accepted professional standards for certified public accountants; (e) and making erroneous statements to the IRS on behalf of Plaintiff and the Partnerships.

157.    As a direct and proximate result of the Accounting Defendants' and Legal Defendants' failure to exercise due care, Plaintiffs have sustained damages in excess of $3,400,000 and are entitled to recover the damages they have suffered due to the professional misconduct.

39

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all issues so triable.

WHEREFORE, Plaintiffs request and Order and Judgment from the Court as follows:

1.  Declaring null and void *ab initio* all Partnership documents executed by Plaintiffs;

2.  Awarding damages to Plaintiffs in an amount to be determined at trial but not less than $3,400,000;

3.  Awarding punitive damages because Defendants' conduct was willful, wanton and malicious and aimed at the public at large;

4.  Awarding Plaintiffs interest, costs and reasonable attorneys fees; and

5.  Granting such further and other relief, including specifically equitable relief, as the Court deems just and equitable.

DATED:  December 13, 2007

Respectfully submitted,

STORCH AMINI & MUNVES PC

Steven G. Storch (SS-5241)
Kathleen E. Wright (KW-5439)
Two Grand Central Tower, 25th Floor
140 East 45th Street
New York, New York 10017
Tel. (212) 490-4100
Attorneys for Plaintiffs

40