STORCH AMINI & MUNVES PC
Two Grand Central Tower, 25th Floor
140 East 45th Street
New York, New York 10017
Tel (212) 490-4100
Steven G. Storch (SS-5241)
Kathleen E. Wright (KW-5439)
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

IRA NATHEL and SHELDON NATHEL,                               :

               Plaintiffs,                               :

      -against-                               :     07 CIV. 10956

RICHARD SIEGAL, GEORGE COLEMAN, ROBERT A. :
TREVISANI,  PAUL HOWARD, HARVEY JOSEPHSON,
RICHARD S. GURALNICK, SCHAIN LEIFER                   :
GURALNICK , BISTATE OIL MANAGEMENT
CORPORATION, SS&T HOLDING CO., LLC,                    :
PALACE EXPLORATION   COMPANY, TAH
DRILLING CO., INC., TAQ DRILLING CO., INC., and   :
OIL AND GAS TITLE HOLDING CORPORATION

                                     :

              Defendants.
-----------------------------------------------------------------------x

# PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THE CROSS-MOTION TO AMEND THE FIRST AMENDED COMPLAINT AND IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT ..............................................................................1

    NATURE OF THE ACTION .........................................................................1
    NATURE OF THE MOTIONS ......................................................................3

THE SECOND AMENDED COMPLAINT ...........................................................6

    A    THE FIRST AND THIRD CLAIMS FOR SECURITIES FRAUD AND
         COMMON LAW FRAUD AGAINST JOSEPHSON ...............................6

    B.   THE FIRST AND SECOND CLAIMS FOR SECURITIES FRAUD AND
         COMMON LAW FRAUD AGAINST THE SIEGAL DEFENDANTS....................9

    C.   THE FOURTH, FIFTH AND EIGHTH CLAIMS AGAINST COLEMAN............13

    D.   THE FOURTH, SIXTH AND NINTH CLAIMS AGAINST TREVISANI ...........15

    E.   THE SEVENTH AND TENTH CLAIMS AGAINST SIEGAL ............................15

    F.   THE ELEVENTH CLAIM FOR DECLARATORY JUDGMENT
         AGAINST THE SIEGAL DEFENDANTS.............................................................16

    G.   THE TWELFTH CLAIM FOR DECLARATORY JUDGMENT AGAINST
         THE GURALNICK DEFENDANTS ....................................................................16

ARGUMENT......................................................................................................17

PLAINTIFFS' CROSS-MOTION TO AMEND SHOULD BE GRANTED AND THE
MOTIONS TO DISMISS DENIED .........................................................................17

    I.    THE STANDARDS ON THE MOTION ..................................................17

    II.   THE FIRST CLAIM IN THE AMENDED COMPLAINT FOR
         SECURITIES FRAUD AGAINST THE SEIGAL DEFENDANTS
         SHOULD BE SUSTAINED ...................................................................18

         A.   THE SECURITIES CLAIM IS NOT BARRED BY THE STATUTE
             OF LIMITATIONS...........................................................................18

B.    PLAINTIFFS HAVE SUFFICIENTLY ALLEGED A SECURITIES CLAIM....................................................................................20

C.    PLAINTIFFS HAVE SUFFICIENTLY ALLEGED SCIENTER..................22

D.    PLAINTIFFS HAVE SUFFICIENTLY ALLEGED CONNECTION AND CAUSATION..........................................................................24

III.    THE FIRST CLAIM SUFFICIENTLY ALLEGES SECURITIES FRAUD AGAINST JOSEPHSON..........................................................................25

IV.    THE COMMON LAW FRAUD CLAIMS AGAINST THE SIEGAL DEFENDANTS (SECOND CLAIM) AND JOSEPHSON (THIRD CLAIM) ARE SUFFICIENT................................................................................28

V.    THE CLAIMS AGAINST THE MANAGING PARTNERS, COLEMAN AND TREVISANI, ARE SUFFICIENT..................................................29

A.    THE FOURTH CLAIM FOR AIDING AND ABETTING SIEGAL'S COMMON LAW FRAUD.......................................................................29

B.    THE FIFTH AND SIXTH CLAIMS FOR BREACH OF CONTRACT.........29

C.    THE EIGHTH AND NINTH CLAIMS FOR BREACH OF FIDUCIARY DUTY..............................................................................31

VI.    THE SEVENTH, TENTH AND ELEVENTH CLAIMS AGAINST SIEGAL ARE SUFFICIENT....................................................................31

A.    TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS....................................................................................31

B.    AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY..............32

C.    DECLARATORY JUDGMENT AGAINST THE SIEGAL DEFENDANTS..................................................................................32

VII.    THE TWELFTH CLAIM AGAINST THE GURALNICK DEFENDANTS IS SUFFICIENT................................................................................33

CONCLUSION    ....................................................................................34

## TABLE OF AUTHORITIES

**Cases:**                                                                                                                    **Page:**

Agrawal v. Razgaitis, 149 A.D.2d 390, 539 N.Y.S.2d 496 (2d Dept. 1989) ........................... 30

Ashley MRI Mgmt. Corp. v. Perkes, M.D., 10 Misc.3d 1068(A) at *5, 814 N.Y.S.2d 559
(Sup. Ct., Nassau Co. 2006), reh'g granted, 12 Misc.3d 1185(A), 824 N.Y.S.2d 760
(Sup. Ct., Nassau Co. 2006) ......................................................................................29, 31

Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007) ........................................................18

Brown v. Earthbound Sports USA, Inc., 481 F.3d 901 (6th Cir. 2007)....................................26

Carroll v. LeBoeuf Lamb, Green & MacCrae, LLP, 392 F. Supp.2d 621 (S.D.N.Y.
2005). ..................................................................................................................................33

Defazio v. Wallis, 500 F. Supp.2d 197 (E.D.N.Y. 2007) ........................................................18

Dura Pharm., Inc. v. Broudo, 544 U.S. 336 (2005) ................................................................20

Fed. Nat'l Mortgage Ass'n v. Olympia Mortgage Corp., 2006 WL 2802092 (E.D.N.Y
Sept. 28, 2006) ....................................................................................................................29

Fraternity Fund Ltd. V. Beacon Hill Asset Mgmt. LLC, 376 F. Supp.2d 385 (S.D.N.Y.
2005) .............................................................................................................................30, 32

Great White Bear, LLC v. Mervyns, LLC, 06 Civ. 13358 (RMB), 2007 WL 1295747
(S.D.N.Y. April 26, 2007) ...................................................................................................18

Hunt v. Enzo Biochem, Inc., 530 F. Supp.2d 580 (S.D.N.Y. 2008).......................................28

In re Complete Mgmt. Inc. Sec. Litig., 153 F. Supp.2d 314 (S.D.N.Y. 2001) ........................23

In re Converium Holding AG Sec. Litig., 04 Civ. 7897, 2007 WL 2684069  (S.D.N.Y.
Sept. 14, 2007) ....................................................................................................................25

In re Openwave Systems Sec. Litig.,07-Civ. 1309 (DLC), 2007 WL 3224584 (Oct. 31,
2007) .........................................................................................................................22, 23, 25

In re Top Tankers, Inc. Sec. Litig., 528 F. Supp.2d 408 (S.D.N.Y. 2007) .............................22

In re Veeco Instruments, Inc. Sec. Litig., 235 F.R.D. 220 (S.D.N.Y.2006): .....................22, 24

Kronos, Inc. v. AVX Corp., 81 N.Y.2d 90, 595 N.Y.S.2d 931 (1993)...................................31

Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir. 2005). ...................................18, 19, 20

Lumberman's Mut. Cas. Co. v. Franey Muha Alliant Ins. Svces., 388 F. Supp.2d 292
(S.D.N.Y. 2005) ..................................................................................................................31

McCoy v. Goldberg, 883 F. Supp.2d 927, 939 (S.D.N.Y. 1995). .....................................24, 28

Merrill Lynch, Pierce, Fenner & Smith v. Dabit, 547 U.S. 71 (2006)....................................24

Milanese v. Rust-Oleum Corp., 244 F.3d 104 (2d Cir. 2001) .................................................17

