STORCH AMINI & MUNVES PC
Two Grand Central Tower, 25th Floor
140 East 45th Street
New York, New York 10017
Tel. (212) 490-4100
Steven G. Storch (SS-5241)
Kathleen E. Wright (KW-5439)
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
IRA NATHEL and SHELDON NATHEL,                                    :

                                        Plaintiffs,               :

                    -against-                                     :      07 CIV. 10956

RICHARD SIEGAL, GEORGE COLEMAN, ROBERT A.  :      **DECLARATION OF**
TREVISANI,  PAUL HOWARD, HARVEY JOSEPHSON,       **KATHLEEN E.**
RICHARD S. GURALNICK, SCHAIN LEIFER            :      **WRIGHT IN SUPPORT**
GURALNICK , BISTATE OIL MANAGEMENT                   **OF CROSS-MOTION**
CORPORATION, SS&T HOLDING CO., LLC,             :
PALACE EXPLORATION   COMPANY, TAH
DRILLING CO., INC., TAQ DRILLING CO., INC., and  :
OIL AND GAS TITLE HOLDING CORPORATION
                                                                  :
                                        Defendants.               :
------------------------------------------------------------------------x

        Kathleen E. Wright, hereby declares, pursuant to 28 U.S.C. 1746(2), under

penalty of perjury that the following is true and correct:

        1.      I am of counsel with the firm of Storch Amini & Munves PC, attorneys for

Ira Nathel and Sheldon Nathel, plaintiffs in the above captioned action ("Plaintiffs").

I make this declaration in support of Plaintiffs' cross-motion to file their Proposed

Second Amended Complaint.  A copy of the proposed Second Amended Complaint is

attached hereto as Exhibit A.

2.      On December 3, 2007, Plaintiffs filed the original complaint in this action. On December 13, 2007, prior to the appearance of any of the defendants, Plaintiffs filed a First Amended Complaint.

3.      Plaintiffs amended the original complaint primarily to correct a misspelling of the name of defendant Schain Leifer Guralnick in the caption.  No material changes were made to the allegations in the body of the complaint.

4.      Therefore, although the Second Amended Complaint is the third complaint in this action, it is the first substantive change to the original complaint.

5.      Attached as Exhibit B is a chart which compares the claims and the parties against whom they are asserted in the First Amended Complaint with the proposed Second Amended Complaint.

6.      Attached as Exhibit C is a copy of the letter I submitted to the Court on April 29, 2008, endorsed by the Court to grant leave to Plaintiffs to file an enlarged memorandum of law of up to 35 pages.

Dated: New York, New York
       May 2, 2008

_____
Kathleen E. Wright

EXHIBIT A

STORCH AMINI & MUNVES PC
Two Grand Central Tower, 25th Floor
140 East 45th Street
New York, New York 10017
Tel. (212) 490-4100
Steven G. Storch (SS-5241)
Kathleen E. Wright (KW-5439)
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
IRA NATHEL and SHELDON NATHEL,                          :

                          Plaintiffs,                   :

              -against-                                 :        07 CIV. 10956

RICHARD SIEGAL, GEORGE COLEMAN, ROBERT A.  :        **PROPOSED SECOND**
TREVISANI, PAUL HOWARD, HARVEY JOSEPHSON,           **AMENDED COMPLAINT**
RICHARD S. GURALNICK, SCHAIN LEIFER               :
GURALNICK , BISTATE OIL MANAGEMENT
CORPORATION, SS&T HOLDING CO., LLC,               :
PALACE EXPLORATION   COMPANY, TAH
DRILLING CO., INC., TAQ DRILLING CO., INC., and   :
OIL AND GAS TITLE HOLDING CORPORATION
                                                         :
                          Defendants.
------------------------------------------------------------------------x

        Plaintiffs Ira Nathel and Sheldon Nathel ("Plaintiffs"), by their attorneys, Storch Amini &

Munves PC, as and for their second amended complaint herein, allege as follows:

## PRELIMINARY STATEMENT

        1.      Plaintiffs, the joint and sole owners of a wholesale fruit and vegetable company

(Nathel & Nathel, Inc.), were fraudulently induced into investing large sums of money in

partnerships formed purportedly to invest in oil and gas well drilling and production interests.

Plaintiffs were falsely told that they could expect legitimate tax deductions and revenues from oil

and gas revenues.  The three investments at issue here, Indian Village, Condor and Hurricane,

were made in 2003 and 2004, but Plaintiffs began investing in the oil and gas partnerships in 2001 based upon misrepresentations which continued through 2004.

  2.  Defendant Richard Siegal ("Siegal"), the creator, sponsor and promoter of the investments, and his companies, Bistate Oil Management Corporation ("Bistate"), SS&T Holding Co., LLC ("SS&T"), Palace Exploration Company ("Palace"), TAH Drilling Co., Inc.("TAH"), TAQ Drilling Co., Inc.("TAQ"), Oil and Gas Title Holding Corporation ("Oil and Gas") (collectively the "Siegal Companies") (and collectively with Siegal and Paul Howard, the "Siegal Defendants"), knew, at the time they induced Plaintiffs into the investments in oil and gas partnerships ("Siegal Partnerships") through written offering materials and oral misrepresentations intended for Plaintiffs, that Plaintiffs could not take advantage of tax deductions for intangible drilling costs and that it was not possible for Plaintiffs to recover their investments from oil and gas revenues.  Siegal had access to, among other things, drilling reports showing that wells proposed to be drilled by the partnerships could not be the subject of legitimate tax deductions and that the wells would not provide the return of Plaintiffs' investment from oil and gas revenues.

  3.  Defendant Paul Howard ("Howard") (together with Siegal and the Siegal Companies, the "Siegal Defendants") a close colleague of Siegal and officer of the Siegal Companies, was an insider and made available the false offering material, and was privy to the same information available to Siegal.  Through these materials he made representations to Plaintiffs regarding the Partnerships that induced them into investing in what he knew were invalid tax shelters that also could not possibly provide a return of Plaintiffs' investment from oil and gas revenues.  He and Siegal also knew that the structure of the partnerships that excluded all but the Managing Partner from any power to participate in or oversee their activities made the sale of partnership interests subject to regulation under federal securities law.

4.     Defendants George Coleman ("Coleman") and Robert A. Trevisani ("Trevisani") worked with Siegal in an effort to make the partnerships appear legitimate, by holding themselves out, and permitting Siegal to hold them out, as persons with expertise in the field of oil and gas drilling, and allowing their names to be utilized as Managing Partners of the partnerships, knowing that they had no such expertise and could not exercise the due diligence described in the offering materials, and knowing that the prospective investors would rely on that supposed expertise in evaluating and investing in the partnership investments.

5.     As Managing Partners of the partnerships, Coleman and Trevisani also breached their fiduciary duties to Plaintiffs individually and breached the partnership agreements by failing to remit distributions to Plaintiffs under the guise of withholding them to purchase securities intended to pay Plaintiffs' obligations to the partnerships, but in reality no such securities were ever purchased.

6.     Defendant Harvey Josephson ("Josephson"), Plaintiffs' trusted accountant-advisor, advised Plaintiffs to invest in the Siegal Partnerships.  Josephson promoted a strategy of investing the tax Plaintiffs were due to pay in the fourth quarter of the year in an oil and gas deal, and he brought the Siegal Partnerships to the Plaintiffs for this express purpose.  He promoted this strategy to Plaintiffs for five Partnerships in which Plaintiffs invested.  As Plaintiffs' trusted advisor, he assured Plaintiffs that Siegal knew what he was doing.  He vouched for the purpose of the Partnerships but never actually investigated the validity of the tax deduction structure or the possibility of returns from oil and gas revenues.

7.     Siegal and the Siegal Companies and the Siegal Partnerships retained Defendants Richard S. Guralnick ("Guralnick"), a certified public accountant, and his firm, Schain Leifer Guralnick ("SLG") ("Guralnick Defendants"), to provide expertise in accounting, the structure of the tax shelters and tax rules and regulations and to prepare Partnership tax returns including the

3

K-1s provided to each of the investors.  The Guralnick Defendants provided such advice to Siegal and the Siegal Companies for at least 15 years, were knowledgeable as to Siegal's operations, and prepared the Partnership returns and K-1's which they knew Plaintiffs would rely upon in preparing their own tax returns.  Plaintiffs relied on the Guralnick Defendants to adhere to accepted standards of practice of their profession, provide accurate information and advice and to prepare tax return documents, including the K-1's,  that did not deviate from the rules of the IRS and other taxing authorities governing tax deductions.

8.    In or about 2006, Plaintiffs learned that they had been fraudulently induced into a Ponzi scheme with false promises of legitimate tax deductions and substantial investment returns.  The intangible drilling cost tax deductions were unsupported by legitimate drilling costs of real wells actually owned by the Partnerships and the purported "returns" to the investors, including Plaintiffs, were either diverted to the Siegal Defendants, or, to the extent any were actually made, were made in large part from recycled cash from other duped investors or were improper and unauthorized advances obtained from unknown sources.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 as the action involves a claim arising under federal law, Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78aa.  The claims asserted herein arise under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.  The partnership investments at issue herein are investment contracts which constitute securities as defined in 15 U.S.C. § 77b(a)(1) and applicable case law.  This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 with respect to Plaintiffs' claims arising under state law.

10.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims herein occurred in this District and many of the documents, records and witnesses related to this action are located in this District.

11.      In connection with the acts, transactions and conduct alleged herein, defendants Siegal, the Siegal Companies, Howard and Josephson directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and interstate telephone communications.

## PARTIES

12.      Ira Nathel and Sheldon Nathel are individuals residing in the State of New York.

13.      Siegal is and at all times herein has been an attorney and accountant and the creator and sponsor of the Siegal Partnerships, and owns and controls, together with his family, the Siegal Companies.

