UNITED STATES DISTRICT COURT                          **FILED ELECTRONICALLY**
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

IRA NATHEL AND SHELDON NATHEL,                    :

            Plaintiffs,                       :

       - against -                              :

RICHARD SIEGAL, GEORGE COLEMAN,              :     07 CIV. 10956 (LBS) (HBP)
HARVEY JOSEPHSON, ROBERT A.                   :
TREVISANI, PAUL HOWARD, RICHARD S.            :
GURALNICK, SCHAIN LEIFER GURALNICK,           :
BISTATE OIL MANAGEMENT                         :     **DECLARATION**
CORPORATION, SS&T HOLDING CO., LLC,           :
PALACE EXPLORATION COMPANY, TAH               :
DRILLING CO., INC., TAQ DRILLING CO.,          :
INC., OIL AND GAS TITLE, HOLDING              :
CORPORATION, JOHN DOES 1-20; JOHN DOE         :
CORPORATIONS 1-20; JOHN DOE LLCs 1-20;         :
and JOHN DOE LLPs 1-20,                        :

            Defendants.                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

       SCOTT M. HIMES, hereby declares, under penalty of perjury pursuant to 28

U.S.C. § 1746, as follows:

       1.    I am an attorney admitted to practice in New York and before this Court

and am a member of Stillman, Friedman & Shechtman, P.C., counsel for Defendants George

Coleman and Robert A. Trevisani in this action. I submit this Declaration in connection with the

reply on our motion to dismiss Plaintiffs' First Amended Complaint and in opposition to

Plaintiffs' cross-motion to file a proposed Second Amended Complaint.

       2.    The purpose of this Declaration is to submit to the Court certain

documents referred to in Plaintiffs' proposed Second Amended Complaint and which are thereby

incorporated by reference in, and integral to, that proposed pleading. As set forth in our

accompanying Memorandum of Law in reply/opposition, provisions in these documents are pertinent to Plaintiffs' proposed claims, demonstrating why those claims fail as a matter of law. As also set forth in the accompanying Memorandum, I respectfully submit that the Court can consider these documents on Defendants' motion and Plaintiffs' cross-motion. (*See* accompanying Reply/Opposition Memorandum of Law, at 6)

      3.    The following documents are submitted herewith (under separate cover):

**A.**    <u>**The Subscription Agreements Plaintiffs Executed**</u>
      **[Referred to in Memorandum of Law, Point I.A.]**

    (i)    Exhibit 1:  Subscription Agreement, Indian Village Drilling Company, executed by Plaintiff Ira Nathel

    (ii)    Exhibit 2:  Subscription Agreement, Condor Drilling Company, executed by Plaintiff Ira Nathel

    (iii)    Exhibit 3:  Subscription Agreement, Hurricane Drilling Company, executed by Plaintiff Ira Nathel

    (iv)    Exhibit 4:  Subscription Agreement, Indian Village Drilling Company, executed by Plaintiff Sheldon Nathel

    (v)    Exhibit 5:  Subscription Agreement, Condor Drilling Company, executed by Plaintiff Sheldon Nathel

    (vi)    Exhibit 6:  Subscription Agreement, Hurricane Drilling Company, executed by Plaintiff Sheldon Nathel

**B.**    <u>**The Partnership Agreements Pertaining to Plaintiffs' Interests**</u>
      **[Referred to in Memorandum of Law, Points II.A., B.]**

    (i)    Exhibit 7:  Agreement and Certificate of Partnership of Indian Village Drilling Company

    (ii)    Exhibit 8:  Agreement and Certificate of Partnership of Condor Drilling Company

    (iii)    Exhibit 9:  Agreement and Certificate of Partnership of Hurricane Drilling Company

4.      I received the foregoing documents, through counsel, from co-defendant parties who maintain the records of the Indian Village Drilling Company Partnership, the Condor Drilling Company Partnership and the Hurricane Drilling Company Partnership.  As such, I understand that these documents were made and kept for the Partnerships in the regular course of the Partnerships' business and activities.  I believe that the attached are true and accurate copies of such documents.

5.      I note, additionally, that the Partnership Agreements are unsigned. However, pursuant to each of the Subscription Agreements (which each Plaintiff signed for each Partnership), "[t]he signature of the undersigned [Plaintiff] to this Subscription Agreement may be deemed for all purposes as the execution of the Partnership Agreement by the undersigned to the same extent and effect as if the undersigned has signed the Partnership Agreement on the date of the acceptance of this subscription . . . ." (Exs. 1-6, at ¶ 5)  As such, Plaintiffs are bound to the Partnership Agreements by virtue of their executing the Subscription Agreements.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_____

SCOTT M. HIMES

Executed:  June 26, 2008

3

UNITED STATES DISTRICT COURT  **FILED ELECTRONICALLY**
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

IRA NATHEL AND SHELDON NATHEL,  :
               :
    Plaintiffs,       :
               :
   - against -      :
               :
RICHARD SIEGAL, GEORGE COLEMAN, : 07 CIV. 10956 (LBS) (HBP)
HARVEY JOSEPHSON, ROBERT A.  :
TREVISANI, PAUL HOWARD, RICHARD S. :
GURALNICK, SCHAIN LEIFER GURALNICK, :
BISTATE OIL MANAGEMENT   :
CORPORATION, SS&T HOLDING CO., LLC, :
PALACE EXPLORATION COMPANY, TAH :
DRILLING CO., INC., TAQ DRILLING CO., :
INC., OIL AND GAS TITLE, HOLDING :
CORPORATION, JOHN DOES 1-20; JOHN DOE :
CORPORATIONS 1-20; JOHN DOE LLCs 1-20; :
and JOHN DOE LLPs 1-20,   :
               :
    Defendants.      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


## EXHIBITS TO DECLARATION OF SCOTT M. HIMES

  Exhibit 1:  Subscription Agreement, Indian Village Drilling Company,
  executed by Plaintiff Ira Nathel

  Exhibit 2:  Subscription Agreement, Condor Drilling Company, executed
  by Plaintiff Ira Nathel

  Exhibit 3:  Subscription Agreement, Hurricane Drilling Company,
  executed by Plaintiff Ira Nathel

  Exhibit 4:  Subscription Agreement, Indian Village Drilling Company,
  executed by Plaintiff Sheldon Nathel

  Exhibit 5:  Subscription Agreement, Condor Drilling Company, executed
  by Plaintiff Sheldon Nathel

Exhibit 6:  Subscription Agreement, Hurricane Drilling Company, executed by Plaintiff Sheldon Nathel

Exhibit 7:  Agreement and Certificate of Partnership of Indian Village Drilling Company

Exhibit 8:  Agreement and Certificate of Partnership of Condor Drilling Company

Exhibit 9:  Agreement and Certificate of Partnership of Hurricane Drilling Company

# EXHIBIT 1

## SUBSCRIPTION AGREEMENT

To: Mr. George G. Coleman
55 Babylon Turnpike
Freeport, NY 11520

RE: *Indian Village Drilling Company*
A New York Partnership
(the "Partnership")

Gentlemen:

1.    Subscription.   The undersigned hereby subscribes for and agrees to purchase 1.50 Partnership Units in *INDIAN VILLAGE DRILLING COMPANY*, a New York partnership, at a price of $250,000, per Unit, and agrees to pay therefore the sum of $375,000., which shall be paid as follows:  Closing, $150,000. cash plus the execution of a full recourse promissory note in the amount of $225,000. bearing interest at the rate of 8% per annum due December 31, 2018, except for the period from the date of the Note to December 31, 2003, when it will bear interest at the rate of 1% per annum.

2.    Acceptance or Rejection.   The undersigned understands that George G. Coleman, the Managing Partner ("the "Managing Partner) of the Partnership, in his sole discretion and for any reason, may accept or reject this subscription, in whole or in part.

3.    No Escrow of Subscription.  The undersigned understands that the total amount subscribed will NOT be deposited in a special account and may be used to fund Partnership Operations except for the payment of the Managing Partner's Management Fee. The total amount subscribed will be returned to the undersigned without interest if this subscription has not been accepted and is subsequently rejected by the Managing Partner of the Partnership as provided in this Agreement. It is understood and agreed that if this subscription is accepted by the Managing Partner, the funds tendered herewith shall be deposited to the general account of the Partnership. No funds will be expended by the Partnership until at least eight Units are subscribed for and accepted by the Managing Partner. Funds shall be considered Partnership assets in payment for the number of Units set forth on the signature page hereof, or such lesser number as may be allocated to the undersigned by the Managing Partner, provided the Partnership's offering of Units is closed. If the undersigned is allocated less than the number of Units subscribed and the full purchase price of the Units subscribed has been timely paid in full,  the Managing Partner shall remit the balance of the subscription amount paid, if any, without interest, to the undersigned within thirty (30) days after such partial acceptance of this subscription.

4.    Information.  The undersigned acknowledges that: (1) the offering of Units was made only through direct, personal communication between the undersigned and the Managing Partner or his duly authorized representative;  (2) the undersigned has had the opportunity to obtain all additional information desired in order to verify an investment in the Partnership, including but not limited to the commission or finder's fee, if any, payable in connection with this

subscription by the undersigned; and (3) the undersigned has been advised in writing by the Managing Partner that a purchaser of Units must be prepared to bear the economic risk of such investment for an indefinite period because of (a) the nature of an investment in oil or gas exploration and development; (b) the Units have not been registered under the Securities Act of 1933, may not be registered or qualified under the state securities laws applicable to the purchase of Units by the undersigned in reliance upon an available exemption therefrom and hence cannot be sold unless they are subsequently so registered, which is not likely, or exemptions from such registration requirements are available; and (c) the Units will be subject to substantial restrictions on transfer as set forth in, among other documents, this Subscription Agreement and the Agreement and Certificate of Partnership of Indian Village Drilling Company (the "Partnership Agreement");(d) the Managing Partner has the absolute discretion to select properties for the purpose of purchase, lease or development in connection;(e) the Managing Partner is or may be a partner in other partnerships which may compete with Indian Village Drilling Company. The Managing Partner shall have no liability to any Partner with respect to the selection of such properties for the Partnership or in the event that another Partnership in which the Managing Partner is a partner such properties independently of the Partnership.

5.     Execution of Agreement.     When accepted by the Managing Partner, in whole or in part, this subscription shall be valid and binding on the undersigned and the Partnership for all purposes, subject to the provisions of paragraph 3(b) above. The undersigned represents and warrants that the undersigned has received and read and understands the Partnership Agreement. The signature of the undersigned to this Subscription Agreement may be deemed for all purposes as the execution of the Partnership Agreement by the undersigned to the same extent and effect as if the undersigned has signed the Partnership Agreement on the date of the acceptance of this subscription by you. The undersigned agrees to execute the Partnership agreement page and, if requested, the Agreement, the Certificate of Partnership, any amendment to either of such documents, or a multiple original copy of any of such document.

6.     Restrictions on Transfer.     The undersigned understands and acknowledges that the Partnership Agreement contains certain provisions restricting the transfer of the Units subscribed for hereby and to which the undersigned will be bound. If this subscription is accepted in whole or in part, the undersigned further agrees that for a period of twenty-four (24) months after the date of such acceptance, the undersigned, under no circumstances will sell, pledge or transfer, or attempt to sell, pledge or transfer all or any part of the Units allocated to the undersigned. In addition, the undersigned agrees that if this subscription is accepted, in whole or in part, the undersigned will not sell or transfer nor attempt to sell or transfer all or any part of the Units allocated to the undersigned unless such Units have first been registered under the Federal Securities act of 1933 and all applicable similar state statutes, or the undersigned first furnishes an opinion of counsel satisfactory to you, stating that exemptions from such registration requirements are available and that the proposed sale is not, and will not place the Partnership, the Managing Partner, nor any of his Affiliates in violation of any applicable federal or state securities law, or any rule or regulation thereunder. The undersigned further understands and agrees that any such transfer will also be subject to the restrictions on transfer contained in the Partnership Agreement.

7.     The undersigned represents that the following initialed statements are true:

_____(a) The undersigned individual's net worth, or joint net worth with the undersigned's spouse at this time exceeds $1,000,000.00.

-2-

_____ (b) The undersigned's individual income in each of the two most recent years was either (i) in excess of $200,000.00 or (ii) joint income with the undersigned's spouse was in excess of $300,000.00 and has a reasonable expectation of reaching the same income level in the current year.

The undersigned acknowledges that the Managing Partner will be relying on the truth and accuracy of the foregoing representation in determining whether to accept or reject this Subscription Agreement, and further acknowledges that this representation acts as an inducement to the Managing Partner to accept the Subscription Agreement.

Dated: _____

Subscription for 1.50 Units,
at $250,000 per Unit.

$375,000. total.

Amount Enclosed: $

_____
Signature

Ira Nathel
_____
Print Name

24 The Glen
_____
Residence Address

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
_____
Identification Number

Glen Head        NY        11545
_____
City        State        Zip

## MANAGING PARTNER'S ACCEPTANCE/REJECTION

Subscription of _IRA NATHEL_ _____ (accepted) ████████ for 1.50 Unit(s) of Partnership Interest and his required initial cash contribution of $ 150000 _____ in payment therefor is hereby (acknowledged) ████████ in full without interest.

Dated: _____

_____
George G. Coleman
Managing Partner

-3-

# EXHIBIT 2

## SUBSCRIPTION AGREEMENT

To:  Mr. George G. Coleman
     475 Northern Boulevard
     Great Neck, NY 11021

                         RE:  *Condor Drilling Company*
                              A New York Partnership
                              (the "Partnership")

Gentlemen:

1.  Subscription.  The undersigned hereby subscribes for and agrees to purchase 2.50 Partnership Units in *CONDOR DRILLING COMPANY*, a New York partnership, at a price of $280,000. per Unit, and agrees to pay therefore the sum of $700,000., which shall be paid as follows: Closing, $250,000. cash plus the execution of a full recourse promissory note in the amount of $450,000. bearing interest at the rate of 8% per annum due December 31, 2018, except for the period from the date of the Note to December 31, 2003, when it will bear interest at the rate of 1% per annum.

2.  Acceptance or Rejection.  The undersigned understands that George G. Coleman, the Managing Partner (the "Managing Partner) of the Partnership, in his sole discretion and for any reason, may accept or reject this subscription, in whole or in part.

3.  No Escrow of Subscription.  The undersigned understands that the total amount subscribed will NOT be deposited in a special account and may be used to fund Partnership Operations except for the payment of the Managing Partner's Management Fee. The total amount subscribed will be returned to the undersigned without interest if this subscription has not been accepted and is subsequently rejected by the Managing Partner of the Partnership as provided in this Agreement. It is understood and agreed that if this subscription is accepted by the Managing Partner, the funds tendered herewith shall be deposited to the general account of the Partnership. No funds will be expended by the Partnership until at least eight Units are subscribed for and accepted by the Managing Partner. Funds shall be considered Partnership assets in payment for the number of Units set forth on the signature page hereof, or such lesser number as may be allocated to the undersigned by the Managing Partner, provided the Partnership's offering of Units is closed. If the undersigned is allocated less than the number of Units subscribed and the full purchase price of the Units subscribed has been timely paid in full, the Managing Partner shall remit the balance of the subscription amount paid, if any, without interest, to the undersigned within thirty (30) days after such partial acceptance of this subscription.

4.  Information.  The undersigned acknowledges that: (l) the offering of Units was made only through direct, personal communication between the undersigned and the Managing Partner or his duly authorized representative; (2) the undersigned has had the opportunity to obtain all additional information desired in order to verify an investment in the Partnership, including but not limited to the commission or finder's fee, if any, payable in connection with this

subscription by the undersigned; and (3) the undersigned has been advised in writing by the Managing Partner that a purchaser of Units must be prepared to bear the economic risk of such investment for an indefinite period because of (a) the nature of an investment in oil or gas exploration and development; (b) the Units have not been registered under the Securities Act of 1933, may not be registered or qualified under the state securities laws applicable to the purchase of Units by the undersigned in reliance upon an available exemption therefrom and hence cannot be sold unless they are subsequently so registered, which is not likely, or exemptions from such registration requirements are available; and (c) the Units will be subject to substantial restrictions on transfer as set forth in, among other documents, this Subscription Agreement and the Agreement and Certificate of Partnership of Condor Drilling Company (the "Partnership Agreement");(d) the Managing Partner has the absolute discretion to select properties for the purpose of purchase, lease or development in connection;(e) the Managing Partner is or may be a partner in other partnerships which may compete with Condor Drilling Company. The Managing Partner shall have no liability to any Partner with respect to the selection of such properties for the Partnership or in the event that another Partnership in which the Managing Partner is a partner such properties independently of the Partnership.

5.    Execution of Agreement.    When accepted by the Managing Partner, in whole or in part, this subscription shall be valid and binding on the undersigned and the Partnership for all purposes, subject to the provisions of paragraph 3(b) above. The undersigned represents and warrants that the undersigned has received and read and understands the Partnership Agreement. The signature of the undersigned to this Subscription Agreement may be deemed for all purposes as the execution of the Partnership Agreement by the undersigned to the same extent and effect as if the undersigned has signed the Partnership Agreement on the date of the acceptance of this subscription by you. The undersigned agrees to execute the Partnership agreement page and, if requested, the Agreement, the Certificate of Partnership, any amendment to either of such documents, or a multiple original copy of any of such document.

6.    Restrictions on Transfer.    The undersigned understands and acknowledges that the Partnership Agreement contains certain provisions restricting the transfer of the Units subscribed for hereby and to which the undersigned will be bound. If this subscription is accepted in whole or in part, the undersigned further agrees that for a period of twenty-four (24) months after the date of such acceptance, the undersigned, under no circumstances will sell, pledge or transfer, or attempt to sell, pledge or transfer all or any part of the Units allocated to the undersigned. In addition, the undersigned agrees that if this subscription is accepted, in whole or in part, the undersigned will not sell or transfer nor attempt to sell or transfer all or any part of the Units allocated to the undersigned unless such Units have first been registered under the Federal Securities act of 1933 and all applicable similar state statutes, or the undersigned first furnishes an opinion of counsel satisfactory to you, stating that exemptions from such registration requirements are available and that the proposed sale is not, and will not place the Partnership, the Managing Partner, nor any of his Affiliates in violation of any applicable federal or state securities law, or any rule or regulation thereunder. The undersigned further understands and agrees that any such transfer will also be subject to the restrictions on transfer contained in the Partnership Agreement.

7.    The undersigned represents that the following initialed statements are true:

_____(a) The undersigned individual's net worth, or joint net worth with the undersigned's spouse at this time exceeds $1,000,000.00.

-2-

_____ (b) The undersigned's individual income in each of the two most recent years was either (i) in excess of $200,000.00 or (ii) joint income with the undersigned's spouse was in excess of $300,000.00 and has a reasonable expectation of reaching the same income level in the current year.

The undersigned acknowledges that the Managing Partner will be relying on the truth and accuracy of the foregoing representation in determining whether to accept or reject this Subscription Agreement, and further acknowledges that this representation acts as an inducement to the Managing Partner to accept the Subscription Agreement.

Dated: _____

Subscription for 2.50 Units,
at $280,000 per Unit.

$700,000. total.

_____
Signature

Amount Enclosed: $ _____

Ira Nathel
Print Name

24 The Glen
Residence Address

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                    Glen Head        NY        11545
Identification Number          City        State        Zip

## MANAGING PARTNER'S ACCEPTANCE/REJECTION

Subscription of   IRA NATHEL   (accepted) ▐▐▐▐ for 2.50 Unit(s) of Partnership Interest and his required initial cash contribution of $ 250,000 in payment therefor is hereby (acknowledged) ▐▐▐▐ in full without interest.

Dated: _____

_____
George G. Coleman
Managing Partner

-3-

# EXHIBIT 3

## SUBSCRIPTION AGREEMENT

To: Robert A. Trevisani
475 Northern Boulevard-Suite 20
Great Neck, New York 11021

RE: *Hurricane Drilling Company*
A New York Partnership
(the "Partnership")

Gentlemen:

1.    Subscription.    The undersigned hereby subscribes for and agrees to purchase Four Partnership Units in *HURRICANE DRILLING COMPANY*, a New York partnership, at a price of $280,000. per Unit, and agrees to pay therefore the sum of $1,120,000., which shall be paid as follows:   Closing, $400,000. cash plus the execution of a full recourse Subscription Note in the amount of $720,000. bearing interest at the rate of 8% per annum due December 31, 2019, except for the period from the date of the Note to December 31, 2004, when it will bear interest at the rate of 1% per annum.

2.    Acceptance or Rejection.    The undersigned understands that Robert A. Trevisani, the Managing Partner ( the "Managing Partner") of the Partnership, in his sole discretion and for any reason, may accept or reject this subscription, in whole or in part.

3.    No Escrow of Subscription.    The undersigned understands that the total amount subscribed will NOT be deposited in a special account and may be used to fund Partnership Operations except for the payment of the Managing Partner's Management Fee. The total amount subscribed will be returned to the undersigned without interest if this subscription has not been accepted and is subsequently rejected by the Managing Partner of the Partnership as provided in this Agreement. It is understood and agreed that if this subscription is accepted by the Managing Partner, the funds tendered herewith shall be deposited to the general account of the Partnership. No funds will be expended by the Partnership until at least eight Units are subscribed for and accepted by the Managing Partner. Funds shall be considered Partnership assets in payment for the number of Units set forth on the signature page hereof, or such lesser number as may be allocated to the undersigned by the Managing Partner, provided the Partnership's offering of Units is closed. If the undersigned is allocated less than the number of Units subscribed and the full purchase price of the Units subscribed has been timely paid in full, the Managing Partner shall remit the balance of the subscription amount paid, if any, without interest, to the undersigned within thirty (30) days after such partial acceptance of this subscription.