<u>Montoya v. Mamma.com Inc.</u>, 05 Civ. 2313, 2006 WL 770573 (S.D.N.Y. March 28, 2006) ......................................................................................................................26

<u>Novak v. Kasaks</u>, 216 F.3d 300 (2000) ........................................................22, 23, 26, 27

<u>Parklex Assocs. v. Parlex Assocs.</u>, 15 Misc.3d 1125(A), 841 N.Y.S.2d 220 (Sup. Ct., Kings Co. Apr. 23, 2007)...................................................................................33

<u>Roberts v. Astoria Med. Group</u>, 43 A.D2d 138, 350 N.Y.S.2d 159 (1st Dept. 1973).............30

<u>S.E.C. v. Credit Bancorp, Ltd.</u>, 195 F. Supp.2d 475 (S.D.N.Y. 2002) ....................................23

<u>Schwartz v. Michaels</u>, 1992 WL 184527 (S.D.N.Y. July 23, 1992).........................................25

<u>Seippel v. Jenkens & Gilchrist, P.C.</u>, 341 F. Supp.2d 363 (S.D.N.Y. 2004), *reh'g granted*, 2004 WL 2403911 (S.D.N.Y. 2004).........................................................................32, 33

<u>Seippel v. Sidley, Austin, Brown & Wood, LLP</u>, 399 F. Supp.2d 283 (S.D.N.Y. 2005) ........................................................................................19, 20, 21

<u>Suez Equity Investors, L.P. v. Toronto-Dominion Bank</u>, 250 F.3d 87 (2d Cir. 2001)............25

<u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 127 S. Ct. 2499, 2510 (2007), ...................22, 24

**Statutes**

15 U.S.C. § 78j(b)........................................................................................................20
15 U.S.C. § 78u-4(b)(1), (2) ........................................................................................21
17 C.F.R. § 240.10b-5.................................................................................................20
28 U.S.C. § 1658(b) ....................................................................................................18
28 U.S.C. § 2201..........................................................................................................32

**Other Authorities**

F.R.C.P. 9(b)................................................................................................................20
Private Securities Litigation Reform Act.....................................................................21

Plaintiffs Ira Nathel and Sheldon Nathel ("Plaintiffs") submit this memorandum of law in support of their cross-motion to amend the First Amended Complaint ("Complaint") and file the proposed Second Amended Complaint ("Amended Complaint") and in opposition to the defendants' motions to dismiss the Complaint.[1] The cross-motion should be granted because the Amended Complaint is sufficient under FRCP 12(b)(6) and the motions should be denied as moot.

## PRELIMINARY STATEMENT

### Nature of the Action

The gravamen of this action is that Plaintiffs, the joint and sole owners of a wholesale fruit and vegetable company, were fraudulently induced – by the promoters and their own accountant/adviser – to invest large sums of money in partnerships formed purportedly to invest in oil and gas well drilling and production interests. Richard Siegal ("Siegal") was the creator, sponsor and, together with Paul Howard ("Howard"), the promoter of the investments. Siegal used his companies, Bistate Oil Management Corporation ("Bistate"), SS&T Holding Co., LLC ("SS&T"), Palace Exploration Company ("Palace"), TAH Drilling Co., Inc.("TAH"), TAQ Drilling Co., Inc.("TAQ"), Oil and Gas Title Holding Corporation ("Oil and Gas") (collectively the "Siegal Companies") (Siegal, Howard and the Siegal Companies hereinafter collectively the "Siegal Defendants") to effectuate the fraud.

---

[1]     A copy of the proposed Second Amended Complaint is annexed as Exhibit A to the Declaration of Kathleen Wright dated May 2, 2008 submitted herewith in support of the cross-motion and in opposition to the defendants' motion to dismiss ("Wright Dec."). The original complaint was filed on December 3, 2007. On December 13, 2007, prior to the appearance of any defendant, Plaintiffs filed the First Amended Complaint in order to correct a misspelling in the caption (Wright Dec. ¶  ). Accordingly, there has been no substantive amendment of the original complaint prior to this motion to amend. For the convenience of the Court and the parties, attached as Exhibit B to the Wright Dec. is a chart ("Chart") comparing the claims and parties in the Complaint and Amended Complaint.

Primarily, the Siegal Defendants' fraud consisted of representations that Plaintiffs could expect legitimate tax deductions and revenues from oil and gas drilling. Although the representations began in 2001, and Plaintiffs invested beginning in that year, they continued through 2004, during which time Plaintiffs invested in a number of partnerships, including Indian Village (2003), Condor (2003) and Hurricane (2004), which are the subject of this action., Plaintiffs allege securities and common law fraud claims against the Siegal Defendants.

In connection with Plaintiff's expectations, George Coleman ("Coleman"), the supposed managing partner of Indian Village and Condor, and Robert A. Trevisani ("Trevisani"), the supposed managing partner of Hurricane, assisted Siegal and Howard in falsely representing that the managing partners had the requisite expertise in oil and gas drilling. Thus, Plaintiffs allege that Coleman and Trevisani aided and abetted Siegal's common law fraud. As partners of Plaintiffs, Coleman and Trevisani also breached their respective partnership agreements. Plaintiffs also state breaches of fiduciary duty claims against Coleman and Trevisani arising out of their failures to properly oversee Plaintiffs' investments. Siegal aided and abetted these breaches.

Harvey Josephson ("Josephson"), Plaintiffs' trusted accountant-advisor, first brought these investments to Plaintiffs' attention in 2001, recommending that Plaintiffs invest in them instead of paying their estimated income taxes, and recklessly continuing to vouch for their legitimacy and validity without any basis and without actually investigating the investments, over a period of three years, up to the time he left Plaintiffs' employ in 2003. Thus, Plaintiffs allege a claim for securities fraud and common law fraud against Josephson.

2

Richard S. Guralnick ("Guralnick"), a certified public accountant, and his firm, Schain Leifer Guralnick ("SLG") (the "Guralnick Defendants"), were, as they had been for approximately 15 years, Siegal's tax advisers and preparers, and they provided the K-1 schedules to the Plaintiffs. As Plaintiffs allege in their professional malpractice claim as to Hurricane only, the Guralnick Defendants failed to comply with accepted accounting standards by making improper allocations of Plaintiffs' investment for tax deduction purposes.

In 2006, Plaintiffs were put on notice through IRS inquiries that the tax deductions they had taken would probably be disallowed and penalties assessed; they learned that the intangible drilling cost tax deductions were unsupported by legitimate drilling costs of real wells actually owned by the Partnerships and that the purported "returns" to the investors, including Plaintiffs, were either diverted to the Siegal Defendants, or, to the extent any were actually made, were made in large part from recycled cash from other duped investors or were improper and unauthorized advances obtained from unknown sources.

**Nature of the Motions**

Because the Amended Complaint removes and adds claims against certain of the defendants, and revises some of the extant claims, as set forth in the Chart, many of the arguments defendants make in their motions are moot. To the extent the arguments are addressed to the claims that remain in the proposed complaint, or apply to the new claims, they are meritless. Thus, the securities law fraud and common law fraud claims are now asserted only against the Siegal Defendants (which includes Howard) and Josephson. These defendants have argued (with respect to the Complaint) that those

3

claims fail to comply with Rule 9(b), fail to allege scienter and causation, and that the securities fraud claim is time barred. As seen below, the Amended Complaint plainly alleges the details of the fraudulent inducement as to each of the defendants separately and adequately alleges scienter. As to the Siegal Defendants, they had access to documents showing the opposite of what they were representing to the Plaintiffs. As to Josephson, his behavior as Plaintiffs' adviser was reckless. Both parties contributed to Plaintiffs' making the investments, and to the loss of Plaintiffs' investments. Defendants' contention that Plaintiffs cannot sue because the tax benefits have not yet been disallowed or penalties imposed is wrong because Plaintiffs are entitled to a declaratory judgment which they now assert as to penalties and the costs of defending the audits. Finally, the contention that the securities fraud claim is time barred is specious since the facts alleged show that Plaintiffs were not on notice of the fraud until 2006, one year before they filed their complaint.