14.      Howard has at all times herein been president of Oil and Gas, chief financial officer of Palace and controller of Bistate and promoted Siegal's partnerships.

15.      Josephson is a certified public accountant in the State of New York.

16.      Coleman was at all times the Managing Partner of certain Siegal Partnerships including the Indian Village and Condor Partnerships.  Upon information and belief based upon his published employment and background, at all times herein, Coleman was the chief executive officer of a family owned children's day camp and had no expertise in connection with, among other things, the selection of drill sites for oil and gas.

17.      Trevisani is the Managing Partner of the Hurricane Partnership promoted by Siegal and Howard.  Upon information and belief, Trevisani is an attorney admitted to the practice of law in the States of New York and Massachusetts and residing in the State of Florida.

Upon information and belief, based upon his published employment and background, he had no expertise in connection with, among other things, the selection of drill sites for oil and gas.

18.    Upon information and belief, Bistate is a corporation formed and existing under the laws of the State of New York with its principal place of business in New York, New York.

19.    Upon information and belief, Palace is a corporation formed under the laws of the State of Oklahoma.

20.    Upon information and belief, Oil and Gas is a corporation formed and existing under the laws of the State of Texas with its principal place of business in New York, New York.

21.    Upon information and belief, SS&T is a limited liability corporation formed and existing under the laws of the State of New York with its principal place of business in New York.

22.    Upon information and belief, TAH is a corporation formed and existing under the laws of the State of Delaware with its principal place of business in New York, New York.

23.    Upon information and belief, TAQ is a corporation formed and existing under the laws of the State of Delaware with its principal place of business in New York, New York.

24.    Upon information and belief Bistate, Palace, Oil and Gas, SS&T, TAH and TAQ (collectively "the Siegal Companies") are all 100% owned and controlled by Siegal and his family.  Siegal, Howard Coleman and Trevisani committed the tortious acts described herein through these corporate defendants.

25.    Guralnick is a certified public accountant residing in the State of New York and SLG is a firm of certified public accountants with its offices in New York, New York in which Guralnick is a named partner.

## FACTS

### Josephson and the Siegal Partnerships

26.     According to Investment Proposals prepared by Siegal to offer investors participations in the partnerships he devised, Siegal is an attorney and an accountant who has been engaged in the oil and gas exploration and development industry since the 1970's.

27.     This activity has largely been conducted through the formation of partnerships Siegal promoted purportedly to acquire leases for oil and gas interests and sites and retain third party companies to drill for oil and gas ("the Siegal Partnerships").

28.     Plaintiffs, as sole owners of a wholesale fruit and vegetable business, have no expertise or experience in the oil and gas industry, in investments involving tax deductions, or in any type of investment partnership.

29.     In or about the beginning of 2000, Plaintiffs retained Harvey Josephson, a certified public accountant, and his firm, to provide professional accounting services, including investment and tax planning advice, and corporate and personal tax reporting advice for their company and them personally.  Plaintiffs entrusted Josephson with the management and maintenance of the books and records of their company and the preparation of their corporate and personal tax returns.

30.     Josephson visited Plaintiffs' office every month to oversee the management of the books and records of their company and provide tax planning and investment advice, and to meet with Plaintiffs, together with Richard Byllott ("Bylott"), the corporate controller of Plaintiffs' company and Plaintiffs' personal representative and agent in connection with their own personal business affairs and taxes.

31.     In or about July 2001, during one of those visits, in a meeting with Byllott and Plaintiffs, Josephson proposed to Byllott and Plaintiffs that Plaintiffs invest in a Siegal

7

partnership called High Island. Byllott informed Josephson that he and the Plaintiffs had no

prior experience, let alone expertise, in the oil and gas industry, the propriety of the claimed tax

deductions, well drilling or investing in oil and gas exploration.

32.    At that meeting, Josephson told Byllott and Plaintiffs that, instead of making their

four quarterly estimated tax payments, Plaintiffs could make only three and invest an amount

equal to the fourth quarter payment, together with executed promissory notes, in a Siegal

partnership which would use the cash and notes to pay a related entity, namely SS&T, TAQ or

TAH, for a turnkey oil and gas drilling contract. According to Josephson, Plaintiffs could then

take a tax deduction of an amount equal to the combined amount of cash and promissory notes

on intangible drilling costs ("IDC") and the purported tax savings would equal or exceed the

cash investments. This was false, as seen below, because the way the partnerships were

structured, there was no possibility of valid tax deductions.

33.    Josephson represented to Byllott and Plaintiffs at that meeting that, if a sufficient

number of the drilled wells struck oil or gas, Plaintiffs would have the added benefit of earning a

return of their investment from revenues generated by the sale of the oil and gas. In fact,

Plaintiffs could not earn a return on their investment through oil and gas revenues because, as

seen below, the potential production from the drilled sites would be insufficient to provide such a

return.

34.    Josephson strongly encouraged them to invest on the strength of his familiarity

with the investments and the fact that he had recommended them to many of his other clients.

Specifically, he represented to Byllott and Plaintiffs that he was very familiar with the Siegal

partnership investment vehicles and had been putting his other clients in them. Upon

information and belief, given the lack of any professional basis to recommend such investments,

and his statement that he had been putting other clients in such investments, Josephson was being

secretly compensated by Siegal and/or the Siegal Companies to promote the Siegal Partnerships. Josephson represented that the IDC tax deductions offered by the Siegal Partnerships were permissible by the Internal Revenue Service ("IRS"), which actually encouraged such investments, and that Plaintiffs could also receive a return of their investment from oil and gas revenues. In fact, the IRS did not encourage such tax-motivated investments, and the IRS had not approved such investments.

35.    Josephson represented to Byllott and Plaintiffs that with respect to Subscription Notes ("Notes") Plaintiffs were required to sign, they would not be required to pay the 8% interest on the Notes after the first year because oil and gas revenues should be sufficient to pay the interest. As proof, he recklessly assured them that similar promissory notes financing Siegal's other partnership structures had not been exercised and that "no one ever sees them [the notes]" because the oil and gas revenues paid down the notes. Josephson gave this assurance without any basis. Specifically, while clearly purporting to be knowledgeable as to such supposed oil and gas revenues and as to the validity or existence of any oil and gas wells, upon information and belief, Josephson made no investigation.

36.    Josephson vouched for Siegal and his partnerships, in particular the Indian Village partnership, without, upon information and belief, actually ever investigating whether the wells were legitimate, whether the investors had ever been sued on the notes, whether the wells had actually been assigned to the Partnerships, whether the wells had not been abandoned or were dry before being assigned to the partnerships or whether investors in other partnerships promoted by Siegal ever received a return on their investments from oil and gas revenues, as opposed to payments from advances or future investors. The basis for the belief that he made no investigation is that, as a tax advisor purporting to have experience in this area sufficient to make a recommendation, he was obligated to undertake an investigation which would have readily

9

disclosed that the representations regarding the investments were inaccurate and could not be confirmed. Nor did Josephson disclose to Byllott and Plaintiffs that the Partnership structures were not, as required, registered with the IRS as valid tax shelters. Josephson also encouraged Plaintiffs to invest by telling them that Congress had approved such IDC tax deductions to reduce foreign oil imports, whereas, as a certified public accountant and tax advisor, he should have known that the amount of tax deductions supposedly available would not be favored by the IRS.

37.     Byllott, on behalf of Plaintiffs, acting as their agent for purposes of handling their Siegal Partnership investments, was the liaison with Josephson, and contacted the Partnership promoters, and received and read the Investment Proposals and the Partnership Agreements on behalf of Plaintiffs. All the representations Josephson made to Byllott were intended for Plaintiffs.

38.     Thus, after the meeting with Josephson, and pursuant to Josephson's introduction, Byllott, on behalf of Plaintiffs, spoke to Siegal and Howard by telephone to confirm the representations of Josephson, which they did, and asked if the IRS had approved the tax aspects of the investment structures. Siegal misleadingly informed Byllott that his partnerships "had never lost an audit". This statement was intended to be conveyed to the Plaintiffs. Siegal knew when he made this statement that it was false because, although some of his similar partnerships were under audit, the audits were not completed and the IRS had not issued any report that the IDC deduction was allowable or that any other aspect of the Partnerships was legitimate.

39.     Subsequently, Siegal and Howard forwarded the subscription documents to Byllott, intended for Plaintiffs, which included an Investment Proposal and a Partnership Agreement, among other documents, as set forth below, which Byllott read on behalf of the

Plaintiffs and which they relied upon.  Plaintiffs received the Investment Proposals from Siegal prior to executing the final Partnership Agreements.

40.    Over the next 3 years, until Josephson was no longer retained at Plaintiffs' company in the fall of 2003, Josephson oversaw this strategy as accountant for the company and Plaintiffs to make the investments in the Partnerships with a view toward tax savings.  The Siegal Partnerships would not have been brought to Plaintiffs' attention had it not been for Josephson.  Plaintiffs would not have invested had it not been for Josephson, together with Siegal and Howard, as set forth below, and put hundreds of thousands of dollars in Indian Village (and in other virtually identical transactions), from 2001 to 2003.

41.    Josephson made the same representations to Byllott and Plaintiffs at similar meetings, with respect to five Siegal Partnerships in which he proposed they invest without any investigation of his own as to their validity.  He brought them the Partnerships as follows: (i) High Island in July 2001; (ii) NF Drilling in November, 2001; (iii) Stagecoach Drilling in June 2001; (iv) Bateman Lake Drilling in November, 2002; and (v) Indian Village in June 2003.