4.    Information.    The undersigned acknowledges that: (1) the offering of Units was made only through direct, personal communication between the undersigned and the Managing Partner or his duly authorized representative;  (2) the undersigned has had the opportunity to obtain all additional information desired in order to verify an investment in the Partnership, including but not limited to the commission or finder's fee, if any, payable in connection with this

subscription by the undersigned; and (3) the undersigned has been advised in writing by the Managing Partner that a purchaser of Units must be prepared to bear the economic risk of such investment for an indefinite period because of (a) the nature of an investment in oil or gas exploration and development; (b) the Units have not been registered under the Securities Act of 1933, may not be registered or qualified under the state securities laws applicable to the purchase of Units by the undersigned in reliance upon an available exemption therefrom and hence cannot be sold unless they are subsequently so registered, which is not likely, or exemptions from such registration requirements are available; and (c) the Units will be subject to substantial restrictions on transfer as set forth in, among other documents, this Subscription Agreement and the Agreement and Certificate of Partnership of Hurricane Drilling Company (the "Partnership Agreement");(d) the Managing Partner has the absolute discretion to select properties for the purpose of purchase, lease or development in connection;(e) the Managing Partner is or may be a partner in other partnerships which may compete with Hurricane Drilling Company. The Managing Partner shall have no liability to any Partner with respect to the selection of such properties for the Partnership or in the event that another Partnership in which the Managing Partner is a partner, has interests in such properties independently of the Partnership.

5.    Execution of Agreement.    When accepted by the Managing Partner, in whole or in part, this subscription shall be valid and binding on the undersigned and the Partnership for all purposes, subject to the provisions of paragraph 3(b) above. The undersigned represents and warrants that the undersigned has received and read and understands the Partnership Agreement. The signature of the undersigned to this Subscription Agreement may be deemed for all purposes as the execution of the Partnership Agreement by the undersigned to the same extent and effect as if the undersigned has signed the Partnership Agreement on the date of the acceptance of this subscription by you. The undersigned agrees to execute the Partnership agreement page and, if requested, the Agreement, the Certificate of Partnership, any amendment to either of such documents, or a multiple original copy of any of such document.

6.    Restrictions on Transfer.    The undersigned understands and acknowledges that the Partnership Agreement contains certain provisions restricting the transfer of the Units subscribed for hereby and to which the undersigned will be bound. If this subscription is accepted in whole or in part, the undersigned further agrees that for a period of twenty-four (24) months after the date of such acceptance, the undersigned, under no circumstances will sell, pledge or transfer, or attempt to sell, pledge or transfer all or any part of the Units allocated to the undersigned. In addition, the undersigned agrees that if this subscription is accepted, in whole or in part, the undersigned will not sell or transfer nor attempt to sell or transfer all or any part of the Units allocated to the undersigned unless such Units have first been registered under the Federal Securities act of 1933 and all applicable similar state statutes, or the undersigned first furnishes an opinion of counsel satisfactory to you, stating that exemptions from such registration requirements are available and that the proposed sale is not, and will not place the Partnership, the Managing Partner, nor any of his Affiliates in violation of any applicable federal or state securities law, or any rule or regulation thereunder. The undersigned further understands and agrees that any such transfer will also be subject to the restrictions on transfer contained in the Partnership Agreement.

7.    The undersigned represents that the following initialed statements are true:

_____(a) The undersigned individual's net worth, or joint net worth with the undersigned's spouse at this time exceeds $1,000,000.00.

-2-

_____ (b) The undersigned's individual income in each of the two most recent years was either (I) in excess of $200,000.00 or (ii) joint income with the undersigned's spouse was in excess of $300,000.00 and has a reasonable expectation of reaching the same income level in the current year.

The undersigned hereby agrees, beginning January 1, 2006 until December 31, 2010 to permit the Managing Partner of the Partnership to retain 75% of the cash flow available for distribution to the undersigned to be used by the Managing Partner to purchase marketable securities to be pledged as additional collateral of the undersigned for his or her Subscription Note.

The undersigned acknowledges that the Managing Partner will be relying on the truth and accuracy of the foregoing representation in determining whether to accept or reject this Subscription Agreement, and further acknowledges that this representation acts as an inducement to the Managing Partner to accept the Subscription Agreement.

Dated:_____

Subscription for Four Units,
at $280,000 per Unit.

$1,120,000. total.

Amount Enclosed: $

_____
Signature

Ira Nathel
Print Name

24 The Glen
Residence Address

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
Identification Number

Glen Head    NY    11545
City         State  Zip

## MANAGING PARTNER'S ACCEPTANCE/REJECTION

Subscription of _IRA NATHEL_ (accepted) ▮▮▮▮ for _FOUR_ Unit(s) of Partnership Interest and his required initial cash contribution of $ _400000_ in payment therefor is hereby (acknowledged) ▮▮▮▮ in full without interest.

Dated:_____

_____
Robert A. Trevisani
Managing Partner

-3-

# EXHIBIT 4

<u>SUBSCRIPTION AGREEMENT</u>

To: Mr. George G. Coleman
475 Northern Boulevard
Great Neck, NY 11021

RE: *Indian Village Drilling Company*
A New York Partnership
(the "Partnership")

Gentlemen:

1.    <u>Subscription</u>.    The undersigned hereby subscribes for and agrees to purchase 1.50 Partnership Units in *INDIAN VILLAGE DRILLING COMPANY*, a New York partnership, at a price of $250,000. per Unit; and agrees to pay therefore the sum of $375,000., which shall be paid as follows: Closing, $150,000. cash plus the execution of a full recourse promissory note in the amount of $225,000. bearing interest at the rate of 8% per annum due December 31, 2018, except for the period from the date of the Note to December 31, 2003, when it will bear interest at the rate of 1% per annum.

2.    <u>Acceptance or Rejection</u>.    The undersigned understands that George G. Coleman, the Managing Partner ( the "Managing Partner) of the Partnership, in his sole discretion and for any reason, may accept or reject this subscription, in whole or in part.

3.    <u>No Escrow of Subscription</u>.    The undersigned understands that the total amount subscribed will NOT be deposited in a special account and may be used to fund Partnership Operations except for the payment of the Managing Partner's Management Fee. The total amount subscribed will be returned to the undersigned without interest if this subscription has not been accepted and is subsequently rejected by the Managing Partner of the Partnership as provided in this Agreement. It is understood and agreed that if this subscription is accepted by the Managing Partner, the funds tendered herewith shall be deposited to the general account of the Partnership. No funds will be expended by the Partnership until at least eight Units are subscribed for and accepted by the Managing Partner. Funds shall be considered Partnership assets in payment for the number of Units set forth on the signature page hereof, or such lesser number as may be allocated to the undersigned by the Managing Partner, provided the Partnership's offering of Units is closed. If the undersigned is allocated less than the number of Units subscribed and the full purchase price of the Units subscribed has been timely paid in full, the Managing Partner shall remit the balance of the subscription amount paid, if any, without interest, to the undersigned within thirty (30) days after such partial acceptance of this subscription.

4.    <u>Information</u>.    The undersigned acknowledges that: (1) the offering of Units was made only through direct, personal communication between the undersigned and the Managing Partner or his duly authorized representative; (2) the undersigned has had the opportunity to obtain all additional information desired in order to verify an investment in the Partnership, including but not limited to the commission or finder's fee, if any, payable in connection with this

subscription by the undersigned; and (3) the undersigned has been advised in writing by the Managing Partner that a purchaser of Units must be prepared to bear the economic risk of such investment for an indefinite period because of (a) the nature of an investment in oil or gas exploration and development; (b) the Units have not been registered under the Securities Act of 1933, may not be registered or qualified under the state securities laws applicable to the purchase of Units by the undersigned in reliance upon an available exemption therefrom and hence cannot be sold unless they are subsequently so registered, which is not likely, or exemptions from such registration requirements are available; and (c) the Units will be subject to substantial restrictions on transfer as set forth in, among other documents, this Subscription Agreement and the Agreement and Certificate of Partnership of Indian Village Drilling Company (the "Partnership Agreement");(d) the Managing Partner has the absolute discretion to select properties for the purpose of purchase, lease or development in connection;(e) the Managing Partner is or may be a partner in other partnerships which may compete with Indian Village Drilling Company. The Managing Partner shall have no liability to any Partner with respect to the selection of such properties for the Partnership or in the event that another Partnership in which the Managing Partner is a partner such properties independently of the Partnership.

5.    <u>Execution of Agreement</u>.    When accepted by the Managing Partner, in whole or in part, this subscription shall be valid and binding on the undersigned and the Partnership for all purposes, subject to the provisions of paragraph 3(b) above. The undersigned represents and warrants that the undersigned has received and read and understands the Partnership Agreement. The signature of the undersigned to this Subscription Agreement may be deemed for all purposes as the execution of the Partnership Agreement by the undersigned to the same extent and effect as if the undersigned has signed the Partnership Agreement on the date of the acceptance of this subscription by you. The undersigned agrees to execute the Partnership agreement page and, if requested, the Agreement, the Certificate of Partnership, any amendment to either of such documents, or a multiple original copy of any of such document.

6.    <u>Restrictions on Transfer</u>.    The undersigned understands and acknowledges that the Partnership Agreement contains certain provisions restricting the transfer of the Units subscribed for hereby and to which the undersigned will be bound. If this subscription is accepted in whole or in part, the undersigned further agrees that for a period of twenty-four (24) months after the date of such acceptance, the undersigned, under no circumstances will sell, pledge or transfer, or attempt to sell, pledge or transfer all or any part of the Units allocated to the undersigned. In addition, the undersigned agrees that if this subscription is accepted, in whole or in part, the undersigned will not sell or transfer nor attempt to sell or transfer all or any part of the Units allocated to the undersigned unless such Units have first been registered under the Federal Securities act of 1933 and all applicable similar state statutes, or the undersigned first furnishes an opinion of counsel satisfactory to you, stating that exemptions from such registration requirements are available and that the proposed sale is not, and will not place the Partnership, the Managing Partner, nor any of his Affiliates in violation of any applicable federal or state securities law, or any rule or regulation thereunder. The undersigned further understands and agrees that any such transfer will also be subject to the restrictions on transfer contained in the Partnership Agreement.

7.    The undersigned represents that the following initialed statements are true:

_____(a) The undersigned individual's net worth, or joint net worth with the undersigned's spouse at this time exceeds $1,000,000.00.

-2-

_____ (b) The undersigned's individual income in each of the two most recent years was either (i) in excess of $200,000.00 or (ii) joint income with the undersigned's spouse was in excess of $300,000.00 and has a reasonable expectation of reaching the same income level in the current year.

The undersigned acknowledges that the Managing Partner will be relying on the truth and accuracy of the foregoing representation in determining whether to accept or reject this Subscription Agreement, and further acknowledges that this representation acts as an inducement to the Managing Partner to accept the Subscription Agreement.

Dated: _____

Subscription for 1.50 Units, at $250,000 per Unit.

$375,000. total.

Amount Enclosed: $ _____

_____
Signature

Sheldon Nathel
Print Name

27 Craig Street
Residence Address

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                          Jericho        NY        11753
Identification Number                City           State     Zip

## MANAGING PARTNER'S ACCEPTANCE/REJECTION

Subscription of _SHELDON NATHEL_____ (accepted) ████████ for
_1.50_ Unit(s) of Partnership Interest and his required initial cash contribution of
$ _150,000 —_ in payment therefor is hereby (acknowledged) ████████ in full without
interest.

Dated: _____

_____
George G. Coleman
Managing Partner

-3-

# EXHIBIT 5

### SUBSCRIPTION AGREEMENT

To: Mr. George G. Coleman
      475 Northern Boulevard
      Great Neck, NY 11021

RE: *Condor Drilling Company*
A New York Partnership
(the "Partnership")

Gentlemen:

    1.    <u>Subscription</u>.   The undersigned hereby subscribes for and agrees to purchase 2.50 Partnership Units in *CONDOR DRILLING COMPANY*, a New York partnership, at a price of $280,000. per Unit, and agrees to pay therefore the sum of $700,000., which shall be paid as follows: Closing, $250,000. cash plus the execution of a full recourse promissory note in the amount of $450,000. bearing interest at the rate of 8% per annum due December 31, 2018, except for the period from the date of the Note to December 31, 2003, when it will bear interest at the rate of 1% per annum.

    2.    <u>Acceptance or Rejection</u>.   The undersigned understands that George G. Coleman, the Managing Partner (the "Managing Partner) of the Partnership, in his sole discretion and for any reason, may accept or reject this subscription, in whole or in part.

    3.    <u>No Escrow of Subscription</u>.   The undersigned understands that the total amount subscribed will NOT be deposited in a special account and may be used to fund Partnership Operations except for the payment of the Managing Partner's Management Fee. The total amount subscribed will be returned to the undersigned without interest if this subscription has not been accepted and is subsequently rejected by the Managing Partner of the Partnership as provided in this Agreement. It is understood and agreed that if this subscription is accepted by the Managing Partner, the funds tendered herewith shall be deposited to the general account of the Partnership. No funds will be expended by the Partnership until at least eight Units are subscribed for and accepted by the Managing Partner. Funds shall be considered Partnership assets in payment for the number of Units set forth on the signature page hereof, or such lesser number as may be allocated to the undersigned by the Managing Partner, provided the Partnership's offering of Units is closed. If the undersigned is allocated less than the number of Units subscribed and the full purchase price of the Units subscribed has been timely paid in full, the Managing Partner shall remit the balance of the subscription amount paid, if any, without interest, to the undersigned within thirty (30) days after such partial acceptance of this subscription.

    4.    <u>Information</u>.   The undersigned acknowledges that: (l) the offering of Units was made only through direct, personal communication between the undersigned and the Managing Partner or his duly authorized representative; (2) the undersigned has had the opportunity to obtain all additional information desired in order to verify an investment in the Partnership, including but not limited to the commission or finder's fee, if any, payable in connection with this

subscription by the undersigned; and (3) the undersigned has been advised in writing by the Managing Partner that a purchaser of Units must be prepared to bear the economic risk of such investment for an indefinite period because of (a) the nature of an investment in oil or gas exploration and development; (b) the Units have not been registered under the Securities Act of 1933, may not be registered or qualified under the state securities laws applicable to the purchase of Units by the undersigned in reliance upon an available exemption therefrom and hence cannot be sold unless they are subsequently so registered, which is not likely, or exemptions from such registration requirements are available; and (c) the Units will be subject to substantial restrictions on transfer as set forth in, among other documents, this Subscription Agreement and the Agreement and Certificate of Partnership of Condor Drilling Company (the "Partnership Agreement");(d) the Managing Partner has the absolute discretion to select properties for the purpose of purchase, lease or development in connection;(e) the Managing Partner is or may be a partner in other partnerships which may compete with Condor Drilling Company. The Managing Partner shall have no liability to any Partner with respect to the selection of such properties for the Partnership or in the event that another Partnership in which the Managing Partner is a partner such properties independently of the Partnership.

5.    Execution of Agreement.    When accepted by the Managing Partner, in whole or in part, this subscription shall be valid and binding on the undersigned and the Partnership for all purposes, subject to the provisions of paragraph 3(b) above. The undersigned represents and warrants that the undersigned has received and read and understands the Partnership Agreement. This signature of the undersigned to this Subscription Agreement may be deemed for all purposes as the execution of the Partnership Agreement by the undersigned to the same extent and effect as if the undersigned has signed the Partnership Agreement on the date of the acceptance of this subscription by you. The undersigned agrees to execute the Partnership agreement page and, if requested, the Agreement, the Certificate of Partnership, any amendment to either of such documents, or a multiple original copy of any of such document.

6.    Restrictions on Transfer.    The undersigned understands and acknowledges that the Partnership Agreement contains certain provisions restricting the transfer of the Units subscribed for hereby and to which the undersigned will be bound. If this subscription is accepted in whole or in part, the undersigned further agrees that for a period of twenty-four (24) months after the date of such acceptance, the undersigned, under no circumstances will sell, pledge or transfer, or attempt to sell, pledge or transfer all or any part of the Units allocated to the undersigned. In addition, the undersigned agrees that if this subscription is accepted, in whole or in part, the undersigned will not sell or transfer nor attempt to sell or transfer all or any part of the Units allocated to the undersigned unless such Units have first been registered under the Federal Securities act of 1933 and all applicable similar state statutes, or the undersigned first furnishes an opinion of counsel satisfactory to you, stating that exemptions from such registration requirements are available and that the proposed sale is not, and will not place the Partnership, the Managing Partner, nor any of his Affiliates in violation of any applicable federal or state securities law, or any rule or regulation thereunder. The undersigned further understands and agrees that any such transfer will also be subject to the restrictions on transfer contained in the Partnership Agreement.

7.    The undersigned represents that the following initialed statements are true:

_____    (a) The undersigned individual's net worth, or joint net worth with the undersigned's spouse at this time exceeds $1,000,000.00.

_____ (b) The undersigned's individual income in each of the two most recent years was either (i) in excess of $200,000.00 or (ii) joint income with the undersigned's spouse was in excess of $300,000.00 and has a reasonable expectation of reaching the same income level in the current year.

The undersigned acknowledges that the Managing Partner will be relying on the truth and accuracy of the foregoing representation in determining whether to accept or reject this Subscription Agreement, and further acknowledges that this representation acts as an inducement to the Managing Partner to accept the Subscription Agreement.

Dated: _____

Subscription for 2.50 Units, at $280,000 per Unit.

$700,000. total.

Amount Enclosed: $ _____

_____
Signature

Sheldon Nathel
Print Name

27 Craig Street
Residence Address

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                          Jericho      NY      11753
Identification Number                City        State    Zip

## MANAGING PARTNER'S ACCEPTANCE/REJECTION

Subscription  of  _SHELDON NATHEL_____ (accepted) ▓▓▓▓ for _2.50_ Unit(s) of Partnership Interest and his required initial cash contribution of $ _700000 —_ in payment therefor is hereby (acknowledged) ▓▓▓▓ in full without interest.

Dated: _____

_____
George G. Coleman
Managing Partner

-3-

# EXHIBIT 6

## SUBSCRIPTION AGREEMENT

To: Robert A. Trevisani
    475 Northern Boulevard-Suite 20
    Great Neck, New York 11021

                      RE: *Hurricane Drilling Company*
                          A New York Partnership
                          (the "Partnership")

Gentlemen:

    1.      Subscription.   The undersigned hereby subscribes for and agrees to purchase Four Partnership Units in *HURRICANE DRILLING COMPANY*, a New York partnership, at a price of $280,000. per Unit, and agrees to pay therefore the sum of $1,120,000., which shall be paid as follows: Closing, $400,000. cash plus the execution of a full recourse Subscription Note in the amount of $720,000. bearing interest at the rate of 8% per annum due December 31, 2019, except for the period from the date of the Note to December 31, 2004, when it will bear interest at the rate of 1% per annum.

    2.      Acceptance or Rejection.   The undersigned understands that Robert A. Trevisani, the Managing Partner ( the "Managing Partner) of the Partnership, in his sole discretion and for any reason, may accept or reject this subscription, in whole or in part.

    3.      No Escrow of Subscription.   The undersigned understands that the total amount subscribed will NOT be deposited in a special account and may be used to fund Partnership Operations except for the payment of the Managing Partner's Management Fee. The total amount subscribed will be returned to the undersigned without interest if this subscription has not been accepted and is subsequently rejected by the Managing Partner of the Partnership as provided in this Agreement. It is understood and agreed that if this subscription is accepted by the Managing Partner, the funds tendered herewith shall be deposited to the general account of the Partnership. No funds will be expended by the Partnership until at least eight Units are subscribed for and accepted by the Managing Partner. Funds shall be considered Partnership assets in payment for the number of Units set forth on the signature page hereof, or such lesser number as may be allocated to the undersigned by the Managing Partner, provided the Partnership's offering of Units is closed. If the undersigned is allocated less than the number of Units subscribed and the full purchase price of the Units subscribed has been timely paid in full, the Managing Partner shall remit the balance of the subscription amount paid, if any, without interest, to the undersigned within thirty (30) days after such partial acceptance of this subscription.

    4.      Information.   The undersigned acknowledges that: (1) the offering of Units was made only through direct, personal communication between the undersigned and the Managing Partner or his duly authorized representative; (2) the undersigned has had the opportunity to obtain all additional information desired in order to verify an investment in the Partnership, including but not limited to the commission or finder's fee, if any, payable in connection with this

subscription by the undersigned; and (3) the undersigned has been advised in writing by the Managing Partner that a purchaser of Units must be prepared to bear the economic risk of such investment for an indefinite period because of (a) the nature of an investment in oil or gas exploration and development; (b) the Units have not been registered under the Securities Act of 1933, may not be registered or qualified under the state securities laws applicable to the purchase of Units by the undersigned in reliance upon an available exemption therefrom and hence cannot be sold unless they are subsequently so registered, which is not likely, or exemptions from such registration requirements are available; and (c) the Units will be subject to substantial restrictions on transfer as set forth in, among other documents, this Subscription Agreement and the Agreement and Certificate of Partnership of Hurricane Drilling Company (the "Partnership Agreement");(d) the Managing Partner has the absolute discretion to select properties for the purpose of purchase, lease or development in connection;(e) the Managing Partner is or may be a partner in other partnerships which may compete with Hurricane Drilling Company. The Managing Partner shall have no liability to any Partner with respect to the selection of such properties for the Partnership or in the event that another Partnership in which the Managing Partner is a partner, has interests in such properties independently of the Partnership.

5.    Execution of Agreement.    When accepted by the Managing Partner, in whole or in part, this subscription shall be valid and binding on the undersigned and the Partnership for all purposes, subject to the provisions of paragraph 3(b) above. The undersigned represents and warrants that the undersigned has received and read and understands the Partnership Agreement. The signature of the undersigned to this Subscription Agreement may be deemed for all purposes as the execution of the Partnership Agreement by the undersigned to the same extent and effect as if the undersigned has signed the Partnership Agreement on the date of the acceptance of this subscription by you. The undersigned agrees to execute the Partnership agreement page and, if requested, the Agreement, the Certificate of Partnership, any amendment to either of such documents, or a multiple original copy of any of such document.