With respect to Coleman and Trevisani, Plaintiffs no longer assert securities fraud, common law fraud and legal malpractice claims against them, and have withdrawn the negligent misrepresentation claim altogether. The Amended Complaint now alleges a new claim for aiding and abetting Siegal's fraud based upon their participation in Siegal's misrepresentations of their positions as managing partners. The Amended Complaint complies with Rule 9(b) by detailing Siegal's fraud, their knowledge of it and their participation. Plaintiffs also allege a breach of contract claim based only upon the respective partnership agreements (as opposed to breaches of other partnership documents) and now specify the terms breached. Thus, these defendants' arguments for dismissal of these claims are no longer valid. In addition, Plaintiffs, as partners, are

4

entitled to sue the general partners for breach of the partnership agreement, without an accounting, because the particular transactions alleged – the withholding of Plaintiffs' specific distributions—can be determined without referral to all the partnerships' accounts.

Other new claims against Coleman and Trevisani as managing partners include breach of fiduciary duty with respect to obligations owed directly to the Plaintiffs, based upon Coleman's failure in 2005 and 2006, and Trevisani's failure in 2007, to oversee the distributions rightfully owed to the Plaintiffs but which they wrongfully withheld supposedly to purchase non-existent securities for their benefit. Also new are claims against Siegal for interfering with the managing partners' respective partnership agreements with Plaintiffs by procuring the breaches thereof, and for aiding and abetting the managing partners' breaches of fiduciary duty. These claims are plainly sufficient on their face.

Finally, Plaintiffs no longer claim disallowed tax deductions or interest as damages, leaving only their investments and penalties if assessed, together with the expenses of defending the audits. In this regard, Plaintiffs allege two new declaratory judgment claims which moot defendants' objections that their claims are premature, and show their entitlement to any future imposition of penalties and other damages such as attorneys' fees and costs in defending the audits caused by the Siegal Defendants' fraud. The first declaratory judgment claim is against the Siegal Defendants based upon their fraud.

The second declaratory judgment claim is against the Guralnick Defendants for professional malpractice based on their preparation and issuance to Plaintiffs of the K-1

schedules for the Hurricane partnership, which Plaintiffs received in 2005.  Plaintiffs

have withdrawn all other previous claims alleged against Guralnick in the Complaint.

This claim alleges that the Guralnick Defendants, in the K-1s, improperly allocated a

larger portion of tax deductible costs to the Plaintiffs than they were entitled to, causing a

larger underpayment of taxes and possible greater penalties as a result, and as to which

they seek a declaratory judgment.  The claim is timely and seeks appropriate damages.

Because amendments should be liberally granted, the Amended Complaint is the

first substantive amendment, it moots defendants' objections and is sufficient under

FRCP 12(b)(6), this Court should grant Plaintiffs' cross-motion to amend and deny the

motions to dismiss.

## THE SECOND AMENDED COMPLAINT

A.    **The First and Third Claims For Securities
      Fraud and Common Law Fraud Against  Josephson**

The Amended Complaint alleges that the Siegal Defendants, including Howard,

who as president of Siegal's company, Oil and Gas, CEO of Palace and controller of

Bistate was, involved in the day to day activities of the Siegal Companies (14, 47),[2]

formed partnerships ("Siegal Partnerships") to acquire leases for oil and gas interests, and

sites for oil and gas drilling (27).  It was Josephson, Plaintiffs' accountant and tax adviser

for their company and their own personal affairs, who brought the Siegal Partnerships to

Plaintiffs and first advised them to engage in a strategy whereby they would invest

instead of paying their income taxes (29).  Josephson met with the Plaintiffs and their

representative and agent, Richard Byllott (who was also the controller for their company)

every month, and in one of those meetings, in July 2001, he made that proposal with

---

[2]    All numbers in parentheticals refer to paragraphs of the Amended Complaint.

respect to a Siegal partnership called High Island (30, 31).  Byllott ensured that Josephson knew that he and the Plaintiffs had no experience whatsoever in oil and gas partnerships or associated tax deductions (31).

According to Josephson, if Plaintiffs paid their fourth quarterly estimated payment to the Siegal partnership, that partnership would pay a related entity of Siegal's for a drilling contract.  Then Plaintiffs could take a tax deduction for the combined amount of cash and notes on intangible drilling costs ("IDC"), and could earn a return of their investment from oil and gas revenues (32, 33).  Josephson encouraged them to invest on the strength of his prior recommendations to other clients and his stated familiarity with the Siegal investments.  He told them that the IRS was encouraging such investments (34), which, as a certified public accountant he should have known was untrue.

He also recklessly assured Plaintiffs that, with respect to a subscription note they were required to sign that accrued interest at 8%, gas and oil revenues could be sufficient to pay the interest and he pointed to similar notes financing other Siegal partnerships that had not been exercised for that very reason.  Josephson gave this assurance "despite his complete lack of any knowledge as to such supposed oil and gas revenues or any knowledge as to the validity or existence of any oil and gas wells." (35).  In fact, Siegal had previously brought many lawsuits to recover on those notes (35).

Josephson vouched for the Siegal partnerships and encouraged his clients to invest without ever actually investigating whether the wells were legitimate, whether they had been assigned to the partnership, whether the wells were dry or abandoned before they were assigned, or whether other investors actually received oil and gas revenues as

opposed to payments from future investors or from advances from unknown sources (36).

In fact, the IDC would not be allowed because, as seen below, many of the sites had been

drilled before the Partnerships were constituted, many had been abandoned or were dry,

and many of the drill sites were not assigned to the specific partnerships (43). Also, as

seen below, oil and gas distributions were problematic. As it turned out, the distributions

were not from oil and gas revenues, but from advances from unknown sources, and the

wells did not last for any extended period of time nor produce revenues for any length of

time (44). Josephson also failed to disclose that the Partnerships were not registered with

the IRS as tax shelters (36).

Byllott, on behalf of Plaintiffs, liased with Josephson, and, at his introduction,

with Siegal and Howard (37, 38). After that July 2001meeting, Byllott spoke to Siegal

and Howard by telephone to confirm Josephson's representations, and he asked whether

the IRS had approved the tax aspects of the investment. Siegal responded that his

partnerships "had never lost an audit." This statement was knowingly false because,

although some of the partnerships were being audited, the audits were not finished and

the IRS had not issued any report on them (38).

Over the next three years, until he left the Plaintiffs, Josephson brought other

Siegal Partnerships to Plaintiffs, including, in July 2003, Indian Village, which he

encouraged Plaintiffs to invest in for the same reasons, and based on the same

representations, that he made in 2001. Plaintiffs relied on Josephson and the Siegal

Defendants in investing over $300,000 in Indian Village (40, 41).

Plaintiffs allege that Josephson committed securities fraud by recklessly

encouraging Plaintiffs to invest, representing falsely without any basis in fact or any

investigation, and contrary to his duty to monitor, that the investments were valid.  By

vouching for Siegal, Josephson knew that Plaintiffs would rely on him and on his

program of tax savings through IDC deductions (101).  The Amended Complaint alleges

that Plaintiffs would not have even known about the investments but for Josephson, and

would not have entered into them but for Josephson and the Siegal Defendants (101,

102).  Plaintiffs lost virtually their entire investment, hold no expectation of earning any

revenues, but on the contrary, expect that the IRS will disallow the tax deductions and

assess penalties (102).

**B.     The First and Second Claims for Securities Fraud**
       **and Common Law Fraud Against the Siegal Defendants**

       The first contact Siegal and Howard had with the Plaintiffs was through Byllott

when they falsely advised him orally that they had never lost an audit (38).  They knew

Byllott was acting on behalf of Plaintiffs and they intended their comments to be

conveyed to Plaintiffs (38 ).  Subsequently, Siegal and Howard forwarded to Byllott, for

conveyance to Plaintiffs, the first subscription documents to High Island partnership,

which included an investment proposal and partnership agreement, which Byllott read on

behalf of the Plaintiffs (39).  Siegal and Howard provided Byllott with the same offering

materials for each partnership, before they invested, including those at issue:  Indian

Village in July 2003, Condor in December 2003, and Hurricane in 2004 (41, 54).