**The Siegal Partnerships**

42.    Each partnership followed the same format.[1]  For each partnership, Siegal and Howard provided Plaintiffs, or Byllott on behalf of Plaintiffs, just before they invested, with an offering memorandum they had prepared, entitled  "Investment Proposal" which made, among other things,  the following false promises and representations:

> (a) Investors can redeploy their upper bracket tax dollars into certain investments and create income and cash flow rather than pay those dollars to federal, state and municipal governments.
>
> (b) Rates of return can unquestionably be earned on monies which would otherwise be paid to taxing authorities.

---

[1]    The offering materials for the Indian Village, Condor and Hurricane Partnerships are essentially the same in all material respects.

(c) The partners will be afforded a substantial active tax loss under Section 263C of the Internal Revenue Code which allows taxpayers to expense the intangible drilling costs incurred in drilling oil and gas wells.

(d) The Partnership can expect an average annual cash flow of approximately 10-15% and often greater of the cash funds invested.

(e) It is reasonable to expect the cash flow to continue for 10-12 years.  The drill sites will be carefully chosen by the Managing Partner of the Partnership (Coleman and/or Trevisani).[2]

(f) The interest payable on the investor's Subscription Note would be 8% per annum paid quarterly and fully tax deductible; the investor would only be required to pay the interest during the first year of the Partnership with future interest to be paid out of the Partnership's cash flow generated from oil and gas revenues or the interest would accrue and be payable at maturity.

(g) The Turnkey Note holder (the drilling company) will subordinate its right to collect the 8% interest from the Partnership on the Turnkey Note to quarterly cash on cash 2.0% returns to the investing partners.

43.     The foregoing representations were false because the IDC was not an appropriate deduction under Section 263C of the Internal Revenue Code, oil and gas revenues could not pay down the interest on the Notes, and the Managing Partners would not carefully select the drilling sites.  Siegal and Howard knew that the IDC tax deductions had not been approved by the IRS.  They also knew from the books and records and the drilling reports relating to Indian Village, Condor and Hurricane, to which they had access, that the IDC would not be allowable because many of sites had been drilled before the Partnerships were constituted and many had already been abandoned, were dry or were capped before Plaintiffs invested.  For the same reason, they knew that investors could not recover their investments from oil and gas revenues.  Furthermore, the IRS believes that the drill sites were not assigned to the specific Partnerships, and Bistate, in response to requests for documents showing the assignments, produced nothing.  The IDC is not

---

[2]     Coleman was the Managing Partner for seven of the Partnerships in which Plaintiffs invested.  The Managing Partner for the eighth, Hurricane Drilling Co., was Trevisani.

a permissible tax deduction for sites that did not belong to the specific Partnerships when drilled or were drilled before Plaintiffs invested.

44.    Records of Bistate show that distributions to the partners from the Partnerships were often made from "advances" and not from oil and gas revenues.  Upon information and belief, these advances were made from Siegal, the companies he controlled and/or cash received from investments made by other partners in unrelated partnerships promoted by Siegal.  There was no provision in the Partnerships' agreements for such "advances" to the Partnerships. Instead, all distributions were to be made from oil and gas revenues.

45.    Siegal and Howard also knew that Plaintiffs could not expect a return of 10-15 per cent or that it was reasonable to expect that return for 10-12 years, because they knew from past partnerships they promoted that the well production did not last that long and did not produce revenues for that period of time.  For example, the partnerships they promoted with basically the same structure in the 1980's through a company called Skava Oil Distribution Corporation ("Skava"), all failed long before 10 to 12 years, and Siegal sued the investors to enforce the subscription notes they signed as part of their investments in partnerships.

46.    Siegal and Howard knew that Coleman, who ran a children's camp, and Trevisani, a lawyer, were not oil and gas experts who could select drilling sites and otherwise manage the partnerships.  In fact, it is Siegal, with Howard's assistance, who manages the Partnerships through the Siegal Companies and used Coleman and Trevisani to make the Partnerships appear legitimate, and Coleman and Trevisani agreed to be so used.

47.    Howard, as a Siegal insider, with day to day involvement in the Siegal Companies, had access to the same books and records as Siegal, and therefore knew that the representations in the Investment Proposals, that the IDC deduction was legitimate and that investors could expect long term oil and gas revenues, were false.  As president of Oil and Gas,

Howard had access to documents showing that many of the drill sites purportedly to be assigned to the Partnerships were already drilled and abandoned and could not be a basis for a IDC tax deduction. Moreover, Bistate produced no documents showing any proper assignment of drill sites to the Partnerships.

48.     The Indian Village Investment Proposal also represented that, in lieu of receiving the quarterly distributions in full, the partners could elect to assign to the Partnership, beginning on January 1, 2005, for no more than five years, 67% percentage of their future distributions with which the Partnership would purchase marketable securities which would increase in value and ultimately be used to pay off the Turnkey Note (which was secured by the Subscription Note). According to their own Investment Proposals, the percentage withholding for Condor was to be 75% and the withholding for purchase of securities was to commence on January 1, 2005 and the Hurricane withholding was also to be 75% and the withholding for purchase of securities was to commence on January 1, 2006.

49.     Siegal and Howard knew when the Investment Proposals were provided to Plaintiffs that the Partnerships would not buy marketable securities with distributions withheld from Plaintiffs and the purpose of the "withholding" was in fact to cover them when there was no cash from any oil and gas well source or from other duped investors to make the distributions. Coleman and Trevisani, who issued memoranda confirming the investors' elections, did not apply the withheld distributions to purchase securities and did not oversee any such purchases.

50.     The Investment Proposals also represented that Siegal's companies "have always maintained the highest level of fiduciary integrity servicing investors with informative reporting and on time distributions" and that Palace had over 1500 producing wells in the lower 48 states. Siegal and Howard knew this representation presented a false picture to Plaintiffs because the

14

Siegal companies had been embroiled in multiple prior lawsuits in the 1990's in which investors

had not received the distributions they had been led to expect or which were even possible.

     51.    The Investment Proposal included forms of documents which, when executed,

comprised the Partnership Documents for each Partnership as follows:

> (a) A Partnership Agreement and Certificate of Partnership ("Partnership
> Agreement") to be executed by the Managing Partner and each investing
> partner;

> (b) A Prospect Agreement between the Partnership, Palace, Oil and Gas and
> Bistate through which Palace assigned oil and gas interests to Oil and Gas as
> nominee for the benefit of the Partnership;

> (c) A Turnkey Drilling Contract between the Partnership and the proposed
> drilling company, which was TAQ, TAH or SS&T;

> (d) A Turnkey Note, bearing interest at 8% per annum, issued by the Partnership
> to the drilling company to finance in part the drilling costs;

> (e) A Subscription Agreement by which the partner subscribes to a partnership
> unit which subscription must be accepted by the Managing Partner;

> (f) A Subscription Note , bearing interest at 8% per annum, executed by the
> partner for the balance of the payment for the partnership unit and applied as
> collateral securing the Turnkey Note; and

> (g) An Assumption Agreement executed by the investing partner assuming the
> partner's pro rata share of the Turnkey Note and pledging the partner's
> Subscription Note to secure that share.

**The Managing Partners**

     52.    All the Partnerships were formed under the laws of the State of New York.

Although styled as general partnerships, the Partnership Agreements unequivocally place all

control and power in the hands of the Managing Partner: Coleman as to Indian Village and

Condor, and Trevisani as to Hurricane. Coleman was the managing partner for 4 other

partnerships in which Plaintiffs invested before Indian Village. According to the Partnership

Agreement, the Managing Partners have full and exclusive power and authority to manage,

control, administer and operate the business affairs of the Partnerships and take all decisions, and the investor partners have no authority to interfere in the business whatsoever, in any capacity.

53.     Coleman executed as Managing Partner all of the Partnership Agreements, except Hurricane, which Trevisani executed as Managing Partner.  In executing the Partnership agreements and purportedly taking on the role of Managing Partners, permitting Siegal and Howard to hold them out as persons with oil and gas experience, Coleman and Trevisani falsely held themselves out to Plaintiffs as having the expertise to choose drill sites carefully for the Partnerships and to manage the Partnerships' affairs.  It was not disclosed to Plaintiffs that Coleman's expertise was in running a children's camp and that Trevisani was a practicing attorney.  Had Coleman and Trevisani actually performed their roles as Managing Partners, they would have seen the drilling reports showing that the sites were largely drilled before the Partnerships were constituted and that many wells had been abandoned and could not produce returns or distributions.

**The Investments**

54.     Relying on Siegal's, Howard's and Josephson's (at least until the Fall of 2003), representations and the representations in the Investment Proposals, and without knowledge of deliberately undisclosed material facts, Plaintiffs invested in the Partnerships as, they believed, limited partners.  The designated dates of the commencement of the Partnerships set forth in the Partnerships agreements were invariably months before Plaintiffs each actually invested cash in the Partnerships as follows:

| Name | Date on Agreement | Date Plaintiffs Invested | Amount Each |
|------|-------------------|--------------------------|-------------|
| High Island | March 1, 2001 | August 23, 2001 | $  50,000 |
| NF | August , 2001 | December 12, 2001 | $200,000 |
| Stagecoach | March 1, 2002 | July 23, 2002 | $100,000 |
| Bateman | September 1, 2002 | December 18, 2002 | $250,000 |
| Indian Village | March 1, 2003 | July 15, 2003 | $150,000 |
| Condor | September 1, 2003 | December 12, 2003 | $250,000 |

| Name | Date on Agreement | Date Plaintiffs Invested | Amount Each |
|------|-------------------|--------------------------|-------------|
| Hurricane | August 1, 2004 | December 9, 2004 | $300,000 |
| Pebble Bay | August 1, 2005 | December 12, 2005 | $400,000 |

55.    Accordingly, the Partnerships were not properly constituted until well after the dates on the Partnership Agreements.  As Siegal and Howard knew, from their admittedly long experience in the oil and gas drilling business, any IDC for sites drilled before the date an investor actually participated in the Partnership could not be deducted by that investor.  Siegal and Howard also knew that the IDC tax deductions could not be taken for drill sites that did not belong to the specific Partnership purportedly generating the deduction or for sites drilled and/or abandoned or capped before the Partnerships were constituted.