6.    Restrictions on Transfer.    The undersigned understands and acknowledges that the Partnership Agreement contains certain provisions restricting the transfer of the Units subscribed for hereby and to which the undersigned will be bound. If this subscription is accepted in whole or in part, the undersigned further agrees that for a period of twenty-four (24) months after the date of such acceptance, the undersigned, under no circumstances will sell, pledge or transfer, or attempt to sell, pledge or transfer all or any part of the Units allocated to the undersigned. In addition, the undersigned agrees that if this subscription is accepted, in whole or in part, the undersigned will not sell or transfer nor attempt to sell or transfer all or any part of the Units allocated to the undersigned unless such Units have first been registered under the Federal Securities act of 1933 and all applicable similar state statutes, or the undersigned first furnishes an opinion of counsel satisfactory to you, stating that exemptions from such registration requirements are available and that the proposed sale is not, and will not place the Partnership, the Managing Partner, nor any of his Affiliates in violation of any applicable federal or state securities law, or any rule or regulation thereunder. The undersigned further understands and agrees that any such transfer will also be subject to the restrictions on transfer contained in the Partnership Agreement.

7.    The undersigned represents that the following initialed statements are true:

_____(a) The undersigned individual's net worth, or joint net worth with the undersigned's spouse at this time exceeds $1,000,000.00.

_____ (b) The undersigned's individual income in each of the two most recent years was either (I) in excess of $200,000.00 or (ii) joint income with the undersigned's spouse was in excess of $300,000.00 and has a reasonable expectation of reaching the same income level in the current year.

The undersigned hereby agrees, beginning January 1, 2006 until December 31, 2010 to permit the Managing Partner of the Partnership to retain 75% of the cash flow available for distribution to the undersigned to be used by the Managing Partner to purchase marketable securities to be pledged as additional collateral of the undersigned for his or her Subscription Note.

The undersigned acknowledges that the Managing Partner will be relying on the truth and accuracy of the foregoing representation in determining whether to accept or reject this Subscription Agreement, and further acknowledges that this representation acts as an inducement to the Managing Partner to accept the Subscription Agreement.

Dated: _____

Subscription for Four Units,
at $280,000 per Unit.

$1,120,000. total.

Amount Enclosed: $ _____

_Signature_
**Sheldon Nathel**
Print Name

**27 Craig Street**
Residence Address

___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___
Identification Number

**Jericho      NY      11753**
City          State      Zip

## MANAGING PARTNER'S ACCEPTANCE/REJECTION

Subscription of _SHELDON NATHEL_ (accepted) ▓▓▓▓ for _FOUR_ Unit(s) of Partnership Interest and his required initial cash contribution of $ _400000 —_ in payment therefor is hereby (acknowledged) ▓▓▓▓ in full without interest.

Dated: _____

Robert A. Trevisani
Managing Partner

-3-

# EXHIBIT 7

AGREEMENT AND CERTIFICATE OF PARTNERSHIP

OF

INDIAN VILLAGE DRILLING COMPANY

THIS AGREEMENT OF PARTNERSHIP (the "Agreement") is made and entered into effective the 1st day of March, 2003 by and among GEORGE G. COLEMAN (referred to as "Managing Partner" and sometimes as a "Partner"), whose principal address is 475 Northern Boulevard, Great Neck, New York 11021 and persons, individuals or other entities whose names and addresses are set forth on Schedule A hereto and who have executed a copy of this Agreement (" hereinafter individually referred to as a "Partner" and collectively with the Managing Partner, referred to as "Partners") pursuant to the New York Uniform Partnership Act (the "Partnership Act").

WITNESSETH:

WHEREAS, the Partners hereby agree to form a partnership pursuant to the Partnership Law of the State of New York (the "Partnership"); and

WHEREAS, it is the intention of the Partners to set forth the terms and conditions under which the Partnership is to operate;

NOW, THEREFORE, it is agreed as follows:

1.  Formation and Term of Partnership

    1.01.   The parties hereto have agreed to form and by executing this Agreement, do enter into a partnership formed under the Partnership act and other applicable laws of the State of New York, which act shall govern the rights and liabilities of the parties, except as otherwise herein expressly provided.

    1.02.   The term of the Partnership shall commence on the date hereof and shall continue until December 31, 2036 unless sooner terminated in accordance with the provisions of this Agreement or as otherwise provided by law.

    1.03.   The parties hereto shall from time to time execute or cause to be executed all such certificates or other documents and do or cause to be done all such filing, recording, publishing or other acts as may be appropriate to comply with the requirements of law for the formation and operation of a partnership under the laws of the State of New York.

2.  Name, Principal Office and Address

    2.01.   The name of the Partnership is INDIAN VILLAGE DRILLING COMPANY and the Partnership shall do business under the name of INDIAN VILLAGE DRILLING COMPANY.

    2.02.   The address of the principal office of the Partnership shall be 475 Northern Boulevard, Great Neck, New York 11021, provided, however, that the Managing Partner may, by written notice to all Partners, change the address of the principal office. The Partnership books and records kept at such place as the Managing Partner may from time to time determine.

3.     Purpose

     3.01.    The purposes of the Partnership shall be to:

     (a)    invest in the acquisition, development and drilling of oil and gas leases;

     (b)    acquire oil and gas leases developed and operated by other oil and gas companies; and/or

     (c)    produce and sell hydrocarbons.

     3.02.    In recognition of the foregoing purposes, the capital of the Partnership may be invested in one or more of the following assets (collectively, the "Partnership Property"):

     (a)    interests in oil and gas leases, royalties and similar oil and gas property interests;

     (b)    equipment and other materials necessary or desirable for drilling, equipping and operating wells on leases in which the Partnership has an interest;

     (c)    acreage;

     (d)    partnership interest in general or limited partnerships engaged in activities that are consistent with the purposes of the Partnership; and

     (e)    interests in other oil and gas properties of a character acquired and developed by other oil and gas companies, such as gathering systems, pipelines, processing plants and other facilities required for the preparation of oil and/or gas production for market.

4.     Partners and Capital

     4.01.    The Managing Partner of the Partnership shall be George G. Coleman ("Managing Partner"). The address of the Managing Partner shall be the same as the office address of the Partnership.

     4.02.    The Partners of the Partnership and their capital contributions shall be as listed on Schedule "A" attached hereto.

     4.03.    The interests of the Partners, other than the Managing Partner, shall be represented by Units and there are hereby authorized for issuance and sale 25 Units of Partnership interest.

     4.04.    During the period from the date hereof, to and including December 31, 2003 (the "Subscription Period"), the Managing Partner, on behalf of the Partnership, shall have the right to offer Initial Units and to admit to the Partnership as Partners those persons who are acceptable to the Managing Partner and who otherwise satisfy the requirements of this Agreement. Each person desiring to become a Partner may apply for admission by (i) completing, signing, and delivering to the Managing Partner a "Subscription Agreement" in such form as established by the Managing Partner; a signed signature page to this agreement and (ii) payment of 100% of his capital commitment. The Managing Partner may, in his sole discretion, decline to admit any person as a Partner for any reason whatsoever. All applications which are rejected shall be returned to the subscriber, together with all funds tendered, without interest. Persons whose

applications are accepted by the Managing Partner will be admitted as Partners in the order that their applications are accepted and payment on their subscriptions are received by the Managing Partner.

4.05. The purchase price for each Unit shall be TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000). By executing the Subscription Agreement, each Partner subscribes and agrees to contribute to the capital of the Partnership the amount shown in his Subscription Agreement. Subject to Section 4.06 below, the Managing Partner reserves the right, in his sole discretion to subdivide Units and sell portions thereof. No Partner in his or its name may subscribe for or hold Units for the benefit of any other person or entity.

4.06. Each Partner will pay for his Partnership interest at Closing, ONE HUNDRED THOUSAND DOLLARS ($100,000) cash per unit plus the execution of a full recourse promissory note (the "Note") in the amount of ONE HUNDRED FIFTY THOUSAND DOLLARS ($150,000) bearing interest at the rate of 8% per annum due on December 31, 2018 and payable to the Partnership.

4.07. The Managing Partner is hereby authorized to sell fractional parts of a Unit provided that the price therefor shall be the pro rata part of the purchase price of a full unit. The smallest fractional unit shall be one-half unit.

4.08. Subscriptions for Units will be accepted by the Managing Partner, in his sole discretion, during the Subscription Period, until subscription for the maximum aggregate Capital Contribution by the Partners of SIX MILLION TWO HUNDRED FIFTY THOUSAND DOLLARS ($6,250,000) has been received and accepted or the Managing Partner, in his sole discretion, closes the Partnership at a lesser amount but in no event less than ONE MILLION TWO HUNDRED FIFTY THOUSAND DOLLARS ($1,250,000) of Capital Contributions in the aggregate. The Managing Partner shall also contribute an amount which, upon contribution, will equal 1% of the aggregate capital Contribution of all Partners, including the Managing partner, to the Initial Partnership Capital. The Managing Partner shall have the right, in his sole discretion and at any time prior to the Closing, to increase the maximum aggregate Capital Contribution by the Partners, upon notice to the Partners.

5.    Allocation of Revenues and Costs and Tax Matters

5.01. All items of Partnership income, expense, gain, deduction, loss or credit shall be allocated to the Partners in proportion to their Capital Contributions.

5.02. The Partners (including the Managing Partner) shall share inter se items of income, gain, deduction, loss and credit allocated to them as a group in proportion to their respective Capital Contributions. Such share shall be computed by the application of a fraction for each Partner, the numerator of which shall be an amount equal to his Capital Contributions and the denominator an amount equal to the aggregate of all Capital Contributions. No Partner shall be entitled to have priority over any other Partner as to profits of the Partnership or otherwise.

5.03. All cash revenues remaining after payment of the obligations incurred for drilling, operation and development of the Partnership Property, administrative costs, capital expenditures and establishing whatever cash reserve considered suitable by the Managing Partner shall be distributed 99% to the Partners and 1% to the Managing Partner.

5.04. All items of Partnership income, gain, deduction, loss and credit for Federal income tax purposes, including allocation of depreciation deductions computed at the partnership

-3-

level, shall be allocated among the Partners in the ratios provided in Paragraphs 5.01. 5.02 and 5.03 of this Section 5. As between an Assignor Partner and his Assignee, the share of income, gains, losses, deductions and credits so allocated shall be apportioned on the basis of the number of days in the calendar year that each was the holder of the Partnership interest assigned, without regard to the results of the Partnership's operations during the periods before and after assignment.

5.05. If at any time the allocation provisions of this Section 5 do not result in the Managing Partner being allocated at least 1% of the Partnership's costs and revenues and at least 1% of each of its specially allocated items of revenues, costs, loss, deduction or credit, then this Paragraph 5.05 shall become operative and cause the Managing Partner to be allocated so much more of each of those items as will cause him to be allocated at all times at least 1% of the Partnership's revenues, costs, and specially allocated items.

5.06. No interest shall be paid on any Capital Contributions of the Partners.

5.07. Upon the transfer of all or a part of a Partnership Interest or upon the death of an individual Partner or upon the distribution of Partnership Property to any party hereto, the Partnership, at the Managing Partner's option, may file an election, in accordance with applicable laws and regulations, to cause the basis of the Partnership Property to be adjusted for Federal income tax purposes as provided by sections 734, 743 and 754 of the Internal Revenue Code of 1986, as amended (the "Code").

6.    Rights, Duties and Obligations of the Managing Partner

6.01. The Managing Partner shall have full and exclusive power and authority on behalf of the Partnership to manage, control, administer and operate the business affairs of the Partnership, and to do or cause to be done any and all acts deemed by the Managing Partner, within his sole discretion, to be necessary or appropriate thereto. In dealing with the Managing Partner on behalf of the Partnership, no person shall be required to inquire into the authority of the Managing Partner to bind the Partnership. The scope of such power and authority shall encompass all matters in any way connected with such business or incidental thereto, including, but not limited to, the power and authority:

(a)    to expand the Partnership capital and revenues in furtherance of the business of the Partnership;

(b)    to enter into and execute agreements and related documents in connection with the business of the Partnership;

(c)    to operate producing properties and/or enter into operating agreements with others with respect to properties acquired by the Partnership, naming a third party as operator, and containing such terms, provisions and conditions as the Managing Partner shall approve, including terms designating a third party as collecting and disbursing agent for Partnership revenues and authorizing expenditure of Partnership revenues toward the employment of new enhanced recovery methods;

(d)    to purchase, at his discretion, at the expense of the Partnership, such amounts of liability and other insurance which may be available to protect the Partnership's properties and business and to protect the Partners against liabilities to third parties arising out of Partnership activities;

(e)    to execute, on behalf of the Partnership, any and all documents or

-4-

instruments of any kind which the Managing Partner may deem appropriate in carrying out the purposes of the Partnership, including, without limitation, pooling, farmout, and unitization agreements, oil and gas sales contracts, division orders, or other marketing agreements, documents or instruments of any kind or character, or amendments thereto;

(f)    to purchase or lease equipment, including production equipment for Partnership purposes;

(g)    to pay, collect, compromise, arbitrate, resort to legal action for or otherwise adjust claims or demands of or against the Partnership;

(h)    to sell payments from production for any Partnership purpose, including but not limited to, the purpose of developing, equipping and improving the properties of the Partnership;

(i)    to acquire leases, permits, reservations, mineral or fee rights, working interests or contractual rights, or options to obtain same, in such oil and/or gas properties as the Managing Partner may select from time to time for investment by the Partnership. The properties may consist of all or any fraction of the total working interest or contractual rights, therein and may be subject to overriding royalty and other leasehold or contractual burdens of a similar nature as the Managing Partner may deem reasonable;

(j)    to determine to what extent the Partnership Property is to be explored, drilled, completed, sold, farmed out or otherwise disposed of or abandoned;

(k)    to employ, on behalf of the Partnership, agents and employees, including accountants, lawyers, engineers, geologists, geophysicists, landmen, and clerical help, and to obtain such other assistance and services as the Managing Partner may deem proper and to pay therefor such remuneration as the Managing Partner may deem reasonable and appropriate;

(l)    to guarantee the payment of money or the performance of any contract or obligation by any person, firm or corporation on behalf of the Partnership;

(m)    to establish from income derived from the Partnership's operations such reserves as the Managing Partner shall deem reasonable to help meet anticipated Partnership expenses, and subject to the requirements of applicable partnership laws, to distribute Partnership income at such times as, and to the extent that the Managing Partner determines there is sufficient cash on hand for Partnership requirements;

(n)    to loan money to the Partnership on substantially the same terms and conditions as would commercial banks, and charge the Partnership interest on the money so loaned not in excess of the amounts which would be charged the Partnership (without reference to the Managing Partner's financial abilities or guarantees) by unrelated banks on comparable loans for the same purpose, without receiving any points or other finance charges or fees;

(o)    to borrow funds on behalf of the Partnership for the purpose of financing costs of the Partnership, and to secure such loan with a mortgage or other lien on any or all of the Partnership Property or the production therefrom or the interest of either the Managing Partner or the Partners in any such property or production therefrom;

(p)    to sell or lease any property to the Partnership, or purchase or lease any property from the Partnership;

-5-

(q)    to convert the Partnership to a limited liability company pursuant to the laws of New York State at any time after two years from the date the Partnership closes.

(r)    to amend this agreement to make immaterial changes without the consent of the Partners and to make material amendments subject to the provisions of this Agreement.

6.02.    Anything in the foregoing provisions of Paragraph 6.01 of this Section 6 to the contrary notwithstanding, the Managing Partner shall not have the authority, without the written consent of the Partners holding a majority in interest of all the Partnership Interests, to sell or to otherwise dispose of all or substantially all of the Partnership's assets and otherwise change the general character of the Partnership's business.

6.03.    The Managing Partner is required to devote only such time as may be necessary for the proper performance of his duties to the Partnership and shall have the right to be engaged, as an employee, partner, consultant, shareholder or in any other capacity, independently or with others, in other business ventures, including, without limitation, ventures to explore, develop and produce oil, gas and other mineral properties in competition with the Partnership without liability for breach of fiduciary duty to the Partnership.  The Managing Partner, independently or as so engaged, shall have the right to develop, manage and operate additional oil, gas and other mineral properties acquired at any time, whether or not competitive to the Partnership.

6.04.    The Managing Partner shall not be liable, responsible or accountable to any of the Partners or the Partnership for any loss or damage resulting from any error in judgment or other acts or omissions on behalf of the Partnership performed or omitted by said Managing Partner in good faith and in a manner reasonably believed to be within the scope of the authority granted to him by this Agreement and in the best interests of this Partnership, unless said Managing Partner has been guilty of gross negligence or willful misconduct with respect to such acts or omissions.  Any loss or damage incurred by the Managing Partner by reason of any act or omission so performed or omitted by him (and not involving gross negligence or willful misconduct) shall be paid by the Partnership, and the Managing Partner shall be indemnified therefor to the extent assets are available, but the Participating Partners shall not have any personal liability to the Managing Partner or to the Partnership on account of such loss or damage.  Moreover, the Managing Partner shall not be liable to the Partnership or any of the Partners because any taxing authorities disallow or adjust deductions or credits in the Partnership's or Partner's income tax returns.  Anything in this Agreement to the contrary notwithstanding, the Managing Partner shall not be personally liable for the return of Capital Contributions of Partners or for any portion thereof (except out of Partnership assets), it being expressly understood that any return of capital shall be made solely from the assets of the Partnership; nor shall the Managing Partner be required to pay to the Partnership or to any of the Partners any capital deficits of any Participating Partner upon dissolution or otherwise.

6.05.    The Managing Partner shall not be deemed to have received commissions, fees or other compensation paid to any firm, proprietorship, partnership or corporation which is an Affiliate of the Managing Partner, or in which the Managing Partner or any Affiliate owns a beneficial interest.  Nothing herein shall restrict the right of the Managing Partner or any other person to receive the income or distribution to which they would otherwise be entitled as a Partner under the terms of this Agreement.  Nothing contained in this Agreement shall be deemed to prevent or restrict the Managing Partner, or any related person or entity, from obtaining or sharing in all or any part of the brokerage fees, commissions or other sums payable in connection with any property purchased or sold by the Partnership.

6.06.    The Managing Partner is hereby authorized to enter into the Prospect

-6-

Agreement with Palace Exploration Company ("Palace") attached hereto as Exhibit "A" and the Turnkey Drilling Contract with TAQ Drilling Co., Inc. ("TAQ") attached hereto as Exhibit "B" and is authorized, without limiting the other provisions of this Section 6 to fulfill its obligations under them.

7.    Rights, Duties, and Obligations of the Partners

The Partners shall have the following rights, duties and obligations:

7.01.    No Partner other than the Managing Partner shall (i) take part in the management of the business or transact any business for the Partnership, (ii) have the power to sign for or to bind the Partnership, or (iii) be paid any salary or have a drawing account or receive interest on his Capital Contributions.

7.02.    The Partners shall have no right to remove the Managing Partner, compel his withdrawal from the Partnership or elect additional managing partners, except on the death, retirement, legal incapacity, bankruptcy or withdrawal of the Managing Partner.

8.    Assignment of Partnership Interests

8.01.    Subject to any requirement or restriction of applicable law and/or regulations issued by the Securities and Exchange Commission, a Partner may sell, assign or otherwise transfer all or any part of his Partnership Interest after the payment of the sums due under Section 4.06. For an Assignment to be effective, an Assignee shall execute this Agreement and Certificate of Partnership and a Note for the balance of the sum due under the Assignor's note.

8.02.    The trustees, executor, administrator, committee or guardian of the estate of a Partner who shall have died or been adjudicated bankrupt or incompetent shall have all the rights and obligations of such Partner for the purpose of settling or managing his estate and such (and only such) power as the deceased, bankrupt, or incompetent Partner possessed to assign all or any part of his Partnership Interest.

8.03.    For Federal income tax purposes, allocation of profits and losses of the Partnership, including depletion and depreciation attributable to any assigned interest, shall be prorated between the assignor and assignee on the number of days such interest was held by each of them during the calendar year, or on any other reasonable basis determined by the Managing Partner which is consistent with applicable law and regulations. The reflection of any assignment on the books of the Partnership shall not constitute the substitution of the assignee as a Partner, which may be effected only as provided above in this Section 8.

8.04.    The Partnership shall, on and after the effective date of the assignment as provided in Paragraph 8.01 of this Section 8, pay all further distributions of profits or return of capital on account of the interest so assigned to assignee. In the absence of notice to the Managing Partner of the assignment of a Partnership Interest, whether by operation of law or otherwise, any payment to an assigned Partner or to his assignee or to their respective executors, administrators or legal representatives shall acquit the Partnership and the Managing Partner or liability, to the extent of such payment, to any person who may be interested in such payment.

8.05.    By executing this Agreement, each Partner shall be deemed to have consented to any assignment consented to by the Managing Partner.

8.06.    No such assignment by a Partner, including an assignment of less than all of a Partner's Partnership Interest hereunder or the assignment of such Partnership Interest to

-7-

more than one party, shall relieve the assignor of his obligations hereunder, whether arising prior to or subsequent to such assignment, nor shall any such assignment require the accounting by the Managing Partner to more than one party, who shall be unanimously designated by the assignees or, if he shall have retained an interest hereunder, the assignor.

9.    Compensation of the Managing Partner

9.01.  The Managing Partner will receive from the Partnership a Twenty-Five Thousand ($25,000.00) Dollar management fee for services, expertise and supervision of the operations of the Partnership on or before December 31, 2003.

9.02.  The Managing Partner will be allocated items of Partnership profits and losses as hereinabove set forth in Section 5.

9.03.  The Managing Partner will receive from the partnership an annual fee for consulting, managerial and administrative services in operating the Partnership, equal to 2% of the net cash revenues, exclusive of Capital Contributions, of the Partnership.  All costs and expenses paid by the Managing Partner in operating the Partnership shall be reimbursed to the Managing Partner over and above the aforesaid fee.

10.    Duration and Termination

10.01.  Subject to the provisions of Article 10.02, the Partnership shall be dissolved and terminated and its affairs wound up upon the first to occur of the following:

(a)    the death, retirement, legal incapacity, voluntary or involuntary bankruptcy, or withdrawal of the Managing Partner, unless 51% of the remaining Partners agree to continue the Partnership and a successor to the Managing Partner is selected;

(b)    a determination by the Managing Partner to terminate and dissolve the Partnership;

(c)    upon disposition of all of the Partnership Property (except for the sale of natural gas or oil);

(d)    the affirmative vote of the holders of 100% of the Partnership Interests; or

(e)    December 31, 2036.