       The Amended Complaint sets forth the false representations in each of the

Investment Proposals, which were materially the same for each Siegal Partnership.  For

example, the Proposals represented that investors "will be afforded a substantial active

tax loss . . . which allows taxpayers to expense the intangible drilling costs incurred in

drilling oil and gas wells;" (42c); the partnership "can expect an average cash flow of

approximately 10-15% and often greater of the cash funds invested," (42d); it is

reasonable to expect the cash flow to continue for 10-12 years; (42e);  the drill sites "will

be carefully chosen by the Managing Partner of the Partnership" (i.e., Coleman or

Trevisani) (42f); interest on the Subscription Note after the first year might be paid out of

the cash flow (42g).

     The Amended Complaint alleges that these representations were false because the

IDC could not be deducted and oil and gas revenues could not pay the interest on the

notes, much less make a return on their investments, and the managing partners would

not carefully select drilling sites.  Siegal and Howard also knew that the tax deductions

had not been approved by the IRS.  More specifically, Siegal and Howard had access to

drilling records and other books and records which showed that many of the sites had

already been drilled, abandoned or were dry or capped, making any IDC deduction

improper (43):

     Indian Village - the Partnership Agreement is dated March 1, 2003.

Plaintiffs did not invest until July 21, 2003 (61).  The drilling reports show that at

least 16 of the 31 sites had been drilled before a single partnership unit had been

purchased.  Indeed, all the wells were drilled before the final investment was

made in December 2003.  Siegal and Howard knew before the sale of the

partnership units that investors would be ineligible to take the IDC tax deductions

for most of the purported drill sites.(62, 63).

     Condor - The Partnership Agreement is dated September 1, 2003, but

Plaintiffs did not purchase their interests until December 12, 2003.  However,

according to drilling reports, at least 22 sites were drilled before September 1,

2003, before a single investor had invested. At least 7 of the sites had been drilled and abandoned before the Partnership was even constituted in December 2003 (71, 72). Siegal and Howard knew before the sale of the Condor partnership units that investors would be ineligible to recognize the IDC tax deductions for most of the supposed drill sites (73).

Hurricane - The Partnership Agreement is dated August 1, 2004, but Plaintiffs did not invest until December 9, 2004 (80). At least 93 of the sites supposedly assigned to the partnership had been drilled before the date of the partnership and at least 24 had been drilled before Plaintiffs invested (82). At least one site had been drilled and abandoned before any partners invested (82).

Accordingly, the Siegal Defendants knew that investors, including Plaintiffs, would not be entitled to the IDC tax deductions. Moreover, records of Bistate show that "distributions" to the investors were not from oil and gas revenues but from advances from unknown sources, probably other investors (44, 66). Indeed, with respect to Condor, 10 out of 12 distributions were financed by advances from unknown sources, not oil and gas revenues as represented (76). Siegal and Howard knew from past experience with similar partnerships that well production did not last 10-12 years so the wells could not produce revenues for that period of time as represented. For example, partnerships they promoted in the 1980's all failed well before 10 years and Siegal sued the investors on their notes (45). Therefore, they knew that they would need to have "advances" to make any distributions to keep up the façade (66).

Yet another representation in the Investment Proposal was false. This was the representation that the partners could elect to have their distributions withheld after a

11

certain date, and have them assigned to purchase marketable securities to pay off the interest on a note the partnership gave to the drilling company, called the Turnkey Note (48). In the case of Indian Village, Coleman, as general partner, confirmed this election to Plaintiffs beginning in January 1, 2005, but no securities were ever bought with the withheld distributions (68). Regarding Condor, Coleman confirmed to Plaintiffs that distributions were being withheld from July 28, 2005 onwards, but none ever funded any marketable securities (77). With respect to Hurricane, Trevisani confirmed to Plaintiffs that distributions were withheld from April 30, 2007 supposedly to buy securities, but none were ever bought (83). In fact, Siegal and Howard knew that the purpose of the withholding was to obtain cash for other purposes, particularly to make "distributions" because they knew that the wells could not return any revenues and their house of cards would fall (49, 67, 68, 69).

Finally, Siegal and Howard falsely represented in the Investment Proposals that they had always maintained "the highest level of fiduciary integrity servicing investors with informative reporting and on time distributions" whereas they knew that the Siegal Companies had been embroiled in multiple lawsuits in the 1990's in which investors contended that they did not receive distributions they were advised were possible (50). They also knew that Coleman, who ran children's camps, and Trevisani, who was an attorney, did not, as supposed managing partners, "carefully select" drilling sites as represented in the Investment Proposals, but to the contrary, Siegal used them to make the partnerships appear legitimate (46).

It was not until November 2006 that Plaintiffs were on notice from the IRS that their partnerships were being audited and that the IRS considered their tax deductions to

be illicit (85). Several things occurred causing Plaintiffs alarm. First, Howard told

Byllott that he should not make the first five pages of the Investment Proposal available

to the IRS (87, 88). Next, March 12, 2007 letters from Coleman and Trevisani, as "tax

matters partners," advised Plaintiffs that in a similar Siegal partnership, the IRS proposed

to disallow IDC deductions and impose penalties (89). The IRS then advised Plaintiffs

that with respect to Plaintiffs' investments, the IRS deemed that the partnerships did not

own working interests in the wells and that proceeds may not have come from wells held

by the partnerships (93).

As a result of the fraud, Plaintiffs were induced to invest and lost virtually their

entire investments in Indian Village ($336,000) (65), Condor ($572,000) (74), and

Hurricane ($1,665,200) (81), and may be subject to disallowance of their tax deductions

and resulting penalties.

**C.**      <u>**The Fourth, Fifth and Eighth Claims Against Coleman**</u>

As noted, the Amended Complaint alleges that Coleman was the named managing

partner of the Indian Village and Condor partnerships. However, his business was

children's camps, which was not disclosed anywhere. The Partnership Agreements,

which Coleman signed as managing partner (53), placed all control and power in the

managing partners, including operating and administering the business affairs of the

partnerships and to make all decisions (52). The Agreement provided that the investor

partners had no authority to interfere in the business (52). Coleman knew that Siegal and

Howard were holding him out as experienced in the oil and gas industry and he permitted

himself be so held out. Had he actually performed his duties, he would have seen the

drilling reports and known that the investors could not legitimately take the IDC

deductions (53).  The Amended Complaint in the Fourth Claim alleges that Coleman aided and abetted the Siegal Defendants in their false representation that the Partnerships would have a capable and knowledgeable managing partner who would manage the affairs of the Partnerships, and he provided substantial assistance in advancing the fraud by allowing his name to be placed on the partnership documents (122-127).

In the Fifth Claim, Plaintiffs set forth a breach of contract claim against Coleman arising out of his breach of Sections 6 and 11 of the Partnership Agreements of Indian Village and Condor.  Section 6 provides that Coleman is to distribute to the partners Partnership income over that required to fund operations.  Section 11 requires Coleman to maintain accurate books and records which will reflect the Partnership transactions.  In memoranda dated January 28, 2005 and July 28, 2006, respectively, Coleman advised Plaintiffs that their future distributions would be withheld to purchase securities (135, 136).  Thereafter, the partnerships notified Plaintiffs that funds were being withheld from distributions (137).  However, no securities were ever purchased, and therefore Coleman wrongfully failed to make the distributions to Plaintiffs, and failed to maintain records which would accurately reflect what happened to the allegedly withheld distributions (138).

The Eighth Claim is against Coleman for breach of his fiduciary duty for failing to act in the best interests of Plaintiffs, his partners, by withholding the distributions to Plaintiffs of Partnership income for the ostensible purpose of assignment to purchase securities, whereas no securities were purchased.  Plaintiffs were damaged in the amount of the withheld distributions from Indian Village and Condor (158-162).