56.    In addition to the cash investments Plaintiffs each executed Subscription Notes pursuant to the Subscription Agreements, as part of their investment in their Partnership units as follows:

| | |
|--|--|
| High Island | $  60,000 |
| NF | $320,000 |
| Stagecoach | $120,000 |
| Bateman | $375,000 |
| Indian Village | $225,000 |
| Condor | $450,000 |
| Hurricane | $720,000 |
| Pebble Bay | $720,000 |

57.    Each year the Partnership tax returns and schedules, and the K-1's for each investor, were prepared by, or under the direction of Guralnick, Siegal's longtime accountant. Guralnick provided the K-1's for each investor to rely upon, detailing the IDC deductions to be used in preparation of their tax returns.  The K-1's were improper because Guralnick made no allocation between the partners to take into account the dates they entered into the Partnerships.

58.    Plaintiffs received quarterly written communications from each Partnership which included distribution checks and purported production reports for the wells owned by each

Partnership.  Many of the distribution checks were reduced by what was reported as a "transfer for the purchase of securities."

59.    These communications never included a description of the "securities" or any evidence that they had been purchased, their value or where they were being held.  This was because, as Siegal and Howard knew, no such purchases were ever made.

**The Indian Village Partnership**

60.    In the Indian Village Investment Proposal, Siegal and Howard represented that the Partnership would be comprised of a minimum of 5 units for a minimum capitalization of $1,250,000.  There would also be a minimum of 25 sites drilled.  The Investment Proposal also states that dry sites will be substituted for other undrilled sites owned by Siegal's company, Palace.

61.    The Partnership Agreement purports to date from March 1, 2003.  However, Plaintiffs did not invest until July 21, 2003 and other investors invested in September and December 2003.  Nevertheless, the Partnership's tax return for 2003 and the K-1's prepared by Guralnick erroneously treat all partners as having commenced their participations on the same date of March 1, 2003.

62.    Drilling reports for the drill sites listed in the Prospect Agreement, purportedly to be held by the Partnership, demonstrate that at least 16 of the 31 sites had been drilled, not only before 5 Partnership units had been sold, but before a single Partnership unit had been purchased. All of the wells were drilled before the final Partnership investment was made in December 2003.  Indeed, at least 2 had been drilled and abandoned before September 5, 2003 which was the first date the Partnership could have been constituted and a third was abandoned before the final partner invested.

63.    Siegal and Howard therefore knew before the sale of the Partnership units, that the investors would be ineligible to take IDC tax deductions for most of the purported drill sites and they knowingly misrepresented to Plaintiffs that the deduction was legitimately available, as represented in the K-1's.

64.    The Indian Village Investment Proposal represented that, after the first year, interest payable on the Subscription Notes would be paid from the Partnership cash flow from sales of oil and gas from successfully drilled wells.  That interest would in turn pay the interest due on the Turnkey Note issued by the Partnership to the drilling company to finance in part the drilling costs.  However, also as represented in the Investment Proposal, the Turnkey noteholder, TAQ, would subordinate its right to collect interest on the Turnkey Note to a quarterly cash on cash 2% return to the investing partners.  In other words, the Siegal Defendants and Howard represented that the proceeds of sales of oil and gas, collected by Bistate, could be sufficient to pay Plaintiffs a quarterly 2% return on the cash they invested.

65.    Plaintiffs each invested $150,000 in cash in Indian Village and executed Subscription Notes with a face amount of $225,000 each.  During the first year after their investment, they each paid in cash $18,000 in interest on the Subscription Notes.  Therefore their total combined cash investments were $336,000 in Indian Village which has virtually all been lost.

66.    Plaintiffs did receive quarterly checks styled Indian Village distributions, along with purported production and expense reports.  However, in order to make those distributions in April, July and October of 2006 the distribution reports note that "advances" were made to the Indian Village Partnership from an unnamed source.  On July, 30, 2007 a distribution was made to the Partnership of less than half of the expected 2% of investment payment.  Six days later a "supplemental distribution" was made of $10,000 funded entirely by another "advance" from an

19

unknown source.  Whatever the source, these distributions were not made, as Siegal, Howard and Josephson represented, from oil and gas revenues from wells held by Indian Village.

67.    Moreover, nowhere in the Indian Village Investment Proposal or Partnership related documents is there any statement that Bistate contemplated borrowing to pay the quarterly 2% payment.  The Siegal Defendants withheld this material information regarding such potential borrowing from Plaintiffs.  They knew in 2003 that they would not be able to make future distributions from the oil and gas revenues since they knew, and it was their way of doing business, that the wells, some or most of which were not able to produce even in 2003, would become non-productive within several years.  By that time, 2006, Plaintiffs had already invested in several other Partnerships.  Had Byllott and Plaintiffs been informed of this material information, Plaintiffs would not have invested in the Partnerships.

68.    Pursuant to the Indian Village Investment Proposal regarding the withholding of distributions to the investors to buy securities to pay off the Subscription Note, Plaintiffs agreed with the Partnership through the Managing Partner to this partial withholding for the purchase of securities.  From July 28, 2005 onwards all the distribution checks Bistate sent to the Plaintiffs from the Partnership reflected this assignment and the withholding of most of the distribution as "transfer for purchase of securities."  However, no such purchases were made, as evidenced by the lack of any Siegal Companies documentation identifying such securities.  Bistate, which issued the distribution checks to Plaintiffs and advised that the distributions were withheld to purchase securities, failed to produce any such documentation despite repeated requests.  Indeed, despite Plaintiffs' express written warning that failure to produce such documentation would be taken as an admission that no securities were purchased, Bistate failed and refused to produce any information concerning securities.

69.     The Siegal Defendants knew from the beginning of the Indian Village Partnership that no such securities would ever be purchased and that, if there were any distributions to be withheld from Plaintiffs, they would be diverted to themselves or the Siegal Companies.  By the artifice of making advances and withholding promised distributions to purchase nonexistent "securities," the Siegal Defendants planned from the beginning to circulate portions of other duped investors' money to keep the house of cards standing because they knew there would not be sufficient revenues from oil and gas to make the distributions.

**The Condor Partnership**

70.     The Condor Drilling Partnership ("Condor") is identical in structure to, and was promoted with the same misrepresentations as Indian Village but for the facts alleged below.

71.     The Condor Investment Proposal represented that a minimum of 5 units would be required for the Partnership to be constituted.  The minimum capitalization for Condor was $1,400,000.  Also, the Turnkey Drilling Contract was with Siegal's company Defendant TAH.  The Partnership Agreement is dated September 1, 2003 but Plaintiffs did not purchase their units until December 12, 2003.  From Bistates's records it appears that the minimum of 5 units was not reached until December 26, 2003 and investments continued until December 31, 2003.

72.     According to the drilling reports, to which Siegal and Howard had access, at least twenty-two (22) of those sites were drilled before September 1, 2003, the date of the Partnership Agreement and before a single partner had invested, let alone the sale of the 5 units necessary to constitute the Partnership.  In addition, at least 7 of the sites had been drilled and abandoned before the Partnership was constituted with the minimum 5 units in December, 2003.

73.     Siegal and Howard therefore knew before the sale of the Partnership units, that the investors would be ineligible to recognize IDC tax deductions for most of the purported drill

21

sites and they knowingly misrepresented to Plaintiffs that the deduction was legitimately available, as they had with the Indian Village Partnership.

74.     Plaintiffs each invested $250,000 in cash in Condor and executed Subscription Notes with a face amount of $450,000 each.  The first year after their investment, they each paid in cash $36,000 in interest on the Subscription Notes.  Therefore their total combined cash investments were $572,000 which has virtually all been lost to Siegal's scheme.

75.     The Partnership tax return for 2003, prepared by Guralnick, applied the IDC as if the Condor Partnership had been fully constituted on September 1, 2003 and drilling had begun after that date.  The K-1's were improper because Guralnick made no allocation between the partners to take into account the dates they, including Plaintiffs, entered into the Partnership.

76.     Ten out of twelve quarterly distributions to Condor (to finance the 2% investment payment to the investors), which the Siegal Defendants had falsely represented would be generated from sales of oil and gas, were in large part financed by "advances" to the Partnership from unknown sources.  As with Indian Village, there is no provision in the Condor Investment Proposal or the Partnership Documents for the distributions to be supported by borrowing of any kind.

77.     Pursuant to the Condor Investment Proposal regarding the withholding of distributions to the investors to buy securities to pay off the Subscription Note, Plaintiffs agreed with the Partnership, through the Managing Partner, to this partial withholding for the purchase of securities, and from July 28, 2005 onwards all the distribution checks to the Plaintiffs from the Partnership, as with Indian Village, reflected a withholding of most of the distribution due to Plaintiffs as "transfer for purchase of securities." However, no such purchases were made, as evidenced by the lack of any Siegal Companies documentation identifying any such securities. Bistate, which issued the distribution checks to Plaintiffs and advised that the distribution were

withheld to purchase securities, failed to produce any such documentation despite repeated requests.

78.     The Siegal Defendants knew from the beginning of the Condor Partnership, as with Indian Village, that no such securities would ever be purchased and that, if there were any distributions, they would be diverted to themselves or the Siegal Companies.  By the artifice of making advances and withholding promised distributions to purchase nonexistent "securities," the Siegal Defendants planned from the beginning to circulate portions of other duped investors' money to keep the house of cards standing because they knew there would not be sufficient revenues from oil and gas to make the distributions.