10.02.  Neither the death, legal disability, bankruptcy, dissolution, withdrawal or expulsion of a Partner, nor the assignment of all or any part of the Partnership Interest of a Partner, nor the substitution nor admission of a Partner shall cause the dissolution or termination of the Partnership, but if this provision conflicts with any applicable law, or any other provision of these Articles, then all of the Partners herewith agree to form a new partnership immediately upon such termination of this Partnership, which new partnership will adopt these Articles of Partnership as its Articles of Partnership and the business of this partnership shall continue in the newly constituted partnership without disruption.

10.03.  Upon the dissolution of the Partnership, it shall be wound up, its debts and liabilities shall be paid and the remaining assets shall be distributed in the order provided herein. Except as otherwise expressly permitted under this Agreement, upon the dissolution of the

-8-

Partnership, the Partnership shall be liquidated by a liquidating trustee who shall be (i) the Managing Partner, or if there be none, (ii) a person or persons designated by a majority in interest of the Partners. In carrying out the liquidation of the Partnership, the liquidating trustee shall have all the rights and powers of the Managing Partner hereunder. Partnership Property may be sold at such prices as may be deemed reasonable by the liquidating trustee, and the proceeds thereof as well as all other cash and properties of the Partnership shall be distributed as follows:

(a)    all the Partnership's debts and liabilities to persons other than the Partners shall be paid and discharged;

(b)    all of the Partnership's debts and liabilities to the Managing Partner and/or Partners shall be paid and discharged;

(c)    to the Partners with respect to any undistributed share of profits; and

(d)    to the Partners with respect to their then capital accounts;

(e)    to the Managing Partner with respect to any undistributed share of profits;

(f)    to the Managing Partner with respect to his then capital account; and

(g)    the remaining assets to the Partners, in accordance with the provisions of Paragraph 5.03 hereof.

10.04.    A Partner shall look solely to the assets of the Partnership for the return of his Capital Contributions and if the Partnership Property remaining after the payment or discharge of the debts and liabilities of the Partnership is insufficient to return same, he shall have no recourse against the Managing Partner or any other Partner. Partnership Property may be distributed by the Managing Partner in kind or on any reasonable basis determined by the Managing Partner, and distribution of the assets shall be conducted exclusively by the Managing Partner, who is authorized to do any and all acts and things authorized by law for those purposes.

10.05.    In connection with the termination of the Partnership, the Partnership's accountants shall prepare and furnish to each Partner a statement setting forth the assets and liabilities of the Partnership as of the date of complete liquidation. After distribution of all of the assets of the Partnership, the Partners shall cease to be such, and the Managing Partner, and to the extent required, Partners shall cause to be executed, acknowledged and filed all documents necessary to cancel the Partnership's Certificate of Partnership and terminate the Partnership.

11.    Books and Accounting; Fiscal Year

11.01.    The Managing Partner shall maintain adequate books and records of account which shall be kept in accordance with the method used for Federal income tax reporting purposes and which will reflect the Partnership transactions and are appropriate or adequate for the Partnership's business. All books and records of the Partnership shall be kept at the office of the Partnership or at such other place or places as may be determined by the Managing Partner and shall be available at reasonable times during business hours and upon reasonable notice for inspection and examination by the Partners or their duly authorized representative.

11.02.    The Partnership shall maintain accounts on an accrual or cash basis as determined by the Managing Partner. The fiscal period of the Partnership shall be the calendar year. The profits and losses of the Partnership shall be calculated in accordance with generally accepted accounting principles consistently applied. Capital accounts for all of the Partners shall

-9-

be maintained as part of the books of the Partnership and the amount of profits and losses of the Partnership, as well as Capital Contributions, and distributions from the Partnership shall be credited or charged, as the case may be, to the capital accounts of the respective Partners. Such capital accounts shall be maintained at all times, using the Federal income tax bases as property contributed to the Partnership.

11.03.    The Managing Partner shall cause income tax returns for the Partnership to be prepared by the Partnership's accountants and filed with appropriate authorities, and shall furnish to each Partner, within 90 days after the close of the Partnership's fiscal year, all tax information with respect to the Partnership as may be required for the preparation of the individual tax returns of the Partners. The Managing Partner is hereby designated as the Tax Matters Partner of the Partnership for all tax issues involving the Partnership.

11.04.    All funds of the Partnership are to be deposited in the Partnership's name in such bank account or accounts as may be designated by the Managing Partner, and shall be withdrawn on the signature of the Managing Partner, or his designee.    The funds of the Partnership shall not be commingled with the funds of any other person.

12.    Amendments

12.01.    This Agreement and the Certificate of Partnership may be amended by the Managing Partner without the agreement or consent of the Partners when such amendment (i) is required by law, (ii) gives effect to the admission of Partners and substitute Partners, or (iii) effects changes of a ministerial nature which do not materially and adversely affect the rights of the Partners.

12.02.    An amendment to this Agreement effecting a substantial modification of the rights of the Partners shall require the approval of Partners holding a majority in interest of all Partnership Interests.  Notwithstanding the foregoing provisions of this Section, no amendment may, without prior written approval of all Partners, (i) enlarge the obligations of any Partner under this Agreement, (ii) enlarge the liability of the Managing Partner to the Partners, or (iii) alter the Partnership in such manner as will result in the Partnership's no longer being classified as a "partnership" for Federal income tax purposes.

13.    Power of Attorney

13.01.    Each Partner hereby irrevocably constitutes, makes, and appoints the Managing Partner and his successors with full power of substitution, as his true and lawful attorney-in-fact and agent for such Partner as a Partner in the Partnership, with full power and authority for such Partner and in such Partner's name, place and stead, to make, execute, acknowledge, publish, file, deliver and swear to in the execution, acknowledgement, filing and recording of:

(a)    this Agreement and counterparts thereof, any separate certificates of partnership and any amendments to or cancellation of such certificates, required under the laws of the State of New York or the laws of any other jurisdiction in which such a certificate is required or may be appropriate to be filed;

(b)    any certificates, instruments and documents including, without limitation, fictitious name certificates, as may be required by, or may be appropriate under, the laws of any jurisdiction in which the Partnership is doing or intends to do business;

-10-

(c)    any other instrument which may be required to be filed by the Partnership under the laws of any jurisdiction or by any governmental agency, or which the Managing Partner deems it is advisable to file;

(d)    any documents which may be required to effect the continuation of the Partnership, the admission of an additional or substitute Partner, or the dissolution and termination of the Partnership;  and

(e)    all certificates and other instruments and all amendments thereto which the Managing Partner deems appropriate or necessary to qualify, or continue the qualification of, the Partnership as a partnership in the jurisdiction in which the Partnership may conduct business or own oil and gas interests.

13.02    The foregoing power of attorney:

(a)    is a special power of attorney coupled with an interest, is irrevocable, and shall not be affected by the disability or death of any of the Partners;

(b)    may be exercised by the Managing Partner by signing separately as attorney-in-fact for each Partner or, after listing all of the Partners executing any instrument, by a single signature of the Managing Partner acting as attorney-in-fact for all of them;  and

(c)    shall survive the delivery of an assignment by a Partner of the whole or any part of his Partnership Interest;  except that where the assignee thereof has been approved by the Managing Partner for admission to the Partnership as a substitute Partner, the power of attorney of the assignor shall survive the delivery of such assignment for the sole purpose of enabling the Managing Partner to execute, acknowledge and file any instrument necessary to effect such substitution.

13.03.    Each Partner hereby agrees to be bound by all of the representations of the Managing Partner made as his attorney-in-fact and waives any and all defenses which may be available to such Partner to contest, negate or disaffirm the power of attorney, and hereby ratifies and confirms all acts which said attorney-in-fact may take as attorney-in-fact hereunder in all respects as though performed by such Partner.

13.04.    In the event of any conflict between the provisions of the Agreement and any document executed or filed by the Managing Partner pursuant to the aforesaid power of attorney, this Agreement shall govern.

13.05.    Any person dealing with the Partnership may conclusively presume and rely upon the fact that any such instrument executed by such agent and attorney-in-fact is authorized, regular and binding without further inquiry.  If required, each Partner shall execute and deliver to the Managing Partner, within five days after the receipt of a request therefor, such further designations, powers of attorney or other instruments as the Managing Partner shall reasonably deem necessary for the purpose of this Section 13.

14.    Miscellaneous

14.01.    Any notice required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given or made if delivered personally to the person to whom sent, or if sent by certified or registered mail, return receipt requested:

(a)    in the case of the Managing Partner, at the office of the Partnership;

-11-

(b)    in the case of a Partner, to his address as it appears on the records of the Partnership; or

(c)    to such other address as the Managing Partner or a Partner, as the case may be, shall designate in writing as aforesaid.

14.02.  If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid, illegal or unenforceable in any respect, the remainder of this Agreement, or the application of such provision to any person or circumstances other than those as to which it is held invalid, illegal or unenforceable, shall not be affected or impaired thereby.

14.03.  Except as otherwise provided herein, this Agreement shall be binding upon the parties hereto, their successors, heirs, devisees, assigns, legal representatives, executors and administrators.

14.04.  The parties have formed this partnership pursuant to the Partnership Act of the State of New York and intend that the Partnership shall be subject to the statute corresponding to the Uniform Partnership Act.  If any provision in this Agreement shall be held to be invalid, such holding shall not in any way whatsoever affect the validity of the remainder of this Agreement or affect the intent of the parties to form the Partnership pursuant to said law.

14.05.  The captions contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit or extend the scope of this Agreement.

14.06.  Wherever the singular number is used in this Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders, and the word "person" shall include a corporation, firm, partnership or other form of association.

14.07.  All documents referred to herein are by this reference made a part hereof as though fully set forth herein.

14.08.  This Agreement may be executed in one or more counterparts and in such event each counterpart shall constitute an original and all such counterparts shall constitute one agreement.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement and Certificate as of the year and date first above written.

MANAGING PARTNER
George G. Coleman

_____

PARTNER

_____

-12-

## ACKNOWLEDGEMENT IN NEW YORK STATE

STATE OF NEW YORK     COUNTY OF                    ss:

    On                              before me, the undersigned, personally came
                       , personally known to me or proved to me on the basis of satisfactory
evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by
his/her/their signature(s) on the instrument, the individual(s) or the person upon behalf of which
the individual(s) acted, executed the instrument.

                                  _____
                                  Notary Public

## ACKNOWLEDGEMENT OUTSIDE NEW YORK STATE

STATE OF            COUNTY OF           ss:

    On                              before me, the undersigned, personally came
                       , personally known to me or proved to me on the basis of satisfactory
evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by
his/her/their signature(s) on the instrument, the individual(s) or the person upon behalf of which
the individual(s) acted, executed the instrument, and that such individual made such appearance
before the undersigned in

(insert city or political subdivision and state or county or other place acknowledgment taken).

                                  _____
                                  Notary Public

Schedule A

| Name | Address | Capital Contribution" and |
|------|---------|---------------------------|

Exhibit "A"

PROSPECT AGREEMENT

THIS AGREEMENT made and entered into effective as of the 1st day of March, 2003 by and among **PALACE EXPLORATION COMPANY** ("Assignor") an Oklahoma corporation, **INDIAN VILLAGE DRILLING COMPANY** ("Assignee"), a New York partnership, with offices and principal place of business at 475 Northern Boulevard, Great Neck, New York 11021, **OIL AND GAS TITLE HOLDING CORP.** ("Nominee Title Holder"), a Texas corporation with offices and principal place of business at 5 East 59 Street, New York, New York 10022, and **THE BISTATE OIL DISTRIBUTION CORP.** ("Designated Distributer"), a New York corporation with offices and principal place of business at 5 East 59 Street, New York, New York 10022.

WHEREAS, **Assignor** represents that it is the owner of certain interests and farmout rights in oil and gas leases and lands covered thereby, which interests and farmout rights in oil and gas leases are hereinafter referred to as the "*Prospects*"; and

WHEREAS, previously oil and gas wells may have been drilled on portions of each of the *Prospects* and field rules have been applied for and approved creating proration drilling units *("PD Units")*; and

WHEREAS, **Assignor** desires to assign, and **Assignee** desires to acquire a portion of the rights and obligations of **Assignor** in and to one PD Unit in each *Prospect*, so that it may participate in the drilling of the wells as indicated hereinafter, subject to the terms and conditions expressed herein.

NOW, THEREFORE, in consideration of the premises, and the covenants, representations and agreements hereinafter contained, the sufficiency of which is hereby acknowledged by the parties hereto, it is hereby agreed by and between the parties hereto as follows:

1.      **Assignor** hereby assigns, transfers and sets over unto **Assignee** such portion of all of its rights in and to the *Prospects* subject to all the terms, conditions, duties and obligations of **Assignor** under the Lease and Farmout agreements assigned thereby which **Assignee** hereby expressly assumes and further subject to the retained rights and conditions contained hereinbelow. Notwithstanding the forgoing, **Assignor** shall convey to **Assignee** its proportionate share of 100% of the working interest on the *Prospects* as shown in Exhibit A attached, as supplemented from time to time. *Any assignments made hereunder shall be without warranty of title, express or implied.*

**Assignor** will convey legal title to the *Prospects;* and wells to **Assignee** but will record title in the name of **Nominee Title Holder** as nominee on behalf of **Assignee**, and **Nominee Title Holder** will maintain separate and distinct records and accounts of the *Prospects* and wells which it is holding on behalf of **Assignee** and will indicate therein that such *Prospects* and wells are held by it only as a nominee and in trust for the benefit of **Assignee**.

2.      **Assignee** shall be responsible for and pay to **Assignor** its proportionate share of all costs incurred in acquiring the leases comprising the *Prospects* as shown on Exhibit A, shall be subject to al preexisting lease and royalty conversions and backins.

3.      Assignor shall deliver to **Assignee** a net revenue interest of 60% on every lease, reserving for itself, as an overriding royalty the difference between the actual net revenue interest purchased by **Assignor** and the 60% net revenue interest delivered to **Assignee**.

4.      **Assignor** agrees to prepare and tender all required delay rentals, shut-in gas well payments, and/or other payments which may be required under the terms of the oil and gas leases subject hereto. **Assignor** shall not be liable to **Assignee** for any mistake it may make in tendering, or failing to tender such payments, except those that involve gross or willful negligence. **Assignor** agrees to promptly provide **Assignee** evidence of any such payment made, by forwarding copies of the applicable receipts directly to **Assignee's** office.

5.      **Assignee** hereby appoints **Designated Distributor** , and **Designated Distributor** hereby accepts to be the distribution agent for **Assignee** for all net cash receipts earned pursuant to the production and sale of oil and gas from the wells drilled on the *Prospects* herein conveyed less all operating expenses incurred in the production and sale of such oil and gas. **Designated Distributor** will charge $2,500 per year for these services and will make distribution to **Assignee** quarterly during the last week of January, April, July and October and issue with such distribution a complete history of receipts and disbursements by well and by month.

6.      This Agreement shall be governed by the laws of the State of New York, and shall bind, and shall inure to the benefit of the parties hereto and their respective successors and assigns, provided that no assignment hereof of any interest therein by and party hereto shall relieve such party of its duties and obligations hereunder, but such party shall remain fully liable and bound thereunder as if no assignment had been made. Any assignment by a party hereto shall be made expressly subject to this Agreement and its Exhibits.

**INDIAN VILALGE DRILLING COMPANY**

By_____

**PALACE EXPLORATION COMPANY**

By_____

-2-

SCHEDULE A TO PROSPECT AGREEMENT

Prospects Assigned

To be supplied on or before December 31, 2003

Exhibit "B"

<u>TURNKEY DRILLING CONTRACT</u>

THIS AGREEMENT made and entered into effective as of the 1st day of March, 2003 by and between **INDIAN VILLAGE DRILLING COMPANY**, ("Owner"), with principal place of business at 475 Northern Boulevard, Great Neck, New York 11021 and **TAQ DRILLING CO., INC.** ("Driller") a New York Corporation with offices and principal place of business at 475 Northern Boulevard, Great Neck 11021.

WHEREAS, **Owner** represents that it is the owner of certain interests and farmout rights in oil and gas leases and lands covered thereby (hereinafter referred to as the "*Drill Sites*"); and wishes to contract with **Driller** to drill one well on each *Drill Site*; and

WHEREAS, the parties intend that **Driller** shall commence the drilling of one well upon each of the *Drill Sites* for the purpose of exploring for oil and gas, and shall provide management and supervision of the drilling of such well together with total financial protection of **Owner** against unforeseen drilling expenses.

NOW, THEREFORE, in consideration of the premises, covenants, representations and agreements hereinafter contained, the sufficiency of which is hereby acknowledged by the parties hereto, it is hereby agreed by and between the parties hereto as follows:

1.      As soon as practicable after the execution of this Agreement, but in no event later than December 31, 2003, **Driller** shall commence or cause to be commenced the actual drilling with suitable rotary tools and the payment or prepayment of each well in search of oil and

gas at legal locations selected by **Owner**, and shall thereafter continue or cause to be continued the drilling thereof with due diligence and in a workmanlike manner to a depth to adequately test the formations or depth as more particularly described in Exhibit A, attached hereto.

       2.      In consideration for drilling the wells, **Owner** shall be responsible for and pay to the **Driller** the non-refundable sum as shown of up to DOLLARS ($      .) based upon the sale of 25 UNITS subscription units by Owner (the "Turnkey Price") as shown on Exhibit "A", less the sum of $25,000, which shall be payable as follows:

      A.      $      . in cash at Closing;

      B.      The balance ($      .) by the delivery of **Owner's** note bearing interest at the rate of eight percent (8%) per annum, payable on or before December 31, 2018 (on account of drilling costs.) ("Turnkey Note") Exhibit B.

      As collateral for the payment of the Turnkey Note (together hereinafter referred to as the "Note"), and for the payment and performance of all liabilities and obligations of **Owner** to **Driller**, **Owner** hereby pledges, transfers, assigns, grants a security interest in and delivers to the **Driller** all of his right, title and interest (i) in the production and proceeds therefrom from all of the wells, drilled hereunder, (ii) in the wells themselves and, (iii) the Subscription Notes of the Partners comprising **Owner** and any security or collateral securing such Subscription Notes. **Owner**, at anytime, may substitute the collateral of the Subscription Notes of its Partners by pledging marketable securities acceptable to **Driller**.

      3.      During the drilling of each well, **Driller** shall at its sole cost, risk and expense provide and furnish the following for each well:

-2-

(a)    Necessary curative work to assure soundness of title to that lease on which the *Drill Site* is located;

(b)    Staking of location and permit to drill;

(c)    Necessary road for access to and location for the *Drill Site*;

(d)    Complete drilling rig and other drilling accessories and equipment necessary to drill to the objective depth;

(e)    All cement and cementing services required for setting surface casing;

(f)    All drilling mud, chemicals, and foreign weight materials, if any, obtained and used in drilling to the objective depth;

(g)    An Electric Induction Log of the borehole from the bottom of the surface casing to the objective depth;

(h)    Plug and abandon according to the regulations of the applicable regulatory agency and settle surface damages if no completion attempt is made;

(i)    All labor and third party services necessarily required for items (a) through (h) above, and customary liability and property insurance.

4.    For the purposes of this Agreement, the point in time at which the well has been drilled to the objective depth, and either plugged and abandoned, or completed up to the tank battery or meter, shall be the Turnkey Point. After such Turnkey Point, all costs shall be borne by the **Owner**.

5.    During the course of the drilling and completing of said well to the Turnkey Point, **Driller** shall be responsible for, and conform to, all applicable obligations imposed on **Owner** under the applicable leases and assignment agreements.

6.    With reference to the wells drilled on the *Drill Sites*, **Driller** shall maintain and hold available for **Owner**;

-3-

(a)    Daily drilling reports;

(b)    Copies of records of any tests which may be made in the borehole and of the analysis which may be made of the materials taken therefrom;

(c)    Copies of Induction Logs to be picked up at the well site and upon completion or abandonment, composite of all logs run in the well;

(d)    In the event the well is abandoned as a dry hole, a certified copy of the plugging records showing that the  well has been plugged and abandoned.

7.    Owner shall not be responsible for paying any cost overruns except those due to extraordinary problems on a well or wells.

The actual costs of completing and drilling a well which result from "extraordinary" circumstances will be borne by Owner if it elects to continue drilling and testing efforts after being informed by Driller of the "extraordinary circumstances." Examples of such "Extraordinary" circumstances would be:

1.    An Act of God, War, Force Majure or a Strike (lasting more than 30 days.

2.    An occurrence of an operational hazard which requires the re-drilling of a Well after drilling more than 75% of the footage to estimated target zone for completion.

3.    A decision by other third party participants in the drilling of a Well not to proceed to completion.

If Driller is rendered unable, wholly or in part, by an occurrence or event beyond its control, to carry out its obligations under this Drilling Contract, it shall give Owner notice of such event or occurrence with reasonably full particulars.  Owner may either elect to terminate this Drilling Contract as to that well and receive a return of the unused portion of the Turnkey Price applicable to that well, or elect to pay for such extraordinary overruns.

8.    **Driller** shall be allowed to sublet or assign any of the work required hereunder at its own expense without the written consent of **Owner**.

9.    **Driller** shall indemnify and hold **Owner** harmless from losses suffered due to the failure of one or more subcontractors to perform contracted services in an adequate and workmanlike manner.

10.    This Agreement shall be binding upon all parties and upon their respective successors and assigns.

11.    This Agreement shall be construed and interpreted under the laws of the State of New York.

IN WITNESS WHEREOF, the parties have executed this Agreement the day and year set forth opposite their respective signatures hereto.

TAQ DRILLING CO., INC.