**D.**    **The Fourth, Sixth and Ninth Claims Against Trevisani**

These claims are essentially the same as the claims against Coleman, but with respect to Hurricane, the only partnership Plaintiffs invested in where Trevisani was the managing partner. Thus, the Fourth Claim is for aiding and abetting Siegal in his holding out Trevisani as the managing partner who would be in charge and in control of the partnership. By knowingly allowing himself to be held out, however, as the manager, and signing all the pertinent documents, Trevisani gave substantial assistance to the fraud (122-127) and is liable for Plaintiffs' damages related to Hurricane.

The Sixth Claim is for breach of sections 6 and 11 of the Hurricane Partnership Agreement for failing to distribute Partnership distributions due to Plaintiffs since April 30, 2007, but instead diverting the income, and failing to maintain the books and records to reflect the whereabouts of the withheld distributions (146-152).

The Ninth Claim for Relief is based upon Trevisani's breach of fiduciary duty, as the managing partner, for withholding Hurricane distributions due to Plaintiffs for purposes other than the stated purpose and failing to conduct proper oversight (163-167).

**E.**    **The Seventh and Tenth Claims Against Siegal**

The Seventh Claim alleges tortious interference with contractual relations arising out of his procurement of the breaches of the partnership agreements by Coleman and Trevisani as set forth above. Plaintiffs allege that Siegal knew of the Partnership Agreements and he procured the breaches of them by causing the managing partners to withhold the distributions which Plaintiffs had agreed would be applied to the purchase of securities but which were in fact diverted to Siegal's company, SS&T (153-157). As a result, Siegal is liable for the distributions withheld.

The Tenth Claim alleges that Siegal aided and abetted Coleman and Trevisani's breaches of fiduciary duty in wrongfully withholding the distributions. Siegal planned the withholding, and knowingly participated in the withholding and wrongful diversion by insinuating himself into the management of the partnerships and causing the withholdings to be diverted to him or his company (168-171).

F.    **The Eleventh Claim for Declaratory Judgment**
      **Against the Siegal Defendants**

Because Plaintiffs have not yet been assessed penalties, although they have been advised that such penalties are likely (85, 90, 93), the Amended Complaint seeks a declaratory judgment against the Siegal Defendants that they are liable for any penalties to be assessed in the future as a result of the underpayment of taxes caused by the fraudulent partnership investments into which Plaintiffs were induced to invest through the Siegal Defendants. Plaintiffs also seek damages for the costs of defending the audits leading to the imposition of penalties (176).

G.    **The Twelfth Claim for Declaratory Judgment**
      **Against the Guralnick Defendants**.

This claim is based upon the professional malpractice of the accountant Guralnick Defendants in their preparation of K-1s for the investors in the Hurricane partnership, which Plaintiffs began to receive in 2005. The Amended Complaint alleges that Guralnick, Siegal's long time accountant and tax preparer, prepared tax returns for the partnerships and the K-1s for the investors to complete their income tax returns and to report their share of the Hurricane partnership's income and expenses (177, 178). Guralnick owed a duty of care directly to Plaintiffs as members/partners of Hurricane, and that duty required him to adhere to generally accepted accounting practices. As such,

16

Guralnick knew that Plaintiffs could only take a tax deduction for the portion of any IDC incurred after the date they joined the partnership (180). Therefore, Guralnick should have identified the pertinent dates for the purposes of the K-1s (181). He would have known that although the Hurricane Partnership was dated August 1, 2004, Plaintiffs did not invest until December 9, 2004 (182). However, Guralnick departed from accepted accounting practice and improperly prepared the K-1s with an allocation based upon Plaintiffs' percentage investment, which resulted in Plaintiffs taking a larger tax deduction for the IDC than they were entitled to (183). Therefore, if the IRS imposes penalties for underpayment of taxes, which Plaintiffs have been advised is likely (85, 90, 93), such underpayment is greater due to Guralnick's malpractice (184). The Guralnick Defendants are also liable for the audit defense costs relating to underpayments of taxes for Hurricane (184).

## ARGUMENT

### PLAINTIFFS' CROSS-MOTION TO AMEND SHOULD BE GRANTED AND THE MOTIONS TO DISMISS DENIED

**I.    The Standards on the Motion**

Federal Rule of Civil Procedure 15(a) provides that "a party may amend the party's pleading once as a matter of course" and "[o]therwise may amend the party's pleading only by leave of court . . .", but that "leave shall be freely given leave when justice so requires." In this regard, "when a cross-motion for leave to file an amended complaint is made in response to a motion to dismiss . . . leave to amend will be denied as futile only if the proposed new claims cannot withstand a 12(b)(6) motion . . . ." [emphasis added]. Milanese v. Rust-Oleum Corp., 244 F.3d 104, 110 (2d Cir. 2001).

See Great White Bear, LLC v. Mervyns, LLC, 06 Civ. 13358 (RMB), 2007 WL 1295747 (S.D.N.Y. April 26, 2007).

The standard under Rule 12(b)(6) requires the court to " ' accept all of the plaintiff's factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff.'. . A complaint should be dismissed only if it does not contain enough allegations of fact to state a claim to relief that is 'plausible on its face.'" Defazio v. Wallis, 500 F. Supp.2d 197, 202 (E.D.N.Y. 2007) (quoting, in part, Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1968 (2007)). It is further still the law that the issue on the motion is whether "plaintiffs should be entitled to offer evidence to support their claims, and not whether they will ultimately be successful . . . ." Defazio, 500 F. Supp.2d at 202.

Under the foregoing standards, the amendment should be allowed because it properly states claims for relief. Accordingly, defendants' motions to dismiss are moot and should be denied and leave granted to Plaintiffs to file their proposed Second Amended Complaint.

## II.    The First Claim in the Amended Complaint for Securities Fraud Against the Siegal Defendants Should be Sustained

### A.    The Securities Claim is Not Barred by the Statute of Limitations

Under the Sarbanes-Oxley Act, private causes of action under Section 10(b) must be filed within two years from the discovery of the violation. 28 U.S.C. § 1658(b). The statute begins to run when the plaintiff either "'obtains actual knowledge of facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge.' Lentell v. Merrill Lynch & Co., 396 F.3d 161, 167

(2d Cir. 2005).  A duty of inquiry arises only where there are circumstances which suggest a "probability, not a possibility" of fraud.  Id. at 167.

Here, Siegal has argued that the statute started to run when Josephson told Plaintiffs in July 2001 that the notes would not be exercised.  However, Siegal deliberately misreads the Complaint (and the Amended Complaint).  In fact, the Amended Complaint (as did the Complaint) actually alleges that Josephson told Plaintiffs that the notes in other similar partnerships "had not been exercised" because "the oil and gas revenues paid down the notes." (35).  Rather than being some type of supposed "storm warning" that the notes were bogus, the statement was actually a misrepresentation – a false reassurance by Plaintiffs' trusted adviser -- that revenues could be obtained from oil and gas drilling for a long period of time sufficient to pay the note (35).  Plaintiffs were clearly entitled to rely on their trusted adviser's advices. Seippel v. Sidley, Austin, Brown & Wood, LLP, 399 F. Supp.2d 283, 291 (S.D.N.Y. 2005) ("it is reasonable for the taxpayer to rely on [his accountant's] advice").  Indeed, it has been held that " 'reassuring statements will prevent the emergence of a duty to inquire . . . if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concern.'"  Id. at 288-89.  Here, there was not even any concern to be allayed.

Siegal also contends that his and Howard's statement to Plaintiffs and Byllott in 2001 that his partnerships "had never lost an audit" (38) is somehow a "storm warning" which should have put Plaintiffs on notice of fraud.  Again, this was not a circumstance suggesting to Plaintiffs the probability that they were being defrauded.  To the contrary, it was a reassuring statement, and a false one, because in fact the IRS had not issued any

report approving of the tax aspects of the partnerships (38). In Seippel, plaintiffs in a tax shelter were served with an IRS notice disallowing tax benefits and it was held that the notice did not raise inquiry duty where plaintiffs' attorneys made reassuring statements to them at the same time. Seippel v. Sidley, Austin, 399 F. Supp.2d at 291.