**The Hurricane Partnership**

79.     The Hurricane Partnership is identical in structure to, and was promoted with the same misrepresentations, as Indian Village but for the facts alleged below.

80.     The Partnership Agreement is dated August 1, 2004 but Plaintiffs did not invest until December 9, 2004.  The minimum number of units to constitute the Partnership was 5 for a minimum capitalization of $1,400,000.  The minimum capitalization was not met until December 2004.  The Turnkey Drilling Contract was also with TAH.  Instead of Coleman, the Managing Partner was Trevisani.

81.     Plaintiffs each invested $400,000 in cash in Hurricane and executed Subscription Notes with a face amount of $720,000 each.  The first year after their investment, they each paid in cash $57,600 in interest on the Subscription Notes.  Therefore their total combined cash investments were $1,665,200 which has virtually all been lost.

82.     At least 2 of the 93 sites assigned to the Partnership in the Prospect Agreement had been drilled before the date of the Partnership Agreement and at least 24 had been drilled

before Plaintiffs invested on December 9, 2004.  Furthermore, at least 1 site had been drilled and abandoned before any partners had invested.

83.     From on or about April 30, 2007, onwards all the distribution checks to the Plaintiffs from Hurricane, as with Indian Village and Condor, reflected a withholding of most of the distribution due to Plaintiffs as "transfer for purchase of securities."  However, no such securities were purchased, as shown by the lack of any Siegal Companies documentation identifying any securities.  Bistate, which issued the distribution checks to Plaintiffs and advised that the distribution were withheld to purchase securities, failed to produce any such documentation despite repeated requests.  Indeed, despite Plaintiffs' express written warning that failure to produce such documentation would be taken as an admission that no securities were purchased, Bistate failed and refused to produce any information concerning securities.

84.     The Siegal Defendants knew from the beginning of the Hurricane Partnership, as with Condor and Indian Village, that no such securities would ever be purchased and that, if there were any distributions, they would be diverted to themselves or the Siegal Companies.  By the artifice of making advances and withholding promised distributions to purchase nonexistent "securities," the Siegal Defendants planned from the beginning to circulate portions of other duped investors' money to keep the house of cards standing because they knew there would not be sufficient revenues from oil and gas to make the distributions.

**Discovery of the Fraud**

85.     In or about November 2006, Byllott, received a written notice from Jeffrey Bacon, an IRS revenue agent in Texas requesting that Plaintiffs extend the limitations period on an audit.  Seeking clarification, Byllott shortly thereafter spoke to Patrick Villarreal ("Agent Villareal"), an IRS revenue agent in Texas, who informed Bylott that Plaintiffs' investments in the Siegal Partnerships were being audited and that the Siegal Partnerships were aggressive tax

24

shelters taking illicit tax deductions and that Plaintiffs were facing trouble. Agent Villareal asked Byllott to forward to him any promotional materials for the Partnerships.

86.    In or about the middle of December, 2006, Byllott telephoned Howard to advise him that Plaintiffs were being audited. Howard assured Byllott that the audits were routine and would not lead to any problems.

87.    Byllott then told Howard that the IRS had asked him to forward Partnership promotional materials and Howard's demeanor changed. He told Byllott he should not send the Partnership Investment Proposals to the IRS and that, if he did so, he should remove the first five pages. Byllott asked him why he should remove the pages and Howard answered in substance that, in those pages, "the IRS is going to see something they don't like."

88.    Howard's statement alarmed Byllott and Plaintiffs. Byllott forwarded to Agent Villarreal the complete Investment Proposal for the Indian Village Partnership without removing any pages.

89.    By letter dated March 12, 2007, Coleman, signing himself as "tax matters partner," informed Plaintiffs that the Condor Partnership was under IRS audit for the taxable year 2003. In a letter of the same date, Trevisani, signing himself also as "tax matters partner," informed Plaintiffs that the Hurricane Partnership was also under IRS audit for the taxable year 2004. The letters advised Plaintiffs that the Partnerships were responding to IRS document requests and otherwise cooperating fully with the audit.

90.    The March 12, 2007 letters also informed Plaintiffs that an IRS audit report to a partner in a similar Siegal partnership structure proposed to disallow a large percentage of the IDC deductions taken by that partner and to impose an accuracy-related penalty.

91.    In written responses to IRS information requests to the Partnerships, dated October 17, 2006 and January 29, 2007, the Siegal Companies' accountant, Guralnick, on SLG

letterhead, advised the IRS, in a letter dated October 16, 2006, that there was no "legal opinion or prospectus describing the material tax issues for the partnership agreement or the deductibility of the IDC amounts" (emphasis added.).  As set forth above, the Investment Proposals described in detail material tax issues related to the deductibility of the IDC and represented that the Partnerships and their tax aspects were valid.

92.    On or about July 17, 2007, the New York State Department of Taxation informed Plaintiff, Ira Nathel, that his tax returns were to be reviewed and his investment in Indian Village subject to audit.

93.    At the same time, an attorney representing Plaintiffs asked Agent Villarreal whether the IRS would allow a tax deduction for IDC costs to the extent of Plaintiffs' investments.  Agent Villarreal responded that, based on documents provided by the Partnerships, the IRS was of the opinion that the Partnerships did not own a working interest in any wells.  He also indicated that proceeds received from the Partnerships may not have been from revenues from sites drilled by the Partnerships in which Plaintiffs had invested but from sites held by the Siegal Companies.

94.    Alarmed by the state of affairs and facing a significant accuracy-related penalty and suspecting fraud, in July, 2007 Plaintiffs made written requests for Partnership documents, to which they are entitled as partners.  However, the requests were rebuffed.

95.    In August 9, 2007, Plaintiffs commenced an action in a New York State court to force the pre-action production of documents that would enable them to identify the wrongdoing of Siegal related entities and individuals and the extent of the misconduct.  Bistate, who appeared for the defendants, ultimately entered into a stipulation, dated August 21, 2007, and agreed to produce documents on behalf of the Partnerships and the Siegal Companies.

96.     Bistate subsequently produced documents relating to the Indian Village, Condor and Hurricane Partnerships.  Those documents confirm that representations made by Josephson at each meeting with Byllott and/or Plaintiffs in which he proposed the Siegal Partnership investments, including Indian Village, and later confirmed in telephone calls with Siegal, were false.  The documents also confirmed that, in each of the conversations Byllott had with Siegal, Howard and Josephson, and the Investment Proposals, material facts had been withheld from them regarding, among other things, the nature of the Partnership interests, the status of the drill sites purportedly held by the Partnerships, the propriety of deducting the IDC costs from Plaintiffs' taxes and the possibility of the return of Plaintiffs' investments from oil and gas revenues.

## FIRST CLAIM FOR RELIEF

### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against the Siegal Defendants, and Josephson)

97.     Plaintiffs repeat and reallege paragraphs 1 to 96 above as if fully set forth herein.

98.     The Partnership interests constitute securities as defined by the Exchange Act because Plaintiffs invested money in them with the expectation of deriving financial benefits and realizing profits solely from the efforts of others.

99.     The Siegal Defendants, in connection with the sale of the Partnership interests in Indian Village, Condor and Hurricane, and Josephson in addition in connection with the sale of the Partnership interests in Indian Village,  employed devices, schemes or artifices to defraud; made untrue statements of material fact verbally and in writing and omitted to disclose material facts necessary in order to make the statements made not misleading, in the light of the circumstances under which they were made; and engaged in acts, practices or a course of

27

business which operated as a fraud and deceit upon Plaintiffs as purchasers of securities, all in violation of Section 10(b) of the Exchange Act and Rule 10(b)-5 promulgated thereunder.

100.    In inducing Plaintiffs to invest in the Partnerships, the Siegal Defendants falsely represented to Plaintiffs that they could take valid IDC tax deductions in the amounts projected and that it was possible for Plaintiffs to receive a return of their investment from oil and gas well revenues generated from wells legitimately held by the Partnerships.  They also misrepresented that the Managing Partners had expertise in oil and gas drilling and would be able to select appropriate sites and otherwise manage the affairs of the Partnerships.  Further, they misrepresented that withheld distributions would be applied to purchase securities to pay off the Turnkey Notes.  As set forth above, the Siegal Defendants knew that the Partnerships could not legitimately return the revenues nor be the basis of valid tax deductions, nor did they intend to purchase securities, and they knew that the Managing Partners did not have any expertise.

101.    Josephson, Plaintiffs' personal accountant and tax adviser, recklessly encouraged Plaintiffs to invest in the Partnerships, representing falsely and without any basis in fact or investigation, and contrary to his duty to monitor, that the Partnerships were capable of returning their investments from oil and gas revenues and that they would be entitled to tax deductions. Josephson knew that by introducing the Plaintiffs to the Partnerships, instigating the program of investing in them instead of paying taxes, and vouching for the Partnerships and their validity, Plaintiffs would rely on him and on the Seigal Defendants in doing so.

102.    Plaintiffs did in fact rely upon the Siegal Defendants and Josephson in investing in Indian Village, and on the Siegal Defendants in investing in Condor and Hurricane.  Plaintiffs would not even have known about the Siegal Partnerships but for Josephson, and would not have invested in them but for Josephson and the Siegal Defendants.  Plaintiffs lost virtually their entire

investment in the Partnerships, have no expectation of earning any significant revenues but do expect the IRS to disallow the tax deductions and assess substantial penalties and interest.

103.    As a direct and proximate result of the aforesaid misconduct, Plaintiffs have sustained and will sustain damages in an amount to be determined at trial in connection with the purchase of the Partnership interests and are therefore entitled to recover damages they have suffered: (i) from Josephson in an amount to be determined at trial but at least in the amount of the $300,000 they invested in cash in Indian Village; and (ii) from the Siegal Defendants in an amount to be determined at trial but at least in the amount of the $1,600,000 in cash they invested in Indian Village, Condor and Hurricane.