Dated:_____       By_____

INDIAN VILLAGE DRILLING COMPANY

Dated:_____       By_____
                                George G. Coleman
                                Managing Partner

-5-

Exhibit A to Exhibit "B"

To Be Supplied On Or Before December 31, 2003

Exhibit "B"
to
Exhibit "B"


TURNKEY NOTE


$        .          New York, New York              , 2003

       Indian Village Drilling Company, a New York partnership (the "Partnership"), for value received, hereby promises to pay to TAQ Drilling Co., Inc., a New York corporation ("TAQ") on December 31, 2018 the principal amount of           DOLLARS ($       .) or such lesser principal amount as may be outstanding hereunder with interest as specified below.

       As part of the purchase price for his interest in the Partnership, each Partner executed and delivered to the Partnership a promissory note payable on or before December 31, 2018 (the "Subscription Note").

       This Note is issued pursuant to a certain Indian Village Drilling Company Turnkey Drilling Contract (the "Contract") dated as of March 1, 2003 by and between the Partnership and TAQ Drilling Co., Inc. and is secured by the Subscription Notes of the Partners and any and all collateral securing such Subscription Notes as well as by the Contract. The Partnership shall have the right at anytime to substitute marketable securities acceptable to TAQ in place of Subscription Notes of its Partners. The Partnership shall be entitled to offset all amounts due and owing to TAQ under this Note for any and all defaults by TAQ under the Contract. Except as specifically limited therein, the holder hereof is entitled to the benefits of the Contract and of such security. Accrued interest hereon shall be payable from Partnership net operating revenues. Principal shall be payable out of 50% of the remaining Partnership net operating revenues.

       The Partnership shall pay interest on the unpaid principal amount hereof commencing the date of issuance hereof, computed on the basis of the actual number of days elapsed over a year of twelve months (each month consisting of thirty days) prior to maturity (whether by acceleration or otherwise) at an annual rate equal to eight percent (8%) payable in arrears at maturity, except for the period from the date of this Note until December 31, 2003 during which period the interest rate will be 1% per annum and will be accrued.

       The indebtedness evidenced by this Note may be prepaid by the Partnership.

       No delay or omission on the part of the holder in exercising any right hereunder shall operate as a waiver of such right or of any other right of such holder, nor shall any delay, omission or waiver on any one occasion be deemed a bar to or waiver of the same or any other right on any future occasion. The Partnership and every endorser or grantor of this Note, regardless of the time order or place of signing, waive presentment, demand, protest and notices of every kind and assent to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of collateral, and to the addition or release of any other party or person primarily or secondarily liable.

       The Partnership agrees to pay all costs of collection of the principal or any interest on this Note, including without limitation reasonable attorneys' fees.

This Note is made and delivered in New York, New York and shall be governed by the laws of the State of New York.

INDIAN VILLAGE DRILLING COMPANY

By_____
   George G. Coleman
   Managing Partner

# EXHIBIT 8

AGREEMENT AND CERTIFICATE OF PARTNERSHIP

OF

CONDOR DRILLING COMPANY

THIS AGREEMENT OF PARTNERSHIP (the "Agreement") is made and entered into effective the 1st day of September, 2003 by and among GEORGE G. COLEMAN (referred to as "Managing Partner" and sometimes as a "Partner", whose principal address is 475 Northern Boulevard, Great Neck, New York 11021 and persons, individuals or other entities whose names and addresses are set forth on Schedule A hereto and who have executed a copy of this Agreement (" hereinafter individually referred to as a "Partner" and collectively with the Managing Partner, referred to as "Partners") pursuant to the New York Uniform Partnership Act (the "Partnership Act").

WITNESSETH:

WHEREAS, the Partners hereby agree to form a partnership pursuant to the Partnership Law of the State of New York (the "Partnership"); and

WHEREAS, it is the intention of the Partners to set forth the terms and conditions under which the Partnership is to operate;

NOW, THEREFORE, it is agreed as follows:

1.     Formation and Term of Partnership

1.01.   The parties hereto have agreed to form and by executing this Agreement, do enter into a partnership formed under the Partnership act and other applicable laws of the State of New York, which act shall govern the rights and liabilities of the parties, except as otherwise herein expressly provided.

1.02.   The term of the Partnership shall commence on the date hereof and shall continue until December 31, 2036 unless sooner terminated in accordance with the provisions of this Agreement or as otherwise provided by law.

1.03.   The parties hereto shall from time to time execute or cause to be executed all such certificates or other documents and do or cause to be done all such filing, recording, publishing or other acts as may be appropriate to comply with the requirements of law for the formation and operation of a partnership under the laws of the State of New York.

2.     Name, Principal Office and Address

2.01.   The name of the Partnership is CONDOR DRILLING COMPANY and the Partnership shall do business under the name of CONDOR DRILLING COMPANY.

2.02.   The address of the principal office of the Partnership shall be 475 Northern Boulevard, Great Neck, New York 11021, provided, however, that the Managing Partner may, by written notice to all Partners, change the address of the principal office. The Partnership books and records kept at such place as the Managing Partner may from time to time determine.

3.    Purpose

3.01.  The purposes of the Partnership shall be to:

(a)    invest in the acquisition, development and drilling of oil and gas leases;

(b)    acquire oil and gas leases developed and operated by other oil and gas companies; and/or

(c)    produce and sell hydrocarbons.

3.02.  In recognition of the foregoing purposes, the capital of the Partnership may be invested in one or more of the following assets (collectively, the "Partnership Property"):

(a)    interests in oil and gas leases, royalties and similar oil and gas property interests;

(b)    equipment and other materials necessary or desirable for drilling, equipping and operating wells on leases in which the Partnership has an interest;

(c)    acreage;

(d)    partnership interest in general or limited partnerships engaged in activities that are consistent with the purposes of the Partnership; and

(e)    interests in other oil and gas properties of a character acquired and developed by other oil and gas companies, such as gathering systems, pipelines, processing plants and other facilities required for the preparation of oil and/or gas production for market.

4.    Partners and Capital

4.01.  The Managing Partner of the Partnership shall be George G. Coleman ("Managing Partner").  The address of the Managing Partner shall be the same as the office address of the Partnership.

4.02.  The Partners of the Partnership and their capital contributions shall be as listed on Schedule "A" attached hereto.

4.03.  The interests of the Partners, other than the Managing Partner, shall be represented by Units and there are hereby authorized for issuance and sale 25 Units of Partnership interest.

4.04.  During the period from the date hereof, to and including December 31, 2003 (the "Subscription Period"), the Managing Partner, on behalf of the Partnership, shall have the right to offer Initial Units and to admit to the Partnership as Partners those persons who are acceptable to the Managing Partner and who otherwise satisfy the requirements of this Agreement. Each person desiring to become a Partner may apply for admission by (i) completing, signing, and delivering to the Managing Partner a "Subscription Agreement" in such form as established by the Managing Partner; a signed signature page to this agreement and (ii) payment of 100% of his capital commitment. The Managing Partner may, in his sole discretion, decline to admit any person as a Partner for any reason whatsoever.  All applications which are rejected shall be returned to the subscriber, together with all funds tendered, without interest.  Persons whose

applications are accepted by the Managing Partner will be admitted as Partners in the order that their applications are accepted and payment on their subscriptions are received by the Managing Partner.

4.05. The purchase price for each Unit shall be TWO HUNDRED EIGHTY THOUSAND DOLLARS ($280,000). By executing the Subscription Agreement, each Partner subscribes and agrees to contribute to the capital of the Partnership the amount shown in his Subscription Agreement. Subject to Section 4.06 below, the Managing Partner reserves the right, in his sole discretion to subdivide Units and sell portions thereof. No Partner in his or its name may subscribe for or hold Units for the benefit of any other person or entity.

4.06. Each Partner will pay for his Partnership interest at Closing, ONE HUNDRED THOUSAND DOLLARS ($100,000) cash per unit plus the execution of a full recourse promissory note (the "Note") in the amount of ONE HUNDRED EIGHTY THOUSAND DOLLARS ($180,000) bearing interest at the rate of 8% per annum due on December 31, 2018 and payable to the Partnership.

4.07. The Managing Partner is hereby authorized to sell fractional parts of a Unit provided that the price therefor shall be the pro rata part of the purchase price of a full unit. The smallest fractional unit shall be one-half unit.

4.08. Subscriptions for Units will be accepted by the Managing Partner, in his sole discretion, during the Subscription Period, until subscription for the maximum aggregate Capital Contribution by the Partners of SEVEN MILLION DOLLARS ($7,000,000) has been received and accepted or the Managing Partner, in his sole discretion, closes the Partnership at a lesser amount but in no event less than ONE MILLION FOUR HUNDRED THOUSAND DOLLARS ($1,400,000) of Capital Contributions in the aggregate. The Managing Partner shall also contribute an amount which, upon contribution, will equal 1% of the aggregate capital Contribution of all Partners, including the Managing Partner, to the Initial Partnership Capital. The Managing Partner shall have the right, in his sole discretion and at any time prior to the Closing, to increase the maximum aggregate Capital Contribution by the Partners, upon notice to the Partners.

5.    Allocation of Revenues and Costs and Tax Matters

5.01. All items of Partnership income, expense, gain, deduction, loss or credit shall be allocated to the Partners in proportion to their Capital Contributions.

5.02. The Partners (including the Managing Partner) shall share inter se items of income, gain, deduction, loss and credit allocated to them as a group in proportion to their respective Capital Contributions. Such share shall be computed by the application of a fraction for each Partner, the numerator of which shall be an amount equal to his Capital Contributions and the denominator an amount equal to the aggregate of all Capital Contributions. No Partner shall be entitled to have priority over any other Partner as to profits of the Partnership or otherwise.

5.03. All cash revenues remaining after payment of the obligations incurred for drilling, operation and development of the Partnership Property, administrative costs, capital expenditures and establishing whatever cash reserve considered suitable by the Managing Partner shall be distributed 99% to the Partners and 1% to the Managing Partner.

5.04. All items of Partnership income, gain, deduction, loss and credit for Federal income tax purposes, including allocation of depreciation deductions computed at the partnership

level, shall be allocated among the Partners in the ratios provided in Paragraphs 5.01. 5.02 and 5.03 of this Section 5. As between an Assignor Partner and his Assignee, the share of income, gains, losses, deductions and credits so allocated shall be apportioned on the basis of the number of days in the calendar year that each was the holder of the Partnership interest assigned, without regard to the results of the Partnership's operations during the periods before and after assignment.

5.05. If at any time the allocation provisions of this Section 5 do not result in the Managing Partner being allocated at least 1% of the Partnership's costs and revenues and at least 1% of each of its specially allocated items of revenues, costs, loss, deduction or credit, then this Paragraph 5.05 shall become operative and cause the Managing Partner to be allocated so much more of each of those items as will cause him to be allocated at all times at least 1% of the Partnership's revenues, costs, and specially allocated items.

5.06. No interest shall be paid on any Capital Contributions of the Partners.

5.07. Upon the transfer of all or a part of a Partnership Interest or upon the death of an individual Partner or upon the distribution of Partnership Property to any party hereto, the Partnership, at the Managing Partner's option, may file an election, in accordance with applicable laws and regulations, to cause the basis of the Partnership Property to be adjusted for Federal income tax purposes as provided by sections 734, 743 and 754 of the Internal Revenue Code of 1986, as amended (the "Code").

6.    Rights, Duties and Obligations of the Managing Partner

6.01. The Managing Partner shall have full and exclusive power and authority on behalf of the Partnership to manage, control, administer and operate the business affairs of the Partnership, and to do or cause to be done any and all acts deemed by the Managing Partner, within his sole discretion, to be necessary or appropriate thereto. In dealing with the Managing Partner on behalf of the Partnership, no person shall be required to inquire into the authority of the Managing Partner to bind the Partnership. The scope of such power and authority shall encompass all matters in any way connected with such business or incidental thereto, including, but not limited to, the power and authority:

(a)    to expand the Partnership capital and revenues in furtherance of the business of the Partnership;

(b)    to enter into and execute agreements and related documents in connection with the business of the Partnership;

(c)    to operate producing properties and/or enter into operating agreements with others with respect to properties acquired by the Partnership, naming a third party as operator, and containing such terms, provisions and conditions as the Managing Partner shall approve, including terms designating a third party as collecting and disbursing agent for Partnership revenues and authorizing expenditure of Partnership revenues toward the employment of new enhanced recovery methods;

(d)    to purchase, at his discretion, at the expense of the Partnership, such amounts of liability and other insurance which may be available to protect the Partnership's properties and business and to protect the Partners against liabilities to third parties arising out of Partnership activities;

(e)    to execute, on behalf of the Partnership, any and all documents or

-4-

instruments of any kind which the Managing Partner may deem appropriate in carrying out the purposes of the Partnership, including, without limitation, pooling, farmout, and unitization agreements, oil and gas sales contracts, division orders, or other marketing agreements, documents or instruments of any kind or character, or amendments thereto;

(f)    to purchase or lease equipment, including production equipment for Partnership purposes;

(g)    to pay, collect, compromise, arbitrate, resort to legal action for or otherwise adjust claims or demands of or against the Partnership;

(h)    to sell payments from production for any Partnership purpose, including but not limited to, the purpose of developing, equipping and improving the properties of the Partnership;

(i)    to acquire leases, permits, reservations, mineral or fee rights, working interests or contractual rights, or options to obtain same, in such oil and/or gas properties as the Managing Partner may select from time to time for investment by the Partnership. The properties may consist of all or any fraction of the total working interest or contractual rights, therein and may be subject to overriding royalty and other leasehold or contractual burdens of a similar nature as the Managing Partner may deem reasonable;

(j)    to determine to what extent the Partnership Property is to be explored, drilled, completed, sold, farmed out or otherwise disposed of or abandoned;

(k)    to employ, on behalf of the Partnership, agents and employees, including accountants, lawyers, engineers, geologists, geophysicists, landmen, and clerical help, and to obtain such other assistance and services as the Managing Partner may deem proper and to pay therefor such remuneration as the Managing Partner may deem reasonable and appropriate;

(l)    to guarantee the payment of money or the performance of any contract or obligation by any person, firm or corporation on behalf of the Partnership;

(m)    to establish from income derived from the Partnership's operations such reserves as the Managing Partner shall deem reasonable to help meet anticipated Partnership expenses, and subject to the requirements of applicable partnership laws, to distribute Partnership income at such times as, and to the extent that the Managing Partner determines there is sufficient cash on hand for Partnership requirements;

(n)    to loan money to the Partnership on substantially the same terms and conditions as would commercial banks, and charge the Partnership interest on the money so loaned not in excess of the amounts which would be charged the Partnership (without reference to the Managing Partner's financial abilities or guarantees) by unrelated banks on comparable loans for the same purpose, without receiving any points or other finance charges or fees;

(o)    to borrow funds on behalf of the Partnership for the purpose of financing costs of the Partnership, and to secure such loan with a mortgage or other lien on any or all of the Partnership Property or the production therefrom or the interest of either the Managing Partner or the Partners in any such property or production therefrom;

(p)    to sell or lease any property to the Partnership, or purchase or lease any property from the Partnership;

-5-

(q)    to convert the Partnership to a limited liability company pursuant to the laws of New York State at any time after two years from the date the Partnership closes.

(r)    to amend this agreement to make immaterial changes without the consent of the Partners and to make material amendments subject to the provisions of this Agreement.

6.02.  Anything in the foregoing provisions of Paragraph 6.01 of this Section 6 to the contrary notwithstanding, the Managing Partner shall not have the authority, without the written consent of the Partners holding a majority in interest of all the Partnership Interests, to sell or to otherwise dispose of all or substantially all of the Partnership's assets and otherwise change the general character of the Partnership's business.

6.03.  The Managing Partner is required to devote only such time as may be necessary for the proper performance of his duties to the Partnership and shall have the right to be engaged, as an employee, partner, consultant, shareholder or in any other capacity, independently or with others, in other business ventures, including, without limitation, ventures to explore, develop and produce oil, gas and other mineral properties in competition with the Partnership without liability for breach of fiduciary duty to the Partnership. The Managing Partner, independently or as so engaged, shall have the right to develop, manage and operate additional oil, gas and other mineral properties acquired at any time, whether or not competitive to the Partnership.

6.04.  The Managing Partner shall not be liable, responsible or accountable to any of the Partners or the Partnership for any loss or damage resulting from any error in judgment or other acts or omissions on behalf of the Partnership performed or omitted by said Managing Partner in good faith and in a manner reasonably believed to be within the scope of the authority granted to him by this Agreement and in the best interests of this Partnership, unless said Managing Partner has been guilty of gross negligence or willful misconduct with respect to such acts or omissions. Any loss or damage incurred by the Managing Partner by reason of any act or omission so performed or omitted by him (and not involving gross negligence or willful misconduct) shall be paid by the Partnership, and the Managing Partner shall be indemnified therefor to the extent assets are available, but the Participating Partners shall not have any personal liability to the Managing Partner or to the Partnership on account of such loss or damage. Moreover, the Managing Partner shall not be liable to the Partnership or any of the Partners because any taxing authorities disallow or adjust deductions or credits in the Partnership's or Partner's income tax returns. Anything in this Agreement to the contrary notwithstanding, the Managing Partner shall not be personally liable for the return of Capital Contributions of Partners or for any portion thereof (except out of Partnership assets), it being expressly understood that any return of capital shall be made solely from the assets of the Partnership; nor shall the Managing Partner be required to pay to the Partnership or to any of the Partners any capital deficits of any Participating Partner upon dissolution or otherwise.

6.05.  The Managing Partner shall not be deemed to have received commissions, fees or other compensation paid to any firm, proprietorship, partnership or corporation which is an Affiliate of the Managing Partner, or in which the Managing Partner or any Affiliate owns a beneficial interest. Nothing herein shall restrict the right of the Managing Partner or any other person to receive the income or distribution to which they would otherwise be entitled as a Partner under the terms of this Agreement. Nothing contained in this Agreement shall be deemed to prevent or restrict the Managing Partner, or any related person or entity, from obtaining or sharing in all or any part of the brokerage fees, commissions or other sums payable in connection with any property purchased or sold by the Partnership.

6.06.  The Managing Partner is hereby authorized to enter into the Prospect

-6-

Agreement with Palace Exploration Company ("Palace") attached hereto as Exhibit "A" and the Turnkey Drilling Contract with TAH Drilling Co., Inc. ("TAH") attached hereto as Exhibit "B" and is authorized, without limiting the other provisions of this Section 6 to fulfill its obligations under them.

7.     Rights, Duties, and Obligations of the Partners

The Partners shall have the following rights, duties and obligations:

7.01.   No Partner other than the Managing Partner shall (i) take part in the management of the business or transact any business for the Partnership, (ii) have the power to sign for or to bind the Partnership, or (iii) be paid any salary or have a drawing account or receive interest on his Capital Contributions.

7.02.   The Partners shall have no right to remove the Managing Partner, compel his withdrawal from the Partnership or elect additional managing partners, except on the death, retirement, legal incapacity, bankruptcy or withdrawal of the Managing Partner.

8.     Assignment of Partnership Interests

8.01.   Subject to any requirement or restriction of applicable law and/or regulations issued by the Securities and Exchange Commission, a Partner may sell, assign or otherwise transfer all or any part of his Partnership Interest after the payment of the sums due under Section 4.06. For an Assignment to be effective, an Assignee shall execute this Agreement and Certificate of Partnership and a Note for the balance of the sum due under the Assignor's note.

8.02.   The trustees, executor, administrator, committee or guardian of the estate of a Partner who shall have died or been adjudicated bankrupt or incompetent shall have all the rights and obligations of such Partner for the purpose of settling or managing his estate and such (and only such) power as the deceased, bankrupt, or incompetent Partner possessed to assign all or any part of his Partnership Interest.

8.03.   For Federal income tax purposes, allocation of profits and losses of the Partnership, including depletion and depreciation attributable to any assigned interest, shall be prorated between the assignor and assignee on the number of days such interest was held by each of them during the calendar year, or on any other reasonable basis determined by the Managing Partner which is consistent with applicable law and regulations. The reflection of any assignment on the books of the Partnership shall not constitute the substitution of the assignee as a Partner, which may be effected only as provided above in this Section 8.

8.04.   The Partnership shall, on and after the effective date of the assignment as provided in Paragraph 8.01 of this Section 8, pay all further distributions of profits or return of capital on account of the interest so assigned to assignee. In the absence of notice to the Managing Partner of the assignment of a Partnership Interest, whether by operation of law or otherwise, any payment to an assigned Partner or to his assignee or to their respective executors, administrators or legal representatives shall acquit the Partnership and the Managing Partner or liability, to the extent of such payment, to any person who may be interested in such payment.

8.05.   By executing this Agreement, each Partner shall be deemed to have consented to any assignment consented to by the Managing Partner.

8.06.   No such assignment by a Partner, including an assignment of less than all of a Partner's Partnership Interest hereunder or the assignment of such Partnership Interest to

-7-

more than one party, shall relieve the assignor of his obligations hereunder, whether arising prior to or subsequent to such assignment, nor shall any such assignment require the accounting by the Managing Partner to more than one party, who shall be unanimously designated by the assignees or, if he shall have retained an interest hereunder, the assignor.

9.    Compensation of the Managing Partner

9.01.    The Managing Partner will receive from the Partnership a Twenty-Five Thousand ($25,000.00) Dollar management fee for services, expertise and supervision of the operations of the Partnership on or before December 31, 2003.

9.02.    The Managing Partner will be allocated items of Partnership profits and losses as hereinabove set forth in Section 5.

9.03.    The Managing Partner will receive from the partnership an annual fee for consulting, managerial and administrative services in operating the Partnership, equal to 2% of the net cash revenues, exclusive of Capital Contributions, of the Partnership. All costs and expenses paid by the Managing Partner in operating the Partnership shall be reimbursed to the Managing Partner over and above the aforesaid fee.

10.    Duration and Termination

10.01.    Subject to the provisions of Article 10.02, the Partnership shall be dissolved and terminated and its affairs wound up upon the first to occur of the following:

(a)    the death, retirement, legal incapacity, voluntary or involuntary bankruptcy, or withdrawal of the Managing Partner, unless 51% of the remaining Partners agree to continue the Partnership and a successor to the Managing Partner is selected;

(b)    a determination by the Managing Partner to terminate and dissolve the Partnership;

(c)    upon disposition of all of the Partnership Property (except for the sale of natural gas or oil);

(d)    the affirmative vote of the holders of 100% of the Partnership Interests; or

(e)    December 31, 2036.