The facts alleged in the Amended Complaint show that Plaintiffs were not on notice of any fraud until at least November 2006 when they received a telephone call from the IRS (85). The securities fraud claim is thus timely and the pleading is sufficient on a motion to dismiss. As the Second Circuit has cautioned, a plaintiff should not be required to file suit "before they can discover with the exercise of reasonable diligence the necessary facts to support their claims." Lentell, 396 F.3d at 168. Moreover, the issue of whether "a plaintiff had sufficient facts to place it on inquiry notice is 'often inappropriate for resolution on a motion to dismiss.'" Id.

B.    **Plaintiffs have Sufficiently Alleged a Securities Claim**

Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) prohibit fraud in connection with the purchase or sale of securities.[3] The basic elements are: (i) a material misrepresentation or omission; (ii) scienter; (iii) in connection with the security's sale or purchase; (iv) transaction causation and (v) loss causation. Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005). A pleading alleging a violation of Section 10b-5 must comply with F.R.C.P. 9(b) requiring that the "circumstances constituting the fraud . . .

---

[3]    Although certain of the defendants give lip service to the idea that the investment partnerships were not securities, none of the defendants move to dismiss on that ground, but on the contrary, assume that the investments are securities. In fact, they are securities. See SEC v. Howey, 328 U.S. 293, 299 (1946). Indeed, where, as here, the "general partners" in the partnership contract delegate all management and decision making powers to the managing partners, the investment contract is a security. See Williamson v. Tucker, 645 F.2d 404, 424 (5th Cir. 1981).

shall be stated with particularity." In this connection also, the Private Securities

Litigation Reform Act ("PSLRA") requires the statements or omissions to be specified,

and in addition requires that the complaint allege facts giving rise to a "strong inference"

of scienter. 15 U.S.C. § 78u-4(b)(1), (2). Nevertheless, "even with the heightened

pleading standard under Rule 9(b) and the [PSLRA], [the Second Circuit does] not

require the pleading of detailed evidentiary matter in securities litigation." Seippel v.

Sidley, Austin, 399 F. Supp.2d at 288-89.

     It is evident from a reading of the Amended Complaint, that Plaintiffs have

identified a number of misrepresentations and omissions, when they were made, and the

reasons they were false. These include: the oral representation that the partnerships had

never lost an audit and the statements in the Investment Proposals that: the investors

could be afforded valid tax deductions for IDC incurred in the oil and gas drilling; the

partnerships could expect cash flow of 10 to 15 % over 10 to 12 years;  the drill sites

would be carefully chosen by the managing partners; the subscription notes, not due for

20 years, could be paid by oil and gas revenues; and that marketable securities would be

bought from withheld distributions.

     As set forth above and in the Amended Complaint, these representations were

made before Plaintiffs invested in each partnership (Indian Village (July 2003), Condor

(Dec. 2003) and Hurricane (Dec. 2004)), were made by Siegal and Howard, and by

Siegal's Companies, orally and in writing, and were false because the IDC tax deductions

were not valid and there was no possibility of Plaintiffs recovering their investments.

The drilling reports showed that wells had already been drilled, or were dry or capped or

abandoned, precluding the use of any valid IDC tax deduction.  Moreover, many of the

wells were drilled before Plaintiffs even invested, again precluding any valid IDC tax deduction. The wells could not return the investments; indeed, they could not generate income for any length of time. To substitute for the non-existent revenues, the Siegal Defendants had to obtain additional monies in the form of withheld distributions, knowing that no marketable securities would be bought. Finally, it was false that the managing partners would choose drill sites or even manage the partnerships. As the court stated in In re Veeco Instruments, Inc. Sec. Litig., 235 F.R.D. 220, 229 (S.D.N.Y.2006): "Plaintiffs extensive allegations of fraud whether or not sufficient to ultimately establish the defendants' liability undoubtedly satisfy Rule 9(b)'s and the PSLRA's heightened pleading requirements."

### C.    Plaintiffs Have Sufficiently Alleged Scienter

As the Supreme Court stated in Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2510 (2007), a complaint adequately pleads scienter if a reasonable person would deem the inference of scienter "cogent" and "at least as likely as any plausible opposing inference." If the inference is as likely as a non culpable explanation, the "tie . . . goes to the plaintiff." In re Top Tankers, Inc. Sec. Litig., 528 F. Supp.2d 408, 413 (S.D.N.Y. 2007). Moreover, within the context of a motion to dismiss, "all the facts alleged, taken collectively, must be considered in deciding whether the pleading gives rise to a strong inference of scienter." Id.

The Second Circuit has identified several types of allegations that may be sufficient for scienter. Novak v. Kasaks, 216 F.3d 300, 308 (2000). Cases in this District, for example, In re Top Tankers, 528 F. Supp.2d at 414 and In re Openwave Systems Sec. Litig.,07-Civ. 1309 (DLC), 2007 WL 3224584 (Oct. 31, 2007) still rely

22

upon <u>Novak</u>.  These cases include allegations that the defendants "knew facts or had access to information suggesting that their public statements were not accurate."  <u>In re Openwave</u>, at 10.  Scienter also includes actual intent, motive and opportunity, or conscious recklessness.  <u>Novak</u>, at 312.

Here, with respect to Siegal, the Amended Complaint clearly alleges actual intent since he was the creator and promoter of the partnerships.  It also alleges that he had access to information showing that wells were dry or abandoned, or that drilling had taken place before the investors actually invested.  He also knew that his prior partnerships had failed well before the 10 to 12 years he had represented that revenues would be generated.  He was also aware of the prior lawsuits involving non-payment of the notes, and that he had sued prior investors on the notes.  He was also aware that the so-called managing partners, Coleman and Trevisani, would not, as he represented, carefully choose the wells sites.  He knew that neither of them had a background in oil and gas drilling.

With respect to Howard, he was a corporate insider and spoke to Byllott on the telephone with Siegal before Plaintiffs invested.  He was an officer of Siegal's Companies and had access to the same information that Siegal did and he marketed the investments as well.  Therefore, he also had actual knowledge, or at the least, under <u>Novak</u>, had access to information that their public statements to the investors were not accurate.  <u>See</u> <u>S.E.C. v. Credit Bancorp, Ltd.</u>, 195 F. Supp.2d 475, 494 (S.D.N.Y. 2002) (where a defendant plays a "central role in marketing an investment, his defense that he was unaware that the investment was a fraud is less credible"); <u>In re Complete Mgmt. Inc. Sec. Litig.</u>, 153 F. Supp.2d 314, 325 (S.D.N.Y. 2001) ("principal managers of a

23

corporation are aware of matters central to that business's operations"). Group pleading also applies to scienter, and plaintiffs are permitted to rely on a presumption that documents published by the partnership are the "collective work of those individuals with direct involvement in the everyday business of the company." In re Veeco, 235 F.R.D. at 232, 233 ("plaintiffs sufficiently plead scienter under the 'group pleading' doctrine" even after the PSLRA).

Both Siegal and Howard had motives to keep the partnerships afloat with new money from investors, and to have distributions withheld for this purpose. Where the allegations are taken in context, it is clear that there are no competing inferences that could explain the contradictions between their misrepresentations and the drilling reports and past experience. Tellabs, 127 S. Ct. at 2511 ("the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically").

**D.  Plaintiffs have Sufficiently alleged Connection and Causation**

All that is required for the "in connection" element of a Rule 10b-5 violation is that "the fraud 'coincide' with a securities transaction . . . ." Merrill Lynch, Pierce, Fenner & Smith v. Dabit, 547 U.S. 71, 85 (2006). Here, the Plaintiffs allege that the misrepresentations and omissions, including the oral representation and the written Investment Proposals, occurred prior to Plaintiffs' entering into the investments and induced them. Such allegations are sufficient.

Transaction causation and loss causation are also sufficiently alleged. Transaction causation involves allegations that the misrepresentations or omissions caused the purchase of securities. McCoy v. Goldberg, 883 F. Supp.2d 927, 939 (S.D.N.Y. 1995). Plaintiffs have alleged that the Siegal Defendants' fraud, including the

Investment Proposals and the misrepresentations regarding the managing partners, caused them to purchase the investments in all three partnerships.