## SECOND CLAIM FOR RELIEF

### (Common Law Fraud against the Siegal Defendants)

104.    Plaintiffs repeat and reallege paragraphs 1 to 103 above as if fully set forth herein.

105.    To induce Plaintiffs to invest in the Partnerships, the Siegal Defendants misrepresented to Plaintiffs directly and through Byllott material facts, specifically set forth above, both verbally and in the Investment Proposals and Siegel Partnership documents including, but not limited to: (a)  that the investments were tax deductible on at least a 2 to 1 basis as intangible drilling costs; (b) that the tax deductions had been approved by the IRS and other taxing authorities; (c) that oil and gas leases would be acquired for the Partnerships; (d) that the Managing Partners, Coleman and Trevisani, had the requisite expertise to manage the Partnerships' business and protect their interests; (e) that the oils and gas drilling sites would be held by the Partnerships and drilled after the  Partnerships were constituted; (f) that the drilling costs incurred by the Partnerships would be paid from cash flow generated from producing oil and gas wells held by the Partnerships; (g) that distributions to Partnerships would be paid from cash flow generated from producing oil and gas wells held by the Partnerships;  (h) that the

29

Turnkey and Subscriptions Notes would be paid off from cash flow generated from producing oil and gas wells; (i) that it was possible Plaintiffs would receive a return of their investment from oil and gas revenues over a period of 10-12 years; and (j) that marketable securities would be purchased with cash distributions Plaintiffs assigned for the purchases and which would increase in value and pay down the drilling costs.

106.    The Siegal Defendants made these misrepresentations knowing that they were false, without any reasonable basis and with reckless disregard for their truth or falsity, with the intention of inducing Plaintiffs to rely on the misrepresentations and turn over substantial sums of money to Siegal.

107.    The Siegal Defendants, at the time they induced Plaintiffs to invest in the Partnerships, also failed to disclose material facts to Plaintiffs regarding the Partnerships, the deductibility of the IDC, the oil and gas drilling sites and return on their investments.  The material facts withheld specifically set forth above include, but are not limited to: (a) that the Partnership structures were tax shelters subject to registration with the IRS; (b) that the IRS had not approved the IDC deductions or issued any ruling any conclusions regarding ongoing audits; (c) that many of the drill sites had already been drilled and/or abandoned or capped even before the Partnerships were created; (e) that rights to drill sites and oil and gas interests were not held by the Partnerships; (f) that the Managing Partners, Coleman and Trevisani, had no expertise in managing the business of the Partnerships and choosing drilling sites (g) that there was no possibility that Plaintiffs would receive the return of their investments from oil and gas revenues; (h) that distributions to the Partnerships would be made through loans from unknown sources; (i) that the Turnkey and Subscription Notes would not be paid off with receipts from sales of oil and gas from successfully drilled wells held by the Partnerships; and (j) that no securities were purchased with distributions withheld from the partners purportedly for that purpose.

30

108.    The Siegal Defendants failed to disclose these material facts knowingly, deliberately and with the express intention of inducing Plaintiffs to invest in the Siegal Partnerships and to defraud Plaintiffs of their money..

109.    Plaintiffs, directly and through Byllott, relied on the representations of the Siegal Defendants and relied on them to disclose all material facts regarding the Partnerships and the propriety of the IDC tax deductions.

110.    Had Byllott and Plaintiffs been informed of the undisclosed material facts, Plaintiffs would not have invested in the Siegal Partnerships and would not have taken the IDC deductions they were led to believe were legitimate.

111.    As a direct and proximate result of the aforesaid material misrepresentations and omissions the Siegal Defendants, Plaintiffs have sustained and will sustain damages to be determined at trial but at least in excess of $1,600,000 they turned over in cash to the Siegal Defendants in connection with the purchase of their Partnership interests in Indian Village, Condor and Hurricane.

## THIRD CLAIM FOR RELIEF

### (Common Law Fraud against Josephson)

112.    Plaintiffs repeat and reallege paragraphs 1 to 111 above as if fully set forth herein.

113.    Josephson instigated the strategy of Plaintiffs investing in the Partnerships in lieu of paying taxes and completed the strategy by introducing Plaintiffs, directly and through Byllott, to the Siegal Partnerships and vouching for them.

114.    Josephson induced Plaintiffs to invest in Indian Village, recklessly and without conducting any investigation as to the basis for his statements as required by his fiduciary relationship with Byllott and Plaintiffs.

31

115.    Josephson misrepresented to Byllott and Plaintiffs: (a) that the investments were legitimately tax deductible; (b) that Siegal and Howard knew what they were doing; (c) that the Turnkey and Subscriptions Notes would be paid off from cash flow generated from producing oil and gas wells; and (d) that it was possible Plaintiffs would receive a return of their investment from oil and gas revenues.

116.    Josephson made these misrepresentations with reckless disregard for their truth or falsity, without any investigation and with the intention of inducing Plaintiffs to rely on the misrepresentations.

117.    At the time Josephson induced Plaintiffs to invest in the Partnerships, he failed to disclose to Byllott and Plaintiffs the material fact that he had not investigated or determined, as he should have as their trusted advisor, whether the IDC tax deductions were likely to be approved by the IRS or whether investors in other Siegal promoted partnerships had received revenues from oil and gas wells held by those partnerships.

118.    Josephson failed to disclose these material facts knowingly and recklessly.

119.    Byllott and Plaintiffs relied on the representations and omissions of  Josephson in proceeding with the strategy and in relying on the Siegal Defendants in investing in the Partnership instead of paying their taxes.

120.    Had Byllott and Plaintiffs been informed of the undisclosed material facts, Plaintiffs would not have invested in the Siegal Partnerships and would not have taken the IDC deductions they were led to believe were legitimate.

121.    As a direct and proximate result of the Josephson's material misrepresentations and omissions, Plaintiffs have sustained and will sustain damages in an amount to be determined at trial but at least in the amount of the $300,000 they invested in cash in Indian Village.

## FOURTH CLAIM FOR RELIEF

### (Aiding and Abetting the Siegal Defendants'
### Common Law Fraud against Coleman and Trevisani)

122.    Plaintiffs repeat paragraphs 1 to 121 above as if fully set forth herein.

123.    As set forth above, the Siegal Defendants perpetrated a fraud on the Plaintiffs with false representations and material omissions regarding, among other things, the Managing Partners of the Partnerships, Coleman and Trevisani.

124.    Coleman knowingly permitted himself to be named as Managing Partner of Indian Village and Condor, and Trevisani knowingly permitted himself to be named as Managing Partner of Hurricane.  The Siegal Defendants, in the Investment Proposals and the Partnership Agreements, represented that the Managing Partners of the Partnerships would carefully select the drilling sites and otherwise completely manage the affairs of the Partnership.

125.    Coleman and Trevisani knew that they had no expertise in choosing drilling sites as represented and knew that they would not perform the duties of a Managing Partner as set forth in the Partnerships documents.

126.    By permitting themselves to be named Managing Partners, signing the documents as Managing Partners and assisting the Siegal Defendants in perpetrating the fraud, Coleman and Trevisani provided substantial assistance to advance the fraud.  Through the fraud, Plaintiffs were deceived into believing that the Partnerships would be properly managed, with proper oversight.  Instead, Plaintiffs bought into Partnerships with no oversight or proper management.

127.    As a result of aiding and abetting the Siegal Defendants' fraud:  (a) Coleman is liable to Plaintiffs for the damages they incurred as a result of the fraud related to their investments in Indian Village and Condor in an amount to be determined at trial but at least in excess of $800,000; and (b) Trevisani is liable to Plaintiffs for the damages they incurred as a

33

result of the fraud related to Hurricane in an amount to be determined at trial but at least in the amount of $800,000.

## FIFTH CLAIM FOR RELIEF

### (Breach of Contract against Coleman)

128.    Plaintiffs repeat paragraphs 1 to 127 above as if fully set forth herein.

129.    As Managing Partner of Indian Village and Condor, Coleman entered into the Partnership Agreements described above.

130.    Plaintiffs became parties to those Partnership Agreements through executing the related Subscription Agreements.

131.    Pursuant to the Indian Village and Condor Partnership Agreements, Coleman was given plenary powers to manage all of the Partnerships' activities.

132.    In related agreements, Plaintiffs agreed with the Partnerships that, after they had received distributions from the Partnerships totaling the amount of the first year's interest payment on the Subscription Notes, 67% of future distributions from Indian Village and 75% of distributions from Condor would be withheld in order to purchase marketable securities to collateralize Plaintiffs' liability on the related Turnkey Notes.

133.    Pursuant to Section 6 of the Partnership Agreements, entitled "Rights Duties and Obligations of the Managing Partner," Coleman is required to distribute to the partners Partnership income over and above that required to fund the Partnerships' operations.

134.    Pursuant to Section 11 of the Partnership Agreements, Coleman, as Managing Partner, is obligated to maintain adequate books and records of account which will reflect the Partnership transactions.

135.    In memoranda dated January 28, 2005, Siegal informed Plaintiffs that their distributions had reached the level they had previously agreed would trigger the withholding

34

from Indian Village distributions to purchase securities. According to the memoranda, the funds withheld would be assigned to Siegal's company, SS&T, in order to purchase zero coupon bonds.

136.    In memoranda dated July 28, 2006, Coleman informed Plaintiffs that their distributions from Condor had reached the threshold for withholding to purchase securities and that the funds withheld would be assigned to SS&T to buy municipal bonds.

137.    In or about January 2005, and on or about July 28, 2006, Indian Village and Condor began withholding the funds from their distributions, and the quarterly notices of distribution to the Plaintiffs stated that the funds had been withheld to purchase securities.