10.02.    Neither the death, legal disability, bankruptcy, dissolution, withdrawal or expulsion of a Partner, nor the assignment of all or any part of the Partnership Interest of a Partner, nor the substitution nor admission of a Partner shall cause the dissolution or termination of the Partnership, but if this provision conflicts with any applicable law, or any other provision of these Articles, then all of the Partners herewith agree to form a new partnership immediately upon such termination of this Partnership, which new partnership will adopt these Articles of Partnership as its Articles of Partnership and the business of this partnership shall continue in the newly constituted partnership without disruption.

10.03.    Upon the dissolution of the Partnership, it shall be wound up, its debts and liabilities shall be paid and the remaining assets shall be distributed in the order provided herein. Except as otherwise expressly permitted under this Agreement, upon the dissolution of the

-8-

Partnership, the Partnership shall be liquidated by a liquidating trustee who shall be (i) the Managing Partner, or if there be none, (ii) a person or persons designated by a majority in interest of the Partners. In carrying out the liquidation of the Partnership, the liquidating trustee shall have all the rights and powers of the Managing Partner hereunder. Partnership Property may be sold at such prices as may be deemed reasonable by the liquidating trustee, and the proceeds thereof as well as all other cash and properties of the Partnership shall be distributed as follows:

(a)    all the Partnership's debts and liabilities to persons other than the Partners shall be paid and discharged;

(b)    all of the Partnership's debts and liabilities to the Managing Partner and/or Partners shall be paid and discharged;

(c)    to the Partners with respect to any undistributed share of profits; and

(d)    to the Partners with respect to their then capital accounts;

(e)    to the Managing Partner with respect to any undistributed share of profits;

(f)    to the Managing Partner with respect to his then capital account; and

(g)    the remaining assets to the Partners, in accordance with the provisions of Paragraph 5.03 hereof.

10.04.    A Partner shall look solely to the assets of the Partnership for the return of his Capital Contributions and if the Partnership Property remaining after the payment or discharge of the debts and liabilities of the Partnership is insufficient to return same, he shall have no recourse against the Managing Partner or any other Partner. Partnership Property may be distributed by the Managing Partner in kind or on any reasonable basis determined by the Managing Partner, and distribution of the assets shall be conducted exclusively by the Managing Partner, who is authorized to do any and all acts and things authorized by law for those purposes.

10.05.    In connection with the termination of the Partnership, the Partnership's accountants shall prepare and furnish to each Partner a statement setting forth the assets and liabilities of the Partnership as of the date of complete liquidation. After distribution of all of the assets of the Partnership, the Partners shall cease to be such, and the Managing Partner, and to the extent required, Partners shall cause to be executed, acknowledged and filed all documents necessary to cancel the Partnership's Certificate of Partnership and terminate the Partnership.

11.    Books and Accounting; Fiscal Year

11.01.    The Managing Partner shall maintain adequate books and records of account which shall be kept in accordance with the method used for Federal income tax reporting purposes and which will reflect the Partnership transactions and are appropriate or adequate for the Partnership's business. All books and records of the Partnership shall be kept at the office of the Partnership or at such other place or places as may be determined by the Managing Partner and shall be available at reasonable times during business hours and upon reasonable notice for inspection and examination by the Partners or their duly authorized representative.

11.02.    The Partnership shall maintain accounts on an accrual or cash basis as determined by the Managing Partner. The fiscal period of the Partnership shall be the calendar year. The profits and losses of the Partnership shall be calculated in accordance with generally accepted accounting principles consistently applied. Capital accounts for all of the Partners shall

be maintained as part of the books of the Partnership and the amount of profits and losses of the Partnership, as well as Capital Contributions, and distributions from the Partnership shall be credited or charged, as the case may be, to the capital accounts of the respective Partners. Such capital accounts shall be maintained at all times, using the Federal income tax bases as property contributed to the Partnership.

11.03.   The Managing Partner shall cause income tax returns for the Partnership to be prepared by the Partnership's accountants and filed with appropriate authorities, and shall furnish to each Partner, within 90 days after the close of the Partnership's fiscal year, all tax information with respect to the Partnership as may be required for the preparation of the individual tax returns of the Partners. The Managing Partner is hereby designated as the Tax Matters Partner of the Partnership for all tax issues involving the Partnerhip.

11.04.   All funds of the Partnership are to be deposited in the Partnership's name in such bank account or accounts as may be designated by the Managing Partner, and shall be withdrawn on the signature of the Managing Partner, or his designee.   The funds of the Partnership shall not be commingled with the funds of any other person.

12.   Amendments

12.01.   This Agreement and the Certificate of Partnership may be amended by the Managing Partner without the agreement or consent of the Partners when such amendment (i) is required by law, (ii) gives effect to the admission of Partners and substitute Partners, or (iii) effects changes of a ministerial nature which do not materially and adversely affect the rights of the Partners.

12.02.   An amendment to this Agreement effecting a substantial modification of the rights of the Partners shall require the approval of Partners holding a majority in interest of all Partnership Interests. Notwithstanding the foregoing provisions of this Section, no amendment may, without prior written approval of all Partners, (i) enlarge the obligations of any Partner under this Agreement, (ii) enlarge the liability of the Managing Partner to the Partners, or (iii) alter the Partnership in such manner as will result in the Partnership's no longer being classified as a "partnership" for Federal income tax purposes.

13.   Power of Attorney

13.01.   Each Partner hereby irrevocably constitutes, makes, and appoints the Managing Partner and his successors with full power of substitution, as his true and lawful attorney-in-fact and agent for such Partner as a Partner in the Partnership, with full power and authority for such Partner and in such Partner's name, place and stead, to make, execute, acknowledge, publish, file, deliver and swear to in the execution, acknowledgement, filing and recording of:

(a)   this Agreement and counterparts thereof, any separate certificates of partnership and any amendments to or cancellation of such certificates, required under the laws of the State of New York or the laws of any other jurisdiction in which such a certificate is required or may be appropriate to be filed;

(b)   any certificates, instruments and documents including, without limitation, fictitious name certificates, as may be required by, or may be appropriate under, the laws of any jurisdiction in which the Partnership is doing or intends to do business;

-10-

(c)     any other instrument which may be required to be filed by the Partnership under the laws of any jurisdiction or by any governmental agency, or which the Managing Partner deems it is advisable to file;

(d)     any documents which may be required to effect the continuation of the Partnership, the admission of an additional or substitute Partner, or the dissolution and termination of the Partnership;  and

(e)     all certificates and other instruments and all amendments thereto which the Managing Partner deems appropriate or necessary to qualify, or continue the qualification of, the Partnership as a partnership in the jurisdiction in which the Partnership may conduct business or own oil and gas interests.

13.02    The foregoing power of attorney:

(a)     is a special power of attorney coupled with an interest, is irrevocable, and shall not be affected by the disability or death of any of the Partners;

(b)     may be exercised by the Managing Partner by signing separately as attorney-in-fact for each Partner or, after listing all of the Partners executing any instrument, by a single signature of the Managing Partner acting as attorney-in-fact for all of them;  and

(c)     shall survive the delivery of an assignment by a Partner of the whole or any part of his Partnership Interest; except that where the assignee thereof has been approved by the Managing Partner for admission to the Partnership as a substitute Partner, the power of attorney of the assignor shall survive the delivery of such assignment for the sole purpose of enabling the Managing Partner to execute, acknowledge and file any instrument necessary to effect such substitution.

13.03.   Each Partner hereby agrees to be bound by all of the representations of the Managing Partner made as his attorney-in-fact and waives any and all defenses which may be available to such Partner to contest, negate or disaffirm the power of attorney, and hereby ratifies and confirms all acts which said attorney-in-fact may take as attorney-in-fact hereunder in all respects as though performed by such Partner.

13.04.   In the event of any conflict between the provisions of the Agreement and any document executed or filed by the Managing Partner pursuant to the aforesaid power of attorney, this Agreement shall govern.

13.05.   Any person dealing with the Partnership may conclusively presume and rely upon the fact that any such instrument executed by such agent and attorney-in-fact is authorized, regular and binding without further inquiry.  If required, each Partner shall execute and deliver to the Managing Partner, within five days after the receipt of a request therefor, such further designations, powers of attorney or other instruments as the Managing Partner shall reasonably deem necessary for the purpose of this Section 13.

14.    Miscellaneous

14.01.  Any notice required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given or made if delivered personally to the person to whom sent, or if sent by certified or registered mail, return receipt requested:

(a)     in the case of the Managing Partner, at the office of the Partnership;

-11-

(b)    in the case of a Partner, to his address as it appears on the records of the Partnership; or

(c)    to such other address as the Managing Partner or a Partner, as the case may be, shall designate in writing as aforesaid.

14.02. If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid, illegal or unenforceable in any respect, the remainder of this Agreement, or the application of such provision to any person or circumstances other than those as to which it is held invalid, illegal or unenforceable, shall not be affected or impaired thereby.

14.03. Except as otherwise provided herein, this Agreement shall be binding upon the parties hereto, their successors, heirs, devisees, assigns, legal representatives, executors and administrators.

14.04. The parties have formed this partnership pursuant to the Partnership Act of the State of New York and intend that the Partnership shall be subject to the statute corresponding to the Uniform Partnership Act. If any provision in this Agreement shall be held to be invalid, such holding shall not in any way whatsoever affect the validity of the remainder of this Agreement or affect the intent of the parties to form the Partnership pursuant to said law.

14.05. The captions contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit or extend the scope of this Agreement.

14.06. Wherever the singular number is used in this Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders, and the word "person" shall include a corporation, firm, partnership or other form of association.

14.07. All documents referred to herein are by this reference made a part hereof as though fully set forth herein.

14.08. This Agreement may be executed in one or more counterparts and in such event each counterpart shall constitute an original and all such counterparts shall constitute one agreement.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement and Certificate as of the year and date first above written.

MANAGING PARTNER
George G. Coleman

_____

PARTNER

_____

-12-

STATE OF NEW YORK     )
                      )
COUNTY OF             )


   On the_____day of_____ before me personally came
_____, to me known to be the individual
described in and who executed the foregoing instrument, and acknowledged that  he executed
the same.



                              _____
                              Notary Public

Schedule A

| Name | Address | Capital Contribution" and |
|------|---------|---------------------------|

Exhibit "A"

PROSPECT AGREEMENT

THIS AGREEMENT made and entered into effective as of the 1st day of September, 2003 by and among **PALACE EXPLORATION COMPANY** ("Assignor") an Oklahoma corporation, **CONDOR DRILLING COMPANY** ("Assignee"), a New York partnership, with offices and principal place of business at 475 Northern Boulevard, Great Neck, New York 11021, **OIL AND GAS TITLE HOLDING CORP.** ("Nominee Title Holder"), a Texas corporation with offices and principal place of business at 5 East 59 Street, New York, New York 10022, and **THE BISTATE OIL DISTRIBUTION CORP.** ("Designated Distributer"), a New York corporation with offices and principal place of business at 5 East 59 Street, New York, New York 10022.

WHEREAS, Assignor represents that it is the owner of certain interests and farmout rights in oil and gas leases and lands covered thereby, which interests and farmout rights in oil and gas leases are hereinafter referred to as the *"Prospects"*; and

WHEREAS, previously oil and gas wells may have been drilled on portions of each of the *Prospects* and field rules have been applied for and approved creating proration drilling units *("PD Units")*; and

WHEREAS, Assignor desires to assign, and Assignee desires to acquire a portion of the rights and obligations of Assignor in and to one PD Unit in each *Prospect*, so that it may participate in the drilling of the wells as indicated hereinafter, subject to the terms and conditions expressed herein.

NOW, THEREFORE, in consideration of the premises, and the covenants, representations and agreements hereinafter contained, the sufficiency of which is hereby acknowledged by the parties hereto, it is hereby agreed by and between the parties hereto as follows:

1. Assignor hereby assigns, transfers and sets over unto **Assignee** such portion of all of its rights in and to the *Prospects* subject to all the terms, conditions, duties and obligations of Assignor under the Lease and Farmout agreements assigned thereby which **Assignee** hereby expressly assumes and further subject to the retained rights and conditions contained hereinbelow. Notwithstanding the forgoing, Assignor shall convey to Assignee its proportionate share of 100% of the working interest on the *Prospects* as shown in Exhibit A attached, as supplemented from time to time. *Any assignments made hereunder shall be without warranty of title, express or implied.*

Assignor will convey legal title to the *Prospects;* and wells to **Assignee** but will record title in the name of **Nominee Title Holder** as nominee on behalf of **Assignee**, and **Nominee Title Holder** will maintain separate and distinct records and accounts of the *Prospects* and wells which it is holding on behalf of **Assignee** and will indicate therein that such *Prospects* and wells are held by it only as a nominee and in trust for the benefit of **Assignee**.

2. Assignee shall be responsible for and pay to **Assignor** its proportionate share of all costs incurred in acquiring the leases comprising the *Prospects* as shown on Exhibit A, shall be subject to al preexisting lease and royalty conversions and backins.

3.    Assignor shall deliver to **Assignee** a net revenue interest of 60% on every lease, reserving for itself, as an overriding royalty the difference between the actual net revenue interest purchased by **Assignor** and the 60% net revenue interest delivered to **Assignee**.

4.    **Assignor** agrees to prepare and tender all required delay rentals, shut-in gas well payments, and/or other payments which may be required under the terms of the oil and gas leases subject hereto. **Assignor** shall not be liable to **Assignee** for any mistake it may make in tendering, or failing to tender such payments, except those that involve gross or willful negligence. **Assignor** agrees to promptly provide **Assignee** evidence of any such payment made, by forwarding copies of the applicable receipts directly to **Assignee's** office.

5.    **Assignee** hereby appoints **Designated Distributor** , and **Designated Distributor** hereby accepts to be the distribution agent for **Assignee** for all net cash receipts earned pursuant to the production and sale of oil and gas from the wells drilled on the *Prospects* herein conveyed less all operating expenses incurred in the production and sale of such oil and gas. **Designated Distributor** will charge $2,500 per year for these services and will make distribution to **Assignee** quarterly during the last week of January, April, July and October and issue with such distribution a complete history of receipts and disbursements by well and by month.

6.    This Agreement shall be governed by the laws of the State of New York, and shall bind, and shall inure to the benefit of the parties hereto and their respective successors and assigns, provided that no assignment hereof of any interest therein by and party hereto shall relieve such party of its duties and obligations hereunder, but such party shall remain fully liable and bound thereunder as if no assignment had been made. Any assignment by a party hereto shall be made expressly subject to this Agreement and its Exhibits.

**CONDOR DRILLING COMPANY**

By_____

**PALACE EXPLORATION COMPANY**

By_____

SCHEDULE A TO PROSPECT AGREEMENT

Prospects Assigned

To be supplied on or before December 31, 2003

Exhibit "B"

<u>TURNKEY DRILLING CONTRACT</u>

THIS AGREEMENT made and entered into effective as of the 1st day of September, 2003 by and between  **CONDOR DRILLING COMPANY,** ("Owner"), with principal place of business at 475 Northern Boulevard, Great Neck, New York 11021 and **TAH DRILLING CO., INC.** ("Driller") a New York Corporation with offices and principal place of business at 475 Northern Boulevard, Great Neck 11021.

WHEREAS, **Owner** represents that it is the owner of certain interests and farmout rights in oil and gas leases and lands covered thereby (hereinafter referred to as the *"Drill Sites"*); and wishes to contract with **Driller** to drill one well on each *Drill Site*; and

WHEREAS, the parties intend that **Driller** shall commence the drilling of one well upon each of the  *Drill Sites* for the purpose of exploring for oil and gas, and shall provide management and supervision of the drilling of such well together with total financial protection of **Owner** against unforeseen drilling expenses.

NOW, THEREFORE, in consideration of the premises, covenants, representations and agreements hereinafter contained, the sufficiency of which is hereby acknowledged by the parties hereto, it is hereby agreed by and between the parties hereto as follows:

1.      As soon as practicable after the execution of this Agreement, but in no event later than December 31, 2003, **Driller** shall commence or cause to be commenced the actual drilling with suitable rotary tools and the payment or prepayment of each well in search of oil and

gas at legal locations selected by **Owner**, and shall thereafter continue or cause to be continued the drilling thereof with due diligence and in a workmanlike manner to a depth to adequately test the formations or depth as more particularly described in Exhibit A, attached hereto.

    2.    In consideration for drilling the wells, **Owner** shall be responsible for and pay to the **Driller** the non-refundable sum as shown of up to

DOLLARS ($    .) based upon the sale of 25 UNITS subscription units by Owner (the "Turnkey Price") as shown on Exhibit "A", less the sum of $25,000, which shall be payable as follows:

    A.    $    . in cash at Closing;

    B.    The balance ($    .) by the delivery of **Owner's** note bearing interest at the rate of eight percent (8%) per annum, payable on or before December 31, 2018 (on account of drilling costs.) ("Turnkey Note") Exhibit B.

As collateral for the payment of the Turnkey Note (together hereinafter referred to as the "Note"), and for the payment and performance of all liabilities and obligations of **Owner** to **Driller**, **Owner** hereby pledges, transfers, assigns, grants a security interest in and delivers to the **Driller** all of his right, title and interest (i) in the production and proceeds therefrom from all of the wells, drilled hereunder, (ii) in the wells themselves and, (iii) the Subscription Notes of the Partners comprising **Owner** and any security or collateral securing such Subscription Notes. **Owner**, at anytime, may substitute the collateral of the Subscription Notes of its Partners by pledging marketable securities acceptable to **Driller**.

    3.    During the drilling of each well, **Driller** shall at its sole cost, risk and expense provide and furnish the following for each well:

(a)     Necessary curative work to assure soundness of title to that lease on which the *Drill Site* is located;

(b)     Staking of location and permit to drill;

(c)     Necessary road for access to and location for the *Drill Site*;

(d)     Complete drilling rig and other drilling accessories and equipment necessary to drill to the objective depth;

(e)     All cement and cementing services required for setting surface casing;

(f)     All drilling mud, chemicals, and foreign weight materials, if any, obtained and used in drilling to the objective depth;

(g)     An Electric Induction Log of the borehole from the bottom of the surface casing to the objective depth;

(h)     Plug and abandon according to the regulations of the applicable regulatory agency and settle surface damages if no completion attempt is made;

(i)     All labor and third party services necessarily required for items (a) through (h) above, and customary liability and property insurance.

4.     For the purposes of this Agreement, the point in time at which the well has been drilled to the objective depth, and either plugged and abandoned, or completed up to the tank battery or meter, shall be the Turnkey Point. After such Turnkey Point, all costs shall be borne by the **Owner**.

5.     During the course of the drilling and completing of said well to the Turnkey Point, Driller shall be responsible for, and conform to, all applicable obligations imposed on Owner under the applicable leases and assignment agreements.

6.     With reference to the wells drilled on the *Drill Sites*, Driller shall maintain and hold available for **Owner**;

-3-

(a)     Daily drilling reports;

(b)     Copies of records of any tests which may be made in the borehole and of the analysis which may be made of the materials taken therefrom;

(c)     Copies of Induction Logs to be picked up at the well site and upon completion or abandonment, composite of all logs run in the well;

(d)     In the event the well is abandoned as a dry hole, a certified copy of the plugging records showing that the   well has been plugged and abandoned.

7.     **Owner** shall not be responsible for paying any cost overruns except those due to extraordinary problems on a well or wells.

The actual costs of completing and drilling a well which result from "extraordinary" circumstances will be borne by **Owner** if it elects to continue drilling and testing efforts after being informed by **Driller** of the "extraordinary circumstances." Examples of such "Extraordinary" circumstances would be:

1.     An Act of God, War, Force Majure or a Strike (lasting more than 30 days.

2.     An occurrence of an operational hazard which requires the re-drilling of a Well after drilling more than 75% of the footage to estimated target zone for completion.

3.     A decision by other third party participants in the drilling of a Well not to proceed to completion.

If **Driller** is rendered unable, wholly or in part, by an occurrence or event beyond its control, to carry out its obligations under this Drilling Contract, it shall give **Owner** notice of such event or occurrence with reasonably full particulars.  **Owner** may either elect to terminate this Drilling Contract as to that well and receive a return of the unused portion of the Turnkey Price applicable to that well, or elect to pay for such extraordinary overruns.

8.     **Driller** shall be allowed to sublet or assign any of the work required

-4-

hereunder at its own expense without the written consent of Owner.

9.      Driller shall indemnify and hold Owner harmless from losses suffered due to the failure of one or more subcontractors to perform contracted services in an adequate and workmanlike manner.

10.     This Agreement shall be binding upon all parties and upon their respective successors and assigns.

11.     This Agreement shall be construed and interpreted under the laws of the State of New York.

IN WITNESS WHEREOF, the parties have executed this Agreement the day and year set forth opposite their respective signatures hereto.

TAH DRILLING CO., INC.


Dated:_____        By_____


CONDOR DRILLING COMPANY


Dated:_____        By_____
                              George G. Coleman
                              Managing Partner

-5-

Exhibit A to Exhibit "B"

To Be Supplied On Or Before December 31, 2003

Exhibit "B"
to
Exhibit "B"


TURNKEY NOTE


$ .                    New York, New York                    , 2003


Condor Drilling Company, a New York partnership (the "Partnership"), for value received, hereby promises to pay to TAH Drilling Co., Inc., a New York corporation ("TAH") on December 31, 2018 the principal amount of                    DOLLARS ($            .) or such lesser principal amount as may be outstanding hereunder with interest as specified below.

As part of the purchase price for his interest in the Partnership, each Partner executed and delivered to the Partnership a promissory note payable on or before December 31, 2018 (the "Subscription Note").