Loss causation is "a causal connection between the material misrepresentation and the loss." In re Converium Holding AG Sec. Litig., 04 Civ. 7897, 2007 WL 2684069 at *3 (S.D.N.Y. Sept. 14, 2007). Plaintiffs clearly allege that the subject of the Siegal Defendants' Investment Proposals, i.e., the possibility of valid tax benefits and returns from oil and gas revenues, caused their losses. The failure to disclose the truth—that the wells were dry or abandoned, and that they had been drilled before Plaintiffs even invested—went to the heart of the value of the investments. See Schwartz v. Michaels, 1992 WL 184527 (S.D.N.Y. July 23, 1992). Indeed, the omission that the managing partners had no experience in oil and gas also went directly to the value of the investments. See Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87 (2d Cir. 2001) (adequate allegation of loss where "concealed lack of managerial ability induced [the company's] failure"). See Schwartz, at * 11 (omission that broker had no experience caused losses in portfolio; loss causation adequate). Since Plaintiffs have adequately alleged loss causation, any issue as to whether the loss was caused by an intervening factor "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.'" Converium Holding, at * 3.

### III.    The First Claim Sufficiently Alleges Securities Fraud against Josephson

The same standards as to the violation of Rule 10b-5, as set forth above, apply to the allegations against Josephson. In addition, Novak identifies another basis for allegations of scienter: that it would be sufficient to allege that the defendants "failed to check information that they had a duty to monitor." In re Openwave Sys. Sec. Litig.,

2007 WL at 10 (quoting Novak). See Montoya v. Mamma.com Inc., 05 Civ. 2313, 2006 WL 770573 at *5 (S.D.N.Y. March 28, 2006) (for a claim based upon recklessness, the complaint "can allege that defendants 'failed to check information they had a duty to monitor'"). Thus, the Second Circuit found the pleading standard was met "where the plaintiff alleged that the defendant, his broker, consistently reassured the plaintiff that the investment advisor responsible for the plaintiff's portfolio 'knew what he was doing' but never actually investigated the advisor's decisions to determine 'whether there was a basis for the [defendant's] assertions.'" Novak, 216 F.3d at 308-09. Similarly, a pleading was sufficient "which alleged reckless scienter with respect to a professional broker who had recklessly participated in a Ponzi scheme, lost money in that scheme, and encouraged others to participate in the scheme." Brown v. Earthbound Sports USA, Inc., 481 F.3d 901, 918 (6th Cir. 2007). Significantly, the broker in Brown encouraged others "to invest in a program, the details of which he knew virtually nothing." Id.

Here, Josephson encouraged his clients, who relied on him, to invest in a program which he vouched for as being valid so that Plaintiffs would be able to follow his strategy of taking tax deductions instead of paying taxes. He also persuaded them on the basis that they could expect revenues from oil and gas drilling which could pay off the note they signed. But he did no investigation of Siegal or his companies, nor did he investigate whether revenues were actually being generated by oil and gas drilling over a period of 10 to 12 years; he did not investigate whether there were lawsuits against Siegal or involving Siegal and the subscription notes which he advised Plaintiffs would be paid through the revenues. Nor did he monitor whether the managing partners were in fact competent to manage the partnerships. Instead, like the broker in Brown, he encouraged

Plaintiffs to invest in a program of which he was ignorant of the true facts.  Like the defendant referred to in <u>Novak</u>, Josephson never investigated Siegal to determine whether there was a basis for his own assertions regarding the partnerships.

Therefore, Josephson's assertions of lack of scienter must fail.  His other objections to the lawsuit against him must fail as well.  The allegations against him in the Amended Complaint are now differentiated from those as against Siegal and the Siegal Defendants and they are very specific.  In his motion to dismiss, Josephson argued that the misrepresentations lack the dates when they were made, their content and do not relate to any particular investments, and are not in connection with any investments.  The Amended Complaint moots these objections.

It is now alleged that Josephson made his reckless statements in July 2001, just prior to Plaintiffs' investing in their first partnership, and he continued in that same reckless conduct in July 2003 when Plaintiffs invested in Indian Village based upon his recommendation.  The Amended Complaint alleges that Josephson brought the investments to Plaintiffs, including Indian Village, met with and encouraged them to invest so that, based on his tax strategy advice, they could take a tax deduction instead of paying their quarterly tax payment.  He touted the partnerships, saying that other clients had invested and received returns from oil and gas revenues such that they never had to pay the Subscription notes.  He persuaded them to invest by telling them that the government approved of these types of shelters, whereas he did not tell them that the partnership should have been registered as a tax shelter but was not.  When the Plaintiffs were told by Siegal that he had never lost an audit, Josephson did not investigation the truth of that statement.  None of the representations Josephson made were true.  The tax

deductions could not be validly taken and there was no possibility that Plaintiffs could recover their investments from oil and gas revenues. Up until 2003, when he left Plaintiffs' employ, he continued to encourage Plaintiffs to commit to the same tax strategy and investments.

Josephson's last objection to the Complaint was the alleged lack of reliance. That too is moot. Plaintiffs clearly allege that were it not for Josephson , they would not have even known about the investments and would not have invested, but for Josephson's encouragement in conjunction with the Siegal Defendants' fraud. Such allegations are sufficient. See McCoy v. Goldberg, 883 F. Supp. at 940 (investment adviser was liable to plaintiff for inducing plaintiff to invest in partnership, while independent promoter of the partnership was also liable for fraudulent inducement; defendant's contention that plaintiff could not satisfy causation requirement rejected; all parties who participated in defrauding the plaintiff would be liable).

Accordingly, the securities fraud claim against Josephson is sufficient.

## IV.    The Common Law Fraud Claims against the Siegal Defendants (Second Claim) and Josephson (Third Claim) are Sufficient

The required elements for common law fraud and violations of securities laws, Section 10(b) and Rule 10b-5, are virtually the same except for the reference to the purchase and sale of securities. Therefore, the "identical analysis applies" in reviewing the pleading. Hunt v. Enzo Biochem, Inc., 530 F. Supp.2d 580, 592 (S.D.N.Y. 2008). Since the securities fraud claims against the Siegal Defendants and Josephson are sufficiently stated, so are the common law fraud claims.

## V.    The Claims Against The Managing Partners, Coleman and Trevisani, are Sufficient

### A.    The Fourth Claim for Aiding and Abetting Siegal's Common Law Fraud

Under New York law, a valid claim for aiding and abetting common law fraud must state: "(1) that a fraud existed; (2) that the defendant had actual knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." Fed. Nat'l Mortgage Ass'n v. Olympia Mortgage Corp., 2006 WL 2802092 (E.D.N.Y Sept. 28, 2006).  As set forth above, Plaintiffs have pled a valid claim of common law fraud against the Siegal Defendants.  As alleged in the proposed Amended Complaint, in furtherance of that fraud, the Siegal Defendants made false representations and material omissions to Plaintiffs regarding Coleman's and Trevisani's expertise to select drilling sites carefully and completely manage the affairs of the partnership of which they were managing partner.  Coleman and Trevisani knew they had no such expertise but knowingly permitted themselves to be named as managing partners of Indian Village and Condor, and Hurricane respectively, and executed the Partnership Agreements as such.  As Plaintiffs allege, in doing so they knew of the fraud and provided substantial assistance in perpetrating the fraud.  Accordingly, the proposed Amended Complaint properly states a claim against Coleman and Trevisani for aiding and abetting the Siegal Defendants' fraud.

### B.    The Fifth and Sixth Claims For Breach of Contract

In New York, a claim for breach of contract must allege "the existence of a contract; plaintiff's performance under the contract; defendants' breach of that contract; and resulting damages." Ashley MRI Mgmt. Corp. v. Perkes, M.D., 10 Misc.3d 1068(A)

at *4, 814 N.Y.S.2d 559 (Sup. Ct., Nassau Co. 2006), *reh'g granted,* 12 Misc.3d

1185(A), 824 N.Y.S.2d 760 (Sup. Ct., Nassau Co. 2006). In their motion to dismiss,

Coleman and Trevisani argued that Plaintiffs were not parties to any agreements except

the partnership agreements, that the Complaint did not specify any provisions breached,

and that Plaintiffs could not sue for breach without first seeking an accounting.[4] The

Amended Complaint moots those objections.