138.    No such securities were ever purchased with the withheld distributions and there are no books and records indicating the use to which those distributions were put. Accordingly, Coleman breached Sections 6 and 11 of the Partnership Agreements by: (i) failing to distribute Partnership income due to Plaintiffs and diverting those funds to unknown purposes; and (ii) failing to maintain adequate books and records which would reflect the Partnerships' transactions with respect to those withheld distributions.

139.    Plaintiffs performed all their obligations under the Partnership Agreements.

140.    As a direct and proximate result of the aforesaid breaches of the Partnership Agreements, Plaintiffs sustained damages in an amount to be determined at trial but at least in the amount of the distributions withheld and improperly diverted.

## SIXTH CLAIM FOR RELIEF

### (Breach of Contract against Trevisani)

141.    Plaintiffs repeat paragraphs 1 to 140 above as if fully set forth herein.

142.    As Managing Partner of Hurricane, Trevisani entered into the Hurricane Partnership Agreement described above.

35

143.    Plaintiffs became parties to the Hurricane Partnership Agreement through executing the related Subscription Agreement.

144.    Pursuant to the Hurricane Partnership Agreement, Trevisani has plenary powers to manage all of the Partnership's activities.

145.    In a related agreement, Plaintiffs agreed with the Partnership that after they had received distributions from the Partnership totaling the amount of the first year's interest payment on the Subscription Note, 75% of future distributions would be withheld in order to purchase marketable securities to collateralize Plaintiffs' liability on the Turnkey Notes.

146.    Pursuant to Section 6 of the Partnership Agreement, entitled "Rights Duties and Obligations of the Managing Partner," Trevisani is required to distribute to the partners Partnership income over and above that required to fund the Partnerships' operations.

147.    Pursuant to Section 11 of the Partnership Agreements, Trevisani, as Managing Partner, is obligated to maintain adequate books and records of account which will reflect the Partnership transactions.

148.    In memoranda to Plaintiffs dated April 30, 2007, Trevisani informed Plaintiffs that their distributions had reached the level they had previously mutually agreed would trigger the 75% withholding to purchase securities. According to the April 30, 2007 memoranda, the funds withheld were to be assigned to Siegal's company, SS&T, in order to purchase municipal bonds.

149.    On or about April 30, 2007, Hurricane began withholding the funds from the Hurricane distributions and the quarterly notices of distribution to the Plaintiffs stated that the funds had been withheld to purchase securities.

150.    No such securities were ever purchased with the withheld distributions and no documents reflect their use. Accordingly, Trevisani breached Sections 6 and 11 of the

36

Partnership Agreement by: (i) failing to distribute to Partnership income due to Plaintiffs and diverting those funds to unknown purposes; and (ii) failing to maintain adequate books and records which would reflect the Partnership transactions with respect to those withheld distributions

151.    Plaintiffs performed all their obligations under the Partnership Agreement.

152.    As a direct and proximate result of the aforesaid breaches of the Partnership Agreement, Plaintiffs sustained damages in an amount to be determined at trial but at least in the amount of the distributions withheld and improperly diverted.

## SEVENTH CLAIM FOR RELIEF

### (Tortious Interference with Contractual Relations against Siegal)

153.    Plaintiffs repeat paragraphs 1 to 152 above as if fully set forth herein.

154.    As described above, Plaintiffs entered into valid Partnership Agreements, for the Indian Village, Condor and Hurricane Partnerships.

155.    Because he devised and promoted the Partnerships, Siegal knew of the existence of the Partnership Agreements and that Plaintiffs were parties to the agreements.  Siegal also knew of the Partnership Agreements because he signed the Prospect Agreements with the Partnerships as President of Palace and because he controlled the Siegal Companies which are parties to multiple agreements with the Partnerships.

156.    As set forth above, Siegal insinuated himself into the day to day management of the Partnerships and their books and records.  From this position he deliberately procured the breaches of the Partnership Agreements committed by Coleman and Trevisani as set forth herein. Siegal caused them to withhold the distributions which Plaintiffs had agreed would be applied to the purchase of securities but were in fact diverted to Siegal's company, SS&T.

157.    As a result of this intentional tortious interference with Plaintiffs' contractual relationships with Coleman, Trevisani and the Partnerships, Siegal is liable to Plaintiffs for the damages incurred from that interference in an amount to be determined at trial but at least in the amount of the distributions withheld.

## EIGHTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty against Coleman)

158.    Plaintiffs repeat paragraphs 1 to 157 above as if fully set forth herein.

159.    Coleman is the Managing Partner of Indian Village and Condor and is in a relationship of trust with his fellow partners, including Plaintiffs. Coleman owed a fiduciary to Plaintiffs arising from his position of trust.

160.    As Managing Partner with plenary powers to manage the Partnerships, Coleman's fiduciary duty obligated him to act at all times in the best interests of his partners in the management and decision making relating to the Partnerships. Plaintiffs trusted Coleman to act in their best interests as partners in Indian Village and Condor.

161.    Coleman breached his fiduciary duty to Plaintiffs directly by withholding distributions of Indian Village and Condor from Plaintiffs, from in or about January 2005, and on or about July 28, 2006 respectively, and assigning those funds to Siegal's company, SS&T, for purposes other than to purchase securities for Plaintiffs' benefit.

162.    As a direct and proximate result of Coleman's breaches of fiduciary duty, Plaintiffs have sustained damages in an amount to be determined at trial but at least in the amount of the withheld distributions from Indian Village and Condor.

## NINTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty against Trevisani)

163.    Plaintiffs repeat paragraphs 1 to 162 above as if fully set forth herein.

38

164.    Trevisani, as Managing Partner of Hurricane, is in a relationship of trust towards his fellow partners, including Plaintiffs.  Trevisani owed a fiduciary duty to Plaintiffs arising from his position of trust.

165.    As Managing Partner with plenary powers to manage the Partnership, Trevisani's fiduciary duty obligated him to act at all times in the best interests of his fellow partners in the management and decision making relating to the Partnership.  Plaintiffs trusted Trevisani to act in their best interests as partners in Hurricane.

166.    Trevisani breached his fiduciary duty to Plaintiffs directly by withholding distributions of Hurricane's income from Plaintiffs, from April 30, 2007 onwards, and assigning those funds to Siegal's company, SS&T, for purposes other than to purchase securities for Plaintiffs' benefit.

167.    As a direct and proximate result of Trevisani's breach of fiduciary duty directly to them, Plaintiffs have sustained damages in an amount to be determined at trial but at least in the amount of the withheld distributions.

## TENTH CLAIM FOR RELIEF

### (Aiding and Abetting Trevisani's and Coleman's Breach of Fiduciary Duty Against Siegal)

168.    Plaintiffs repeat paragraphs 1 to 167 above as if fully set forth herein.

169.    As set forth above, Coleman was the Managing Partner of Indian Village and Condor, and Trevisani was the Managing Partner of Hurricane and each breached their fiduciary duties to Plaintiffs.

170.    As the promoter of Indian Village, Condor and Hurricane, and by insinuating himself into the day to day management of the Partnerships, Siegal knowingly participated in Coleman's and Trevisani's breaches of their fiduciary duty to Plaintiffs.

39

171.    As a result of Siegal's aiding and abetting Coleman's and Trevisani's breaches of

fiduciary duty, Plaintiffs have sustained damages in an amount to be determined at trial but at

least in the amount of the withheld distributions.

## ELEVENTH CLAIM FOR RELIEF

**(Declaratory Judgment Pursuant to 28 U.S.C. § 2201 Against Siegal Defendants)**

172.    Plaintiffs repeat paragraphs 1 to 171 above as if fully set forth herein.

173.    As a result of the wrongdoing of the Siegal Defendants as set forth above,

Plaintiffs' tax returns in connection with their investment in Indian Village, Condor and

Hurricane are currently subject to audit and the IRS has indicated that the IDC tax deductions

will likely be disallowed and penalties imposed.

174.    The IRS has indicated it will likely disallow the IDC tax deductions and assess

penalties on the basis of, among other things, the Partnerships not owning a working interest in

the oil and gas drilling sites, the IDC being incurred before investors participated in the specific

Partnership, and the sites having been drilled and abandoned before the Partnerships were

constituted.

175.    The likelihood that Plaintiffs will incur penalties as a result of the defendants'

wrongdoing, renders the Siegal Defendants liable for the penalties Plaintiffs may incur in the

future with respect to all three Partnerships

176.    Accordingly, Plaintiffs are entitled to a declaratory judgment that the Siegal

Defendants are liable to Plaintiffs in the amount that may be assessed for penalties for Indian

Village, Condor and Hurricane and the cost of defending the audits.

**TWELTH CLAIM FOR RELIEF**

**(Declaratory Judgment pursuant to 28 U.S.C. § 2201 based upon
Professional Malpractice Against Guralnick Defendants)**

177.    Plaintiffs repeat paragraphs 1 to 176 above as if fully set forth herein.

178.    Guralnick has for more than fifteen years been retained by Siegal to render full accounting and tax services to the Partnerships.  The services included preparing tax returns for Hurricane and the K-1s for Plaintiffs for the 2004 tax year so they could report their share of the Partnership's income and expenses to taxing authorities.

179.    In 2005, Guralnick transmitted to the Hurricane Partnership the tax returns and K-1's he prepared and knew and intended that the Hurricane Partnership would forward the Schedules K-1 to Plaintiffs, and that Plaintiffs would rely on them to complete their Federal and New York State tax returns for 2004.

180.    Guralnick owed a duty to the Hurricane Partnership to exercise due care in the performance of his professional services.  That duty of care was also owed to Plaintiffs as member-partners of the Partnership.  Guralnick's duty of care requires him to adhere to generally accepted accounting principles and standards and the rules and regulations of taxing authorities.

181.    As an accounting professional and tax preparer, Guralnick knew that the Plaintiffs could only take a tax deduction for the portion of any IDC incurred after the date they joined the Partnership.