This Note is issued pursuant to a certain Condor Drilling Company Turnkey Drilling Contract (the "Contract") dated as of September 1, 2003 by and between the Partnership and TAH Drilling Co., Inc. and is secured by the Subscription Notes of the Partners and any and all collateral securing such Subscription Notes as well as by the Contract. The Partnership shall have the right at anytime to substitute marketable securities acceptable to TAH in place of Subscription Notes of its Partners. The Partnership shall be entitled to offset all amounts due and owing to TAH under this Note for any and all defaults by TAH under the Contract. Except as specifically limited therein, the holder hereof is entitled to the benefits of the Contract and of such security. Accrued interest hereon shall be payable from Partnership net operating revenues. Principal shall be payable out of 50% of the remaining Partnership net operating revenues.

The Partnership shall pay interest on the unpaid principal amount hereof commencing the date of issuance hereof, computed on the basis of the actual number of days elapsed over a year of twelve months (each month consisting of thirty days) prior to maturity (whether by acceleration or otherwise) at an annual rate equal to eight percent (8%) payable in arrears at maturity, except for the period from the date of this Note until December 31, 2003 during which period the interest rate will be 1% per annum and will be accrued.

The indebtedness evidenced by this Note may be prepaid by the Partnership.

No delay or omission on the part of the holder in exercising any right hereunder shall operate as a waiver of such right or of any other right of such holder, nor shall any delay, omission or waiver on any one occasion be deemed a bar to or waiver of the same or any other right on any future occasion. The Partnership and every endorser or grantor of this Note, regardless of the time order or place of signing, waive presentment, demand, protest and notices of every kind and assent to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of collateral, and to the addition or release of any other party or person primarily or secondarily liable.

The Partnership agrees to pay all costs of collection of the principal or any interest on this Note, including without limitation reasonable attorneys' fees.

This Note is made and delivered in New York, New York and shall be governed by the laws of the State of New York.

CONDOR DRILLING COMPANY

By_____
       George G. Coleman
       Managing Partner

# EXHIBIT 9

AGREEMENT AND CERTIFICATE OF PARTNERSHIP

OF

## HURRICANE DRILLING COMPANY

THIS AGREEMENT OF GENERAL PARTNERSHIP (the "Agreement") is made and entered into effective the 1st day of August, 2004 by and among ROBERT A. TREVISANI (referred to as "Managing Partner" and sometimes as a "Partner"), whose principal address is 475 Northern Boulevard, Suite 20, Great Neck, New York 11021 and persons, individuals or other entities whose names and addresses are set forth on Schedule A hereto and who have executed a copy of this Agreement ("hereinafter individually referred to as a "Partner" and collectively with the Managing Partner, referred to as "Partners") pursuant to the New York Uniform Partnership Act (the "Partnership Act").

WITNESSETH:

WHEREAS, the Partners hereby agree to form a general partnership pursuant to the Partnership Law of the State of New York (the "Partnership"); and

WHEREAS, it is the intention of the Partners to set forth the terms and conditions under which the Partnership is to operate;

NOW, THEREFORE, it is agreed as follows:

1.  Formation and Term of Partnership

1.01.    The parties hereto have agreed to form and by executing this Agreement, do enter into a general partnership formed under the Partnership Act and other applicable laws of the State of New York, which act shall govern the rights and liabilities of the parties, except as otherwise herein expressly provided.

1.02.    The term of the Partnership shall commence on the date hereof and shall continue until December 31, 2037 unless sooner terminated in accordance with the provisions of this Agreement or as otherwise provided by law.

1.03.    The parties hereto shall from time to time execute or cause to be executed all such certificates or other documents and do or cause to be done all such filing, recording, publishing or other acts as may be appropriate to comply with the requirements of law for the formation and operation of a partnership under the laws of the State of New York.

2.  Name, Principal Office and Address

2.01.    The name of the Partnership is **HURRICANE DRILLING COMPANY** and the Partnership shall do business under the name of **HURRICANE DRILLING COMPANY**.

2.02.    The address of the principal office of the Partnership shall be 475 Northern Boulevard, Suite 20, Great Neck, New York 11021, provided, however, that the Managing Partner may, by written notice to all Partners, change the address of the principal office. The Partnership books and records shall be kept at the principal office of the Partnership or such other place designated by the Managing Partner.

3.    Purpose

   3.01.  The purposes of the Partnership shall be to:

   (a) invest in the acquisition, development and drilling of oil and gas leases;

   (b) acquire oil and gas leases developed and operated by other oil and gas companies; and/or

   (c) produce and sell hydrocarbons.

   3.02.  In recognition of the foregoing purposes, the capital of the Partnership may be invested in one or more of the following assets (collectively, the "Partnership Property"):

   (a) interests in oil and gas leases, royalties and similar oil and gas property interests;

   (b) equipment and other materials necessary or desirable for drilling, equipping and operating wells on leases in which the Partnership has an interest;

   (c) acreage; and

   (d) interests in other oil and gas properties of a character acquired and developed by other oil and gas companies, such as gathering systems, pipelines, processing plants and other facilities required for the preparation of oil and/or gas production for market.

4.    Partners and Capital

   4.01.  The Managing Partner of the Partnership shall be Robert A. Trevisani ("Managing Partner").  The address of the Managing Partner shall be the same as the office address of the Partnership.

   4.02.  The Partners of the Partnership and their capital contributions shall be as listed on Schedule "A" attached hereto.

   4.03.  The interests of the Partners, other than the Managing Partner, shall be represented by Units and there are hereby authorized for issuance and sale 50 Units of Partnership interest.

   4.04.  During the period from the date hereof, to and including December 31, 2004 (the "Subscription Period"), the Managing Partner, on behalf of the Partnership, shall have the right to offer Initial Units and to admit to the Partnership as Partners those persons who are acceptable to the Managing Partner and who otherwise satisfy the requirements of this Agreement. Each person desiring to become a Partner may apply for admission by (i) completing, signing, and delivering to the Managing Partner a "Subscription Agreement" in such form as established by the Managing Partner; a signed signature page to this agreement and (ii) payment of 100% of his capital commitment.  The Managing Partner may, in his sole discretion, decline to admit any person as a Partner for any reason whatsoever.  All applications which are rejected shall be returned to the subscriber, together with all funds tendered, without interest.  Persons whose applications are accepted by the Managing Partner will be admitted as Partners in the order that their applications are accepted and payment on their subscriptions are received by the Managing Partner.

4.05.  The purchase price for each Unit shall be TWO HUNDRED EIGHTY THOUSAND DOLLARS ($280,000).  By executing the Subscription Agreement, each Partner subscribes and agrees to contribute to the capital of the Partnership the amount shown in his Subscription Agreement.  Subject to Section 4.06 below, the Managing Partner reserves the right, in his sole discretion to subdivide Units and sell portions thereof.  No Partner in his or its name may subscribe for or hold Units for the benefit of any other person or entity.

4.06.  Each Partner will pay for his Partnership Unit at Closing, ONE HUNDRED THOUSAND DOLLARS ($100,000) cash plus the execution of a full recourse Subscription Note (the "Note") in the amount of ONE HUNDRED EIGHTY THOUSAND DOLLARS ($180,000) bearing interest at the rate of 8% per annum due on December 31, 2019 and payable to the Partnership.

4.07.  The Managing Partner is hereby authorized to sell fractional parts of a Unit provided that the price therefor shall be the pro rata part of the purchase price of a full unit.  The smallest fractional unit shall be one-half unit.

4.08.  Subscriptions for Units will be accepted by the Managing Partner, in his sole discretion, during the Subscription Period, until subscription for the maximum aggregate Capital Contribution by the Partners of FOURTEEN MILLION DOLLARS ($14,000,000) has been received and accepted. The Managing Partner, may in his sole discretion, close the Partnership at a lesser amount but in no event less than TWO MILLION EIGHT HUNDRED THOUSAND DOLLARS ($2,800,000) of Capital Contributions in the aggregate.  The Managing Partner shall also contribute an amount which, upon contribution, will equal 1% of the aggregate Capital Contributions of all Partners, including the Managing Partner.

5.    Allocation of Revenues and Costs and Tax Matters

5.01.  All items of Partnership income, expense, gain, deduction, loss or credit shall be allocated to the Partners in proportion to their Capital Contributions.

5.02.  The Partners (including the Managing Partner) shall share inter se items of income, gain, deduction, loss and credit allocated to them as a group in proportion to their respective Capital Contributions.  Such share shall be computed by the application of a fraction for each Partner, the numerator of which shall be an amount equal to his Capital Contribution and the denominator an amount equal to the aggregate of all Capital Contributions.  No Partner shall be entitled to have priority over any other Partner as to profits of the Partnership or otherwise.

5.03.  All cash revenues remaining after payment of the obligations incurred for drilling, operation and development of the Partnership Property, administrative costs, capital expenditures and establishing whatever cash reserve considered suitable by the Managing Partner shall be distributed to all the Partners in proportion to their Capital Contributions.

5.04.  All items of Partnership income, gain, deduction, loss and credit for Federal income tax purposes, including allocation of depreciation deductions computed at the Partnership level, shall be allocated among the Partners in the ratios provided in Paragraphs 5.01. 5.02 and 5.03 of this Section 5.  As between an Assignor Partner and his Assignee, the share of income, gains, losses, deductions and credits so allocated shall be apportioned on the basis of the number of days in the calendar year that each was the holder of the Partnership interest assigned, without regard to the results of the Partnership's operations during the periods before and after assignment.

5.05.  No interest shall be paid on any Capital Contributions of the Partners.

-3-

5.06.  Upon the transfer of all or a part of a Partnership Interest or upon the death of an individual Partner or upon the distribution of Partnership Property to any party hereto, the Partnership, at the Managing Partner's option, may file an election, in accordance with applicable laws and regulations, to cause the basis of the Partnership Property to be adjusted for Federal income tax purposes as provided by sections 734, 743 and 754 of the Internal Revenue Code of 1986, as amended (the "Code").

6.    Rights, Duties and Obligations of the Managing Partner

6.01.  The Managing Partner shall have the power and authority on behalf of the Partnership to manage, control, administer and operate the business affairs of the Partnership, and to do or cause to be done any and all acts deemed by the Managing Partner, within his sole discretion, to be necessary or appropriate thereto.  In dealing with the Managing Partner on behalf of the Partnership, no person shall be required to inquire into the authority of the Managing Partner to bind the Partnership.  The scope of such power and authority shall encompass all matters in any way connected with such business or incidental thereto, including, but not limited to, the power and authority:

(a)    to expand the Partnership capital and revenues in furtherance of the business of the Partnership;

(b)    to enter into and execute agreements and related documents in connection with the business of the Partnership;

(c)    to operate producing properties and/or enter into operating agreements with others with respect to properties acquired by the Partnership, naming a third party as operator, and containing such terms, provisions and conditions as the Managing Partner shall approve, including terms designating a third party as collecting and disbursing agent for Partnership revenues and authorizing expenditure of Partnership revenues toward the employment of new enhanced recovery methods;

(d)    to execute, on behalf of the Partnership, any and all documents or instruments of any kind which the Managing Partner may deem appropriate in carrying out the purposes of the Partnership, including, without limitation, pooling, farmout, and unitization agreements, oil and gas sales contracts, division orders, or other marketing agreements, documents or instruments of any kind or character, or amendments thereto;

(e)    to purchase or lease equipment, including production equipment for Partnership purposes;

(f)    to pay, collect, compromise, arbitrate, resort to legal action for or otherwise adjust claims or demands of or against the Partnership;

(g)    to sell payments from production for any Partnership purpose, including but not limited to, the purpose of developing, equipping and improving the properties of the Partnership;

(h)    to acquire leases, permits, reservations, mineral or fee rights, working interests or contractual rights, or options to obtain same, in such oil and/or gas properties as the Managing Partner may select from time to time for investment by the Partnership.  The properties may consist of all or any fraction of the total working interest or contractual rights, therein and may be subject to overriding royalty and other leasehold or contractual burdens of a similar nature as the Managing Partner may deem reasonable;

-4-

(i)     to determine to what extent the Partnership Property is to be explored, drilled, completed, sold, farmed out or otherwise disposed of or abandoned;

(j)     to employ, on behalf of the Partnership, agents and employees, including accountants, lawyers, engineers, geologists, geophysicists, landmen, and clerical help, and to obtain such other assistance and services as the Managing Partner may deem proper and to pay therefor such remuneration as the Managing Partner may deem reasonable and appropriate;

(k)     to guarantee the payment of money or the performance of any contract or obligation by any person, firm or corporation on behalf of the Partnership;

(l)     to establish from income derived from the Partnership's operations such reserves as the Managing Partner shall deem reasonable to help meet anticipated Partnership expenses, and subject to the requirements of applicable partnership laws, to distribute Partnership income at such times as, and to the extent that the Managing Partner determines there is sufficient cash on hand not needed for Partnership requirements;

(m)     to borrow funds on behalf of the Partnership for the purpose of financing costs of the Partnership, and to secure such loan with a mortgage or other lien on any or all of the Partnership Property or the production therefrom or the interest of either the Managing Partner or the Partners in any such property or production therefrom;

(n)     to convert the Partnership to a limited liability company pursuant to the laws of New York State at any time after two years from the date the Partnership closes.

(o)     to amend this agreement to make immaterial changes without the consent of the Partners and to make material amendments subject to the provisions of this Agreement.

6.02.   Anything in the foregoing provisions of Paragraph 6.01 of this Section 6 to the contrary notwithstanding, the Managing Partner shall not have the authority, without the written consent of the Partners holding a majority in interest of all the Partnership Interests, to sell or to otherwise dispose of all or substantially all of the Partnership's assets and otherwise change the general character of the Partnership's business.

6.03.   The Managing Partner is required to devote only such time as may be necessary for the proper performance of his duties to the Partnership and shall have the right to be engaged, as an employee, partner, consultant, shareholder or in any other capacity, independently or with others, in other business ventures, including, without limitation, ventures to explore, develop and produce oil, gas and other mineral properties in competition with the Partnership without liability for breach of fiduciary duty to the Partnership. The Managing Partner, independently or as so engaged, shall have the right to develop, manage and operate additional oil, gas and other mineral properties acquired at any time, whether or not competitive to the Partnership.

6.04.   The Managing Partner shall not be liable, responsible or accountable to any of the Partners or the Partnership for any loss or damage resulting from any error in judgment or other acts or omissions on behalf of the Partnership performed or omitted by said Managing Partner in good faith and in a manner reasonably believed to be within the scope of the authority granted to him by this Agreement and in the best interests of this Partnership, unless said Managing Partner has been guilty of gross negligence or willful misconduct with respect to such acts or omissions. Any loss or damage incurred by the Managing Partner by reason of any act or omission so performed or omitted by him (and not involving gross negligence or willful misconduct) shall be paid by the Partnership, and the Managing Partner shall be indemnified therefor to the extent assets are available, but the other Partners shall not have any personal liability to the Managing Partner

or to the Partnership on account of such loss or damage. Anything in this Agreement to the contrary notwithstanding, the Managing Partner shall not be personally liable for the return of the Capital Contributions of any Partner or for any portion thereof (except out of Partnership assets), it being expressly understood that any return of capital shall be made solely from the assets of the Partnership.

6.05. The Managing Partner shall not be deemed to have received commissions, fees or other compensation paid to any firm, proprietorship, partnership or corporation which is an Affiliate of the Managing Partner, or in which the Managing Partner or any Affiliate owns a beneficial interest. Nothing herein shall restrict the right of the Managing Partner or any other person to receive the income or distribution to which they would otherwise be entitled as a Partner under the terms of this Agreement. Nothing contained in this Agreement shall be deemed to prevent or restrict the Managing Partner, or any related person or entity, from obtaining or sharing in all or any part of the brokerage fees, commissions or other sums payable in connection with any property purchased or sold by the Partnership.

6.06. The Managing Partner is hereby authorized to enter into the Prospect Agreement with Palace Exploration Company ("Palace") attached hereto as Exhibit "A" and the Turnkey Drilling Contract with TAH Drilling Co., Inc. ("TAH") attached hereto as Exhibit "B" and is authorized, without limiting the other provisions of this Section 6 to fulfill its obligations under them.

7.    Rights, Duties, and Obligations of the Partners

The Partners shall have the following rights, duties and obligations:

7.01. Subject to the provisions of Section 9 hereof, no Partner shall be paid any salary or receive any interest on his or her Capital Contribution.

7.02. Notwithstanding the Partner's delegation of authority to the Managing Partner set forth in Article 6 hereof, the Partners affirm their obligations as general partners under the Partnership Law of the State of New York.

7.03. The Partners upon a vote of sixty-six and two-thirds percent (66 2/3%) vote of the interests in the Partnership may elect a successor Managing Partner.

8.    Assignment of Partnership Interests

8.01. Subject to any requirement or restriction of applicable law and/or regulations issued by the Securities and Exchange Commission, a Partner may sell, assign or otherwise transfer all or any part of his Partnership Interest after the payment of all sums due from said Partner under Section 4.06. For an Assignment to be effective, an Assignee shall execute this Agreement and Certificate of Partnership and a Note for the balance of the sum due under the Assignor's Note.

8.02. The trustees, executor, administrator, committee or guardian of the estate of a Partner who shall have died or been adjudicated bankrupt or incompetent shall have all the rights and obligations of such Partner for the purpose of settling or managing his estate and such (and only such) power as the deceased, bankrupt, or incompetent Partner possessed to assign all or any part of his Partnership Interest.

8.03. For Federal income tax purposes, allocation of profits and losses of the Partnership, including depletion and depreciation attributable to any assigned interest, shall be prorated between the assignor and assignee on the number of days such interest was held by each

-6-

of them during the calendar year, or on any other reasonable basis determined by the Managing Partner which is consistent with applicable law and regulations. The reflection of any assignment on the books of the Partnership shall not constitute the substitution of the assignee as a Partner, which may be effected only as provided above in this Section 8.

8.04. The Partnership shall, on and after the effective date of the assignment as provided in Paragraph 8.01 of this Section 8, pay all further distributions of profits or return of capital on account of the interest so assigned to the assignee of the Partnership Interest. In the absence of notice to the Managing Partner of the assignment of a Partnership Interest, whether by operation of law or otherwise, any payment to a Partner or to his or her executors, administrators or legal representatives shall acquit the Partnership and the Managing Partner of liability, to the extent of such payment, to any person who may otherwise be interested in such payment.

8.05. No such assignment by a Partner, including an assignment of less than all of a Partner's Partnership Interest hereunder or the assignment of such Partnership Interest to more than one party, shall relieve the assignor of his obligations hereunder, whether arising prior to or subsequent to such assignment, nor shall any such assignment require the accounting by the Managing Partner to more than one party, either to the assignor, if he or she shall have retained an interest in the Partnership or to the assignee designated by all of the assignees or, if none, to the assignee selected by the Managing Partner in his sole discretion.

9.   Compensation of the Managing Partner

9.01. The Managing Partner will be paid a fee by the Partnership of a Fifteen Thousand ($15,000.00) Dollar management fee on or before December 31, 2004 for his services, expertise and supervision of the operations of the Partnership.

9.02. The Managing Partner will be allocated items of Partnership profits and losses as herein above set forth in Section 5.

9.03. The Managing Partner shall receive no additional fees from the Partnership. All costs and expenses incurred by the Managing Partner in operating the Partnership shall be reimbursed to the Managing Partner over and above the aforesaid fee.

10.   Duration and Termination

10.01. Subject to the provisions of Article 10.02, the Partnership shall be dissolved and terminated and its affairs wound up upon the first to occur of the following:

(a)   the death, retirement, legal incapacity, voluntary or involuntary bankruptcy, or withdrawal of the Managing Partner, unless 51% of the remaining Partners agree to continue the Partnership and a successor to the Managing Partner is selected;

(b)   a determination by the Managing Partner to terminate and dissolve the Partnership;

(c)   upon disposition of all of the Partnership Property (except for the sale of natural gas or oil in the ordinary course of the Partnership's business);

(d)   the affirmative vote of the holders of 51% of the Partnership Interests; or

-7-

(e)    December 31, 2037.

10.02.    Neither the death, legal disability, bankruptcy, dissolution, withdrawal or expulsion of a Partner, nor the assignment of all or any part of the Partnership Interest of a Partner, nor the substitution nor admission of a Partner shall cause the dissolution or termination of the Partnership, but if this provision conflicts with any applicable law, or any other provision of these Articles, then all of the Partners herewith agree to form a new partnership immediately upon such termination of this Partnership, which new partnership will adopt these Articles of Partnership as its Articles of Partnership and the business of this partnership shall continue in the newly constituted partnership without disruption.

10.03.    Upon the dissolution of the Partnership, it shall be wound up, its debts and liabilities shall be paid and the remaining assets shall be distributed in the order provided herein. Except as otherwise expressly permitted under this Agreement, upon the dissolution of the Partnership, the Partnership shall be liquidated by a liquidating trustee who shall be (i) the Managing Partner, or if there be none, (ii) a person or persons designated by a majority in interest of the Partners. In carrying out the liquidation of the Partnership, the liquidating trustee shall have all the rights and powers of the Managing Partner hereunder. Partnership Property may be sold at such prices as may be deemed reasonable by the liquidating trustee, and the proceeds thereof as well as all other cash and properties of the Partnership shall be distributed as follows:

(a)    all the Partnership's debts and liabilities to persons other than the Partners shall be paid and discharged;

(b)    all of the Partnership's debts and liabilities to the Managing Partner and/or Partners shall be paid and discharged;

(c)    to the Partners with respect to any undistributed share of profits; and

(d)    to the Partners with respect to their then positive capital account balances as determined after taking into all capital account adjustments for the Partnership taxable year during which such liquidation occurs, and shall be made by the end of such taxable year (or, if later, within ninety (90) days after the date of such liquidation). For purposes of this subparagraph, a liquidation of the Partnership shall mean a liquidation as set forth in Section 1.704-1(b)(2)(ii)(g) of the Regulations; and

(e)    the remaining assets to the Partners, in accordance with the provisions of Paragraph 5.03 hereof.

If, following the liquidation of a Partner's interest in the Partnership (within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g) a Partner has a deficit balance in his capital account (as determined after taking into account all adjustments to said capital account, including the adjustments for the year during which such liquidation occurs), such Partner shall be unconditionally obligated to pay the amount of such deficit balance to the Partnership by the end of such taxable year (or, if later, within ninety (90) days after the date of such liquidation), which amount shall be applied and distributed in accordance with the provisions of this paragraph.