The claims are now based solely on the pertinent partnership agreements to which

Plaintiffs are parties. They specify the particular sections of the agreements breached.

They allege damages in the amounts of the distributions withheld by the partnerships.

Further, Plaintiffs may sue their co-partners without first seeking an accounting.

As the court stated in Agrawal v. Razgaitis, 149 A.D.2d 390, 390-91, 539 N.Y.S.2d 496

(2d Dept. 1989): "a partner may maintain an action at law against a co-partner when no

complex accounting is required or when only one transaction is involved which is fully

closed but unadjusted." See also Roberts v. Astoria Med. Group, 43 A.D2d 138, 139,

350 N.Y.S.2d 159 (1st Dept. 1973) (individual partner may vindicate specific wrong

which involves a partnership transaction which can be determined without examination

of partnership's accounts). Such is the case here. Plaintiffs seek to recover based upon a

breach made directly to them involving one transaction and distributions improperly

withheld only from them. The amount of each withholding may be determined by

---

[4]    Coleman and Trevisani also argued that the alleged breaches constituted mismanagement and so the claims had to brought derivatively. However, the Amended Complaint eliminates any claims which could be considered mismanagement, and only asserts breaches of contract where the resulting harm is to the Plaintiffs directly, not to the partnership itself. See Fraternity Fund Ltd. V. Beacon Hill Asset Mgmt. LLC, 376 F. Supp.2d 385, 409 (S.D.N.Y. 2005) (where principal wrong was a fraud that injured the plaintiffs, not the corporation, even though self-dealing might have been involved, plaintiffs could sue directly in their individual capacity; and the "same rules apply to actions by limited partners against a partnership.")

reference to the remittance advices issued by Bistate. No "complex accounting" is required to determine Plaintiffs' damages.

### C.    The Eighth and Ninth Claims for Breach of Fiduciary Duty

A claim for breach of fiduciary duty must plead the relationship giving rise to a fiduciary duty and a breach of that duty. Lumberman's Mut. Cas. Co. v. Franey Muha Alliant Ins. Svces., 388 F. Supp.2d 292, 303 (S.D.N.Y. 2005). Coleman, as a partner in Indian Village and Condor, and Trevisani as a partner in Hurricane, owe fiduciary duties to Plaintiffs as fellow partners. See Ashley MRI Mgmt., 10 Misc.3d 1068(A) at *5, 814 N.Y.S.2d 559 (Sup. Ct., Nassau Co. Jan. 3, 2006) ("partner has a fiduciary obligation to the other partners in a partnership"). As such, they must "'pursue the interests of those to whom a duty of loyalty is owed." Id. As described above, Plaintiffs allege breaches of that duty when the managing partners withheld distributions to which Plaintiffs were entitled without properly applying them to the represented purpose.[5] Therefore, these claims are sufficient.

## VI.    The Seventh, Tenth and Eleventh Claims against Siegal are Sufficient

### A.    Tortious Interference with Contractual Relations

The elements of the Seventh Claim are: "(1) the existence of a contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and (4) damages to plaintiff." Kronos, Inc. v. AVX Corp., 81 N.Y.2d 90, 94, 595 N.Y.S.2d 931 (1993). Here, Plaintiffs allege the existence of valid partnership contracts; Siegal's knowledge of the contracts he created and promoted; and Siegal's

---

[5]    As with the breach of contract claim, Plaintiffs may sue Coleman and Trevisani individually since Plaintiffs are alleging breach of fiduciary duty for injuries suffered by them directly, not by the partnerships.

deliberate inducement of Coleman and Trevisani to breach the Partnership Agreements by withholding Partnership distributions and wrongfully diverting them to Siegal's company, SS&T. As a result, Plaintiffs incurred damages in the amount of the distributions improperly withheld and diverted. Siegal is therefore liable to Plaintiffs for those damages since he engineered the breaches.

### B.    Aiding and Abetting Breaches of Fiduciary Duty

The elements of the Tenth Claim are: "(1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." Fraternity Fund Ltd., 479 F. Supp.2d at 360. Here, Plaintiffs' allege claims against Coleman and Trevisani for breaches of their fiduciary duties to Plaintiffs based on the improper diversion of withheld distributions. Plaintiffs also allege that Siegal deliberately induced Coleman and Trevisani to withhold and divert the distributions and therefore, he is liable to Plaintiffs for aiding and abetting the breaches of fiduciary duty.

### C.    Declaratory Judgment Against the Siegal Defendants

In the Eleventh Claim, Plaintiffs seek a declaratory judgment, pursuant to 28 U.S.C. § 2201, that the Siegal Defendants are liable for penalties that may be assessed by the IRS or other taxing authorities, in addition to professional fees that may be incurred in connection with audits. "'[A] declaratory judgment is available to resolve a real question of conflicting legal interests. That the liability may be contingent does not necessarily defeat jurisdiction of a declaratory judgment action. Rather, courts should focus on the practical likelihood that the contingencies will occur.'" Seippel v. Jenkens & Gilchrist, P.C., 341 F. Supp.2d 363, 383 (S.D.N.Y. 2004), reh'g granted, 2004 WL 2403911

(S.D.N.Y. 2004). Here, Plaintiffs have alleged claims of fraud against the Siegal

Defendants, which, if proved, would render them liable for these damages. Plaintiffs

have also alleged that the IRS has advised them that penalties will likely be assessed.

The Claim is therefore sufficient. See Seippel, Id. (motion to dismiss declaratory

judgment claim denied where plaintiffs' fraud claim was upheld).

## VII.    The Twelfth Claim against The Guralnick Defendants is Sufficient

The only claim in the Amended Complaint against the Guralnick Defendants is

for a declaratory judgment that they are liable for penalties that may be assessed, and

audit defense fees that may be incurred, in connection with the Hurricane partnership. As

noted, that the liability may be contingent does not defeat the claim so long as there is a

valid claim alleged in the pleading. Id. Here, Plaintiffs allege professional malpractice.

A claim for malpractice must allege: (1) a duty to plaintiff; (2) breach of that duty by

failing to adhere to the standards of the accounting profession; (3) injury to the plaintiff;

and (4) recoverable damages due to the injury. Carroll v. LeBoeuf Lamb, Green &

MacCrae, LLP, 392 F. Supp. 2d 621, 625 (S.D.N.Y. 2005). Plaintiffs allege that

Guralnick owed a duty to Plaintiffs as partners of the Hurricane partnership (see Parklex

Assocs. v. Parlex Assocs., 15 Misc.3d 1125(A) at *9, 841 N.Y.S.2d 220 (Sup. Ct., Kings

Co. Apr. 23, 2007) ("accountant for a limited partnership may be held directly liable to

the limited partners")); they departed from generally accepted accounting practice by

preparing the 2004 Hurricane K-1s with an allocation of the IDC based on Plaintiffs'

percentage investment in the Partnership instead of when they actually invested; and

Plaintiffs will be assessed penalties based upon their underpayment of taxes as a result of

the erroneous K-1s. Accordingly, the claim of professional malpractice is valid and

would render the Guralnick Defendants liable for whatever portion of Hurricane penalties arise as a result of the erroneous K-1s and the costs of defending the audit.

## CONCLUSION

By reason of all of the foregoing, it is respectfully submitted that Plaintiffs' cross-motion to amend be granted and defendants' motions to dismiss be denied. In the event the Court determines that the Amended Complaint is deficient in some respect, Plaintiffs request leave to replead.

Dated: New York, New York
      May 2, 2008

                    STORCH AMINI & MUNVES PC

                    Steven G. Storch (SS-5241)
                    Kathleen E. Wright (KW-5439)
                    Two Grand Central Tower, 25th Floor
                    140 East 45th Street
                    New York, New York 10017
                    Tel (212) 490-4100
                    Attorneys for Plaintiffs