182.    In order to prepare the Hurricane Partnership return and the Plaintiffs' K-1s for the 2004 tax year, Guralnick should have reviewed the Partnership's books and records including information identifying the date the Partnership was created in 2004 and the date the Plaintiffs invested in the Partnership.

183.    From those records, Guralnick knew, or should have known, that Plaintiffs did not invest in Hurricane until December 9, 2004.  He also knew, or should have known, that, according to the Partnership Agreement, the Partnership was created on August 1, 2004. Nevertheless, in preparing Plaintiffs' K-1s for Hurricane for the year 2004, Guralnick departed from accepted accounting practice and, instead of allocating to Plaintiffs only their portion of the IDC incurred after the date of their investments, he improperly prepared the Partnership tax returns and the K-1s by allocating a much larger portion of Hurricane's IDC for 2004 based on Plaintiffs' percentage investment in the Partnership.

184.    This overstatement in improperly prepared K-1s was a departure from accepted professional accounting practice and a breach of the professional duty of care he owed to Plaintiffs.  This breach of duty resulted in Plaintiffs taking a larger tax deduction for IDC than they were entitled to deduct for 2004.

185.    As a direct and proximate result of Guralnick's breach of his professional duty, Plaintiffs will likely be damaged as a result of the penalties the IRS has indicated will be assessed against them for underpayment of 2004 taxes, which underpayment is greater due to Guralnick's malpractice.  The Guralnick Defendants are liable to Plaintiffs for that portion of the penalties assessed by any taxing authority as a result of the preparation of improper K-1s for Plaintiffs as partners of Hurricane for the 2004 tax year.  They are also liable to Plaintiffs for that portion of expenses incurred in defending against the audit related to Hurricane.

186.    Accordingly, a declaratory judgment pursuant to 28 U.S.C. § 2201 based upon professional malpractice against the Guralnick Defendants should be granted.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all issues so triable.

**WHEREFORE**, Plaintiffs demand judgment:

1.      On their First Claim, for violation of Section 10(b) of the Exchange Act and Rule 10b-5: (a) against the Siegal Defendants in an amount to be determined at trial but not less than the total net loss of their investments in Indian Village, Condor and Hurricane; (b) against Josephson in an amount to be determined at trial but not less than the total net loss of their investments in Indian Village;

2.      On their Second Claim, for common law fraud against the Siegal Defendants in an amount to be determined at trial but not less than the total net loss of their investments in Indian Village, Condor and Hurricane;

3.      On their Third Claim, for common law fraud against Josephson in an amount to be determined at trial but not less than the total net loss of their investments in Indian Village;

4.      On their Fourth Claim, for aiding and abetting common law fraud: (a)  against Coleman in an amount to be determined at trial but not less than the total net loss of their investments in Indian Village and Condor; and (b) against Trevisani in an amount to be determined at trial but not less than the total net loss of their investments in Hurricane;

5.      On their Fifth Claim, for breach of contract against Coleman in an amount to be determined at trial but not less than the total amounts withheld from Plaintiffs from their Indian Village and Condor distributions;

6.      On their Sixth Claim, for breach of contract against Trevisani in an amount to be determined at trial but not less than the total amounts withheld from Plaintiffs from their Hurricane distributions;

7.      On their Seventh Claim, for tortious interference with contractual relations against Siegal in an amount to be determined at trial but not less than the total amounts withheld from Plaintiffs from their Indian Village, Condor and Hurricane distributions;

43

8.      On their Eighth Claim, for breach of fiduciary duty against Coleman in an amount to be determined at trial but not less than the total amounts withheld from Plaintiffs from their Indian Village and Condor distributions;

9.      On their Ninth Claim, for breach of fiduciary duty against Trevisani in an amount to be determined at trial but not less than the total amounts withheld from Plaintiffs from their Hurricane distributions;

10.     On their Tenth Claim, for aiding abetting Coleman's and Trevisani's breach of fiduciary duty against Siegal in an amount to be determined at trial but not less than the total amounts withheld from Plaintiffs from their Indian Village, Condor and Hurricane distributions;

11.     On their Eleventh Claim, for declaratory judgment pursuant to 28 U.S.C. § 2201 against the Siegal Defendants in an amount to be determined at trial but not less than the total amounts likely to be assessed as penalties against Plaintiffs by the IRS and other taxing authorities arising from their investments in Indian Village, Condor and Hurricane and the costs of defending the taxing authorities' audits;

12.     On their Twelfth Claim, for declaratory judgment pursuant to 28 U.S.C. § 2201 against the Guralnick Defendants in an amount to be determined at trial but not less than the total amounts likely to be assessed as penalties against Plaintiffs by the IRS and other taxing authorities arising from their investments in Hurricane and the costs  incurred in defending  the taxing authorities' audits;

13.     Together with interest thereon and the costs and disbursements of this action; and

44

14.     Granting such other and further relief as the Court deems just and proper.


Dated: New York, New York
       May 2, 2008

STORCH AMINI & MUNVES PC

Steven G. Storch (SS-5241)
Kathleen E. Wright (KW-5439)
Two Grand Central Tower, 25th Floor
140 East 45th Street
New York, New York 10017
Tel. (212) 490-4100
Attorneys for Plaintiffs

EXHIBIT B

## COMPARISON OF CLAIMS

| Claim # | First Amended Complaint | Proposed Second Amended Complaint |
|---|---|---|
| First Claim | Violation of Section 10(b) of the Exchange Act and Rule 10b-5<br><br>**Against:** Siegal, Josephson, Coleman, Trevisani, Howard, Guralnick, SLG | Violation of Section 10(b) of the Exchange Act and Rule 10b-5<br><br>**Against:** Siegal, Siegal Companies[1], Howard and Josephson |
| Second Claim | Common Law Fraud/Fraudulent Inducement<br><br>**Against:** All defendants | Common Law Fraud<br><br>**Against:** Siegal, Siegal Companies, and Howard ("Siegal Defendants") |
| Third Claim | Common Law Fraud/Fraudulent Non-disclosure<br><br>**Against:** All defendants | Common Law Fraud<br><br>**Against:** Josephson |
| Fourth Claim | Negligent Misrepresentation<br><br>**Against:** All defendants | Aiding and Abetting Siegal's Common Law Fraud<br><br>**Against:** Coleman and Trevisani |
| Fifth Claim | Breach of Fiduciary Duty<br><br>**Against:** Siegal, Josephson, Coleman, Trevisani, Guralnick, SLG | Breach of Contract<br><br>**Against:** Coleman |
| Sixth Claim | Breach of Contract<br><br>**Against:** Coleman, Trevisani, Siegal Companies | Breach of Contract<br><br>**Against:** Trevisani |
| Seventh Claim | Professional Malpractice<br><br>**Against:** Guralnick, SLG, Trevisani | Tortious Interference with Contractual Relations<br><br>**Against:** Siegal |
| Eighth Claim | No Claim | Breach of Fiduciary Duty<br><br>**Against:** Coleman |

---

[1] Bistate Oil Management Corporation, SS&T Holding Co., LLC, Palace Exploration Company, TAH Drilling Co., Inc., TAQ Drilling Co., Inc., and Oil and Gas Title Holding Corporation.

| Claim # | First Amended Complaint | Proposed Second Amended Complaint |
|---|---|---|
| Ninth Claim | No Claim | Breach of Fiduciary Duty<br><br>**Against:** Trevisani |
| Tenth Claim | No Claim | Aiding and Abetting Trevisani's and Coleman's Breach of Fiduciary Duty<br><br>**Against:** Siegal |
| Eleventh Claim | No Claim | Declaratory Judgment Pursuant to 28 U.S.C. §2201<br><br>**Against:** Siegal Defendants |
| Twelfth Claim | No Claim | Declaratory Judgment pursuant to 28 U.S.C. § 2201 based upon Professional Malpractice<br><br>**Against:** Guralnick Defendants |

# EXHIBIT C

APR-29-2008  01:27          STORCH AMINI & MUNVES PC                    212 490 4208      P.02



RECEIVED
APR 2 9 2008
CHAMBERS OF
LEONARD B. SAND

STORCH AMINI MUNVES PC
A New York Professional Corporation

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4-29-08

KATHLEEN E. WRIGHT
Member NY and NJ Bars

April 29, 2008

**VIA FACSIMILE**

Hon. Leonard B. Sand
United States District Court Judge
Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street, Room 1650
New York, New York  10007

     Re:  *Nathel v. Siegal et al.* 07 Civ. 10956 (LBS)

Dear Judge Sand:

     This firm represents the plaintiffs in the above-referenced action.  I write to request leave to file an enlarged memorandum of law in opposition to the defendants' motions to dismiss the complaint.  Defendants have made four separate motions to dismiss all the claims asserted against all the defendants.  Due to the extent of the arguments necessary to address the multiple motions, I request leave to file a memorandum of law of thirty-five (35) pages in length if necessary.

     Since the due date of Plaintiffs' opposition is May 2, 2008, I appreciate your permitting this letter to be sent via facsimile.

     I appreciate the Court's kind attention to this request.

               Respectfully submitted,

               Kathleen E. Wright

cc:  Sean R. O'Brien, Esq. (*via email*)
     John H. Eickemeyer, Esq. (*via email*)
     Scott M. Himes, Esq. (*via email*)
     Susan B. Ratner, Esq. (*via email*)

*Granted*
*/s/ B Sand*
*USDJ*
4/29/08

2 Grand Central Tower   New York, New York 10017   Tel: 212.490.4100   Fax: 212.490.4208   E-mail: kwright@samlegal.com
Washington, DC   South River, NJ

**MEMO ENDORSED**

MEMO ENDORSED *(vertical, left margin)*

TOTAL P.02