10.04.    A Partner shall look solely to the assets of the Partnership for the return of his Capital Contributions and if the Partnership Property remaining after the payment or discharge of the debts and liabilities of the Partnership is insufficient to return same, he shall have no recourse against the Managing Partner or any other Partner. Partnership Property may be distributed by the liquidating trustee in kind or on any reasonable basis determined by the liquidating trustee, and

-8-

distribution of the assets shall be conducted exclusively by the liquidating trustee, who is authorized to do any and all acts and things authorized by law for those purposes.

10.05.   In connection with the termination of the Partnership, the Partnership's accountants shall prepare and furnish to each Partner a statement setting forth the assets and liabilities of the Partnership as of the date of complete liquidation.  After distribution of all of the assets of the Partnership, the Partners shall cease to be such, and the Managing Partner, and to the extent required, Partners shall cause to be executed, acknowledged and filed all documents necessary to cancel the Partnership's Certificate of Partnership and terminate the Partnership.

11.   Books and Accounting; Fiscal Year

11.01.   The Managing Partner shall maintain adequate books and records of account which shall be kept in accordance with the method used for Federal income tax reporting purposes and which will reflect the Partnership transactions and are appropriate or adequate for the Partnership's business.  All books and records of the Partnership shall be kept at the principal office of the Partnership or at such other place or places as may be determined by the Managing Partner and shall be available at reasonable times during business hours and upon reasonable notice for inspection and examination by the Partners or their duly authorized representative.

11.02.  The Partnership shall maintain accounts on an accrual or cash basis as determined by the Managing Partner.  The fiscal period of the Partnership shall be the calendar year.  The profits and losses of the Partnership shall be calculated in accordance with generally accepted accounting principles consistently applied.  Capital accounts for all of the Partners shall be maintained as part of the books of the Partnership and the amount of profits and losses of the Partnership, as well as Capital Contributions, and distributions from the Partnership shall be credited or charged, as the case may be, to the capital accounts of the respective Partners.  Such capital accounts shall be maintained at all times, using the Federal income tax bases of property contributed to the Partnership.

11.03.   The Managing Partner shall cause income tax returns for the Partnership to be prepared by the Partnership's accountants and filed with appropriate authorities, and shall furnish to each Partner, within 90 days after the close of the Partnership's fiscal year, all tax information with respect to the Partnership as may be required for the preparation of the individual tax returns of the Partners. The Managing Partner is hereby designated as the Tax Matters Partner of the Partnership for all tax issues involving the Partnership.

11.04.   All funds of the Partnership are to be deposited in the Partnership's name in such bank account or accounts as may be designated by the Managing Partner, and shall be withdrawn on the signature of the Managing Partner, or his designee. The funds of the Partnership shall not be commingled with the funds of any other person.

12.   Amendments

12.01.   This Agreement and the Certificate of Partnership may be amended by the Managing Partner without the agreement or consent of the Partners when such amendment (i) is required by law, (ii) gives effect to the admission of Partners and substitute Partners, or (iii) effects changes of a ministerial nature which do not materially and adversely affect the rights of the Partners.

12.02.   An amendment to this Agreement effecting a substantial modification of the rights of the Partners shall require the approval of Partners holding a majority in interest of all

-9-

Partnership Interests. Notwithstanding the foregoing provisions of this Section, no amendment may, without prior written approval of all Partners, (i) enlarge the obligations of any Partner under this Agreement, (ii) enlarge the liability of the Managing Partner to the Partners, or (iii) alter the Partnership in such manner as will result in the Partnership's no longer being classified as a "partnership" for Federal income tax purposes.

13.    Power of Attorney

13.01.    Each Partner hereby irrevocably constitutes, makes, and appoints the Managing Partner and his successors with full power of substitution, as his true and lawful attorney-in-fact and agent for such Partner as a Partner in the Partnership, with full power and authority for such Partner and in such Partner's name, place and stead, to make, execute, acknowledge, publish, file, deliver and swear to in the execution, acknowledgment, filing and recording of:

(a)    this Agreement and counterparts thereof, any separate certificates of partnership and any amendments to or cancellation of such certificates, required under the laws of the State of New York or the laws of any other jurisdiction in which such a certificate is required or may be appropriate to be filed;

(b)    any certificates, instruments and documents including, without limitation, fictitious name certificates, as may be required by, or may be appropriate under, the laws of any jurisdiction in which the Partnership is doing or intends to do business;

(c)    any other instrument which may be required to be filed by the Partnership under the laws of any jurisdiction or by any governmental agency, or which the Managing Partner deems it is advisable to file;

(d)    any documents which may be required to effect the continuation of the Partnership, the admission of an additional or substitute Partner, or the dissolution and termination of the Partnership; and

(e)    all certificates and other instruments and all amendments thereto which the Managing Partner deems appropriate or necessary to qualify, or continue the qualification of, the Partnership as a partnership in the jurisdiction in which the Partnership may conduct business or own oil and gas interests.

13.02    The foregoing power of attorney:

(a)    is a special power of attorney coupled with an interest, is irrevocable, and shall not be affected by the disability or death of any of the Partners;

(b)    may be exercised by the Managing Partner by signing separately as attorney-in-fact for each Partner or, after listing all of the Partners executing any instrument, by a single signature of the Managing Partner acting as attorney-in-fact for all of them; and

(c)    shall survive the delivery of an assignment by a Partner of the whole or any part of his Partnership Interest; except that where the assignee thereof has been approved by the Managing Partner for admission to the Partnership as a substitute Partner, the power of attorney of the assignor shall survive the delivery of such assignment for the sole purpose of enabling the Managing Partner to execute, acknowledge and file any instrument necessary to effect such substitution.

13.03.    Each Partner hereby agrees to be bound by all of the representations of the

-10-

Managing Partner made as his attorney-in-fact and waives any and all defenses which may be available to such Partner to contest, negate or disaffirm the power of attorney, and hereby ratifies and confirms all acts which said attorney-in-fact may take as attorney-in-fact hereunder in all respects as though performed by such Partner.

13.04.  In the event of any conflict between the provisions of this Agreement and any document executed or filed by the Managing Partner pursuant to the aforesaid power of attorney, this Agreement shall govern.

13.05.  Any person dealing with the Partnership may conclusively presume and rely upon the fact that any such instrument executed by the Managing Partner as attorney-in-fact is authorized, regular and binding without further inquiry.  If required, each Partner shall execute and deliver to the Managing Partner, within five days after the receipt of a request therefor, such further designations, powers of attorney or other instruments as the Managing Partner shall reasonably deem necessary for the purpose of this Section 13.

14.   Miscellaneous

14.01.  Any notice required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given or made if delivered personally to the person to whom sent, or if sent by certified or registered mail, return receipt requested:

(a)   in the case of the Managing Partner, at the office of the Partnership;

(b)   in the case of a Partner, to his address as it appears on the records of the Partnership;  or

(c)   to such other address as the Managing Partner or a Partner, as the case may be, shall designate in writing as aforesaid.

14.02.  If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid, illegal or unenforceable in any respect, the remainder of this Agreement, or the application of such provision to any person or circumstances other than those as to which it is held invalid, illegal or unenforceable, shall not be affected or impaired thereby.

14.03.  Except as otherwise provided herein, this Agreement shall be binding upon the parties hereto, their successors, heirs, devisees, assigns, legal representatives, executors and administrators.

14.04.  The parties have formed this partnership pursuant to the Partnership Act of the State of New York and intend that the Partnership shall be subject to the statute corresponding to the Uniform Partnership Act.  If any provision in this Agreement shall be held to be invalid, such holding shall not in any way whatsoever affect the validity of the remainder of this Agreement or affect the intent of the parties to form the Partnership pursuant to said law.

14.05.  The captions contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit or extend the scope of this Agreement.

14.06.  Wherever the singular number is used in this Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders, and the word "person" shall include a corporation, firm, partnership or other form of association.

-11-

14.07. All documents referred to herein are by this reference made a part hereof as though fully set forth herein.

14.08. This Agreement may be executed in one or more counterparts and in such event each counterpart shall constitute an original and all such counterparts shall constitute one agreement.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement and Certificate as of the year and date first above written.

MANAGING PARTNER
Robert A. Trevisani

_____

PARTNER

_____

-12-

## ACKNOWLEDGMENT IN NEW YORK STATE

STATE OF NEW YORK    COUNTY OF            ss:

      On                        before me, the undersigned, personally came
                 , personally known to me or proved to me on the basis of satisfactory evidence
to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their
signature(s) on the instrument, the individual(s) or the person upon behalf of which the individual(s)
acted, executed the instrument.

_____
Notary Public

## ACKNOWLEDGMENT OUTSIDE NEW YORK STATE

STATE OF            COUNTY OF        ss:

      On                        before me, the undersigned, personally came
                 , personally known to me or proved to me on the basis of satisfactory evidence
to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their
signature(s) on the instrument, the individual(s) or the person upon behalf of which the individual(s)
acted, executed the instrument, and that such individual made such appearance before the
undersigned in

(insert city or political subdivision and state or county or other place acknowledgment taken).

_____
Notary Public

Schedule A

| Name | Address | Capital Contribution" and |
|------|---------|---------------------------|

Exhibit "A"

PROSPECT AGREEMENT

THIS AGREEMENT made and entered into effective as of the 1st day of August, 2004 by and among **PALACE EXPLORATION COMPANY** ("Assignor") an Oklahoma corporation, **HURRICANE DRILLING COMPANY** ("Assignee"), a New York partnership, with offices and principal place of business at 475 Northern Boulevard, Suite 20, Great Neck, New York 11021, **OIL AND GAS TITLE HOLDING CORP.** ("Nominee Title Holder"), a Texas corporation with offices and principal place of business at 5 East 59 Street, New York, New York 10022, and **THE BISTATE OIL DISTRIBUTION CORP.** ("Designated Distributer"), a New York corporation with offices and principal place of business at 5 East 59 Street, New York, New York 10022.

WHEREAS, **Assignor** represents that it is the owner of certain interests and farmout rights in oil and gas leases and lands covered thereby, which interests and farmout rights in oil and gas leases are hereinafter referred to as the *"Prospects"*; and

WHEREAS, previously oil and gas wells may have been drilled on portions of each of the *Prospects* and field rules have been applied for and approved creating proration drilling units *("PD Units")*; and

WHEREAS, **Assignor** desires to assign, and **Assignee** desires to acquire a portion of the rights and obligations of **Assignor** in and to one PD Unit in each *Prospect*, so that it may participate in the drilling of the wells as indicated hereinafter, subject to the terms and conditions expressed herein.

NOW, THEREFORE, in consideration of the premises, and the covenants, representations and agreements hereinafter contained, the sufficiency of which is hereby acknowledged by the parties hereto, it is hereby agreed by and between the parties hereto as follows:

1.     **Assignor** hereby assigns, transfers and sets over unto **Assignee** such portion of all of its rights in and to the *Prospects* subject to all the terms, conditions, duties and obligations of **Assignor** under the Lease and Farmout agreements assigned thereby which **Assignee** hereby expressly assumes and further subject to the retained rights and conditions contained hereinbelow. Notwithstanding the forgoing, **Assignor** shall convey to **Assignee** its proportionate share of 100% of the working interest on the *Prospects* as shown in Exhibit A attached, as supplemented from time to time. *Any assignments made hereunder shall be without warranty of title, express or implied.*

**Assignor** will convey legal title to the *Prospects;* and wells to **Assignee** but will record title in the name of **Nominee Title Holder** as nominee on behalf of **Assignee**, and **Nominee Title Holder** will maintain separate and distinct records and accounts of the *Prospects* and wells which it is holding on behalf of **Assignee** and will indicate therein that such *Prospects* and wells are held by it only as a nominee and in trust for the benefit of **Assignee**.

2.     **Assignee** shall be responsible for and pay to **Assignor** its proportionate share of all costs incurred in acquiring the leases comprising the *Prospects* as shown on Exhibit A, shall be subject to all preexisting lease and royalty conversions and backins.

3.     Assignor shall deliver to Assignee a net revenue interest of 60% on every lease, reserving for itself, as an overriding royalty the difference between the actual net revenue interest purchased by Assignor and the 60% net revenue interest delivered to Assignee.

4.     Assignor agrees to prepare and tender all required delay rentals, shut-in gas well payments, and/or other payments which may be required under the terms of the oil and gas leases subject hereto. Assignor shall not be liable to Assignee for any mistake it may make in tendering, or failing to tender such payments, except those that involve gross or willful negligence. Assignor agrees to promptly provide Assignee evidence of any such payment made, by forwarding copies of the applicable receipts directly to Assignee's office.

5.     Assignee hereby appoints Designated Distributor, and Designated Distributor hereby accepts to be the distribution agent for Assignee for all net cash receipts earned pursuant to the production and sale of oil and gas from the wells drilled on the *Prospects* herein conveyed less all operating expenses incurred in the production and sale of such oil and gas. Designated Distributor will charge $2,500 per year for these services and will make distribution to Assignee quarterly during the last week of January, April, July and October and issue with such distribution a complete history of receipts and disbursements by well and by month.

6.     This Agreement shall be governed by the laws of the State of New York, and shall bind, and shall inure to the benefit of the parties hereto and their respective successors and assigns, provided that no assignment hereof of any interest therein by and party hereto shall relieve such party of its duties and obligations hereunder, but such party shall remain fully liable and bound thereunder as if no assignment had been made. Any assignment by a party hereto shall be made expressly subject to this Agreement and its Exhibits.

**PALACE EXPLORATION COMPANY**     **OIL AND GAS TITLE HOLDING CORP.**

By_____     By_____
   Richard D. Siegal                Paul A. Howard
   President                        President

**HURRICANE DRILLING COMPANY**     **THE BISTATE OIL DISTRIBUTION CORP.**

By_____     By_____
   Robert A. Trevisani              Richard D. Siegal
   Managing Partner                 President

-2-

SCHEDULE A TO PROSPECT AGREEMENT

Prospects Assigned

To be supplied on or before December 31, 2004

Exhibit "B"

<u>TURNKEY DRILLING CONTRACT</u>

THIS AGREEMENT made and entered into effective as of the 1st day of August, 2004 by and between **HURRICANE DRILLING COMPANY**, ("Owner"), with principal place of business at 475 Northern Boulevard, Suite 20, Great Neck, New York 11021 and **TAH DRILLING CO., INC.** ("Driller") a New York Corporation with offices and principal place of business at 475 Northern Boulevard, Great Neck, New York 11021.

WHEREAS, **Owner** represents that it is the owner of certain interests and farmout rights in oil and gas leases and lands covered thereby (hereinafter referred to as the *"Drill Sites"*); and wishes to contract with **Driller** to drill one well on each *Drill Site*; and

WHEREAS, the parties intend that **Driller** shall commence the drilling of one well upon each of the *Drill Sites* for the purpose of exploring for oil and gas, and shall provide management and supervision of the drilling of such well together with total financial protection of Owner against unforeseen drilling expenses.

NOW, THEREFORE, in consideration of the premises, covenants, representations and agreements hereinafter contained, the sufficiency of which is hereby acknowledged by the parties hereto, it is hereby agreed by and between the parties hereto as follows:

1.      As soon as practicable after the execution of this Agreement, but in no event later than December 31, 2004, **Driller** shall commence or cause to be commenced the actual drilling with suitable rotary tools and the payment or prepayment of each well in search of oil and

gas at legal locations selected by **Owner**, and shall thereafter continue or cause to be continued the drilling thereof with due diligence and in a workmanlike manner to a depth to adequately test the formations or depth as more particularly described in Exhibit A, attached hereto.

2.    In consideration for drilling the wells, **Owner** shall be responsible for and pay to the **Driller** the non-refundable sum of SEVEN MILLION FIVE HUNDRED THOUSAND DOLLARS ($7,500,000.) (the "Turnkey Price") as shown on Exhibit "A", which shall be payable as follows:

A.    $                              . in cash at Closing;

B.    The balance ($                        .) by the delivery of **Owner's** note bearing interest at the rate of eight percent (8%) per annum, payable on or before December 31, 2019 (on account of drilling costs.) ("Turnkey Note") Exhibit B.

As collateral for the payment of the Turnkey Note (together hereinafter referred to as the "Note"), and for the payment and performance of all liabilities and obligations of **Owner** to **Driller**, **Owner** hereby pledges, transfers, assigns, grants a security interest in and delivers to the **Driller** all of his right, title and interest (i) in the production and proceeds therefrom from all of the wells, drilled hereunder, (ii) in the wells themselves and, (iii) the Subscription Notes of the Partners comprising **Owner** and any security or collateral securing such Subscription Notes. **Owner**, at anytime, may add additional collateral to secure the Subscription Notes of its Partners by pledging marketable securities acceptable to **Driller**.

3.    During the drilling of each well, **Driller** shall at its sole cost, risk and expense provide and furnish the following for each well:

-2-

(a)    Necessary curative work to assure soundness of title to that lease on which the *Drill Site* is located;

(b)    Staking of location and permit to drill;

(c)    Necessary road for access to and location for the *Drill Site*;

(d)    Complete drilling rig and other drilling accessories and equipment necessary to drill to the objective depth;

(e)    All cement and cementing services required for setting surface casing;

(f)    All drilling mud, chemicals, and foreign weight materials, if any, obtained and used in drilling to the objective depth;

(g)    An Electric Induction Log of the borehole from the bottom of the surface casing to the objective depth;

(h)    Plug and abandon according to the regulations of the applicable regulatory agency and settle surface damages if no completion attempt is made;

(i)    All labor and third party services necessarily required for items (a) through (h) above, and customary liability and property insurance.

4.    For the purposes of this Agreement, the point in time at which the well has been drilled to the objective depth, and either plugged and abandoned, or completed up to the tank battery or meter, shall be the Turnkey Point. After such Turnkey Point, all costs shall be borne by the **Owner**.

5.    During the course of the drilling and completing of said well to the Turnkey Point, **Driller** shall be responsible for, and conform to, all applicable obligations imposed on **Owner** under the applicable leases and assignment agreements.

-3-

6. With reference to the wells drilled on the *Drill Sites*, **Driller** shall maintain and hold available for **Owner**;

    (a)    Daily drilling reports;

    (b)    Copies of records of any tests which may be made in the borehole and of the analysis which may be made of the materials taken therefrom;

    (c)    Copies of Induction Logs to be picked up at the well site and upon completion or abandonment, composite of all logs run in the well;

    (d)    In the event the well is abandoned as a dry hole, a certified copy of the plugging records showing that the well has been plugged and abandoned.

7. **Owner** shall not be responsible for paying any cost overruns.

8. **Driller** shall be allowed to sublet or assign any of the work required hereunder at its own expense without the written consent of **Owner**.

9. **Driller** shall indemnify and hold **Owner** harmless from losses suffered due to the failure of one or more subcontractors to perform contracted services in an adequate and workmanlike manner.

10. This Agreement shall be binding upon all parties and upon their respective successors and assigns.

11. This Agreement shall be construed and interpreted under the laws of the State of New York.

-4-

IN WITNESS WHEREOF, the parties have executed this Agreement the day and year set forth opposite their respective signatures hereto.

**TAH DRILLING CO., INC.**

Dated:_____      By_____

**HURRICANE DRILLING COMPANY**

Dated:_____      By_____
                        Robert A. Trevisani
                        Managing Partner

-5-

Exhibit A to Exhibit "B"

To Be Supplied On Or Before December 31, 2004

Exhibit "B"
to
Exhibit "B"


TURNKEY NOTE


$  .    New York, New York    August 1, 2004


   Hurricane Drilling Company, a New York partnership (the "Partnership"), for value received, hereby promises to pay to TAH Drilling Co., Inc., a New York corporation ("TAH") on December 31, 2019 the principal amount of       DOLLARS ($   .) or such lesser principal amount as may be outstanding hereunder with interest as specified below.

   As part of the purchase price for his interest in the Partnership, each Partner executed and delivered to the Partnership a promissory note payable on or before December 31, 2019 (the "Subscription Note").

   This Note is issued pursuant to a certain Hurricane Drilling Company Turnkey Drilling Contract (the "Contract") dated as of August 1, 2004 by and between the Partnership and TAH Drilling Co., Inc. and is secured by the Subscription Notes of the Partners and any and all collateral securing such Subscription Notes as well as by the Contract. The Partnership shall have the right at anytime to substitute marketable securities acceptable to TAH in place of Subscription Notes of its Partners. The Partnership shall be entitled to offset all amounts due and owing to TAH under this Note for any and all defaults by TAH under the Contract. Except as specifically limited therein, the holder hereof is entitled to the benefits of the Contract and of such security. Accrued interest hereon shall be payable from Partnership net operating revenues. Principal shall be payable out of 50% of the remaining Partnership net operating revenues.

   The Partnership shall pay interest on the unpaid principal amount hereof commencing the date of issuance hereof, computed on the basis of the actual number of days elapsed over a year of twelve months (each month consisting of thirty days) prior to maturity (whether by acceleration or otherwise) at an annual rate equal to eight percent (8%) payable in arrears at maturity, except for the period from the date of this Note until December 31, 2004 during which period the interest rate will be 1% per annum and will be accrued.

   The indebtedness evidenced by this Note may be prepaid by the Partnership.

   No delay or omission on the part of the holder in exercising any right hereunder shall operate as a waiver of such right or of any other right of such holder, nor shall any delay, omission or waiver on any one occasion be deemed a bar to or waiver of the same or any other right on any future occasion. The Partnership and every endorser or grantor of this Note, regardless of the time order or place of signing, waive presentment, demand, protest and notices of every kind and assent to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of collateral, and to the addition or release of any other party or person primarily or secondarily liable.

   The Partnership agrees to pay all costs of collection of the principal or any interest on this Note, including without limitation reasonable attorneys' fees.

This Note is made and delivered in New York, New York and shall be governed by the laws of the State of New York.

HURRICANE DRILLING COMPANY

By_____
      Robert A. Trevisani, Managing Partner

-2-