IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

IRA NATHEL and SHELDON NATHEL,                    :
                                                  :
                            Plaintiffs,           :
                                                  :
        -against-                                 :
                                                  :        07-CIV-10956 (LBS)
RICHARD SIEGAL, GEORGE COLEMAN, HARVEY  :
JOSEPHSON, ROBERT A. TREVISANI, PAUL              :
HOWARD, RICHARD S. GURALNICK, SCHAIN              :
LEIFER GURALNICK, BISTATE OIL                     :
MANAGEMENT CORPORATION, SS&T HOLDING  :
CO., LLC, PALACE EXPLORATION COMPANY,             :
TAH DRILLING CO., INC., TAQ DRILLING CO.,         :
INC., OIL AND GAS TITLE HOLDING                   :
CORPORATION, JOHN DOES 1-20, JOHN DOE             :
CORPORATIONS 1-20, JOHN DOE LLCs 1-20, and        :
JOHN DOE LLPs 1-20                                :
                                                  :
                            Defendants.           :
                                                  :
-----------------------------------------------------------------x

## AFFIRMATION OF SEAN R. O'BRIEN IN OPPOSITION
## TO PLAINTIFFS' MOTION TO FILE A SECOND AMENDED COMPLAINT

I, Sean R. O'Brien, affirm as follows:

1.      I am a member of the law firm, Arkin Kaplan Rice LLP, and represent Defendants

Richard Siegal, Paul Howard, Palace Exploration Company, The Bistate Oil Management Corp.,

Oil and Gas Title Holding Corp., SS&T Holding Corporation, TAQ Drilling Company and TAH

Drilling Company (collectively, the "Palace Defendants") in the above-captioned action.

2.      I make this affirmation in opposition to Plaintiffs' Motion to File a Second

Amended Complaint and in support of the Palace Defendants' Motion to Dismiss.

3.      Attached as Exhibit A is a true copy of the First Amended Complaint ("FAC")

filed in this action.

4.      Attached as Exhibit B is a true copy of the Proposed Second Amended Complaint ("SAC").

5.      Attached as Exhibit C is a true copy of the Subscription Agreement for the Indian Village Company executed by Ira Nathel.

6.      Attached as Exhibit D is a true copy of a production and sales report that was sent to the partners of Condor Drilling Company, including Ira and Sheldon Nathel, on or about January 28, 2005.

*        *        *

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 26th day of June, 2008, in New York, New York.

SEAN R. O'BRIEN

# Exhibit

# A

STORCH AMINI & MUNVES PC
Two Grand Central Tower, 25th Floor
140 East 45th Street
New York, New York 10017
Tel. (212) 490-4100
Steven G. Storch (SS-5241)
Kathleen E. Wright (KW-5439)
Attorneys for Plaintiffs

RECEIVED
DEC 13 2007
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------
IRA NATHEL and SHELDON NATHEL,

                Plaintiffs,

      -against-

RICHARD SIEGAL, GEORGE COLEMAN, HARVEY
JOSEPHSON, ROBERT A. TREVISANI,
PAUL HOWARD, RICHARD S. GURALNICK;
SCHAIN LEIFER GURALNICK; BISTATE OIL
MANAGEMENT CORPORATION,
SS&T HOLDING CO., LLC, PALACE EXPLORATION
COMPANY, TAH DRILLING CO., INC.
TAQ DRILLING CO.; INC., OIL AND GAS TITLE,
HOLDING CORPORATION, JOHN DOES 1-20;
JOHN DOE CORPORATIONS 1-20;
JOHN DOE LLCs 1-20; and JOHN DOE LLPs 1-20

                Defendants.
------------------------------------------------------------x

07 CIV. 10956

FIRST
AMENDED
COMPLAINT

Plaintiffs Ira Nathel and Sheldon Nathel, by their attorneys, Storch Amini & Munves PC,

as and for their complaint against Richard Siegal ("Siegal"), George Coleman

("Coleman"), Harvey Josephson ("Josephson"), Robert A. Trevisani ("Trevisani"), Paul

Howard ("Howard"), Richard S. Guralnick ("Guralnick"), Schain Leifer Guralnick

("SLG"), Bistate Oil Management Corporation ("Bistate"), Palace Exploration Company

("Palace"), SS&T Drilling Co, LLC ("SS&T"), TAQ Drilling Co., Inc.("TAQ"), TAH

Drilling Co., Inc.("TAH"), Oil and Gas Title Holding Corporation ("Oil & Gas"), John

Does 1-20 ("Individual Does"), John Doe Corporations 1-20 ("Corporate Does"), John

Doe LLCs 1-20 ("LLC Does"), and John Doe LLPs 1-20 ("LLP Does") allege as follows:

## PRELIMINARY STATEMENT

1.    The claims set forth herein arise from Defendants' misconduct,

intentional material misrepresentations, omissions and false promises, through which

Plaintiffs were fraudulently induced to invest large sums of money in partnerships formed

purportedly to invest in oil and gas well drilling and production interests which

investments Defendants' promised were legitimately tax deductible and would produce a

return on the cash invested.  Defendants' representations were false and made knowingly

with the intention of taking Plaintiffs' money for themselves for their own enrichment.

2.    Defendants represented to Plaintiffs verbally and in writing including

in Investment Proposals for each partnership, that, through certain partnership investment

structures Plaintiffs could invest pre-tax dollars in oil and gas drilling interests and not

only legitimately take tax deductions of more than twice the amount invested as

intangible drilling costs ("IDC"), but also receive a substantial return on the cash

invested.

3.    Defendants represented that Plaintiffs would be able to deduct as IDC

costs more that $2.00 for every dollar invested in the Partnerships.  Defendants

represented to Plaintiffs that the partnership structure to take advantage of available tax

deductions was proper and consistent with federal and state tax laws and regulations.

Defendants represented that the structure had been approved by taxing authorities and

had been successfully subjected to audits.  According to Defendants, the United States

government sanctioned the IDC deductions in order to encourage investment in domestic oil and gas exploration to diminish dependence on foreign imports.

4.   As a further inducement to invest in their schemes, Defendants promised that Plaintiffs would receive a minimum quarterly return of 2% on cash invested.  Defendants also represented that the quarterly distributions they would receive, and payments to pay down the drilling costs, would be generated from the revenues from producing oil and gas wells drilled for the partnerships.

5.   Defendants also represented to Plaintiffs that, due to the economic viability of the oil and gas wells, they would never be required to pay the principal due on the promissory notes they would execute to fund oil and drilling costs and that, after the first year, they would not be liable for the interest on the notes.  Defendants represented that the principal and interest would be paid down by receipts for sales of oil and gas from successfully drilled wells.

6.   Defendants also promised that, if Plaintiffs assigned a portion of their distributions from the partnerships to the drilling companies, those monies would be used to purchase marketable securities that would also eventually be used to pay promissory notes executed to fund partnership investments and activities.

7.   Plaintiffs had no experience in the oil and gas industry and relied on Defendants' statements that they had  decades of experience in the oil and gas industry and had successfully created numerous similar investments structures from which investing partners had received valuable tax deductions and substantial returns.  Plaintiffs

reasonably relied on Defendants' representations and entrusted substantial amounts of

money to Defendants and invested in eight partnerships ("the Siegal Partnerships").[1]

  8. Plaintiffs also had no expertise in accounting, the creation of tax

shelters or tax rules and regulations.  The partnerships retained Defendants Guralnick, a

certified public accountant and his firm SLG to provide such expertise and Plaintiffs

relied on them to adhere to the standards of practice of their profession, provide accurate

information and advice and to prepare tax return documents that did not deviate from the

rules of the IRS and other taxing authorities governing tax deductions.

  9. Notwithstanding how the partnerships were styled, Plaintiffs were de

facto limited partners in the Siegal Partnerships.  Each partnership agreement expressly

granted all the power to act to the Managing Partner, who was either Defendant Coleman

or Defendant Trevisani, and specifically excluded all investing partners from any power

or any participation in the partnerships' activities or decisions.

  10. Plaintiffs placed their trust in Siegal, Coleman, Josephson, Trevisani,

Howard, Guralnick and SLG and invested money in the partnerships with the expectation

of deriving financial benefits and realizing profits from the efforts of Defendants.

  11. Not only have Plaintiffs discovered that substantially all of these

representations and promises were false but also that Defendants omitted to inform

Plaintiffs of facts that would have made a material difference to their investment

decisions.  These omissions include the failure to disclose that, the partnerships should

have been registered with the IRS as tax shelters and that, if the IRS scrutinized the

structures it would find them improper and disallow the IDC deductions.

---

[1] Specifically the partnerships are named:  NF Drilling Co., High Island Drilling Co., Bateman Drilling Co., Stagecoach Drilling Co., Pebble Bay Drilling Co., Hurricane Drilling Co., Indian Village Drilling Co. and Condor Drilling Co.

12. In November 2006, Plaintiffs were, for the first time, alerted to problems with the Partnerships. They were informed by the Internal Revenue Service ("IRS") that their tax returns were to be audited with specific focus on deductions for the Indian Village Drilling Co. ("Indian Village") partnership investment. Plaintiffs subsequently learned that a partner in one of Siegal's programs had been audited and the tax deduction was not only largely disallowed but that the partner had incurred an accuracy related penalty. Plaintiffs were also informed that substantially all of Defendant Bistate's drilling programs were being audited by the IRS.

13. During a telephone conversation with an IRS revenue agent seeking clarification, the Plaintiffs were advised that the Siegal Partnerships were aggressive tax shelters taking improper tax deductions and that Plaintiffs could be liable for stiff penalties and back taxes. The agent requested that Plaintiffs forward to him any offering memoranda or marketing materials they had regarding the Siegal Partnerships.

14. During a discussion of this request with Defendant Howard, Bistate's controller and Plaintiffs' contact at the Siegal entities, Howard advised Plaintiffs not to send any Investment Proposals to the IRS and, if they did, to remove the initial pages with the narrative proposal and representations. When asked why, Howard responded that the IRS would not like what was in the pages. Plaintiffs' representative provided to the IRS the complete Investment Proposal of the Indian Village partnership and later learned that Defendants Guralnick and SLG had represented to the IRS that there were no such proposals for any of the partnerships.

15. Plaintiffs discovered that the representations Defendants made regarding the tax deductibility of their investments, upon which Plaintiffs had relied,

were false, that Defendants knew they were false or were made with reckless disregard for the truth, and they now faced substantial monetary losses due to unanticipated tax payments, interest and penalties.

16. Plaintiffs repeatedly requested Bistate to provide partnership documents and materials to which, as partners, they were entitled. Bistate ignored, rebuffed or simply failed to produce any materials and documents. Plaintiffs had to resort to legal action in New York State court to force Bistate to provide documents. Plaintiffs learned in September, 2007 when Bistate finally produced documents that some of the oil and gas wells purportedly drilled at the request of some of the Partnerships had in fact been drilled before the Partnerships were created and, in some instances, had been abandoned prior to Plaintiffs' investment.

17. Defendants knew, at the time they induced Plaintiffs into the investments, with representations to the contrary, that Plaintiffs could not take advantage of IDC tax deductions for intangible drilling costs incurred on wells drilled before Plaintiffs acquired their partnership interests.

18. Records produced by Bistate also show that distributions to the partners from the partnerships were often made from "advances" and not from oil and gas revenues. Upon information and belief, these advances were made from Siegal, the companies he controlled and/or cash received from investments made by other partners in unrelated partnerships promoted by Siegal.

19. There was no provision in the Partnerships' agreements for such "advances" to the Partnerships and no documentation has been provided to Plaintiffs demonstrating the source or repayment terms.

20. According to Defendants' representations, all distributions would be made from cash flow produced from receipts for the sale of oil and gas produced form successfully drilled wells.

21. Accordingly, Plaintiffs now realized that they had been fraudulently induced into a giant Ponzi scheme with false promises of legitimate tax deductions and substantial investment returns. The IDC tax deductions were unsupported by legitimate drilling costs and the "returns" were made in large part from recycled cash from other duped investors or were diverted to Defendants for their own purposes.

22. The balance of this complaint will set forth in detail the facts and circumstances of defendants' fraudulent activities, failure to meet their duties of trust and professional care and breaches of the agreements entered into with Plaintiffs leading to the claims for relief herein.

## JURISDICTION AND VENUE

23. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 as the claims involve issues of substantive federal taxation law and Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78aa. Claims asserted herein arise under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. The investments at issue in the claims herein are investment contracts which constitute securities as defined in 15 U.S.C. § 77b(a)(1) and applicable case law. Under 28 U.S.C. § 1367 this Court also has supplemental jurisdiction over plaintiffs' claims arising under state law.

24. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims herein occurred in

7

this district and many of the documents, records and witnesses related to this action are located in this district.

25. In connection with the acts, transactions and conduct alleged herein, Defendants directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and interstate telephone communications.

## PARTIES

26. Plaintiffs Ira Nathel and Sheldon Nathel are individuals residing in the State of New York.

27. Individual Defendants Siegal and Howard are individuals residing in the State of New York.

28. Individual Defendant Josephson is a certified public accountant residing in the State of New York.

29. Defendant Coleman is an individual residing in the State of New York who, upon information and belief, is engaged in the teaching profession.

30. Individual Defendant Guralnick is a certified public accountant residing in the State of New York.

31. Upon information and belief, Defendant Trevisani is an attorney admitted to the practice of law in the States of New York and Massachusetts and residing in the State of Massachusetts.

32. Defendant SLG is a firm of certified public accountants with its offices in New York, New York.

33. Upon information and belief, Defendant Bistate is a corporation formed and existing under the laws of the State of New York with its principal place of business in New York, New York.

34. Upon information and belief, Defendant Palace is a corporation formed under the laws of the State of Oklahoma.

35. Upon information and belief, Defendant Oil & Gas is a corporation formed and existing under the laws of the State of Texas with its principal place of business in New York, New York.

36. Upon information and belief, defendant, SS&T is a limited liability corporation formed and existing under the laws of the State of New York with its principal place of business in New York.

37. Upon information and belief, defendant TAH is a corporation formed and existing under the laws of State of Delaware with its principal place of business in New York, New York.

38. Upon information and belief, Defendant TAQ is a corporation formed and existing under the laws of the State of Delaware with its principal place of business in New York, New York.

39. Upon information and belief Defendants Bistate, Palace, Oil & Gas, SS&T, TAH and TAQ (collectively "the Siegal Companies") are all 100% owned and controlled by Siegal and his family. Siegal, Coleman, Trevisani, Josephson and Howard, committed the tortious acts and breaches described herein through these corporate Defendants.

40. Upon information and belief Defendants John Does 1-20 are persons, yet to be identified, who also committed tortious acts and breaches described herein.

41. Upon information and belief Defendants John Does Corporations 1-20 are corporate entities, yet to be identified, who also committed the tortious acts and breaches described herein.

42. Upon information and belief Defendants John Doe LLCs 1-20 are limited liability companies, and professional partnerships, yet to be identified, who also committed the tortious acts and breaches described herein.

43. Upon information and belief Defendants John Doe LLPs 1-20 are law firms, accounting firms and other professionals, yet to be identified, who also committed tortious acts and breaches described herein.

## FACTS RELEVANT TO ALL CLAIMS FOR RELIEF

### Background

44. According to Investment Proposals prepared by Siegal to offer investors participations in the partnerships he devised, Defendant Siegal is an attorney and an accountant who has been engaged in the oil and gas exploration and development industry since the 1970s.

45. This activity has largely been conducted through the formation of partnerships Siegal promoted purportedly to acquire leases for oil and gas interests and sites and retain third party companies to drill for oil and gas ("the Siegal Partnerships").

46. Plaintiffs are engaged in the wholesale fruit and vegetable business and have no expertise or experience in the oil and gas industry, accounting or tax sheltering.

10

47. In or about the end of 2000, Plaintiffs retained Harvey Josephson, a certified public accountant, to provide professional accounting services including assistance with tax reporting. In or about November 2001, after providing Plaintiffs with professional accounting services for about a year and seeing that Plaintiffs' business was thriving, Josephson approached Plaintiff's corporate controller, Richard Byllott ("Byllott"), with a proposal to invest in a Siegal partnership.

48. Josephson told Byllott that, instead of making four quarterly estimated tax payments, Plaintiffs could make only three and invest the fourth payment, together with an executed promissory note, in a Siegal partnership which would use the money and Notes to pay a related entity, namely Defendants SS&T, TAQ or TAH for a turnkey oil and gas drilling contract. Plaintiffs could then take a tax deduction or an amount equal to the combined amount of cash and promissory notes on IDC and the purported tax savings would equal or exceed the cash investments.

49. If a sufficient number of the drilled wells struck oil or gas, as was guaranteed according to Josephson, Plaintiffs would have the added benefit of earning a return on their investment from revenues generated by the sale of the oil and gas.

50. Josephson assured Byllott and Plaintiffs that he had been putting his clients in similar Siegal partnerships for years and that his clients had taken the IDC tax deductions without any problems with the Internal Revenue Service ("IRS") or any other taxing authorities. He informed Byllott and Plaintiffs that his clients had also received substantial cash on cash profits from their investments as oil and gas had been found in abundance.

11

51. In order to confirm Josephson's assessment of the propriety of the tax deductibility of the proposed investment, in or about January 2002 Byllott spoke to Siegal by telephone and asked if the IRS had approved the tax aspects of the investment structures. Siegal informed Byllott that his partnerships "had never lost an audit". At or about the same time, Siegal and Josephson also assured Plaintiffs that Congress had made the tax deductions available to encourage investment in the oil and gas industry because the United States government was anxious to promote oil and gas exploration internally to reduce the country' dependency on foreign imports.

52. Upon information and belief, Josephson had a financial interest in the Siegal Companies and other Siegal Partnerships and was compensated by Siegal and/or the Siegal Companies for securing Plaintiffs agreement to invest in the Siegal Partnerships and hand over money to Siegal and/or the Siegal Companies.

**The Structure of the Siegal Partnerships**

53. Each partnership followed the same format.[2] Siegal provided Plaintiffs with an offering memorandum styled an "Investment Proposal" which made the following promises and representations of present fact:

    (a) Investors can redeploy their upper bracket tax dollars into certain investments and create income and cash flow rather than pay those dollars to federal, state and municipal governments.

    (b) Rates of return can unquestionably be earned on monies which would otherwise be paid to taxing authorities.

    (c) The partners will be afforded a substantial active tax loss under Section 263C of the Internal Revenue Code which allows taxpayers to expense the intangible drilling costs incurred in drilling oil and gas wells.

---

[2] For the sake of brevity the Complaint will specifically reference the materials relating to the Indian Village Drilling Company partnership purportedly dated March 1, 2003, but in which Plaintiffs invested on July 15, 2003

(d) The Partnership can expect an average annual cash flow of approximately 10-15% and often greater of the cash funds invested.

(e) It is reasonable to expect the cash flow to continue for 10-12 years.

(f) A $100,000 cash investment will result in a deduction of 2.25 times that amount. An investor in the 50% tax bracket will save $112,500. That is the investor will have channeled $100,000 of his tax dollars into an active investment and put another $12,500 in his pocket. The investment should also yield 10% per annum of which approximately 25% will be tax free.

(g) The Partnership will be formed with a minimum of five (5) units for capitalization and would contract with a specific drilling company to drill a minimum number of wells at a turnkey price, on sites purchased from Palace.

(h) The drill sites will be carefully chosen by the Managing Partner of the Partnership.

(i) To the extent that during the drilling of a site the results lead to the condemnation of any additional drill site, the Partnership will have the right to exchange the undrilled site for another undrilled site controlled by Palace in the same area.

(j) The t urnkey drilling costs will be paid partially in cash and partially with a Turnkey Note issued by the Partnership and secured by Subscription Notes executed by the investing partners.

(k) Each investor will purchase a unit in the partnership with a certain sum in cash, for example $100,000, and with the execution of a Subscription Note in the amount of 1.25 times the cash investment. The $100,000 cash investment will create a tax deduction of $225,000.

(l) The interest payable on the Subscription Note would be 8% per annum paid quarterly and fully tax deductible. The investor would only be required to pay the interest during the first year of the Partnership with future interest to be paid out of the Partnership's cash flow generated from oil and gas revenues or the interest would accrue and be payable at the maturity of the Subscription Note.

(m) Oil and Gas Title, as nominee, holds all the titles to the properties and wells for the investors' benefit.

(n) Bistate collects all the monies from the sale of oil and gas, pays all the lease expenses to non-related third party vendors and distributes cash flow payments to investors.

(o) Distributions to the partners are quarterly and accompanied with a report of all sales of oil and gas by month and by well and a schedule of expenses paid on the owned wells and leases.

(p) The Turnkey Note holder will subordinate its right to collect the 8% interest from the Partnership on the Turnkey Note to a quarterly cash on cash 2.0% return to the investing partners.

54. The Indian Village Investment Proposal also represented that, in lieu of receiving the quarterly distributions in full, the partners could elect to assign to the Partnership, for no more than five years, 67% percentage of their future distributions with which the Partnership would purchase marketable securities which would increase in value and ultimately be used to pay off the Turnkey Note.[3]

55. The Investment Proposal also represented that Siegal's companies "have always maintained the highest level of fiduciary integrity servicing investors with informative reporting and on time distributions" and that Defendant Palace had over 1500 producing wells in the lower 48 states.

56. The Investment Proposal included draft agreements as follows:

(a) A Partnership Agreement and Certificate of Partnership ("Partnership Agreement") to be executed by the Managing Partner and each investing partner;[4]

(b) A Prospect Agreement between the Partnership, Palace, Oil and Gas and Bistate through which Palace assigned oil and gas interests to Oil and Gas as nominee for the benefit of the Partnership and Bistate is named the Designated Distributor of oil and gas production;

(c) A Turnkey Drilling Contract between the Partnership and the proposed drilling company, which was TAQ, TAH or SS&T;

---

[3] The percentage withholding varied with each Partnership between 67% and 75%.
[4] Defendant Coleman was the Managing Partner for seven of the Partnerships in which Plaintiffs invested. The Managing Partner for the eighth, Hurricane Drilling Co., was Defendant Trevisani.

(d) A Turnkey Note, bearing interest at 8% per annum, issued by the Partnership to the drilling company to finance in part the drilling costs;

(e) A Subscription Agreement by which the partner subscribes to a partnership unit which subscription must be accepted by the Managing Partner;

(f) A Subscription Note, bears interest at 8% per annum, executed by the partner for the balance of the payment for the partnership unit and applied as collateral securing the Turnkey Note; and

(g) An Assumption Agreement executed by the investing partner assuming the partner's pro rata share of the Turnkey Note and pledging the partner's Subscription Note to secure that share.

57. As with all the Siegal Partnership documents, none of the signatures on any of the above agreements relating to Indian Village are dated. Only the Partnership Agreements contain dates, in the opening paragraphs, as of which the Partnerships were purportedly formed. The Indian Village Partnership Agreement is purportedly dated March 1, 2003. However, Plaintiffs, who were the first participants, did not invest until July 15, 2003. The minimum number of five (5) units for capitalization of Indian Village were not sold until September 5, 2003 and the last investor joined in December 2003.

58. To the best of Plaintiffs' knowledge, no allocations were made between partners based upon the date of the acquisition of his or her Partnership interest.

**The Partnership Terms**

59. All the Partnerships were formed under the laws of the State of New York. Although styled as general partnerships, the Partnership Agreements unequivocally place all control and power in the hands of the Managing Partner only. The Managing Partners have full and exclusive power and authority to manage, control, administer and operate the business affairs of the Partnerships and take all decisions:

15

"The scope of such power and authority shall encompass all matters in any way connected with such business or incidental thereto."

60. The Partnership Agreements and Certificates of Partnership expressly exclude the investing partners from any involvement in the Partnerships' business or decision making and preclude them from removing the Managing Partner.

61. Plaintiffs had no prior experience, let alone expertise, in the oil and gas industry, well drilling or investing in oil and gas exploration and were excluded from any decision making related to the Partnerships. Accordingly, they were entirely dependent on the expertise and efforts of others to provide the promised financial and tax benefits from the investments. The Partnerships were investment contracts structured as investments of money in a common enterprise with the expectation of profits derived from the efforts of the promoter Siegal, the Managing Partners and/or the Siegal Companies or other third parties including Defendants Guralnick and SLG.

**Representations Regarding**
**the Subscription Notes and Partnership Distributions**

62. As part of the inducement to enter into the Partnerships, Josephson and Siegal represented to Plaintiffs that, as a practical matter due to the economics of the transaction, Plaintiffs would not be required to pay the 8% interest on the Subscription Note after the first year. All future payments due would be paid from cash flow from revenue generated by the sale of gas and oil from successfully drilled wells which, in turn, would pay down the Turnkey Notes. Josephson assured Plaintiffs that none of the similar promissory notes financing Siegal's partnership structures had ever been exercised and that "no one ever sees them."

16

63. Josephson and other yet to be identified defendants assured Plaintiffs that funds generated by the oil and gas sales in excess of the amounts due quarterly on the Turnkey Note would be distributed to the Partnership and then to the partners except for any portion of the distributions the partners had assigned to the Partnerships to purchase marketable securities. These securities were assumed to increase in value to the point where they would eventually be equal to the value of the Turnkey Notes and could be used to pay off those Notes.

64. Defendants further induced Plaintiffs into the Partnerships with a promise of a guaranteed quarterly return on their cash invested The Investment Proposal expressly states that the Turnkey Note holder will subordinate its right to collect interest on the Note to a cash on cash 2% quarterly return to the investing partners. That is, the partners were guaranteed a quarterly payment of 2% on the cash they invested.

65. Defendants intentionally did not disclose to Plaintiffs that the Partnership structures should have been registered with the IRS as tax shelters and that, if the IRS reviewed the structures closely it would find the tax aspects improper and disallow the IDC deductions.

**Plaintiffs Invested in the Partnerships**
**In Reliance on Defendants' Representations**

66. Relying on Defendants representations and the representations in the Investment Proposal, and without knowledge of material facts that Defendants did not disclose, Plaintiffs invested as limited partners in the Partnerships. The designated dates of the commencement of the Partnerships set forth in the Partnerships agreements were invariably months before Plaintiffs actually invested in the Partnerships as follows:

| Name | Date on Agreement | Date Plaintiffs Invested | Amount |
|------|-------------------|--------------------------|--------|
| NF Drilling | August, 2001[5] | December 12, 2001 | $200,000 |
| High Island Drilling | March 1, 2001 | August, 23, 2001 | $ 50,000 |
| Stagecoach Drilling | March 1, 2002 | July, 23, 2002 | $100,000 |
| Bateman Drilling | September 1, 2002 | December, 2002[6] | $250,000 |
| Indian Village Drilling | March 1, 2003 | July 15, 2003 | $150,000 |
| Condor Drilling | September 1, 2003 | December 12, 2003 | $250,000 |
| Hurricane Drilling | August 1, 2004 | December 9, 2004 | $300,000 |
| Pebble Bay Drilling | August 1, 2005 | December 12, 2005 | $400,000 |

67. Upon information and belief, each year the Partnership tax returns and schedules were prepared by Defendants Guralnick, SLG and personnel controlled by Defendants. Schedule K-1 were provided to Plaintiffs detailing the IDC deductions to be used in preparation of their tax returns.

68. Plaintiffs received quarterly written communications from each Partnership which included distribution checks and purported production reports for the wells owned by each Partnership. Many of the distribution checks were reduced by what was reported as a "transfer for the purchase of securities".

69. These communications never included a description of the "securities" or any evidence that they had been purchased, their value or where they were being held.

**The Fraud Is Revealed**

70. In or about November 2006, Plaintiffs' corporate controller, Richard Byllott, received a written notice from Jeffrey Bacon, an IRS revenue agent in Texas requesting that Plaintiffs extend the limitations period on an audit. Seeking clarification, Byllott shortly thereafter spoke to Patrick Villarreal, an IRS revenlue agent in Texas, who informed Bylott that Plaintiffs' investments in the Siegal Partnerships were being audited

---

[5] Upon information and belief the date on the Partnership Agreement is in or about August 2001.
[6] On or about December 12, 2002.

and that the Siegal Partnerships were aggressive tax shelters taking illicit tax deductions and that Plaintiffs were facing trouble.

71. Revenue agent asked Byllott to forward to him any promotional materials for the Partnerships that he or Plaintiffs had received. Byllott said he would consult his tax accountant and get back to revenue agent Villarreal.

72. In or about the middle of December, 2006, Byllott telephoned Paul Howard, who, upon information and belief, is the controller for Bistate and was Byllott's contact at the Siegal Partnerships and Bistate. In that conversation, Byllott discussed with Howard the fact that Plaintiffs were being audited. Howard tried to assure Byllott that the audits were routine and would not lead to any problems.

73. When Byllott told Howard that the IRS had asked him to forward promotional materials, Howard's demeanor changed. He told Byllott he should not send the Partnership Investment Proposals to the IRS and that, if he did so, he should remove the first five pages. Byllott asked him why he should remove the pages and Howard answered in substance that, in those pages, "the IRS is going to see something they don't like."

74. Howard's statement understandably caused alarm and Plaintiffs, through a representative, forwarded to Mr. Villarreal the complete Investment Proposal for the Indian Village Partnership without removing any pages.

75. By letter dated March 12, 2007, Defendant Coleman, signing himself as "tax matters partner", informed Plaintiffs that the Condor Partnership was under IRS audit for the taxable year 2003. In a letter of the same date, Defendant Trevisani, signing himself also as "tax matters partner", informed Plaintiffs that the Hurricane Partnership

19

was also under IRS audit for the taxable year 2004. The letters advised Plaintiffs that the Partnerships were responding to IRS document requests and otherwise cooperating fully with the audit.

76. The March 12, 2007 letters also informed Plaintiffs that an IRS audit report to a partner in a similar partnership structure proposed to disallow a large percentage of the IDC deductions taken by the partner and to impose an accuracy-related penalty.

77. Plaintiffs learned in September 2007, that Defendants were not cooperating fully with the IRS and were not acting in the interests of Plaintiffs in their dealings with the IRS. In written responses to IRS information requests dated October 17, 2006 and January 29, 2007, on SLG letterhead, Defendant Guralnick told the IRS that there "is no promotional or marketing material, offering memorandum or prospectus used to solicit partners or investors." In other words, Guralnick told the IRS that the Investment Proposals, which were designed solely to sell the Partnership interests, did not exist.

78. Guralnick had also advised the IRS, in a letter dated October 16, 2006, also on SLG letterhead, that there was no "legal opinion or prospectus describing the material tax issues for the [Hurricane] partnership agreement or the deductibility of the IDC amounts." As set forth above, the Investment Proposals laid out in detail the tax issues and the deductibility of the IDC and represented that the Partnerships and their tax aspects were proper.

79. On or about July 17, 2007, the New York State Department of Taxation informed Plaintiff, Ira Nathel, that his tax returns were to be reviewed and his investment in Indian Village subject to audit.

80. In the meantime an attorney for Plaintiffs inquired of IRS revenue agent Villarreal whether the IRS would allow a tax deduction for IDC costs to the extent of Plaintiffs' investments. Revenue agent Villarreal responded that, based on documents provided by the Partnerships, the IRS deemed that the Partnerships did not own a working interest in any wells. Agent Villarreal also indicated that proceeds received from the Partnerships may not have been from revenues from wells drilled by the Partnerships in which Plaintiffs had invested.

81. Alarmed by the state of affairs and facing a significant accuracy-related penalty, Plaintiffs wished to assess the possibility of taking action against those potentially liable for misconduct towards them. Not knowing who all the likely miscreants were, Plaintiffs made certain requests for Partnership documents, to which they are entitled, from Bistate and Siegal. However, the requests were ignored, rebuffed or promised documents never materialized.

82. In August 9, 2007, Plaintiffs commenced an action in New York State Court to force the pre-action production of documents that would enable them to identify the wrongdoing entities and individuals and the extent of the misconduct. Bistate ultimately entered into a stipulation, dated August 21, 2007, and agreed to produce documents.

83. Bistate subsequently produced documents relating to the Condor, Hurricane and Indian Village Partnerships. Those documents confirm that

21

representations made by Defendants verbally, and in writing in the Investment Proposals, in the quarterly distributions, and in correspondence with the IRS, were false. Plaintiffs also learned that Defendants had withheld material facts from them regarding, among other things, the nature of the Partnership interests, the propriety of deducting the IDC costs from Plaintiffs' taxes and the return on the Plaintiffs investments.

84. Plaintiffs also learned that Defendant Coleman is a teacher and Defendant Trevisani is an attorney. Accordingly, they have no professional background to qualify them to act as plenipotentiary Managing Partners in oil and gas exploration Partnerships and to protect those Partnerships' interests. In particular, they would have no expertise to choose "carefully" the oil and gas drill sites as the Investment Proposals represented they would. Defendants falsely represented that Coleman and Trevisani's had the requisite expertise and Plaintiff relied on those representations to their detriment.

85. Plaintiffs do not currently have access to Bistate's documents pertaining to all the Partnerships but believe that all the allegations herein apply with equal validity to all eight Partnerships in which they were induced to invest.

**Defendants Misrepresented the Indian Village IDC Deduction**

86. According to the Investment Proposal, the Partnership would be comprised of a minimum of 5 units for a mimimum capitalization of $1,250,000. There would also be a minimum of 25 sites drilled. The Investment Proposal also states that dry sites will be substituted for other undrilled sites owned by Palace .

87. The Partnership Agreement purports to date from March 1, 2003. However, from the Partnership General Ledger information provided by Bistate, the first three units of the Partnership were purchased by Plaintiffs on July 21, 2003. The

minimum of 5 units was not reached until September 5, 2003. Thus, unbeknownst to Plaintiffs, the Partnership did not, by its own terms, exist until September 5, 2003. Additional contributions were made as late as December 22, 2003. Nevertheless, the Partnership tax return for 2003 treats all partners as having commenced their participations on the same date of March 1, 2003.

88. Bistate has admitted that the Partnership Agreement dates are inaccurate in affidavits provided to the IRS by Maria Scibelli, who describes herself as Secretary of Bistate. In those affidavits she purports to explain the lack of dates for the signatures for all the related agreements by merely stating the she received or viewed the executed agreements "substantially contemporaneously" with receipts for the partners' investments.

89. The Prospect Agreement provided to Plaintiffs before they bought their Partnership units named 31 drill sites to be assigned to the Partnership. In other words the Indian Village drill sites were purportedly assigned before any partners had acquired their interest and, more importantly, before any cash or Notes were contributed to the Partnership. Accordingly, it would have been impossible as of March 1, 2003 to determine what the terms of the Turnkey Drilling Contract would be as it was unknown how much would be contributed to the Partnership in cash and Subscription Notes.

90. Furthermore, the drilling reports for the sites listed in Exhibit A to the Prospect Agreement demonstrate that at least 16 of the 31 sites had been drilled, not only before 5 Partnership units had been sold, but before a single Partnership unit had been purchased. All of the wells were drilled before the final Partnership investment was made in December 2003. Indeed, at least 2 had been drilled and abandoned before

23

September 5, 2003 which was the first date the Partnership could have been constituted and a third was abandoned before the final partner invested.

91. Accordingly, Defendants knew at the time they solicited Plaintiffs participation in Indian Village that the Partnership and partners were not entitled to take deductions for IDC for most of the purported drill sites and knowingly misrepresented to Plaintiffs that the deduction was legitimately available.

**Defendants Misrepresented the**
**Return on Plaintiffs' Indian Village Investment**

92. The Investment Proposal promised that, after the first year, interest payable on the Subscription Notes would be paid from the Partnership cash flow from sales of oil and gas from successfully drilled wells. That interest would in turn pay the interest due on the Turnkey Note. However, also as promised in the Investment Proposal, the Turnkey Noteholder, Defendant TAQ, would subordinate its right to collect interest on the Turnkey Note to a quarterly cash on cash 2% return to the investing partners. In other words, the proceeds of sales of oil and gas, collected buy Bistate, were guaranteed to be sufficient to pay Plaintiffs a quarterly 2% return on the cash they invested.

93. Bistate's documents show that distributions were made quarterly by Bistate to the Indian Village Partnership. However, in order to make those distributions in April, July and October of 2006 the distribution reports note that "advances" were made to the Partnership from an unnamed source. On July, 30, 2007 a distribution was made to the Partnership of less than half of the guaranteed 2% payment. Six days later a "supplemental distribution" was made of $10,000 funded entirely by another "advance" from an unknown source. Whatever the source, these distributions were not made, as Defendants promised, from oil and gas revenues.

94. Moreover, nowhere in the Investment Proposal or Partnership related documents is there any statement that Bistate contemplated borrowing to pay the quarterly 2% payment. Defendants withheld all information regarding such borrowing from Plaintiffs. There are no promissory notes to memorialize such advances. Bistate was circulating cash from other partnership investments to pay Indian Village and keep the partners from: (a) discovering that no oil and gas sales were insufficient to fund the promised return on investment; and (b) to pay down the Turnkey Note for drilling that Plaintiffs now know never took place or was completed and abandoned before the Partnership was constituted.

95. The Investment Proposal also represented that Plaintiffs could agree to assign 67% of their future distributions to the Partnerships, for a period of not more than five years. The Partnerships would use the withheld distributions to purchase marketable securities which would provide additional collateral and eventually be used to pay off the Turnkey Notes.

96. From July 28, 2005 onwards all the distribution checks to the Plaintiffs from the Partnership reflected this assignment and the withholding of most of the distribution as "transfer for purchase of securities". However, despite express and repeated requests, Bistate has failed to provide any documents that would identify the specific securities purportedly purchased or where and by whom they are being held. The only conclusion to draw from this refusal to provide documents relating securities which should belong to Plaintiffs is that the securities do not, and never did, exist.

97. Defendants withheld from Plaintiffs the fact that there were insufficient, or no, oil and gas receipts to fund Partnership distributions let alone pay off

what turned out to be bogus Turnkey and Subscription Notes.  By the artifice of making

advances and withholding promised distributions to purchase nonexistent "securities"

Defendants hoped to keep the house of cards standing for twenty-five years.  At that time

Defendants planned to represent that the Turnkey Note and Subscription Notes had all

been paid off by oil and gas receipts and from the sale of the "securities" which would

have increased in value over the twenty-five years sufficiently to equal the value of the

Notes.  The Turnkey and Subscription Notes are bogus and there are no securities to back

them and the purported distributions were made largely from cash received from other

investors who had been duped into turning over money to Defendants for interests in

similar partnerships.

**Condor Partnership Misrepresentations**

98. The Condor Partnership is identical in structure to, and was promoted

with the same misrepresentations as Indian Village but for the facts alleged below.

99. The Condor Investment Proposal represented that a minimum of five

units would be required for the Partnership to be constituted.  Whereas the minimum

capitalization for Indian Village was $1,250,000, for Condor it was $1,400,000. Also, the

Turnkey Drilling Contract was with Siegal's company Defendant TAH instead of

Defendant TAQ.  The Partnership Agreement is dated September 1, 2003 but Plaintiffs

did not purchase their units until December 12, 2003.  From Bistates's records it appears

that the minimum of five units was not reached until December 26, 2003 and investments

continued until December 31, 2003.

100.    According to the Condor Prospect Agreement, 139 drill sites were

purportedly to be assigned to the Condor Partnership.  Again these supposed drill sites

were assigned before the Partnership could have been constituted pursuant to its own terms and it would have been impossible to determine the terms of the Turnkey Agreement before the Partnership had been fully constituted.

101.    Moreover, according to the drilling reports produced by Bistate for the Condor wells, at least twenty-two (22) of those sites were drilled before September 1, 2003, the date of the Partnership Agreement and before a single partner had invested, let alone the sale of the 5 units necessary to constitute the Partnership. In addition, at least 7 of the sites had been drilled and abandoned before the Partnership was constituted with the minimum 5 units in December, 2003.

102.    Still, the Partnership tax return for 2003 deducts the IDC as if the Partnership had been fully constituted on September 1, 2003 and drilling had begun after that date. Defendants knew that much of the IDC costs so deducted, if indeed any, could not be legitimately tax deductible. Yet they had misrepresented to Plaintiffs that their investment would be substantially tax deductible as IDC. SLG and Guralnick prepared and signed tax returns they knew, or should have known, were fraudulent or prepared with reckless disregard for their truthfulness.

103.    Bistate's records also show that of the of 12 quarterly distributions to the Condor Partnership, which Defendants promised would be generated from sales of oil and gas, 10 were in large part financed by "advances" to the Partnership from unknown sources. As with the Indian Village Partnership, there is no provision in the Investment Proposal or the Partnership documents for the distributions to be supported by borrowing of any kind. Again information that many distributions were not made from oil and gas revenues but from "advances" was withheld from Plaintiffs.

104.    Also, from July 28, 2006 onwards all the distribution checks to the Plaintiffs from the Partnership, as with Indian Village, reflected a withholding of most of the distribution due to Plaintiffs as "transfer for purchase of securities". However, despite express and repeated requests, Bistate has failed to provide any documents that would identify the securities purportedly purchased or where and by whom they are being held. The securities do not exist.

105.    Defendants withheld from Plaintiffs the fact that there were insufficient, or no, oil and gas revenues to fund Partnership distributions let alone pay off what turned out to be bogus Turnkey and Subscription Notes. By the same artifice of making advances and withholding promised distributions to purchase nonexistent "securities" they used in Indian Village, Defendants hoped to keep the house of cards standing for twenty-five years. At that time they planned to represent that the Turnkey Note and Subscription Notes had all been paid off by oil and gas receipts and from the sale of the "securities" which would have increased in value over the twenty-five years sufficiently to equal the value of the Notes. In fact, the Turnkey and Subscription Notes are bogus and there were no security purchases to back them and the purported distributions must have been made largely from cash received from other investors who had been duped into turning over money to Defendants for interests in other partnerships.

**Hurricane Partnership Misrepresentations**

106.    The Hurricane Partnership is identical in structure to, and was promoted with the same misrepresentations, as Indian Village but for the facts alleged below.

107.    The Partnership Agreement is dated August 1, 2004 but Plaintiffs did not invest until December 9, 2004. The minimum number of units to constitute the Partnership was 5 for a minimum capitalization of $1,400,000. According the Bistate's documents, that minimum capitalization was not met until December 2004. The Turnkey Drilling Contract was also with TAH. Instead of Coleman, the Managing Partner was Defendant Trevisani.

108.    Bistates documents show that of the 93 sites assigned to the Partnership in the Prospect Agreement, at least 2 had been drilled before the date of the Partnership Agreement and at least 24 had been drilled before Plaintiffs invested on December 9, 2004. Furthermore, at least 1 site had been drilled and abandoned before any partners had invested.

109.    From on or about April 30, 2007, most of the distribution to Plaintiffs from the Hurricane Partnership was withheld for the "transfer for purchase of securities." Again, despite express and repeated requests, Bistate has failed to provide any documents that would identify the securities purportedly purchased or where and by whom they are being held. The securities do not exist.

110.    Defendants withheld from Plaintiffs the fact that there were insufficient, or no, oil and gas revenues to fund Partnership distributions let alone pay off what turned out to be bogus Turnkey and Subscription Notes. By the same artifice of making advances and withholding promised distributions to purchase nonexistent "securities" they used in Indian Village, Defendants hoped to keep the house of cards standing for twenty-five years. At that time they planned to represent that the Turnkey Note and Subscription Notes had all been paid off by oil and gas receipts and from the

sale of the "securities" which would have increased in value over the twenty-five years

sufficiently to equal the value of the Notes. In fact, the Turnkey and Subscription Notes

are bogus and there were no security purchases to back them and the purported

distributions must have been made largely from cash received from other investors who

had been duped into turning over money to Defendants for interests in other partnerships.

### FIRST CLAIM FOR RELIEF

**Violation of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder Against
Siegal, Josephson, Coleman, Trevisani, Howard, Guralnick,
SLG, The Individual, Corporate, LLC and LLP Does**

111.    Plaintiffs repeat and reallege paragraphs 1 to 110 above as if fully

set forth herein.

112.    As fully set forth above, the Partnership interests constitute

securities as defined by the Exchange Act because Plaintiffs invested money in them with

the expectation of deriving financial benefits and realizing profits solely from the efforts

of Defendants.

113.    As fully described above, Defendants, in connection with the sale

of the Partnership interests, employed devices, schemes or artifices to defraud; made

untrue statements of material fact verbally and in writing and omitted to disclose material

facts necessary in order to make the statements made not misleading, in the light of the

circumstances under which they were made; and engaged in acts, practices or a course of

business which operated as a fraud and deceit upon Plaintiffs as purchasers of securities,

all in violation of Section 10(b) of the Exchange Act and Rule 10(b)-5 promulgated

thereunder.

114.    Defendants knew and intended that Plaintiff, would rely upon Defendants' misrepresentations and omissions in making investment decisions in purchasing the Partnership interests.

115.    In purchasing the Partnership interests, Plaintiffs justifiably relied on the above described misrepresentations and acted without knowledge of the above described omissions.

116.    As a direct and proximate result of the aforesaid misconduct, Plaintiffs sustained damages in excess of $3,400,000 in connection with the purchase of the Partnership interests and are therefore entitled to recover damages they have suffered from Defendants due to Defendants' violations of the Exchange Act and Rule 10(b)-5.

## SECOND CLAIM FOR RELIEF

## Common Law Fraud/Fraudulent Inducement Against All Defendants

117.    Plaintiffs repeat and reallege paragraphs 1 to 116 above as if fully set for the herein.

118.    To induce Plaintiffs to invest in the Partnerships, Defendants made to Plaintiffs misrepresentations of present material facts, specifically set forth above, both verbally and in the Siegel Partnership documents and Investment Proposals including, but not limited to: (a)  that the investments were tax deductible on at least a 2 to 1 basis as intangible drilling costs; (b) that the tax deductions had been approved by the IRS and other taxing authorities; (c) that oil and gas leases would be acquired for the benefit of the Partnerships; (d) that he Managing Partners had the requisite expertise to manage the Partnerships' business and protect their interests; (e) that oil and gas sites be drilled after the  Partnerships were constituted; (f)  that the drilling costs incurred by the

Partnerships would be paid from cash flow generated from producing oil and gas wells;
(g) that distributions to Partnerships would be paid from cash flow generated from producing oil and gas wells; (h) that the Turnkey and Subscriptions Notes would be paid off from cash flow generated from producing oil and gas wells; and (i) that marketable securities would be purchased with cash distributions Plaintiffs assigned for the purchases and which would increase in value and pay down the drilling costs.

119.    Defendants made these misrepresentations knowing that they were false, without any reasonable basis and with reckless disregard for their truth or falsity, with the intention of inducing Plaintiffs to rely on the misrepresentations and turn over substantial sums of money to Defendant.

120.    Defendants' conduct, as alleged herein, was intentional and deliberate, and was undertaken with fraudulent, wanton or evil motive in conscious disregard of the rights of Plaintiffs and the public at large.

121.    Plaintiffs justifiably relied on Defendants' misrepresentations and, to their detriment, turned over substantial sums of money to Defendants.

122.    As a direct and proximate result of the aforesaid misconduct, Plaintiffs sustained damages in excess of $3,400,000 in connection with the purchase of the Partnership interests and are therefore entitled to recover damages they have suffered from Defendants due to the misrepresentations.

## THIRD CLAIM FOR RELIEF

### Fraudulent Non-disclosure Against All Defendants

123.    Plaintiffs repeat and reallege paragraphs 1 to 122 above as if fully set for the herein.

124. Defendants failed to disclose material facts to Plaintiffs regarding the Partnerships, the IDC, the oil and gas drilling sites and return on their investments. The material facts withheld specifically set forth above include, but are not limited to: (a) the Partnership structures were tax shelters subject to registration with the IRS; (b) the Partnership structures would not support the promised IDC deductions; (c) Josephson had a financial interest in Siegal entities and was compensated for inducing Plaintiffs to invest in the Siegal Partnerships; (d) many of the drill sites had already been drilled and/or abandoned before the Partnerships were created; (e) rights to drill sites and oil and gas interests were not transferred to the Partnerships; (f) the Managing Partners had no expertise to manage the business of the Partnerships; (g) distributions to the Partnerships would be made through loans from unknown sources; (h) the Turnkey and Subscription Notes would not be paid off with receipts from sales of oil and gas from successfully drilled wells; and (i) no securities were purchased with distributions withheld from the partners purportedly for that purpose.

125. Defendants failed to disclose these material facts knowingly, deliberately and with the express intention of inducing Plaintiffs to invest in the Siegal Partnerships and to defraud Plaintiffs of their money.

126. Defendants' conduct, as alleged herein, was intentional and deliberate, and was undertaken with fraudulent, wanton or evil motive in conscious disregard of the rights of Plaintiffs and the public at large.

127. Plaintiffs relied on Defendants to disclose all material facts regarding the Partnerships and the propriety of the IDC tax deductions.

33

128.   Had Defendants informed Plaintiffs of these material facts, Plaintiffs would not have invested in the Siegal Partnerships and would not have taken the IDC deductions they were lead to believe were legitimate.

129.   As a direct and proximate result of Defendants aforesaid material omissions, Plaintiffs sustained damages in excess of $3,400,000 in connection with the purchase of the Partnership interests and are therefore entitled to recover damages

## FOURTH CLAIM FOR RELIEF

### Negligent Misrepresentation Against All Defendants

130.   Plaintiffs repeat paragraphs 1 to 129 above as if fully set for the herein.

131.   As fully set forth above, to induce Plaintiffs to invest in the Partnerships, Defendants made multiple misrepresentations of present material facts to Plaintiffs including, but limited to, that: (a) the investments were tax deductible on at least a 2.5 to 1 basis as IDC; (b) the tax deductions had been approved by the IRS and other taxing authorities; (c) that working oil and gas interests would be acquired for the benefit of the Partnerships; (d) that the Managing Partners had the requisite expertise to manage the Partnerships' business and protect their interests; (e) oil and gas sites would not be drilled before Partnerships were constituted; (f)  that the drilling costs incurred by the Partnerships would be paid from cash flow generated from producing oil and gas wells; (g) that distributions to Partnerships would be paid from cash flow generated from producing oil and gas wells; (h) that the Turnkey and Subscriptions Notes would be paid off from cash flow generated from producing oil and gas wells; and (i) that marketable

securities would be purchased with cash distributions Plaintiffs assigned for the

purchases and which would increase in value and pay down the drilling costs.

132.    Defendants made these misrepresentations negligently, without

any reasonable basis for believing they were true and with the intention of inducing

Plaintiffs to rely on the misrepresentations and turn over substantial sums of money to

Defendant.

133.    Plaintiffs relied on Defendants' negligent misrepresentations and,

to their detriment, turned over substantial sums of money to Defendants.

134.    As a direct and proximate result of the aforesaid misconduct,

Plaintiffs sustained damages in excess of $3,400,000 in connection with the purchase of

the Partnership interests and are therefore entitled to recover damages they have suffered

from Defendants due to Defendants' misrepresentations.

### FIFTH CLAIM FOR RELIEF

**Breach of Fiduciary Duty**
**Against Siegal, Josephson, Coleman, Trevisani, Guralnick**
**SLG, and The Individual, Corporate, LLC and LLP  Does**

135.    Plaintiffs repeat paragraphs 1 to 134 above as if fully set for the

herein.

136.    Siegal, Coleman and Trevisani were partners and fiduciaries of

Plaintiffs pursuant to executed Partnership Agreements.

137.    Josephson, Guralnick and SLG were agents, and professional

advisors placed in a positions of trust by Plaintiffs.

138.    All the Defendants named in this Fifth Claim owed a fiduciary

duty to Plaintiffs as partners and/or as a result of their providing professional investment,

35

accounting and tax advice to Plaintiffs in connection with the Partnerships and/or relating to the preparation of the Partnership tax returns.

139. Defendants knew that Plaintiffs were relying on Defendants' superior knowledge in these areas in connection with Plaintiffs' decision to invest in the Partnerships and in the preparation of their tax returns.

140. Defendants owed a duty of care to Plaintiffs in connection with providing tax advice and information and advice on the Partnership structures and in steering and advising Plaintiffs to take tax positions based on the Partnership structures.

141. Defendants breached their fiduciary duty to Plaintiffs as partners through numerous acts and omissions including, but not limited to, the following: (a) fraudulently or with gross negligence or without due care, steering Plaintiffs into an illegal tax shelter, and by organizing, promoting, and implementing the illegal tax shelter; (b) misrepresenting the tax deductibility of Plaintiffs' investments; (c) mismanaging the Partnerships' oil and gas interests; (d) mismanaging the Partnerships' investment monies and using them for purposes other than oil and gas interest development; (e) failing to disclose to Plaintiffs informed of material facts relating to the Partnership structure and its tax aspects; (f) failing to inform Plaintiffs there were insufficient revenues from status the oil and gas exploration; (g) failing to keep adequate Partnership records, conduct audits and report to Plaintiffs ; (h) preparing tax returns and Schedules K-1 with improper IDC deductions; and (i) misrepresenting Partnership activities.

142. Defendants' conduct, as alleged herein, was intentional and deliberate, and was undertaken with fraudulent, wanton or evil motive in conscious disregard of the rights of Plaintiffs and the public at large.

143. As a direct and proximate result of the aforesaid breaches of fiduciary duty, Plaintiffs sustained damages in excess of $3,400,000 and are therefore entitled to recover damages they have suffered from Defendants due to Defendants' acts.

## SIXTH CLAIM FOR RELIEF

### Breach of Contract Against Coleman, Trevisani, The Siegal Companies and Corporate Does

144. Plaintiffs repeat paragraphs 1 to 143 above as if fully set for the herein.

145. Plaintiffs, individually and as partners in the Siegal Partnerships entered into the contracts described fully above, namely: (a) Partnership Agreements; (b) Prospect Agreements; (c) Turnkey Drilling Contracts; (d) Subscription Agreements; (e) Assumption Agreements; and (f) Additional Collateral Agreements.

146. Plaintiffs performed all their obligations as individuals and partners under those contracts.

147. Coleman, Trevisani and the Siegal Companies, breached their contractual obligations under the agreements by, among other things: (a) failure to ensure performance of Partnership related contracts; (b) failure to acquire working interests in oil and gas wells; (c) failure to establish adequate Partnership operational reserves; (d) failure to maintain adequate Partnership books and records; (e) failure to assign appropriate drill sites after the constitution of the Partnerships and to drill those sites to the Partnership so as to qualify for the promised IDC tax deductions; (f) failure to provide alternative drill sites; (g) failure to make 2% cash on cash quarterly distributions; (h) taking unauthorized advances to pay Partnership distributions; and (i) failure to purchase

securities with distribution withheld from Plaintiffs for additional Turnkey Note collateral.

148.    As a direct and proximate result of the aforesaid breaches of contract, Plaintiffs sustained damages in excess of $3,400,000 and are therefore entitled to recover damages they have suffered from Defendants due to Defendants' breaches.

## SEVENTH CLAIM FOR RELIEF

### Professional Malpractice Against Guralnick, SLG, Trevisani, Individual Does, LLC Does and LLP Does

149.    Plaintiffs repeat paragraphs 1 to 148 above as if fully set for the herein.

150.    Defendants Guralnick and SLG, the Individual Does and the accounting professional LLC and LLP Does (collectively "the Accounting Defendants") were engaged specifically to render full accounting and tax services and advice to the Partnerships.  The services included preparing tax returns and Schedules K-1 which reported Plaintiffs' share of the Partnerships' income and expenses.

151.    Also as part of the professional services for which they were retained, Guralnick and SLG responded to information requests from the IRS regarding the Partnerships' activities, structures and tax aspects.

152.    Guralnick and SLG transmitted the tax returns they prepared to the Partnerships and were necessarily aware that Plaintiffs received the tax documents, particularly the Schedules K-1 to file with their Federal and State tax returns.

153.    Guralnick, and SLG owed a duty to Plaintiffs to exercise due care in the performance of their professional services.  The had a duty to adhere at a minimum

38

to: (a) generally accepted accounting principles; (b) generally accepted auditing standards; and (c) the rules and regulations of taxing authorities including the IRS.

154.    Upon information and belief, Trevisani, Individual Does and legal professional LLC and LLP Does (collectively "the Legal Defendants") were retained to provide legal services and advice regarding the Partnerships' activities, structures and tax aspects.

155.    The Legal Defendants owed a duty to Plaintiffs to exercise due care in providing those legal services and advice.

156.    As more fully alleged above, the Accounting Defendants and Legal Defendants failed to exercise the required due care through their negligent and fraudulent conduct towards the Partnerships and Plaintiffs. Such conduct includes, but is not limited to: (a) providing erroneous advice and failing to disclose material facts regarding the legal and tax aspects of the Partnerships, the partnership interests and the deductibility of the IDC; (b) preparing tax returns and Schedules K-1 which improperly provided for tax deductions for IDC; (c) failing to prepare, maintain and audit adequate books and records and financial statements for the Partnerships; (d) deviating from the recognized and accepted professional standards for certified public accountants; (e) and making erroneous statements to the IRS on behalf of Plaintiff and the Partnerships.

157.    As a direct and proximate result of the Accounting Defendants' and Legal Defendants' failure to exercise due care, Plaintiffs have sustained damages in excess of $3,400,000 and are entitled to recover the damages they have suffered due to the professional misconduct.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all issues so triable.

WHEREFORE, Plaintiffs request and Order and Judgment from the Court as follows:

1.    Declaring null and void *ab initio* all Partnership documents executed by

       Plaintiffs;

2.    Awarding damages to Plaintiffs in an amount to be determined at trial but

       not less than $3,400,000;

3.    Awarding punitive damages because Defendants' conduct was willful,

       wanton and malicious and aimed at the public at large;

4.    Awarding Plaintiffs interest, costs and reasonable attorneys fees; and

5.    Granting such further and other relief, including specifically equitable

       relief, as the Court deems just and equitable.

DATED:  December 13, 2007                    Respectfully submitted,

                                             STORCH AMINI & MUNVES PC

                                             Steven G. Storch (SS-5241)
                                             Kathleen E. Wright (KW-5439)
                                             Two Grand Central Tower, 25th Floor
                                             140 East 45th Street
                                             New York, New York 10017
                                             Tel. (212) 490-4100
                                             Attorneys for Plaintiffs

# Exhibit

# B

STORCH AMINI & MUNVES PC
Two Grand Central Tower, 25th Floor
140 East 45th Street
New York, New York 10017
Tel. (212) 490-4100
Steven G. Storch (SS-5241)
Kathleen E. Wright (KW-5439)
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

IRA NATHEL and SHELDON NATHEL,                          :

                  Plaintiffs,                        :

      -against-                                      :          07 CIV. 10956

RICHARD SIEGAL, GEORGE COLEMAN, ROBERT A.  :
TREVISANI, PAUL HOWARD, HARVEY JOSEPHSON,          **PROPOSED SECOND**
RICHARD S. GURALNICK, SCHAIN LEIFER                     **AMENDED COMPLAINT**
GURALNICK , BISTATE OIL MANAGEMENT                 :
CORPORATION, SS&T HOLDING CO., LLC,
PALACE EXPLORATION   COMPANY, TAH               :
DRILLING CO., INC., TAQ DRILLING CO., INC., and
OIL AND GAS TITLE HOLDING CORPORATION            :

                 Defendants.                        :

-----------------------------------------------------------------------x

     Plaintiffs Ira Nathel and Sheldon Nathel ("Plaintiffs"), by their attorneys, Storch Amini &

Munves PC, as and for their second amended complaint herein, allege as follows:

## PRELIMINARY STATEMENT

     1.     Plaintiffs, the joint and sole owners of a wholesale fruit and vegetable company

(Nathel & Nathel, Inc.), were fraudulently induced into investing large sums of money in

partnerships formed purportedly to invest in oil and gas well drilling and production interests.

Plaintiffs were falsely told that they could expect legitimate tax deductions and revenues from oil

and gas revenues.  The three investments at issue here, Indian Village, Condor and Hurricane,

were made in 2003 and 2004, but Plaintiffs began investing in the oil and gas partnerships in 2001 based upon misrepresentations which continued through 2004.

2.    Defendant Richard Siegal ("Siegal"), the creator, sponsor and promoter of the investments, and his companies, Bistate Oil Management Corporation ("Bistate"), SS&T Holding Co., LLC ("SS&T"), Palace Exploration Company ("Palace"), TAH Drilling Co., Inc.("TAH"), TAQ Drilling Co., Inc.("TAQ"), Oil and Gas Title Holding Corporation ("Oil and Gas") (collectively the "Siegal Companies") (and collectively with Siegal and Paul Howard, the "Siegal Defendants"), knew, at the time they induced Plaintiffs into the investments in oil and gas partnerships ("Siegal Partnerships") through written offering materials and oral misrepresentations intended for Plaintiffs, that Plaintiffs could not take advantage of tax deductions for intangible drilling costs and that it was not possible for Plaintiffs to recover their investments from oil and gas revenues. Siegal had access to, among other things, drilling reports showing that wells proposed to be drilled by the partnerships could not be the subject of legitimate tax deductions and that the wells would not provide the return of Plaintiffs' investment from oil and gas revenues.

3.    Defendant Paul Howard ("Howard") (together with Siegal and the Siegal Companies, the "Siegal Defendants") a close colleague of Siegal and officer of the Siegal Companies, was an insider and made available the false offering material, and was privy to the same information available to Siegal. Through these materials he made representations to Plaintiffs regarding the Partnerships that induced them into investing in what he knew were invalid tax shelters that also could not possibly provide a return of Plaintiffs' investment from oil and gas revenues. He and Siegal also knew that the structure of the partnerships that excluded all but the Managing Partner from any power to participate in or oversee their activities made the sale of partnership interests subject to regulation under federal securities law.

2

4.      Defendants George Coleman ("Coleman") and Robert A. Trevisani ("Trevisani") worked with Siegal in an effort to make the partnerships appear legitimate, by holding themselves out, and permitting Siegal to hold them out, as persons with expertise in the field of oil and gas drilling, and allowing their names to be utilized as Managing Partners of the partnerships, knowing that they had no such expertise and could not exercise the due diligence described in the offering materials, and knowing that the prospective investors would rely on that supposed expertise in evaluating and investing in the partnership investments.

5.      As Managing Partners of the partnerships, Coleman and Trevisani also breached their fiduciary duties to Plaintiffs individually and breached the partnership agreements by failing to remit distributions to Plaintiffs under the guise of withholding them to purchase securities intended to pay Plaintiffs' obligations to the partnerships, but in reality no such securities were ever purchased.

6.      Defendant Harvey Josephson ("Josephson"), Plaintiffs' trusted accountant-advisor, advised Plaintiffs to invest in the Siegal Partnerships. Josephson promoted a strategy of investing the tax Plaintiffs were due to pay in the fourth quarter of the year in an oil and gas deal, and he brought the Siegal Partnerships to the Plaintiffs for this express purpose. He promoted this strategy to Plaintiffs for five Partnerships in which Plaintiffs invested. As Plaintiffs' trusted advisor, he assured Plaintiffs that Siegal knew what he was doing. He vouched for the purpose of the Partnerships but never actually investigated the validity of the tax deduction structure or the possibility of returns from oil and gas revenues.

7.      Siegal and the Siegal Companies and the Siegal Partnerships retained Defendants Richard S. Guralnick ("Guralnick"), a certified public accountant, and his firm, Schain Leifer Guralnick ("SLG") ("Guralnick Defendants"), to provide expertise in accounting, the structure of the tax shelters and tax rules and regulations and to prepare Partnership tax returns including the

K-1s provided to each of the investors. The Guralnick Defendants provided such advice to Siegal and the Siegal Companies for at least 15 years, were knowledgeable as to Siegal's operations, and prepared the Partnership returns and K-1's which they knew Plaintiffs would rely upon in preparing their own tax returns. Plaintiffs relied on the Guralnick Defendants to adhere to accepted standards of practice of their profession, provide accurate information and advice and to prepare tax return documents, including the K-1's, that did not deviate from the rules of the IRS and other taxing authorities governing tax deductions.

8.      In or about 2006, Plaintiffs learned that they had been fraudulently induced into a Ponzi scheme with false promises of legitimate tax deductions and substantial investment returns. The intangible drilling cost tax deductions were unsupported by legitimate drilling costs of real wells actually owned by the Partnerships and the purported "returns" to the investors, including Plaintiffs, were either diverted to the Siegal Defendants, or, to the extent any were actually made, were made in large part from recycled cash from other duped investors or were improper and unauthorized advances obtained from unknown sources.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 as the action involves a claim arising under federal law, Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78aa. The claims asserted herein arise under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. The partnership investments at issue herein are investment contracts which constitute securities as defined in 15 U.S.C. § 77b(a)(1) and applicable case law. This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 with respect to Plaintiffs' claims arising under state law.

4

10.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims herein occurred in this District and many of the documents, records and witnesses related to this action are located in this District.

11.    In connection with the acts, transactions and conduct alleged herein, defendants Siegal, the Siegal Companies, Howard and Josephson directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and interstate telephone communications.

## PARTIES

12.    Ira Nathel and Sheldon Nathel are individuals residing in the State of New York.

13.    Siegal is and at all times herein has been an attorney and accountant and the creator and sponsor of the Siegal Partnerships, and owns and controls, together with his family, the Siegal Companies.

14.    Howard has at all times herein been president of Oil and Gas, chief financial officer of Palace and controller of Bistate and promoted Siegal's partnerships.

15.    Josephson is a certified public accountant in the State of New York.

16.    Coleman was at all times the Managing Partner of certain Siegal Partnerships including the Indian Village and Condor Partnerships. Upon information and belief based upon his published employment and background, at all times herein, Coleman was the chief executive officer of a family owned children's day camp and had no expertise in connection with, among other things, the selection of drill sites for oil and gas.

17.    Trevisani is the Managing Partner of the Hurricane Partnership promoted by Siegal and Howard. Upon information and belief, Trevisani is an attorney admitted to the practice of law in the States of New York and Massachusetts and residing in the State of Florida.

Upon information and belief, based upon his published employment and background, he had no expertise in connection with, among other things, the selection of drill sites for oil and gas.

18.    Upon information and belief, Bistate is a corporation formed and existing under the laws of the State of New York with its principal place of business in New York, New York.

19.    Upon information and belief, Palace is a corporation formed under the laws of the State of Oklahoma.

20.    Upon information and belief, Oil and Gas is a corporation formed and existing under the laws of the State of Texas with its principal place of business in New York, New York.

21.    Upon information and belief, SS&T is a limited liability corporation formed and existing under the laws of the State of New York with its principal place of business in New York.

22.    Upon information and belief, TAH is a corporation formed and existing under the laws of the State of Delaware with its principal place of business in New York, New York.

23.    Upon information and belief, TAQ is a corporation formed and existing under the laws of the State of Delaware with its principal place of business in New York, New York.

24.    Upon information and belief Bistate, Palace, Oil and Gas, SS&T, TAH and TAQ (collectively "the Siegal Companies") are all 100% owned and controlled by Siegal and his family. Siegal, Howard Coleman and Trevisani committed the tortious acts described herein through these corporate defendants.

25.    Guralnick is a certified public accountant residing in the State of New York and SLG is a firm of certified public accountants with its offices in New York, New York in which Guralnick is a named partner.

## FACTS

### Josephson and the Siegal Partnerships

26.     According to Investment Proposals prepared by Siegal to offer investors

participations in the partnerships he devised, Siegal is an attorney and an accountant who has

been engaged in the oil and gas exploration and development industry since the 1970's.

27.     This activity has largely been conducted through the formation of partnerships

Siegal promoted purportedly to acquire leases for oil and gas interests and sites and retain third

party companies to drill for oil and gas ("the Siegal Partnerships").

28.     Plaintiffs, as sole owners of a wholesale fruit and vegetable business, have no

expertise or experience in the oil and gas industry, in investments involving tax deductions, or in

any type of investment partnership.

29.     In or about the beginning of 2000, Plaintiffs retained Harvey Josephson, a

certified public accountant, and his firm, to provide professional accounting services, including

investment and tax planning advice, and corporate and personal tax reporting advice for their

company and them personally.  Plaintiffs entrusted Josephson with the management and

maintenance of the books and records of their company and the preparation of their corporate

and personal tax returns.

30.     Josephson visited Plaintiffs' office every month to oversee the management of the

books and records of their company and provide tax planning and investment advice, and to meet

with Plaintiffs, together with Richard Byllott ("Bylott"), the corporate controller of Plaintiffs'

company and Plaintiffs' personal representative and agent in connection with their own personal

business affairs and taxes.

31.     In or about July 2001, during one of those visits, in a meeting with Byllott and

Plaintiffs, Josephson proposed to Byllott and Plaintiffs that Plaintiffs invest in a Siegal

partnership called High Island. Byllott informed Josephson that he and the Plaintiffs had no

prior experience, let alone expertise, in the oil and gas industry, the propriety of the claimed tax

deductions, well drilling or investing in oil and gas exploration.

32.    At that meeting, Josephson told Byllott and Plaintiffs that, instead of making their

four quarterly estimated tax payments, Plaintiffs could make only three and invest an amount

equal to the fourth quarter payment, together with executed promissory notes, in a Siegal

partnership which would use the cash and notes to pay a related entity, namely SS&T, TAQ or

TAH, for a turnkey oil and gas drilling contract. According to Josephson, Plaintiffs could then

take a tax deduction of an amount equal to the combined amount of cash and promissory notes

on intangible drilling costs ("IDC") and the purported tax savings would equal or exceed the

cash investments. This was false, as seen below, because the way the partnerships were

structured, there was no possibility of valid tax deductions.

33.    Josephson represented to Byllott and Plaintiffs at that meeting that, if a sufficient

number of the drilled wells struck oil or gas, Plaintiffs would have the added benefit of earning a

return of their investment from revenues generated by the sale of the oil and gas. In fact,

Plaintiffs could not earn a return on their investment through oil and gas revenues because, as

seen below, the potential production from the drilled sites would be insufficient to provide such a

return.

34.    Josephson strongly encouraged them to invest on the strength of his familiarity

with the investments and the fact that he had recommended them to many of his other clients.

Specifically, he represented to Byllott and Plaintiffs that he was very familiar with the Siegal

partnership investment vehicles and had been putting his other clients in them. Upon

information and belief, given the lack of any professional basis to recommend such investments,

and his statement that he had been putting other clients in such investments, Josephson was being

8

secretly compensated by Siegal and/or the Siegal Companies to promote the Siegal Partnerships. Josephson represented that the IDC tax deductions offered by the Siegal Partnerships were permissible by the Internal Revenue Service ("IRS"), which actually encouraged such investments, and that Plaintiffs could also receive a return of their investment from oil and gas revenues. In fact, the IRS did not encourage such tax-motivated investments, and the IRS had not approved such investments.

35.    Josephson represented to Byllott and Plaintiffs that with respect to Subscription Notes ("Notes") Plaintiffs were required to sign, they would not be required to pay the 8% interest on the Notes after the first year because oil and gas revenues should be sufficient to pay the interest. As proof, he recklessly assured them that similar promissory notes financing Siegal's other partnership structures had not been exercised and that "no one ever sees them [the notes]" because the oil and gas revenues paid down the notes. Josephson gave this assurance without any basis. Specifically, while clearly purporting to be knowledgeable as to such supposed oil and gas revenues and as to the validity or existence of any oil and gas wells, upon information and belief, Josephson made no investigation.

36.    Josephson vouched for Siegal and his partnerships, in particular the Indian Village partnership, without, upon information and belief, actually ever investigating whether the wells were legitimate, whether the investors had ever been sued on the notes, whether the wells had actually been assigned to the Partnerships, whether the wells had not been abandoned or were dry before being assigned to the partnerships or whether investors in other partnerships promoted by Siegal ever received a return on their investments from oil and gas revenues, as opposed to payments from advances or future investors. The basis for the belief that he made no investigation is that, as a tax advisor purporting to have experience in this area sufficient to make a recommendation, he was obligated to undertake an investigation which would have readily

9

disclosed that the representations regarding the investments were inaccurate and could not be confirmed. Nor did Josephson disclose to Byllott and Plaintiffs that the Partnership structures were not, as required, registered with the IRS as valid tax shelters. Josephson also encouraged Plaintiffs to invest by telling them that Congress had approved such IDC tax deductions to reduce foreign oil imports, whereas, as a certified public accountant and tax advisor, he should have known that the amount of tax deductions supposedly available would not be favored by the IRS.

37.    Byllott, on behalf of Plaintiffs, acting as their agent for purposes of handling their Siegal Partnership investments, was the liaison with Josephson, and contacted the Partnership promoters, and received and read the Investment Proposals and the Partnership Agreements on behalf of Plaintiffs. All the representations Josephson made to Byllott were intended for Plaintiffs.

38.    Thus, after the meeting with Josephson, and pursuant to Josephson's introduction, Byllott, on behalf of Plaintiffs, spoke to Siegal and Howard by telephone to confirm the representations of Josephson, which they did, and asked if the IRS had approved the tax aspects of the investment structures. Siegal misleadingly informed Byllott that his partnerships "had never lost an audit". This statement was intended to be conveyed to the Plaintiffs. Siegal knew when he made this statement that it was false because, although some of his similar partnerships were under audit, the audits were not completed and the IRS had not issued any report that the IDC deduction was allowable or that any other aspect of the Partnerships was legitimate.

39.    Subsequently, Siegal and Howard forwarded the subscription documents to Byllott, intended for Plaintiffs, which included an Investment Proposal and a Partnership Agreement, among other documents, as set forth below, which Byllott read on behalf of the

Plaintiffs and which they relied upon. Plaintiffs received the Investment Proposals from Siegal prior to executing the final Partnership Agreements.

40.    Over the next 3 years, until Josephson was no longer retained at Plaintiffs' company in the fall of 2003, Josephson oversaw this strategy as accountant for the company and Plaintiffs to make the investments in the Partnerships with a view toward tax savings. The Siegal Partnerships would not have been brought to Plaintiffs' attention had it not been for Josephson. Plaintiffs would not have invested had it not been for Josephson, together with Siegal and Howard, as set forth below, and put hundreds of thousands of dollars in Indian Village (and in other virtually identical transactions), from 2001 to 2003.

41.    Josephson made the same representations to Byllott and Plaintiffs at similar meetings, with respect to five Siegal Partnerships in which he proposed they invest without any investigation of his own as to their validity. He brought them the Partnerships as follows: (i) High Island in July 2001; (ii) NF Drilling in November, 2001; (iii) Stagecoach Drilling in June 2001; (iv) Bateman Lake Drilling in November, 2002; and (v) Indian Village in June 2003.

**The Siegal Partnerships**

42.    Each partnership followed the same format.[1] For each partnership, Siegal and Howard provided Plaintiffs, or Byllott on behalf of Plaintiffs, just before they invested, with an offering memorandum they had prepared, entitled "Investment Proposal" which made, among other things, the following false promises and representations:

  (a) Investors can redeploy their upper bracket tax dollars into certain investments and create income and cash flow rather than pay those dollars to federal, state and municipal governments.

  (b) Rates of return can unquestionably be earned on monies which would otherwise be paid to taxing authorities.

---

[1]    The offering materials for the Indian Village, Condor and Hurricane Partnerships are essentially the same in all material respects.

(c) The partners will be afforded a substantial active tax loss under Section 263C of the Internal Revenue Code which allows taxpayers to expense the intangible drilling costs incurred in drilling oil and gas wells.

(d) The Partnership can expect an average annual cash flow of approximately 10-15% and often greater of the cash funds invested.

(e) It is reasonable to expect the cash flow to continue for 10-12 years. The drill sites will be carefully chosen by the Managing Partner of the Partnership (Coleman and/or Trevisani).[2]

(f) The interest payable on the investor's Subscription Note would be 8% per annum paid quarterly and fully tax deductible; the investor would only be required to pay the interest during the first year of the Partnership with future interest to be paid out of the Partnership's cash flow generated from oil and gas revenues or the interest would accrue and be payable at maturity.

(g) The Turnkey Note holder (the drilling company) will subordinate its right to collect the 8% interest from the Partnership on the Turnkey Note to quarterly cash on cash 2.0% returns to the investing partners.

43.    The foregoing representations were false because the IDC was not an appropriate deduction under Section 263C of the Internal Revenue Code, oil and gas revenues could not pay down the interest on the Notes, and the Managing Partners would not carefully select the drilling sites. Siegal and Howard knew that the IDC tax deductions had not been approved by the IRS. They also knew from the books and records and the drilling reports relating to Indian Village, Condor and Hurricane, to which they had access, that the IDC would not be allowable because many of sites had been drilled before the Partnerships were constituted and many had already been abandoned, were dry or were capped before Plaintiffs invested. For the same reason, they knew that investors could not recover their investments from oil and gas revenues. Furthermore, the IRS believes that the drill sites were not assigned to the specific Partnerships, and Bistate, in response to requests for documents showing the assignments, produced nothing. The IDC is not

---

[2]    Coleman was the Managing Partner for seven of the Partnerships in which Plaintiffs invested. The Managing Partner for the eighth, Hurricane Drilling Co., was Trevisani.

a permissible tax deduction for sites that did not belong to the specific Partnerships when drilled or were drilled before Plaintiffs invested.

44.     Records of Bistate show that distributions to the partners from the Partnerships were often made from "advances" and not from oil and gas revenues. Upon information and belief, these advances were made from Siegal, the companies he controlled and/or cash received from investments made by other partners in unrelated partnerships promoted by Siegal. There was no provision in the Partnerships' agreements for such "advances" to the Partnerships. Instead, all distributions were to be made from oil and gas revenues.

45.     Siegal and Howard also knew that Plaintiffs could not expect a return of 10-15 per cent or that it was reasonable to expect that return for 10-12 years, because they knew from past partnerships they promoted that the well production did not last that long and did not produce revenues for that period of time. For example, the partnerships they promoted with basically the same structure in the 1980's through a company called Skava Oil Distribution Corporation ("Skava"), all failed long before 10 to 12 years, and Siegal sued the investors to enforce the subscription notes they signed as part of their investments in partnerships.

46.     Siegal and Howard knew that Coleman, who ran a children's camp, and Trevisani, a lawyer, were not oil and gas experts who could select drilling sites and otherwise manage the partnerships. In fact, it is Siegal, with Howard's assistance, who manages the Partnerships through the Siegal Companies and used Coleman and Trevisani to make the Partnerships appear legitimate, and Coleman and Trevisani agreed to be so used.

47.     Howard, as a Siegal insider, with day to day involvement in the Siegal Companies, had access to the same books and records as Siegal, and therefore knew that the representations in the Investment Proposals, that the IDC deduction was legitimate and that investors could expect long term oil and gas revenues, were false. As president of Oil and Gas,

Howard had access to documents showing that many of the drill sites purportedly to be assigned to the Partnerships were already drilled and abandoned and could not be a basis for a IDC tax deduction. Moreover, Bistate produced no documents showing any proper assignment of drill sites to the Partnerships.

48.     The Indian Village Investment Proposal also represented that, in lieu of receiving the quarterly distributions in full, the partners could elect to assign to the Partnership, beginning on January 1, 2005, for no more than five years, 67% percentage of their future distributions with which the Partnership would purchase marketable securities which would increase in value and ultimately be used to pay off the Turnkey Note (which was secured by the Subscription Note). According to their own Investment Proposals, the percentage withholding for Condor was to be 75% and the withholding for purchase of securities was to commence on January 1, 2005 and the Hurricane withholding was also to be 75% and the withholding for purchase of securities was to commence on January 1, 2006.

49.     Siegal and Howard knew when the Investment Proposals were provided to Plaintiffs that the Partnerships would not buy marketable securities with distributions withheld from Plaintiffs and the purpose of the "withholding" was in fact to cover them when there was no cash from any oil and gas well source or from other duped investors to make the distributions. Coleman and Trevisani, who issued memoranda confirming the investors' elections, did not apply the withheld distributions to purchase securities and did not oversee any such purchases.

50.     The Investment Proposals also represented that Siegal's companies "have always maintained the highest level of fiduciary integrity servicing investors with informative reporting and on time distributions" and that Palace had over 1500 producing wells in the lower 48 states. Siegal and Howard knew this representation presented a false picture to Plaintiffs because the

14

Siegal companies had been embroiled in multiple prior lawsuits in the 1990's in which investors

had not received the distributions they had been led to expect or which were even possible.

51.    The Investment Proposal included forms of documents which, when executed,

comprised the Partnership Documents for each Partnership as follows:

(a) A Partnership Agreement and Certificate of Partnership ("Partnership
Agreement") to be executed by the Managing Partner and each investing
partner;

(b) A Prospect Agreement between the Partnership, Palace, Oil and Gas and
Bistate through which Palace assigned oil and gas interests to Oil and Gas as
nominee for the benefit of the Partnership;

(c) A Turnkey Drilling Contract between the Partnership and the proposed
drilling company, which was TAQ, TAH or SS&T;

(d) A Turnkey Note, bearing interest at 8% per annum, issued by the Partnership
to the drilling company to finance in part the drilling costs;

(e) A Subscription Agreement by which the partner subscribes to a partnership
unit which subscription must be accepted by the Managing Partner;

(f) A Subscription Note , bearing interest at 8% per annum, executed by the
partner for the balance of the payment for the partnership unit and applied as
collateral securing the Turnkey Note; and

(g) An Assumption Agreement executed by the investing partner assuming the
partner's pro rata share of the Turnkey Note and pledging the partner's
Subscription Note to secure that share.

**The Managing Partners**

52.    All the Partnerships were formed under the laws of the State of New York.

Although styled as general partnerships, the Partnership Agreements unequivocally place all

control and power in the hands of the Managing Partner: Coleman as to Indian Village and

Condor, and Trevisani as to Hurricane. Coleman was the managing partner for 4 other

partnerships in which Plaintiffs invested before Indian Village. According to the Partnership

Agreement, the Managing Partners have full and exclusive power and authority to manage,

15

control, administer and operate the business affairs of the Partnerships and take all decisions, and

the investor partners have no authority to interfere in the business whatsoever, in any capacity.

53.     Coleman executed as Managing Partner all of the Partnership Agreements, except

Hurricane, which Trevisani executed as Managing Partner.  In executing the Partnership

agreements and purportedly taking on the role of Managing Partners, permitting Siegal and

Howard to hold them out as persons with oil and gas experience, Coleman and Trevisani falsely

held themselves out to Plaintiffs as having the expertise to choose drill sites carefully for the

Partnerships and to manage the Partnerships' affairs.  It was not disclosed to Plaintiffs that

Coleman's expertise was in running a children's camp and that Trevisani was a practicing

attorney.  Had Coleman and Trevisani actually performed their roles as Managing Partners, they

would have seen the drilling reports showing that the sites were largely drilled before the

Partnerships were constituted and that many wells had been abandoned and could not produce

returns or distributions.

**The Investments**

54.     Relying on Siegal's, Howard's and Josephson's (at least until the Fall of 2003),

representations and the representations in the Investment Proposals, and without knowledge of

deliberately undisclosed material facts, Plaintiffs invested in the Partnerships as, they believed,

limited partners.  The designated dates of the commencement of the Partnerships set forth in the

Partnerships agreements were invariably months before Plaintiffs each actually invested cash in

the Partnerships as follows:

| Name | Date on Agreement | Date Plaintiffs Invested | Amount Each |
|------|-------------------|--------------------------|-------------|
| High Island | March 1, 2001 | August 23, 2001 | $ 50,000 |
| NF | August , 2001 | December 12, 2001 | $200,000 |
| Stagecoach | March 1, 2002 | July 23, 2002 | $100,000 |
| Bateman | September 1, 2002 | December 18, 2002 | $250,000 |
| Indian Village | March 1, 2003 | July 15, 2003 | $150,000 |
| Condor | September 1, 2003 | December 12, 2003 | $250,000 |

16

| Name | Date on Agreement | Date Plaintiffs Invested | Amount Each |
|------|-------------------|--------------------------|-------------|
| Hurricane | August 1, 2004 | December 9, 2004 | $300,000 |
| Pebble Bay | August 1, 2005 | December 12, 2005 | $400,000 |

55. Accordingly, the Partnerships were not properly constituted until well after the

dates on the Partnership Agreements. As Siegal and Howard knew, from their admittedly long

experience in the oil and gas drilling business, any IDC for sites drilled before the date an

investor actually participated in the Partnership could not be deducted by that investor. Siegal

and Howard also knew that the IDC tax deductions could not be taken for drill sites that did not

belong to the specific Partnership purportedly generating the deduction or for sites drilled and/or

abandoned or capped before the Partnerships were constituted.

56. In addition to the cash investments Plaintiffs each executed Subscription Notes

pursuant to the Subscription Agreements, as part of their investment in their Partnership units as

follows:

| High Island | $ 60,000 |
|-------------|----------|
| NF | $320,000 |
| Stagecoach | $120,000 |
| Bateman | $375,000 |
| Indian Village | $225,000 |
| Condor | $450,000 |
| Hurricane | $720,000 |
| Pebble Bay | $720,000 |

57. Each year the Partnership tax returns and schedules, and the K-1's for each

investor, were prepared by, or under the direction of Guralnick, Siegal's longtime accountant.

Guralnick provided the K-1's for each investor to rely upon, detailing the IDC deductions to be

used in preparation of their tax returns. The K-1's were improper because Guralnick made no

allocation between the partners to take into account the dates they entered into the Partnerships.

58. Plaintiffs received quarterly written communications from each Partnership which

included distribution checks and purported production reports for the wells owned by each

17

Partnership. Many of the distribution checks were reduced by what was reported as a "transfer for the purchase of securities."

59.     These communications never included a description of the "securities" or any evidence that they had been purchased, their value or where they were being held. This was because, as Siegal and Howard knew, no such purchases were ever made.

**The Indian Village Partnership**

60.     In the Indian Village Investment Proposal, Siegal and Howard represented that the Partnership would be comprised of a minimum of 5 units for a minimum capitalization of $1,250,000. There would also be a minimum of 25 sites drilled. The Investment Proposal also states that dry sites will be substituted for other undrilled sites owned by Siegal's company, Palace.

61.     The Partnership Agreement purports to date from March 1, 2003. However, Plaintiffs did not invest until July 21, 2003 and other investors invested in September and December 2003. Nevertheless, the Partnership's tax return for 2003 and the K-1's prepared by Guralnick erroneously treat all partners as having commenced their participations on the same date of March 1, 2003.

62.     Drilling reports for the drill sites listed in the Prospect Agreement, purportedly to be held by the Partnership, demonstrate that at least 16 of the 31 sites had been drilled, not only before 5 Partnership units had been sold, but before a single Partnership unit had been purchased. All of the wells were drilled before the final Partnership investment was made in December 2003. Indeed, at least 2 had been drilled and abandoned before September 5, 2003 which was the first date the Partnership could have been constituted and a third was abandoned before the final partner invested.

18

63.    Siegal and Howard therefore knew before the sale of the Partnership units, that the investors would be ineligible to take IDC tax deductions for most of the purported drill sites and they knowingly misrepresented to Plaintiffs that the deduction was legitimately available, as represented in the K-1's.

64.    The Indian Village Investment Proposal represented that, after the first year, interest payable on the Subscription Notes would be paid from the Partnership cash flow from sales of oil and gas from successfully drilled wells. That interest would in turn pay the interest due on the Turnkey Note issued by the Partnership to the drilling company to finance in part the drilling costs. However, also as represented in the Investment Proposal, the Turnkey noteholder, TAQ, would subordinate its right to collect interest on the Turnkey Note to a quarterly cash on cash 2% return to the investing partners. In other words, the Siegal Defendants and Howard represented that the proceeds of sales of oil and gas, collected by Bistate, could be sufficient to pay Plaintiffs a quarterly 2% return on the cash they invested.

65.    Plaintiffs each invested $150,000 in cash in Indian Village and executed Subscription Notes with a face amount of $225,000 each. During the first year after their investment, they each paid in cash $18,000 in interest on the Subscription Notes. Therefore their total combined cash investments were $336,000 in Indian Village which has virtually all been lost.

66.    Plaintiffs did receive quarterly checks styled Indian Village distributions, along with purported production and expense reports. However, in order to make those distributions in April, July and October of 2006 the distribution reports note that "advances" were made to the Indian Village Partnership from an unnamed source. On July, 30, 2007 a distribution was made to the Partnership of less than half of the expected 2% of investment payment. Six days later a "supplemental distribution" was made of $10,000 funded entirely by another "advance" from an

19

unknown source. Whatever the source, these distributions were not made, as Siegal, Howard and

Josephson represented, from oil and gas revenues from wells held by Indian Village.

67.    Moreover, nowhere in the Indian Village Investment Proposal or Partnership

related documents is there any statement that Bistate contemplated borrowing to pay the

quarterly 2% payment. The Siegal Defendants withheld this material information regarding such

potential borrowing from Plaintiffs. They knew in 2003 that they would not be able to make

future distributions from the oil and gas revenues since they knew, and it was their way of doing

business, that the wells, some or most of which were not able to produce even in 2003, would

become non-productive within several years. By that time, 2006, Plaintiffs had already invested

in several other Partnerships. Had Byllott and Plaintiffs been informed of this material

information, Plaintiffs would not have invested in the Partnerships.

68.    Pursuant to the Indian Village Investment Proposal regarding the withholding of

distributions to the investors to buy securities to pay off the Subscription Note, Plaintiffs agreed

with the Partnership through the Managing Partner to this partial withholding for the purchase of

securities. From July 28, 2005 onwards all the distribution checks Bistate sent to the Plaintiffs

from the Partnership reflected this assignment and the withholding of most of the distribution as

"transfer for purchase of securities." However, no such purchases were made, as evidenced by

the lack of any Siegal Companies documentation identifying such securities. Bistate, which

issued the distribution checks to Plaintiffs and advised that the distributions were withheld to

purchase securities, failed to produce any such documentation despite repeated requests. Indeed,

despite Plaintiffs' express written warning that failure to produce such documentation would be

taken as an admission that no securities were purchased, Bistate failed and refused to produce

any information concerning securities.

69.    The Siegal Defendants knew from the beginning of the Indian Village Partnership

that no such securities would ever be purchased and that, if there were any distributions to be

withheld from Plaintiffs, they would be diverted to themselves or the Siegal Companies.  By the

artifice of making advances and withholding promised distributions to purchase nonexistent

"securities," the Siegal Defendants planned from the beginning to circulate portions of other

duped investors' money to keep the house of cards standing because they knew there would not

be sufficient revenues from oil and gas to make the distributions.

**The Condor Partnership**

70.    The Condor Drilling Partnership ("Condor") is identical in structure to, and was

promoted with the same misrepresentations as Indian Village but for the facts alleged below.

71.    The Condor Investment Proposal represented that a minimum of 5 units would be

required for the Partnership to be constituted.  The minimum capitalization for Condor was

$1,400,000.  Also, the Turnkey Drilling Contract was with Siegal's company Defendant TAH.

The Partnership Agreement is dated September 1, 2003 but Plaintiffs did not purchase their units

until December 12, 2003.  From Bistates's records it appears that the minimum of 5 units was

not reached until December 26, 2003 and investments continued until December 31, 2003.

72.    According to the drilling reports, to which Siegal and Howard had access, at least

twenty-two (22) of those sites were drilled before September 1, 2003, the date of the Partnership

Agreement and before a single partner had invested, let alone the sale of the 5 units necessary to

constitute the Partnership.  In addition, at least 7 of the sites had been drilled and abandoned

before the Partnership was constituted with the minimum 5 units in December, 2003.

73.    Siegal and Howard therefore knew before the sale of the Partnership units, that

the investors would be ineligible to recognize IDC tax deductions for most of the purported drill

21

sites and they knowingly misrepresented to Plaintiffs that the deduction was legitimately available, as they had with the Indian Village Partnership.

74.    Plaintiffs each invested $250,000 in cash in Condor and executed Subscription Notes with a face amount of $450,000 each. The first year after their investment, they each paid in cash $36,000 in interest on the Subscription Notes. Therefore their total combined cash investments were $572,000 which has virtually all been lost to Siegal's scheme.

75.    The Partnership tax return for 2003, prepared by Guralnick, applied the IDC as if the Condor Partnership had been fully constituted on September 1, 2003 and drilling had begun after that date. The K-1's were improper because Guralnick made no allocation between the partners to take into account the dates they, including Plaintiffs, entered into the Partnership.

76.    Ten out of twelve quarterly distributions to Condor (to finance the 2% investment payment to the investors), which the Siegal Defendants had falsely represented would be generated from sales of oil and gas, were in large part financed by "advances" to the Partnership from unknown sources. As with Indian Village, there is no provision in the Condor Investment Proposal or the Partnership Documents for the distributions to be supported by borrowing of any kind.

77.    Pursuant to the Condor Investment Proposal regarding the withholding of distributions to the investors to buy securities to pay off the Subscription Note, Plaintiffs agreed with the Partnership, through the Managing Partner, to this partial withholding for the purchase of securities, and from July 28, 2005 onwards all the distribution checks to the Plaintiffs from the Partnership, as with Indian Village, reflected a withholding of most of the distribution due to Plaintiffs as "transfer for purchase of securities." However, no such purchases were made, as evidenced by the lack of any Siegal Companies documentation identifying any such securities. Bistate, which issued the distribution checks to Plaintiffs and advised that the distribution were

withheld to purchase securities, failed to produce any such documentation despite repeated requests.

78.    The Siegal Defendants knew from the beginning of the Condor Partnership, as with Indian Village, that no such securities would ever be purchased and that, if there were any distributions, they would be diverted to themselves or the Siegal Companies. By the artifice of making advances and withholding promised distributions to purchase nonexistent "securities," the Siegal Defendants planned from the beginning to circulate portions of other duped investors' money to keep the house of cards standing because they knew there would not be sufficient revenues from oil and gas to make the distributions.

**The Hurricane Partnership**

79.    The Hurricane Partnership is identical in structure to, and was promoted with the same misrepresentations, as Indian Village but for the facts alleged below.

80.    The Partnership Agreement is dated August 1, 2004 but Plaintiffs did not invest until December 9, 2004. The minimum number of units to constitute the Partnership was 5 for a minimum capitalization of $1,400,000. The minimum capitalization was not met until December 2004. The Turnkey Drilling Contract was also with TAH. Instead of Coleman, the Managing Partner was Trevisani.

81.    Plaintiffs each invested $400,000 in cash in Hurricane and executed Subscription Notes with a face amount of $720,000 each. The first year after their investment, they each paid in cash $57,600 in interest on the Subscription Notes. Therefore their total combined cash investments were $1,665,200 which has virtually all been lost.

82.    At least 2 of the 93 sites assigned to the Partnership in the Prospect Agreement had been drilled before the date of the Partnership Agreement and at least 24 had been drilled

before Plaintiffs invested on December 9, 2004. Furthermore, at least 1 site had been drilled and abandoned before any partners had invested.

83.    From on or about April 30, 2007, onwards all the distribution checks to the Plaintiffs from Hurricane, as with Indian Village and Condor, reflected a withholding of most of the distribution due to Plaintiffs as "transfer for purchase of securities." However, no such securities were purchased, as shown by the lack of any Siegal Companies documentation identifying any securities. Bistate, which issued the distribution checks to Plaintiffs and advised that the distribution were withheld to purchase securities, failed to produce any such documentation despite repeated requests. Indeed, despite Plaintiffs' express written warning that failure to produce such documentation would be taken as an admission that no securities were purchased, Bistate failed and refused to produce any information concerning securities.

84.    The Siegal Defendants knew from the beginning of the Hurricane Partnership, as with Condor and Indian Village, that no such securities would ever be purchased and that, if there were any distributions, they would be diverted to themselves or the Siegal Companies. By the artifice of making advances and withholding promised distributions to purchase nonexistent "securities," the Siegal Defendants planned from the beginning to circulate portions of other duped investors' money to keep the house of cards standing because they knew there would not be sufficient revenues from oil and gas to make the distributions.

**Discovery of the Fraud**

85.    In or about November 2006, Byllott, received a written notice from Jeffrey Bacon, an IRS revenue agent in Texas requesting that Plaintiffs extend the limitations period on an audit. Seeking clarification, Byllott shortly thereafter spoke to Patrick Villarreal ("Agent Villareal"), an IRS revenue agent in Texas, who informed Bylott that Plaintiffs' investments in the Siegal Partnerships were being audited and that the Siegal Partnerships were aggressive tax

shelters taking illicit tax deductions and that Plaintiffs were facing trouble. Agent Villareal asked Byllott to forward to him any promotional materials for the Partnerships.

86.    In or about the middle of December, 2006, Byllott telephoned Howard to advise him that Plaintiffs were being audited. Howard assured Byllott that the audits were routine and would not lead to any problems.

87.    Byllott then told Howard that the IRS had asked him to forward Partnership promotional materials and Howard's demeanor changed. He told Byllott he should not send the Partnership Investment Proposals to the IRS and that, if he did so, he should remove the first five pages. Byllott asked him why he should remove the pages and Howard answered in substance that, in those pages, "the IRS is going to see something they don't like."

88.    Howard's statement alarmed Byllott and Plaintiffs. Byllott forwarded to Agent Villarreal the complete Investment Proposal for the Indian Village Partnership without removing any pages.

89.    By letter dated March 12, 2007, Coleman, signing himself as "tax matters partner," informed Plaintiffs that the Condor Partnership was under IRS audit for the taxable year 2003. In a letter of the same date, Trevisani, signing himself also as "tax matters partner," informed Plaintiffs that the Hurricane Partnership was also under IRS audit for the taxable year 2004. The letters advised Plaintiffs that the Partnerships were responding to IRS document requests and otherwise cooperating fully with the audit.

90.    The March 12, 2007 letters also informed Plaintiffs that an IRS audit report to a partner in a similar Siegal partnership structure proposed to disallow a large percentage of the IDC deductions taken by that partner and to impose an accuracy-related penalty.

91.    In written responses to IRS information requests to the Partnerships, dated October 17, 2006 and January 29, 2007, the Siegal Companies' accountant, Guralnick, on SLG

25

letterhead, advised the IRS, in a letter dated October 16, 2006, that there was no "legal opinion

or prospectus describing the material tax issues for the partnership agreement or the deductibility

of the IDC amounts" (emphasis added.). As set forth above, the Investment Proposals described

in detail material tax issues related to the deductibility of the IDC and represented that the

Partnerships and their tax aspects were valid.

92.     On or about July 17, 2007, the New York State Department of Taxation informed

Plaintiff, Ira Nathel, that his tax returns were to be reviewed and his investment in Indian Village

subject to audit.

93.     At the same time, an attorney representing Plaintiffs asked Agent Villarreal

whether the IRS would allow a tax deduction for IDC costs to the extent of Plaintiffs'

investments. Agent Villarreal responded that, based on documents provided by the Partnerships,

the IRS was of the opinion that the Partnerships did not own a working interest in any wells. He

also indicated that proceeds received from the Partnerships may not have been from revenues

from sites drilled by the Partnerships in which Plaintiffs had invested but from sites held by the

Siegal Companies.

94.     Alarmed by the state of affairs and facing a significant accuracy-related penalty

and suspecting fraud, in July, 2007 Plaintiffs made written requests for Partnership documents, to

which they are entitled as partners. However, the requests were rebuffed.

95.     In August 9, 2007, Plaintiffs commenced an action in a New York State court to

force the pre-action production of documents that would enable them to identify the wrongdoing

of Siegal related entities and individuals and the extent of the misconduct. Bistate, who appeared

for the defendants, ultimately entered into a stipulation, dated August 21, 2007, and agreed to

produce documents on behalf of the Partnerships and the Siegal Companies.

26

96.     Bistate subsequently produced documents relating to the Indian Village, Condor and Hurricane Partnerships. Those documents confirm that representations made by Josephson at each meeting with Byllott and/or Plaintiffs in which he proposed the Siegal Partnership investments, including Indian Village, and later confirmed in telephone calls with Siegal, were false. The documents also confirmed that, in each of the conversations Byllott had with Siegal, Howard and Josephson, and the Investment Proposals, material facts had been withheld from them regarding, among other things, the nature of the Partnership interests, the status of the drill sites purportedly held by the Partnerships, the propriety of deducting the IDC costs from Plaintiffs' taxes and the possibility of the return of Plaintiffs' investments from oil and gas revenues.

## FIRST CLAIM FOR RELIEF

### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against the Siegal Defendants, and Josephson)

97.     Plaintiffs repeat and reallege paragraphs 1 to 96 above as if fully set forth herein.

98.     The Partnership interests constitute securities as defined by the Exchange Act because Plaintiffs invested money in them with the expectation of deriving financial benefits and realizing profits solely from the efforts of others.

99.     The Siegal Defendants, in connection with the sale of the Partnership interests in Indian Village, Condor and Hurricane, and Josephson in addition in connection with the sale of the Partnership interests in Indian Village, employed devices, schemes or artifices to defraud; made untrue statements of material fact verbally and in writing and omitted to disclose material facts necessary in order to make the statements made not misleading, in the light of the circumstances under which they were made; and engaged in acts, practices or a course of

27

business which operated as a fraud and deceit upon Plaintiffs as purchasers of securities, all in violation of Section 10(b) of the Exchange Act and Rule 10(b)-5 promulgated thereunder.

100.    In inducing Plaintiffs to invest in the Partnerships, the Siegal Defendants falsely represented to Plaintiffs that they could take valid IDC tax deductions in the amounts projected and that it was possible for Plaintiffs to receive a return of their investment from oil and gas well revenues generated from wells legitimately held by the Partnerships. They also misrepresented that the Managing Partners had expertise in oil and gas drilling and would be able to select appropriate sites and otherwise manage the affairs of the Partnerships. Further, they misrepresented that withheld distributions would be applied to purchase securities to pay off the Turnkey Notes. As set forth above, the Siegal Defendants knew that the Partnerships could not legitimately return the revenues nor be the basis of valid tax deductions, nor did they intend to purchase securities, and they knew that the Managing Partners did not have any expertise.

101.    Josephson, Plaintiffs' personal accountant and tax adviser, recklessly encouraged Plaintiffs to invest in the Partnerships, representing falsely and without any basis in fact or investigation, and contrary to his duty to monitor, that the Partnerships were capable of returning their investments from oil and gas revenues and that they would be entitled to tax deductions. Josephson knew that by introducing the Plaintiffs to the Partnerships, instigating the program of investing in them instead of paying taxes, and vouching for the Partnerships and their validity, Plaintiffs would rely on him and on the Seigal Defendants in doing so.

102.    Plaintiffs did in fact rely upon the Siegal Defendants and Josephson in investing in Indian Village, and on the Siegal Defendants in investing in Condor and Hurricane. Plaintiffs would not even have known about the Siegal Partnerships but for Josephson, and would not have invested in them but for Josephson and the Siegal Defendants. Plaintiffs lost virtually their entire

investment in the Partnerships, have no expectation of earning any significant revenues but do expect the IRS to disallow the tax deductions and assess substantial penalties and interest.

103.    As a direct and proximate result of the aforesaid misconduct, Plaintiffs have sustained and will sustain damages in an amount to be determined at trial in connection with the purchase of the Partnership interests and are therefore entitled to recover damages they have suffered: (i) from Josephson in an amount to be determined at trial but at least in the amount of the $300,000 they invested in cash in Indian Village; and (ii) from the Siegal Defendants in an amount to be determined at trial but at least in the amount of the $1,600,000 in cash they invested in Indian Village, Condor and Hurricane.

### SECOND CLAIM FOR RELIEF

#### (Common Law Fraud against the Siegal Defendants)

104.    Plaintiffs repeat and reallege paragraphs 1 to 103 above as if fully set forth herein.

105.    To induce Plaintiffs to invest in the Partnerships, the Siegal Defendants misrepresented to Plaintiffs directly and through Byllott material facts, specifically set forth above, both verbally and in the Investment Proposals and Siegel Partnership documents including, but not limited to: (a) that the investments were tax deductible on at least a 2 to 1 basis as intangible drilling costs; (b) that the tax deductions had been approved by the IRS and other taxing authorities; (c) that oil and gas leases would be acquired for the Partnerships; (d) that the Managing Partners, Coleman and Trevisani, had the requisite expertise to manage the Partnerships' business and protect their interests; (e) that the oils and gas drilling sites would be held by the Partnerships and drilled after the Partnerships were constituted; (f) that the drilling costs incurred by the Partnerships would be paid from cash flow generated from producing oil and gas wells held by the Partnerships; (g) that distributions to Partnerships would be paid from cash flow generated from producing oil and gas wells held by the Partnerships; (h) that the

Turnkey and Subscriptions Notes would be paid off from cash flow generated from producing oil and gas wells; (i) that it was possible Plaintiffs would receive a return of their investment from oil and gas revenues over a period of 10-12 years; and (j) that marketable securities would be purchased with cash distributions Plaintiffs assigned for the purchases and which would increase in value and pay down the drilling costs.

106.    The Siegal Defendants made these misrepresentations knowing that they were false, without any reasonable basis and with reckless disregard for their truth or falsity, with the intention of inducing Plaintiffs to rely on the misrepresentations and turn over substantial sums of money to Siegal.

107.    The Siegal Defendants, at the time they induced Plaintiffs to invest in the Partnerships, also failed to disclose material facts to Plaintiffs regarding the Partnerships, the deductibility of the IDC, the oil and gas drilling sites and return on their investments.  The material facts withheld specifically set forth above include, but are not limited to: (a) that the Partnership structures were tax shelters subject to registration with the IRS; (b) that the IRS had not approved the IDC deductions or issued any ruling any conclusions regarding ongoing audits; (c) that many of the drill sites had already been drilled and/or abandoned or capped even before the Partnerships were created; (e) that rights to drill sites and oil and gas interests were not held by the Partnerships; (f) that the Managing Partners, Coleman and Trevisani, had no expertise in managing the business of the Partnerships and choosing drilling sites (g) that there was no possibility that Plaintiffs would receive the return of their investments from oil and gas revenues; (h) that distributions to the Partnerships would be made through loans from unknown sources; (i) that the Turnkey and Subscription Notes would not be paid off with receipts from sales of oil and gas from successfully drilled wells held by the Partnerships; and (j) that no securities were purchased with distributions withheld from the partners purportedly for that purpose.

108.    The Siegal Defendants failed to disclose these material facts knowingly, deliberately and with the express intention of inducing Plaintiffs to invest in the Siegal Partnerships and to defraud Plaintiffs of their money..

109.    Plaintiffs, directly and through Byllott, relied on the representations of the Siegal Defendants and relied on them to disclose all material facts regarding the Partnerships and the propriety of the IDC tax deductions.

110.    Had Byllott and Plaintiffs been informed of the undisclosed material facts, Plaintiffs would not have invested in the Siegal Partnerships and would not have taken the IDC deductions they were led to believe were legitimate.

111.    As a direct and proximate result of the aforesaid material misrepresentations and omissions the Siegal Defendants, Plaintiffs have sustained and will sustain damages to be determined at trial but at least in excess of $1,600,000 they turned over in cash to the Siegal Defendants in connection with the purchase of their Partnership interests in Indian Village, Condor and Hurricane.

### THIRD CLAIM FOR RELIEF

### (Common Law Fraud against Josephson)

112.    Plaintiffs repeat and reallege paragraphs 1 to 111 above as if fully set forth herein.

113.    Josephson instigated the strategy of Plaintiffs investing in the Partnerships in lieu of paying taxes and completed the strategy by introducing Plaintiffs, directly and through Byllott, to the Siegal Partnerships and vouching for them.

114.    Josephson induced Plaintiffs to invest in Indian Village, recklessly and without conducting any investigation as to the basis for his statements as required by his fiduciary relationship with Byllott and Plaintiffs.

31

115.    Josephson misrepresented to Byllott and Plaintiffs: (a) that the investments were legitimately tax deductible; (b) that Siegal and Howard knew what they were doing; (c) that the Turnkey and Subscriptions Notes would be paid off from cash flow generated from producing oil and gas wells; and (d) that it was possible Plaintiffs would receive a return of their investment from oil and gas revenues.

116.    Josephson made these misrepresentations with reckless disregard for their truth or falsity, without any investigation and with the intention of inducing Plaintiffs to rely on the misrepresentations.

117.    At the time Josephson induced Plaintiffs to invest in the Partnerships, he failed to disclose to Byllott and Plaintiffs the material fact that he had not investigated or determined, as he should have as their trusted advisor, whether the IDC tax deductions were likely to be approved by the IRS or whether investors in other Siegal promoted partnerships had received revenues from oil and gas wells held by those partnerships.

118.    Josephson failed to disclose these material facts knowingly and recklessly.

119.    Byllott and Plaintiffs relied on the representations and omissions of Josephson in proceeding with the strategy and in relying on the Siegal Defendants in investing in the Partnership instead of paying their taxes.

120.    Had Byllott and Plaintiffs been informed of the undisclosed material facts, Plaintiffs would not have invested in the Siegal Partnerships and would not have taken the IDC deductions they were led to believe were legitimate.

121.    As a direct and proximate result of the Josephson's material misrepresentations and omissions, Plaintiffs have sustained and will sustain damages in an amount to be determined at trial but at least in the amount of the $300,000 they invested in cash in Indian Village.

## FOURTH CLAIM FOR RELIEF

### (Aiding and Abetting the Siegal Defendants'
### Common Law Fraud against Coleman and Trevisani)

122.    Plaintiffs repeat paragraphs 1 to 121 above as if fully set forth herein.

123.    As set forth above, the Siegal Defendants perpetrated a fraud on the Plaintiffs

with false representations and material omissions regarding, among other things, the Managing

Partners of the Partnerships, Coleman and Trevisani.

124.    Coleman knowingly permitted himself to be named as Managing Partner of

Indian Village and Condor, and Trevisani knowingly permitted himself to be named as

Managing Partner of Hurricane.  The Siegal Defendants, in the Investment Proposals and the

Partnership Agreements, represented that the Managing Partners of the Partnerships would

carefully select the drilling sites and otherwise completely manage the affairs of the Partnership.

125.    Coleman and Trevisani knew that they had no expertise in choosing drilling sites

as represented and knew that they would not perform the duties of a Managing Partner as set

forth in the Partnerships documents.

126.    By permitting themselves to be named Managing Partners, signing the documents

as Managing Partners and assisting the Siegal Defendants in perpetrating the fraud, Coleman and

Trevisani provided substantial assistance to advance the fraud.  Through the fraud, Plaintiffs

were deceived into believing that the Partnerships would be properly managed, with proper

oversight.  Instead, Plaintiffs bought into Partnerships with no oversight or proper management.

127.    As a result of aiding and abetting the Siegal Defendants' fraud:  (a) Coleman is

liable to Plaintiffs for the damages they incurred as a result of the fraud related to their

investments in Indian Village and Condor in an amount to be determined at trial but at least in

excess of $800,000; and (b) Trevisani is liable to Plaintiffs for the damages they incurred as a

result of the fraud related to Hurricane in an amount to be determined at trial but at least in the amount of $800,000.

## FIFTH CLAIM FOR RELIEF

### (Breach of Contract against Coleman)

128.    Plaintiffs repeat paragraphs 1 to 127 above as if fully set forth herein.

129.    As Managing Partner of Indian Village and Condor, Coleman entered into the Partnership Agreements described above.

130.    Plaintiffs became parties to those Partnership Agreements through executing the related Subscription Agreements.

131.    Pursuant to the Indian Village and Condor Partnership Agreements, Coleman was given plenary powers to manage all of the Partnerships' activities.

132.    In related agreements, Plaintiffs agreed with the Partnerships that, after they had received distributions from the Partnerships totaling the amount of the first year's interest payment on the Subscription Notes, 67% of future distributions from Indian Village and 75% of distributions from Condor would be withheld in order to purchase marketable securities to collateralize Plaintiffs' liability on the related Turnkey Notes.

133.    Pursuant to Section 6 of the Partnership Agreements, entitled "Rights Duties and Obligations of the Managing Partner," Coleman is required to distribute to the partners Partnership income over and above that required to fund the Partnerships' operations.

134.    Pursuant to Section 11 of the Partnership Agreements, Coleman, as Managing Partner, is obligated to maintain adequate books and records of account which will reflect the Partnership transactions.

135.    In memoranda dated January 28, 2005, Siegal informed Plaintiffs that their distributions had reached the level they had previously agreed would trigger the withholding

34

from Indian Village distributions to purchase securities. According to the memoranda, the funds withheld would be assigned to Siegal's company, SS&T, in order to purchase zero coupon bonds.

136. In memoranda dated July 28, 2006, Coleman informed Plaintiffs that their distributions from Condor had reached the threshold for withholding to purchase securities and that the funds withheld would be assigned to SS&T to buy municipal bonds.

137. In or about January 2005, and on or about July 28, 2006, Indian Village and Condor began withholding the funds from their distributions, and the quarterly notices of distribution to the Plaintiffs stated that the funds had been withheld to purchase securities.

138. No such securities were ever purchased with the withheld distributions and there are no books and records indicating the use to which those distributions were put. Accordingly, Coleman breached Sections 6 and 11 of the Partnership Agreements by: (i) failing to distribute Partnership income due to Plaintiffs and diverting those funds to unknown purposes; and (ii) failing to maintain adequate books and records which would reflect the Partnerships' transactions with respect to those withheld distributions.

139. Plaintiffs performed all their obligations under the Partnership Agreements.

140. As a direct and proximate result of the aforesaid breaches of the Partnership Agreements, Plaintiffs sustained damages in an amount to be determined at trial but at least in the amount of the distributions withheld and improperly diverted.

### SIXTH CLAIM FOR RELIEF

#### (Breach of Contract against Trevisani)

141. Plaintiffs repeat paragraphs 1 to 140 above as if fully set forth herein.

142. As Managing Partner of Hurricane, Trevisani entered into the Hurricane Partnership Agreement described above.

35

143.    Plaintiffs became parties to the Hurricane Partnership Agreement through executing the related Subscription Agreement.

144.    Pursuant to the Hurricane Partnership Agreement, Trevisani has plenary powers to manage all of the Partnership's activities.

145.    In a related agreement, Plaintiffs agreed with the Partnership that after they had received distributions from the Partnership totaling the amount of the first year's interest payment on the Subscription Note, 75% of future distributions would be withheld in order to purchase marketable securities to collateralize Plaintiffs' liability on the Turnkey Notes.

146.    Pursuant to Section 6 of the Partnership Agreement, entitled "Rights Duties and Obligations of the Managing Partner," Trevisani is required to distribute to the partners Partnership income over and above that required to fund the Partnerships' operations.

147.    Pursuant to Section 11 of the Partnership Agreements, Trevisani, as Managing Partner, is obligated to maintain adequate books and records of account which will reflect the Partnership transactions.

148.    In memoranda to Plaintiffs dated April 30, 2007, Trevisani informed Plaintiffs that their distributions had reached the level they had previously mutually agreed would trigger the 75% withholding to purchase securities. According to the April 30, 2007 memoranda, the funds withheld were to be assigned to Siegal's company, SS&T, in order to purchase municipal bonds.

149.    On or about April 30, 2007, Hurricane began withholding the funds from the Hurricane distributions and the quarterly notices of distribution to the Plaintiffs stated that the funds had been withheld to purchase securities.

150.    No such securities were ever purchased with the withheld distributions and no documents reflect their use. Accordingly, Trevisani breached Sections 6 and 11 of the

36

Partnership Agreement by: (i) failing to distribute to Partnership income due to Plaintiffs and diverting those funds to unknown purposes; and (ii) failing to maintain adequate books and records which would reflect the Partnership transactions with respect to those withheld distributions

151.    Plaintiffs performed all their obligations under the Partnership Agreement.

152.    As a direct and proximate result of the aforesaid breaches of the Partnership Agreement, Plaintiffs sustained damages in an amount to be determined at trial but at least in the amount of the distributions withheld and improperly diverted.

## SEVENTH CLAIM FOR RELIEF

### (Tortious Interference with Contractual Relations against Siegal)

153.    Plaintiffs repeat paragraphs 1 to 152 above as if fully set forth herein.

154.    As described above, Plaintiffs entered into valid Partnership Agreements, for the Indian Village, Condor and Hurricane Partnerships.

155.    Because he devised and promoted the Partnerships, Siegal knew of the existence of the Partnership Agreements and that Plaintiffs were parties to the agreements.  Siegal also knew of the Partnership Agreements because he signed the Prospect Agreements with the Partnerships as President of Palace and because he controlled the Siegal Companies which are parties to multiple agreements with the Partnerships.

156.    As set forth above, Siegal insinuated himself into the day to day management of the Partnerships and their books and records.  From this position he deliberately procured the breaches of the Partnership Agreements committed by Coleman and Trevisani as set forth herein. Siegal caused them to withhold the distributions which Plaintiffs had agreed would be applied to the purchase of securities but were in fact diverted to Siegal's company, SS&T.

157.    As a result of this intentional tortious interference with Plaintiffs' contractual relationships with Coleman, Trevisani and the Partnerships, Siegal is liable to Plaintiffs for the damages incurred from that interference in an amount to be determined at trial but at least in the amount of the distributions withheld.

## EIGHTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty against Coleman)

158.    Plaintiffs repeat paragraphs 1 to 157 above as if fully set forth herein.

159.    Coleman is the Managing Partner of Indian Village and Condor and is in a relationship of trust with his fellow partners, including Plaintiffs. Coleman owed a fiduciary to Plaintiffs arising from his position of trust.

160.    As Managing Partner with plenary powers to manage the Partnerships, Coleman's fiduciary duty obligated him to act at all times in the best interests of his partners in the management and decision making relating to the Partnerships. Plaintiffs trusted Coleman to act in their best interests as partners in Indian Village and Condor.

161.    Coleman breached his fiduciary duty to Plaintiffs directly by withholding distributions of Indian Village and Condor from Plaintiffs, from in or about January 2005, and on or about July 28, 2006 respectively, and assigning those funds to Siegal's company, SS&T, for purposes other than to purchase securities for Plaintiffs' benefit.

162.    As a direct and proximate result of Coleman's breaches of fiduciary duty, Plaintiffs have sustained damages in an amount to be determined at trial but at least in the amount of the withheld distributions from Indian Village and Condor.

## NINTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty against Trevisani)

163.    Plaintiffs repeat paragraphs 1 to 162 above as if fully set forth herein.

164.    Trevisani, as Managing Partner of Hurricane, is in a relationship of trust towards his fellow partners, including Plaintiffs. Trevisani owed a fiduciary duty to Plaintiffs arising from his position of trust.

165.    As Managing Partner with plenary powers to manage the Partnership, Trevisani's fiduciary duty obligated him to act at all times in the best interests of his fellow partners in the management and decision making relating to the Partnership. Plaintiffs trusted Trevisani to act in their best interests as partners in Hurricane.

166.    Trevisani breached his fiduciary duty to Plaintiffs directly by withholding distributions of Hurricane's income from Plaintiffs, from April 30, 2007 onwards, and assigning those funds to Siegal's company, SS&T, for purposes other than to purchase securities for Plaintiffs' benefit.

167.    As a direct and proximate result of Trevisani's breach of fiduciary duty directly to them, Plaintiffs have sustained damages in an amount to be determined at trial but at least in the amount of the withheld distributions.

## TENTH CLAIM FOR RELIEF

### (Aiding and Abetting Trevisani's and Coleman's Breach of Fiduciary Duty Against Siegal)

168.    Plaintiffs repeat paragraphs 1 to 167 above as if fully set forth herein.

169.    As set forth above, Coleman was the Managing Partner of Indian Village and Condor, and Trevisani was the Managing Partner of Hurricane and each breached their fiduciary duties to Plaintiffs.

170.    As the promoter of Indian Village, Condor and Hurricane, and by insinuating himself into the day to day management of the Partnerships, Siegal knowingly participated in Coleman's and Trevisani's breaches of their fiduciary duty to Plaintiffs.

171.    As a result of Siegal's aiding and abetting Coleman's and Trevisani's breaches of

fiduciary duty, Plaintiffs have sustained damages in an amount to be determined at trial but at

least in the amount of the withheld distributions.

## ELEVENTH CLAIM FOR RELIEF

### (Declaratory Judgment Pursuant to 28 U.S.C. § 2201 Against Siegal Defendants)

172.    Plaintiffs repeat paragraphs 1 to 171 above as if fully set forth herein.

173.    As a result of the wrongdoing of the Siegal Defendants as set forth above,

Plaintiffs' tax returns in connection with their investment in Indian Village, Condor and

Hurricane are currently subject to audit and the IRS has indicated that the IDC tax deductions

will likely be disallowed and penalties imposed.

174.    The IRS has indicated it will likely disallow the IDC tax deductions and assess

penalties on the basis of, among other things, the Partnerships not owning a working interest in

the oil and gas drilling sites, the IDC being incurred before investors participated in the specific

Partnership, and the sites having been drilled and abandoned before the Partnerships were

constituted.

175.    The likelihood that Plaintiffs will incur penalties as a result of the defendants'

wrongdoing, renders the Siegal Defendants liable for the penalties Plaintiffs may incur in the

future with respect to all three Partnerships

176.    Accordingly, Plaintiffs are entitled to a declaratory judgment that the Siegal

Defendants are liable to Plaintiffs in the amount that may be assessed for penalties for Indian

Village, Condor and Hurricane and the cost of defending the audits.

## TWELTH CLAIM FOR RELIEF

### (Declaratory Judgment pursuant to 28 U.S.C. § 2201 based upon Professional Malpractice Against Guralnick Defendants)

177.    Plaintiffs repeat paragraphs 1 to 176 above as if fully set forth herein.

178.    Guralnick has for more than fifteen years been retained by Siegal to render full accounting and tax services to the Partnerships. The services included preparing tax returns for Hurricane and the K-1s for Plaintiffs for the 2004 tax year so they could report their share of the Partnership's income and expenses to taxing authorities.

179.    In 2005, Guralnick transmitted to the Hurricane Partnership the tax returns and K-1's he prepared and knew and intended that the Hurricane Partnership would forward the Schedules K-1 to Plaintiffs, and that Plaintiffs would rely on them to complete their Federal and New York State tax returns for 2004.

180.    Guralnick owed a duty to the Hurricane Partnership to exercise due care in the performance of his professional services. That duty of care was also owed to Plaintiffs as member-partners of the Partnership. Guralnick's duty of care requires him to adhere to generally accepted accounting principles and standards and the rules and regulations of taxing authorities.

181.    As an accounting professional and tax preparer, Guralnick knew that the Plaintiffs could only take a tax deduction for the portion of any IDC incurred after the date they joined the Partnership.

182.    In order to prepare the Hurricane Partnership return and the Plaintiffs' K-1s for the 2004 tax year, Guralnick should have reviewed the Partnership's books and records including information identifying the date the Partnership was created in 2004 and the date the Plaintiffs invested in the Partnership.

183.    From those records, Guralnick knew, or should have known, that Plaintiffs did not invest in Hurricane until December 9, 2004. He also knew, or should have known, that, according to the Partnership Agreement, the Partnership was created on August 1, 2004. Nevertheless, in preparing Plaintiffs' K-1s for Hurricane for the year 2004, Guralnick departed from accepted accounting practice and, instead of allocating to Plaintiffs only their portion of the IDC incurred after the date of their investments, he improperly prepared the Partnership tax returns and the K-1s by allocating a much larger portion of Hurricane's IDC for 2004 based on Plaintiffs' percentage investment in the Partnership.

184.    This overstatement in improperly prepared K-1s was a departure from accepted professional accounting practice and a breach of the professional duty of care he owed to Plaintiffs. This breach of duty resulted in Plaintiffs taking a larger tax deduction for IDC than they were entitled to deduct for 2004.

185.    As a direct and proximate result of Guralnick's breach of his professional duty, Plaintiffs will likely be damaged as a result of the penalties the IRS has indicated will be assessed against them for underpayment of 2004 taxes, which underpayment is greater due to Guralnick's malpractice. The Guralnick Defendants are liable to Plaintiffs for that portion of the penalties assessed by any taxing authority as a result of the preparation of improper K-1s for Plaintiffs as partners of Hurricane for the 2004 tax year. They are also liable to Plaintiffs for that portion of expenses incurred in defending against the audit related to Hurricane.

186.    Accordingly, a declaratory judgment pursuant to 28 U.S.C. § 2201 based upon professional malpractice against the Guralnick Defendants should be granted.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all issues so triable.

**WHEREFORE**, Plaintiffs demand judgment:

1.     On their First Claim, for violation of Section 10(b) of the Exchange Act and Rule 10b-5: (a) against the Siegal Defendants in an amount to be determined at trial but not less than the total net loss of their investments in Indian Village, Condor and Hurricane; (b) against Josephson in an amount to be determined at trial but not less than the total net loss of their investments in Indian Village;

2.     On their Second Claim, for common law fraud against the Siegal Defendants in an amount to be determined at trial but not less than the total net loss of their investments in Indian Village, Condor and Hurricane;

3.     On their Third Claim, for common law fraud against Josephson in an amount to be determined at trial but not less than the total net loss of their investments in Indian Village;

4.     On their Fourth Claim, for aiding and abetting common law fraud: (a) against Coleman in an amount to be determined at trial but not less than the total net loss of their investments in Indian Village and Condor; and (b) against Trevisani in an amount to be determined at trial but not less than the total net loss of their investments in Hurricane;

5.     On their Fifth Claim, for breach of contract against Coleman in an amount to be determined at trial but not less than the total amounts withheld from Plaintiffs from their Indian Village and Condor distributions;

6.     On their Sixth Claim, for breach of contract against Trevisani in an amount to be determined at trial but not less than the total amounts withheld from Plaintiffs from their Hurricane distributions;

7.     On their Seventh Claim, for tortious interference with contractual relations against Siegal in an amount to be determined at trial but not less than the total amounts withheld from Plaintiffs from their Indian Village, Condor and Hurricane distributions;

8.    On their Eighth Claim, for breach of fiduciary duty against Coleman in an amount to be determined at trial but not less than the total amounts withheld from Plaintiffs from their Indian Village and Condor distributions;

9.    On their Ninth Claim, for breach of fiduciary duty against Trevisani in an amount to be determined at trial but not less than the total amounts withheld from Plaintiffs from their Hurricane distributions;

10.    On their Tenth Claim, for aiding abetting Coleman's and Trevisani's breach of fiduciary duty against Siegal in an amount to be determined at trial but not less than the total amounts withheld from Plaintiffs from their Indian Village, Condor and Hurricane distributions;

11.    On their Eleventh Claim, for declaratory judgment pursuant to 28 U.S.C. § 2201 against the Siegal Defendants in an amount to be determined at trial but not less than the total amounts likely to be assessed as penalties against Plaintiffs by the IRS and other taxing authorities arising from their investments in Indian Village, Condor and Hurricane and the costs of defending the taxing authorities' audits;

12.    On their Twelfth Claim, for declaratory judgment pursuant to 28 U.S.C. § 2201 against the Guralnick Defendants in an amount to be determined at trial but not less than the total amounts likely to be assessed as penalties against Plaintiffs by the IRS and other taxing authorities arising from their investments in Hurricane and the costs incurred in defending the taxing authorities' audits;

13.    Together with interest thereon and the costs and disbursements of this action; and

44

14.　　Granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
　　　　May 2, 2008

STORCH AMINI & MUNVES PC

Steven G. Storch (SS-5241)
Kathleen E. Wright (KW-5439)
Two Grand Central Tower, 25th Floor
140 East 45th Street
New York, New York 10017
Tel. (212) 490-4100
Attorneys for Plaintiffs

# EXHIBIT B

## COMPARISON OF CLAIMS

| Claim # | First Amended Complaint | Proposed Second Amended Complaint |
|---|---|---|
| First Claim | Violation of Section 10(b) of the Exchange Act and Rule 10b-5<br><br>**Against:** Siegal, Josephson, Coleman, Trevisani, Howard, Guralnick, SLG | Violation of Section 10(b) of the Exchange Act and Rule 10b-5<br><br>**Against:** Siegal, Siegal Companies[1], Howard and Josephson |
| Second Claim | Common Law Fraud/Fraudulent Inducement<br><br>**Against:** All defendants | Common Law Fraud<br><br>**Against:** Siegal, Siegal Companies, and Howard ("Siegal Defendants") |
| Third Claim | Common Law Fraud/Fraudulent Non-disclosure<br><br>**Against:** All defendants | Common Law Fraud<br><br>**Against:** Josephson |
| Fourth Claim | Negligent Misrepresentation<br><br>**Against:** All defendants | Aiding and Abetting Siegal's Common Law Fraud<br><br>**Against:** Coleman and Trevisani |
| Fifth Claim | Breach of Fiduciary Duty<br><br>**Against:** Siegal, Josephson, Coleman, Trevisani, Guralnick, SLG | Breach of Contract<br><br>**Against:** Coleman |
| Sixth Claim | Breach of Contract<br><br>**Against:** Coleman, Trevisani, Siegal Companies | Breach of Contract<br><br>**Against:** Trevisani |
| Seventh Claim | Professional Malpractice<br><br>**Against:** Guralnick, SLG, Trevisani | Tortious Interference with Contractual Relations<br><br>**Against:** Siegal |
| Eighth Claim | No Claim | Breach of Fiduciary Duty<br><br>**Against:** Coleman |

---

[1] Bistate Oil Management Corporation, SS&T Holding Co., LLC, Palace Exploration Company, TAH Drilling Co., Inc., TAQ Drilling Co., Inc., and Oil and Gas Title Holding Corporation.

| Claim # | First Amended Complaint | Proposed Second Amended Complaint |
|---------|-------------------------|-----------------------------------|
| Ninth Claim | No Claim | Breach of Fiduciary Duty<br><br>**Against:** Trevisani |
| Tenth Claim | No Claim | Aiding and Abetting Trevisani's and Coleman's Breach of Fiduciary Duty<br><br>**Against:** Siegal |
| Eleventh Claim | No Claim | Declaratory Judgment Pursuant to 28 U.S.C. §2201<br><br>**Against:** Siegal Defendants |
| Twelfth Claim | No Claim | Declaratory Judgment pursuant to 28 U.S.C. § 2201 based upon Professional Malpractice<br><br>**Against:** Guralnick Defendants |

# EXHIBIT C

APR-29-2008  01:27          STORCH AMINI & MUNVES PC                    212 490 4208      P.02



STORCH AMINI MUNVES PC
A New York Professional Corporation

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4-29-08

KATHLEEN E. WRIGHT
Member NY and NJ Bars

April 29, 2008

VIA FACSIMILE

Hon. Leonard B. Sand
United States District Court Judge
Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street, Room 1650
New York, New York 10007

Re:    *Nathel v. Siegal et al.* 07 Civ. 10956 (LBS)

Dear Judge Sand:

This firm represents the plaintiffs in the above-referenced action. I write to request leave to file an enlarged memorandum of law in opposition to the defendants' motions to dismiss the complaint. Defendants have made four separate motions to dismiss all the claims asserted against all the defendants. Due to the extent of the arguments necessary to address the multiple motions, I request leave to file a memorandum of law of thirty-five (35) pages in length if necessary.

Since the due date of Plaintiffs' opposition is May 2, 2008, I appreciate your permitting this letter to be sent via facsimile.

I appreciate the Court's kind attention to this request.

Respectfully submitted,

Kathleen E. Wright

cc:    Sean R. O'Brien, Esq. (*via email*)
John H. Eickemeyer, Esq. (*via email*)
Scott M. Himes, Esq. (*via email*)
Susan B. Ratner, Esq. (*via email*)

2 Grand Central Tower  New York, New York 10017  Tel: 212.490.4100  Fax: 212.490.4208  E-mail: kwright@samlegal.com
Washington, DC   South River, NJ

MEMO ENDORSED

TOTAL P.02

## Office Services

From:  NYSD_ECF_Pool@nysd.uscourts.gov
Sent:  Friday, May 02, 2008 5:22 PM
To:  deadmail@nysd.uscourts.gov
Subject: Activity in Case 1:07-cv-10956-LBS Nathel et al v. Siegal et al Declaration in Support of Motion

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing.**

### U.S. District Court

### United States District Court for the Southern District of New York

## Notice of Electronic Filing

The following transaction was entered by Wright, Kathleen on 5/2/2008 at 5:21 PM EDT and filed on 5/2/2008
**Case Name:**        Nathel et al v. Siegal et al
**Case Number:**    1:07-cv-10956
**Filer:**              Ira Nathel
                     Sheldon Nathel
**Document Number:** 55

**Docket Text:**
**DECLARATION of Kathleen E. Wright in Support re: [54] CROSS MOTION to Amend the Complaint and Opposition to Defendants' Motion to Dismiss re: [53] Notice (Other)** *of Cross Motion.***. Document filed by Ira Nathel, Sheldon Nathel. (Attachments: # (1) Exhibit A - Proposed Amended Complaint pages 1-26, # (2) Exhibit A - Proposed Amended Complaint pages 27-45, # (3) Exhibit B, # (4) Exhibit C)(Wright, Kathleen)**

**1:07-cv-10956 Notice has been electronically mailed to:**

Daniel L. Carroll    dcarroll@ingramllp.com

John H. Eickemeyer    jeickemeyer@vedderprice.com, ecf_nydocket@vedderprice.com

Justin M. Sher    jsher@arkin-law.com

Kathleen E. Wright    kwright@samlegal.com, jfender@samlegal.com

Lisa Christine Solbakken    lsolbakken@arkin-law.com

Michelle A. Rice    mrice@arkin-law.com

Scott M. Himes    shimes@stillmanfriedman.com

Sean R. O'Brien    bgreene@arkin-law.com

Stanley Samuel Arkin    sarkin@arkin-law.com

Steven Gary Storch    storch@samlegal.com, jfender@samlegal.com

**1:07-cv-10956 Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1008691343 [Date=5/2/2008] [FileNumber=4544490-0]
[4a018c68c22275b9872302229853f687a50a90b73bfe0912c71b6fe945fc710cb0f8b
11f35e827a477df133f5ff5401455a1562d0a74a678659fd19ac5a85b45a]]
**Document description:**Exhibit A - Proposed Amended Complaint pages 1-26
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1008691343 [Date=5/2/2008] [FileNumber=4544490-1]
[985af1fd1a6631237592d3158b7ee6eb68188d3044ed9f3a36355e9deab03d9d9664
9cf46162f3db83496a498dc03b30bbc981c9c7427b06bddc39ca2b3b8963]]
**Document description:**Exhibit A - Proposed Amended Complaint pages 27-45
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1008691343 [Date=5/2/2008] [FileNumber=4544490-2]
[0d36719697030fc17f0da602e2b45e39639b23917921c72251ff8165950737684cec
f6b9a06703a7fdddb9ea3d1c157f463c5ddcc26ea8d705812351d826213e]]
**Document description:**Exhibit B
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1008691343 [Date=5/2/2008] [FileNumber=4544490-3]
[138eeab3a21b268b6604c233cc08d33bfb83a1892106174238b318ad5ae3b363294d
8ac52381092e694d9734bedacd2e9de96cfad35ecdd026c99e074c729825]]
**Document description:**Exhibit C
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1008691343 [Date=5/2/2008] [FileNumber=4544490-4]
[73818efb3d1d201f5d39b167adde4d2ffd4a7e0c44d057ceb345f14d7da40ff0f74a
302d7e51db17f5177ee22a433c666cc12dad284f27a8ef6efc58e4ddc4ed]]

# Exhibit
# C

# SUBSCRIPTION AGREEMENT

To: Mr. George G. Coleman
    55 Babylon Turnpike
    Freeport, NY 11520

                         RE: *Indian Village Drilling Company*
                             A New York Partnership
                             (the "Partnership")

Gentlemen:

    1.    <u>Subscription.</u>  The undersigned hereby subscribes for and agrees to purchase 1.50 Partnership Units in *INDIAN VILLAGE DRILLING COMPANY*, a New York partnership, at a price of $250,000. per Unit, and agrees to pay therefore the sum of $375,000., which shall be paid as follows: Closing, $150,000. cash plus the execution of a full recourse promissory note in the amount of $225,000. bearing interest at the rate of 8% per annum due December 31, 2018, except for the period from the date of the Note to December 31, 2003, when it will bear interest at the rate of 1% per annum.

    2.    <u>Acceptance or Rejection.</u>  The undersigned understands that George G. Coleman, the Managing Partner ( the "Managing Partner) of the Partnership, in his sole discretion and for any reason, may accept or reject this subscription, in whole or in part.

    3.    <u>No Escrow of Subscription.</u>  The undersigned understands that the total amount subscribed will NOT be deposited in a special account and may be used to fund Partnership Operations except for the payment of the Managing Partner's Management Fee. The total amount subscribed will be returned to the undersigned without interest if this subscription has not been accepted and is subsequently rejected by the Managing Partner of the Partnership as provided in this Agreement. It is understood and agreed that if this subscription is accepted by the Managing Partner, the funds tendered herewith shall be deposited to the general account of the Partnership. No funds will be expended by the Partnership until at least eight Units are subscribed for and accepted by the Managing Partner. Funds shall be considered Partnership assets in payment for the number of Units set forth on the signature page hereof, or such lesser number as may be allocated to the undersigned by the Managing Partner, provided the Partnership's offering of Units is closed. If the undersigned is allocated less than the number of Units subscribed and the full purchase price of the Units subscribed has been timely paid in full, the Managing Partner shall remit the balance of the subscription amount paid, if any, without interest, to the undersigned within thirty (30) days after such partial acceptance of this subscription.

    4.    <u>Information.</u>  The undersigned acknowledges that: (l) the offering of Units was made only through direct, personal communication between the undersigned and the Managing Partner or his duly authorized representative;  (2) the undersigned has had the opportunity to obtain all additional information desired in order to verify an investment in the Partnership, including but not limited to the commission or finder's fee, if any, payable in connection with this

subscription by the undersigned;  and (3) the undersigned has been advised in writing by the Managing Partner that a purchaser of Units must be prepared to bear the economic risk of such investment for an indefinite period because of (a) the nature of an investment in oil or gas exploration and development; (b) the Units have not been registered under the Securities Act of 1933, may not be registered or qualified under the state securities laws applicable to the purchase of Units by the undersigned in reliance upon an available exemption therefrom and hence cannot be sold unless they are subsequently so registered, which is not likely, or exemptions from such registration requirements are available;  and (c) the Units will be subject to substantial restrictions on transfer as set forth in, among other documents, this Subscription Agreement and the Agreement and Certificate of Partnership of Indian Village Drilling Company (the "Partnership Agreement");(d) the Managing Partner has the absolute discretion to select properties for the purpose of purchase, lease or development in connection;(e) the Managing Partner is or may be a partner in other partnerships which may compete with Indian Village Drilling Company.  The Managing Partner shall have no liability to any Partner with respect to the selection of such properties for the Partnership or in the event that another Partnership in which the Managing Partner is a partner such properties independently of the Partnership.

    5.    Execution of Agreement.    When accepted by the Managing Partner, in whole or in part, this subscription shall be valid and binding on the undersigned and the Partnership for all purposes, subject to the provisions of paragraph 3(b) above.  The undersigned represents and warrants that the undersigned has received and read and understands the Partnership Agreement.  The signature of the undersigned to this Subscription Agreement may be deemed for all purposes as the execution of the Partnership Agreement by the undersigned to the same extent and effect as if the undersigned has signed the Partnership Agreement on the date of the acceptance of this subscription by you.  The undersigned agrees to execute the Partnership agreement page and, if requested, the Agreement, the Certificate of Partnership, any amendment to either of such documents, or a multiple original copy of any of such document.

    6.    Restrictions on Transfer.    The undersigned understands and acknowledges that the Partnership Agreement contains certain provisions restricting the transfer of the Units subscribed for hereby and to which the undersigned will be bound.  If this subscription is accepted in whole or in part, the undersigned further agrees that for a period of twenty-four (24) months after the date of such acceptance, the undersigned, under no circumstances will sell, pledge or transfer, or attempt to sell, pledge or transfer all or any part of the Units allocated to the undersigned.  In addition, the undersigned agrees that if this subscription is accepted, in whole or in part, the undersigned will not sell or transfer nor attempt to sell or transfer all or any part of the Units allocated to the undersigned unless such Units have first been registered under the Federal Securities act of 1933 and all applicable similar state statutes, or the undersigned first furnishes an opinion of counsel satisfactory to you, stating that exemptions from such registration requirements are available and that the proposed sale is not, and will not place the Partnership, the Managing Partner, nor any of his Affiliates in violation of any applicable federal or state securities law, or any rule or regulation thereunder.  The undersigned further understands and agrees that any such transfer will also be subject to the restrictions on transfer contained in the Partnership Agreement.

    7.    The undersigned represents that the following initialed statements are true:

_____(a) The undersigned individual's net worth, or joint net worth with the undersigned's spouse at this time exceeds $1,000,000.00.

_____ (b) The undersigned's individual income in each of the two most recent years was either (i) in excess of $200,000.00 or (ii) joint income with the undersigned's spouse was in excess of $300,000.00 and has a reasonable expectation of reaching the same income level in the current year.

The undersigned acknowledges that the Managing Partner will be relying on the truth and accuracy of the foregoing representation in determining whether to accept or reject this Subscription Agreement, and further acknowledges that this representation acts as an inducement to the Managing Partner to accept the Subscription Agreement.

Dated: _____

Subscription for 1.50 Units, at $250,000 per Unit.

$375,000. total.

Amount Enclosed: $

_____
Signature

Ira Nathel
Print Name

24 The Glen
Residence Address

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
Identification Number

Glen Head      NY      11545
City        State        Zip

## MANAGING PARTNER'S ACCEPTANCE/REJECTION

Subscription of _IRA NATHEL_____ (accepted) ▮▮▮▮ for _1.50_ Unit(s) of Partnership Interest and his required initial cash contribution of $ _150,000 ─ in payment therefor is hereby (acknowledged) ▮▮▮▮ in full without interest.

Dated: _____

_____
George G. Coleman
Managing Partner

-3-

# Exhibit

# D

THE BISTATE OIL DISTRIBUTION CORP.
Special Distribution Account
for the account of
CONDOR DRILLING COMPANY

1-1060
260

CHECK NO. 11986

Gotham Bank
of New York
1412 Broadway
New York, NY 10018

| 01 | 28 | 05 |
DATE

PAY EXACTLY

| 75,905 | 99 |
DOLLARS | CENTS

PAY TO THE ORDER OF

** VOID **   FILE COPY
VOID!!!!!
VOID!!!!!
VOID!!!!!

VOID

⑈11986⑈ ⑆0260⑈10605⑈ 004⑈031 873⑈

| OWNER CODE NAME | OWNER DECIMAL INTEREST | THE BISTATE OIL DISTRIBUTION CORP. Special Distribution Account for the account of CONDOR DRILLING COMPANY | CHECK DATE | 01/28/05 |
|---|---|---|---|---|
| | | | CHECK NO. | 11986 |
| FILE COPY | 100.000 | | CHECK AMT. | 75,905.99 |

SEE ENCLOSED PRODUCTION AND SALES REPORT

CONDOR DRILLING COMPANY

PRODUCTION & SALES REPORT

REVENUE RECEIVED AND EXPENSES PAID THRU 11/30/04

| DATE | WELL | OIL GAS | BBL MCF | GROSS | TAX | NET REV INT | OWNERS NET VALUE |
|---|---|---|---|---|---|---|---|
| 08 04 | AARON 1-22 | G | 5170 | 33075 | 628 | .3605 | 117 |
| 09 04 | AARON 1-22 | G | 5573 | 33352 | 645 | .3605 | 118 |
| 09 04 | AARON 1-22 | G | 7562 | 341840 | 17092 | .3605 | 1171 |
| 10 04 | AARON 1-22 | G | | 3060.0 | -644 | .3605 | 2 |
| 10 04 | AARON 1-22 | G | 464.0 | 686 | -686 | .3605 | 107 |
| 10 04 | AARON 1-22 | G | 6843 | 360110 | 41163 | .3605 | 838 |
| 11 04 | AARON 1-22 | G | 5490 | 261843 | 30089 | .3605 | 838 |
| 11 04 | AARON 1-34 | G | | -2971 | -2977 | .3649 | 11 |
| 09 04 | ALLEN 1-34 | G | 17995 | 133588 | 23961 | .3649 | 407 |
| 09 04 | ALLEN 1-34 | G | 11999 | 184815 | 3805 | .3649 | 304 |
| 10 04 | ALLEN 1-34 | G | 1119 | 50592 | 2173 | .3649 | 300 |
| 10 04 | ALLEN 1-34 | G | 17541 | 100378 | 18141 | .3649 | 407 |
| 11 04 | ALLEN 1-34 | G | 1126 | 59216 | 4450 | .2173 | 119 |
| 04 04 | ALLEN 1-34 | G | 195 | 8417 | 410 | .5170 | 110 |
| 05 04 | ARCS 15-9-18-1N4 | G | -4330 | -22428 | -6995 | .5170 | 10 |
| 09 04 | ARCS 15-9-18-1N4 | G | 5492 | 30362 | 5708 | .5170 | 127 |
| 09 04 | ARCS 15-9-18-1N4 | G | 5257 | 23972 | 91 | .5170 | 126 |
| 04 04 | ARCS 15-9-18-1N4 | G | 4974 | 23072 | 3954 | .5170 | 39 |
| 04 04 | ARCS 15-9-18-1N4 | G | 195 | 8417 | 1179 | .5170 | 29 |
| 09 04 | BERKYRAN 15-2-2 | G | 259 | 12635 | 540 | .6071 | 73 |
| 09 04 | BRAZEAU 1-32-47-14M5 | G | 44255 | 295382 | 55328 | .6071 | 1177 |
| 09 04 | BRAZEAU 1-32-47-14M5 | O | 2176 | 88998 | 10157 | .6071 | 540 |
| 04 04 | BRAZEAU 1-32-47-14M5 | G | | 49311 | 5594 | .6071 | 265 |
| 04 04 | BRAZEAU 1-32-47-14M5 | O | 2120 | 121172 | 156286 | .6071 | 1001 |
| 09 04 | BRAZEAU 1-32-47-14M5 | O | 43154 | 59575 | 5605 | .6071 | 520 |
| 09 04 | BRAZEAU 1-32-47-14M5 | O | | 977522 | 81264 | .6071 | 796 |
| 10 04 | BRAZEAU 1-32-47-14M5 | G | 41013 | 212269 | | .6071 | 543 |
| 10 04 | BRAZEAU 1-32-47-14M5 | O | 2013 | 89511 | 542 | .6071 | 303 |
| 10 04 | BROUSSARD HEBERT D-1 | O | | 55524 | 14321 | .6071 | -22 |
| 07 04 | BROUSSARD HEBERT D-1 | O | 0 | 0 | 861 | .1532 | -1 |
| 08 04 | BROUSSARD HEBERT D-1 | O | 74952 | 466602 | 40900 | .1532 | 652 |
| 08 04 | BROUSSARD HEBERT D-1 | O | 76122 | 42645 | 33283 | .1532 | 571 |
| 08 04 | BROUSSARD HEBERT D-1 | O | 938 | 480982 | 37407 | .1532 | 596 |
| 04 04 | BROUSSARD HEBERT D-1 | O | 77290 | 426747 | 3659 | .1532 | 99 |
| 04 04 | BROUSSARD HEBERT D-1 | O | 1101 | 68160 | 1842 | .1532 | 50 |
| 04 04 | CARLTON PREVOST-1 | G | 715 | 34682 | 1842 | .1532 | 44 |
| 04 04 | CARLTON PREVOST-1 | G | 90 | 3119 | | .2144 | 4 |
| 04 04 | CARLTON PREVOST-1 | G | -135 | -1697 | -1697 | .2144 | -4 |
| 04 04 | CARLTON PREVOST-1 | G | -135 | -1697 | 1697 | .2144 | 46 |
| 04 04 | CARLTON PREVOST-1 | G | 3712 | 291957 | 790 | .1627 | 44 |
| 04 04 | CARLTON PREVOST-1 | G | 3537 | 132116 | 12191 | .1631 | 68 |
| 04 04 | CARLTON PREVOST-1 | G | 5263 | 141476 | 3115 | .1631 | -69 |
| 04 04 | CARLTON PREVOST-1 | G | 1247 | 14944 | | .1631 | 32 |
| 04 04 | CARLTON PREVOST-1 | G | 1295 | 60566 | 8553 | .2144 | 76 |
| 08 04 | CARLTON PREVOST-1 | G | -1173 | -14382 | | .1269 | -31 |
| 08 04 | CARLTON PREVOST-1 | G | 631 | 28006 | 3499 | .1272 | 31 |

CONDOR DRILLING COMPANY

PRODUCTION & SALES REPORT

REVENUE RECEIVED AND EXPENSES PAID THRU 11/30/04

| DATE | WELL | OIL GAS | BBL MCF | GROSS | TAX | NET REV INT | OWNERS NET VALUE |
|---|---|---|---|---|---|---|---|
| 08 04 | CARLTON PREVOST-1 | G | 43196 | 328591 | 7961 | .1631 | 523 |
| 08 04 | CARLTON PREVOST-1 | G | -43196 | -328591 | -96572 | .1272 | -108 |
| 08 04 | CARLTON PREVOST-1 | G | -43196 | -328572 | -12045 | .1272 | -512 |
| 08 04 | CARLTON PREVOST-1 | G | 41541 | 1594435 | 190582 | .1598 | 2 |
| 08 04 | CARLTON PREVOST-1 | G | -212 | -2605 | | .1247 | -1764 |
| 08 04 | CARLTON PREVOST-1 | G | -42119 | -1615888 | -201253 | .1247 | -1764 |
| 09 04 | CARLTON PREVOST-1 | G | 5263 | 41476 | 1115 | .1596 | 65 |
| 09 04 | CARLTON PREVOST-1 | G | 210 | 2933 | | .1596 | -6 |
| 09 04 | CARLTON PREVOST-1 | G | 210 | 2933 | | .2144 | -6 |
| 09 04 | CARLTON PREVOST-1 | G | 3792 | 174060 | 21714 | .1269 | 193 |
| 09 04 | CARLTON PREVOST-1 | G | 8039 | -50040 | -1704 | .1627 | 79 |
| 09 04 | CARLTON PREVOST-1 | G | 3792 | 193289 | 21713 | .1631 | 79 |
| 10 04 | CARLTON PREVOST-1 | G | -3792 | -50040 | -1703 | .1631 | -194 |
| 10 04 | CARLTON PREVOST-1 | G | 3792 | 174060 | 21713 | .1272 | 194 |
| 10 04 | CARLTON PREVOST-1 | G | -210 | -2933 | | .2144 | -6 |
| 10 04 | CARLTON PREVOST-1 | G | -1742 | -172912 | -21712 | .2144 | -190 |
| 10 04 | CARLTON PREVOST-1 | G | 8039 | 50030 | 1703 | .1631 | -190 |
| 09 04 | CARLTON PREVOST-1 | G | 174060 | 174060 | 21712 | .1247 | 190 |
| 09 04 | CARLTON PREVOST-1 | G | 3651 | 193289 | 22119 | .1269 | 215 |
| 10 04 | CROWLEY 1-35 | G | -2417 | -192289 | -2417 | .1269 | -215 |
| 11 04 | CROWLEY 1-35 | G | 7902 | 56643 | 1633 | .1627 | 89 |
| 04 04 | CROWLEY 1-35 | G | 3653 | 192289 | 24118 | .1272 | 215 |
| 09 04 | CROWLEY 1-35 | G | 3653 | 184541 | 14790 | .1269 | 132 |
| 10 04 | CROWLEY 1-35 | G | 13868 | 341179 | 3521 | .1269 | 21 |
| 10 04 | CHAPMAN 38-3 | G | 2507 | 13641 | 1024 | .2710 | 34 |
| 10 04 | ALLAR CLAWSON 1-207 | G | 22154 | 111536 | 8380 | .0840 | 87 |
| 10 04 | ALLAR CLAWSON 1-207 | G | 20929 | 87163 | 6551 | .0840 | 68 |
| 04 04 | ALLAR CLAWSON 1-207 | G | 21567 | 94180 | 7091 | .0840 | 73 |
| 10 04 | CROWLEY 1-35 | G | 197 | 10071 | 461 | .0840 | 8 |
| 07 04 | CROWLEY 1-35 | G | -7652 | -44531 | -7996 | .1894 | -69 |
| 08 04 | CROWLEY 1-35 | G | -7652 | | | .1894 | -69 |
| 08 04 | CROWLEY 1-35 | G | 0 | 0 | -65 | .2520 | -1 |
| 08 04 | CROWLEY 1-35 | G | 0 | 0 | | .1894 | -134 |
| 08 04 | CROWLEY 1-35 | G | 5213 | 35051 | 6095 | .2520 | 73 |
| 05 04 | G. FILES 2-10 | G | 2811 | 28601 | 3186 | .2520 | 63 |
| 04 04 | G. FILES 2-10 | G | 188 | 8520 | 626 | .2520 | 15 |
| 10 04 | G. FILES 2-10 | G | 3930 | 22330 | 4027 | .2520 | 44 |
| 10 04 | CROWLEY 1-35 | G | 186 | 9757 | 717 | .1894 | 17 |
| 10 04 | CROWLEY 1-35 | G | 19517 | 86276 | 6223 | .1978 | 158 |
| 04 04 | FILES 2-10 | G | 17269 | 65721 | 5771 | .1978 | 153 |
| 04 04 | G. FILES 2-10 | G | 14806 | 80093 | 5429 | .1978 | 138 |
| 04 04 | G. FILES 2-10 | G | 14520 | 75250 | | .1978 | 122 |
| 04 04 | G. FILES 2-10 | G | 12685 | 66901 | 4807 | .1978 | 95 |
| 10 04 | FLOWERS 1-37 | G | 11162 | 55372 | 3625 | .1978 | 95 |
| 10 04 | FLOWERS 1-37 | G | 16670 | 50052 | 3616 | .1978 | 54 |
| 04 04 | FLOWERS 1-37 | G | 2210 | 11894 | 894 | .4878 | 27 |
| 04 04 | FLOWERS 1-37 | G | 1313 | 5902 | 444 | .4878 | 21 |
| 04 04 | FLOWERS 1-37 | G | 956 | 4551 | 342 | .4078 | |

## CONDOR DRILLING COMPANY — PRODUCTION & SALES REPORT
### REVENUE RECEIVED AND EXPENSES PAID THRU: 11/30/04

| DATE | WELL | OIL GAS | BBL MCF | GROSS | TAX | NET REV INT | OWNERS NET VALUE |
|---|---|---|---|---|---|---|---|
| 08 04 | FORTHUN 2-1H | G | 6467 | 39275 | 847 | .3605 | 129 |
| 04 04 | FORTHUN 2-1H | G | 6470 | 36656 | 740 | .3605 | 129 |
| 10 04 | FORTHUN 2-1H | G | 6565 | 296804 | 14840 | .3605 | 1016 |
| 04 04 | FORTHUN 2-1H | G | 6330 | 39096 | -1091 | .3605 | 4 |
| 10 04 | FORTHUN 2-1H | G | 6130 | 311 | 911 | .3605 | 40 |
| 11 04 | FORTHUN 2-1H | G | 6331 | 32096 | 138 | .3605 | 40 |
| 10 04 | FRANK 35-7 | O | 5331 | 256420 | 29488 | .3605 | 818 |
| 04 04 | FRANK 35-7 | O |  | -108 | -9 | .2710 | 0 |
| 11 04 | FRANK 35-7 | O | 5019 | 16051 | 1292 | .2710 | 40 |
| 08 04 | FRANK 35-7 | O | 7284 | 24243 | 1961 | .2710 | 61 |
| 11 04 | FRANK 35-7 | O | 558 | 24906 | 2005 | .2710 | 62 |
| 10 04 | FRANK 35-7 | O | 3287 | 11466 | 923 | .2710 | 29 |
| 10 04 | FRANK 35-7 | O | 628 | 32729 | 2635 | .2710 | 82 |
| 10 04 | FRANK 35-7 | O | 357 | 1689 | 136 | .2710 | 4 |
| 11 04 | HEINZ 12-17H2 | O | 236 | 11933 | 1107 | .3212 | 32 |
| 04 04 | HILD 1-21 | G | 2953 | 3784 | 5333 | .3784 | 32 |
| 02 04 | HILD 1-21 | G | 2953 | -106662 | -5331 | .3784 | -384 |
| 10 04 | HILD 1-21 | G | 1235 | 73932 | 8272 | .1279 | 241 |
| 11 04 | HILD 1-21 | G | 642 | 3103 | 233 | .1275 | 7 |
| 08 04 | HORSE THIEF-1 | G | 2122 | 12672 | 952 | .1275 | 28 |
| 11 04 | HORSE THIEF-1 | G | -2123 | -12672 | -952 | .1275 | -15 |
| 07 04 | HORSE THIEF-1 | G | 585 | 2527 | 175 | .1275 | 5 |
| 10 04 | HORSE THIEF-1 | G | 526 | 2049 | 154 | .1275 | 2 |
| 08 04 | HORSE THIEF-1 | G | 51670 | 297904 | 21439 | .0272 | 75 |
| 07 04 | HORSE THIEF-1 | G | 184 | 7687 | 555 | .0272 | 2 |
| 10 04 | HORSE THIEF-1 | G | 45116 | 229036 | 16484 | .0272 | 58 |
| 11 04 | HUDDERS 1-23 | G | 42462 | 215354 | 15499 | .0272 | 54 |
| 09 04 | HUDDERS 1-23 | G |  | -114 | 0 | .0007 | 0 |
| 09 04 | HUDDERS 1-23 | G | 10009 | 51626 | 115 | .0272 | 1 |
| 10 04 | HUDDERS 1-23 | G | 185 | 4103 | 4101 | .0007 | 0 |
| 09 04 | HUDDERS 1-23 | G | 195 | 5755 | 1838 | .0007 | 0 |
| 10 04 | HUDDERS 1-23 | G | 10512 | 25942 | 1432 | .0007 | 21 |
| 09 04 | JACOBS 8-22 | G |  | 62466 | 1739 | .0363 | 0 |
| 10 04 | JACOBS 8-22 | G |  | 27196 | 759 | .0363 | 9 |
| 09 04 | JACOBS 8-22 | G |  | 10681 | 3136 | .0363 | 4 |
| 09 04 | JACOBS 8-22 | G |  | 45438 | 605 | .0323 | 1 |
| 08 04 | JACOBS 8-22 | G |  | 22990 | 1585 | .0272 | 0 |
| 09 04 | JACOBS 8-22 | G |  | 8477 | 606 | .0007 | 1 |
| 09 04 | JACOBS 8-22 | G |  | 8382 | 595 | .0007 | 20 |
| 09 04 | JACOBS 8-22 | G |  | 21138 | 1711 | .0363 | 8 |
| 09 04 | JACOBS 8-22 | G |  | 48050 | 4325 | .3678 | 161 |
| 08 04 | KERMIT 1-13H2 | O | 1063 | 3678 | -393 | .3678 | 6 |
| 09 04 | KERMIT 1-13H2 | O |  | 3678 | 4580 | .3678 | 175 |
| 10 04 | KERMIT 1-13H2 | O | 1024 | 53840 | 6193 | .3678 | 130 |
| 08 04 | KERMIT 1-13H2 | O | 828 | 39825 | 419 | .0457 | 4 |
| 09 04 | LINDVIG 44-11 | G | 130 | 8369 | 442 | .0457 | 175 |
| 08 04 | LINDVIG 44-11 | G | 1878 | 8849 | 238 | .0457 | 5 |
| 04 04 | LINDVIG 44-11 | G | 2039 | 10295 | 240 | .0457 | 5 |

## CONDOR DRILLING COMPANY — PRODUCTION & SALES REPORT
### REVENUE RECEIVED AND EXPENSES PAID THRU: 11/30/04

CONDOR DRILLING COMPANY
PRODUCTION & SALES REPORT
REVENUE RECEIVED AND EXPENSES PAID THRU:11/30/04

| DATE | WELL | OIL GAS | BBL MCF | GROSS | TAX | NET REV INT | OWNERS NET VALUE |
|---|---|---|---|---|---|---|---|
| 09 04 | LINDVIG 44-11 | G | 2556 | 112570 | 5628 | .0457 | 49 |
| 08 04 | LINDVIG 44-11 | G | 1960 | 10334 | 319 | .0457 | 48 |
| 04 04 | LINDVIG 44-11 | G | 2340 | 11852 | 13631 | .0457 | 48 |
| 09 04 | LINDVIG 44-11 | G | 2094 | 98323 | 13307 | .0457 | 40 |
| 08 04 | LLAGE 6-1 | G |  | -104 | 0 | .4325 | 0 |
| 11 04 | LLAGE 6-1 | G | 66481 | 349806 | 13828 | .4325 | 1453 |
| 09 04 | LLAGE 6-1 | G | 812 | 13020 | 4757 | .4325 | 0 |
| 11 04 | LLAGE 6-1 | G | 7660 | 45516 | 45516 | .4325 | 1564 |
| 10 04 | LLAGE 6-1 | G | 14770 | 779079 | 96855 | .4325 | 2942 |
| 08 04 | LLAGE 6-1 | G | 70787 | 541111 | 94724 | .4325 | 2299 |
| 11 04 | LLAGE 6-1 | G | 948 | 33260 | 3327 | .4325 | 2774 |
| 09 04 | LOVELESS 1-11 | G | 1499 | 22891 | 1648 | .1626 | 37 |
| 10 04 | LOVELESS 1-11 | G | 504 | 7818 | 809 | .1626 | 55 |
| 09 04 | LOVELESS 1-11 | G | 618 | 23257 | 1923 | .5332 | 37 |
| 10 04 | LOVELESS 1-11 | G | 4514 | 18010 | 1970 | .1626 | 40 |
| 09 04 | LOVELESS 1-11 | G | 1337 | 13638 | 1353 | .0976 | 13 |
| 10 04 | MAHLER 3-13B | G | 4085 | 18010 | 1801 | .0976 | 16 |
| 09 04 | MAHLER 3-13B | G | 3949 | 193970 | 13815 | .3403 | 606 |
| 10 04 | MAHLER 3-13B | G | 32452 | 174481 | 8521 | .3403 | 374 |
| 10 04 | MILLER 2-10 | G | 21198 | 186401 | 2855 | .3286 | 121 |
| 07 04 | MILLER 2-10 | G | 754 | 39666 | 1276 | .3286 | 54 |
| 11 04 | MILLER 2-10 | G | 368 | 17724 | 720 | .3286 | 7 |
| 09 04 | MILLER 2-10 | G | 166 | 467 | 457 | .0314 | 2 |
| 06 04 | MOORE 1-33 | G | 120 | 4364 | 171 | .0314 | 2 |
| 10 04 | MOORE 1-33 | G | 4364 | 23990 | 1713 | .0314 | 5 |
| 11 04 | MOORE 1-33 | G | 744 | 13702 | 2177 | .0314 | 5 |
| 07 04 | MOORE 1-33 | G | 3530 | 8153 | 594 | .0314 | 7 |
| 09 04 | MOORE 1-33 | G | 183 | 13570 | 989 | .0314 | 4 |
| 10 04 | MOORE 1-33 | G | 2899 | 14782 | 1076 | .0314 | 4 |
| 10 04 | MOORE 1-33 | G | 330 | 13064 | 952 | .0314 | 4 |
| 08 04 | MOORE 1-33 | G | 379 | 17748 | 1444 | .0314 | 5 |
| 04 04 | MOORE 1-33 | G | 369 | 17748 | 1292 | .0314 | 9 |
| 11 04 | NYGARD 1-19H | O | 599 | 3566 | 72 | .2995 | 10 |
| 10 04 | NYGARD 1-19H | O | 479 | 2853 | 60 | .2995 | 8 |
| 11 04 | NYGARD 1-19H | O | 694 | 2853 | 207 | .2995 | 8 |
| 10 04 | NYGARD 1-19H | O | 615 | 2684 | 59 | .2995 | 7 |
| 07 04 | FEMRINA 16-30-48-8 | G | 629 | 30447 | 1522 | .2995 | 87 |
| 08 04 | FEMRINA 16-30-48-8 | G | -5074 | -204817 | -6249 | .2995 | 55 |
| 09 04 | FEMRINA 16-30-48-8 | G | 615 | 33 | 168 | .5338 | 53 |
| 10 04 | FEMRINA 16-30-48-8 | G | 2130 | 2441 | 964 | .5338 | 52 |
| 11 04 | FEMRINA 16-30-48-8 | G | 2129 | 2285 | 199 | .5338 | 12 |
| 08 04 | FEMRINA 16-30-48-8 | O | 60 | 11828 | 2876 | .5338 | 40 |
| 09 04 | FEMRINA 16-30-48-8 | O | 120 | 5574 | 207 | .5338 | 29 |
| 10 04 | FEMRINA 16-30-48-8 | G | 1747 | 8466 | 2252 | .5338 | 23 |
| 08 04 | FEMRINA 16-30-48-8 | G | 101 | 4420 | 101 | .5338 | 33 |
| 09 04 | FEMRINA 16-30-48-8 | O | 177 | 2147 | 177 | .5338 | 11 |

CONDOR DRILLING COMPANY

PRODUCTION & SALES REPORT

REVENUE RECEIVED AND EXPENSES PAID THRU:11/30/04

| DATE | WELL | OIL/GAS | BBL/MCF | GROSS | TAX | NET REV INT | OWNERS NET VALUE |
|---|---|---|---|---|---|---|---|
| 08 04 | PRICE-1 | G | 742 | 3428 | 327 | .2700 | 8 |
| 09 04 | PRICE-1 | G | 940 | 4464 | 405 | .2700 | 11 |
| 10 04 | PRICE-1 | G | 403 | 2086 | 226 | .2700 | 5 |
| 10 04 | PRINCESS 10-9 | G | 6936 | 30099 | 8605 | .1373 | 41 |
| 07 04 | RUTH 1-23 | G | 1493 | 7469 | 1426 | .1373 | 195 |
| 08 04 | RUTH 1-23 | G | 3880 | 22060 | 2057 | .2057 | 55 |
| 09 04 | RUTH 1-23 | G | 3880 | 22066 | 441 | .2057 | 44 |
| 10 04 | RUTH 1-23 | G | 4857 | 219560 | 10978 | .2057 | 429 |
| 09 04 | RUTH 1-23 | G | 1230 | 77270 | -641 | .2057 | 1 |
| 09 04 | RUTH 1-23 | G | 1810 | 95130 | 174 | .2057 | 16 |
| 10 04 | RUTH 1-23 | G | 3939 | 189435 | 21787 | .2057 | 345 |
| 09 04 | SIMPSON CANYON 1045 | G | 5184 | 213409 | 9859 | .2057 | 103 |
| 10 04 | SIMPSON CANYON 1045 | G | 462 | 2178076 | 10060 | .5420 | 1126 |
| 11 04 | SIMPSON CANYON 1045 | G | 6602 | 21283 | 1252 | .5420 | 1402 |
| 05 04 | SIMPSON CANYON 1-79 | G | 116 | 183 | 183 | .0322 | 12 |
| 11 04 | SIMPSON 1-22 | G | 7745 | 39860 | 2869 | .0322 | 10 |
| 09 04 | SIMPSON 1-22 | G | 8120 | 34394 | 2476 | .0322 | 10 |
| 10 04 | SIMPSON 1-22 | G | 7375 | 31690 | 275 | .0322 | 2 |
| 07 04 | STATE LEASE 17453-1 | G | 120 | 725 | 61 | .3469 | 2 |
| 08 04 | STATE LEASE 17453-1 | G | 224 | 10076 | 1256 | .3469 | 31 |
| 10 04 | STATE LEASE 17453-1 | G | 11 | 26617 | 3294 | .3469 | 80 |
| 11 04 | STATE LEASE 17453-1 | G | 554 | 26732 | 3333 | .3469 | 81 |
| 11 04 | STATE LEASE 17453-1 | G | -74 | -205 | | .1736 | 0 |
| 08 04 | STATE TRACT 277-2 | G | 1794 | 11242 | 844 | .1736 | 18 |
| 09 04 | STATE TRACT 277-2 | G | 1697 | 9178 | 689 | .1703 | 14 |
| 10 04 | STATE TRACT 277-2 | G | 20 | 890 | 41 | .1355 | 1 |
| 11 04 | STATE TRACT 277-2 | G | -260 | -260 | | .1355 | 20 |
| 10 04 | STATE TRACT 277-2 | G | 2287 | 12650 | 948 | .1355 | 20 |
| 11 04 | STATE TRACT 277-2 | G | 10 | 520 | 24 | .1355 | 12 |
| 11 04 | STATE TRACT 277-2 | G | -4 | 211 | 10 | .1736 | -25 |
| 10 04 | STATE TRACT 277-3 | G | 12705 | 80100 | 6016 | .1736 | 1262 |
| 11 04 | STATE TRACT 277-3 | G | -88 | -11105 | | .1736 | -159 |
| 10 04 | STATE TRACT 277-3 | G | 99742 | 539195 | 40506 | .1703 | 849 |
| 11 04 | STATE TRACT 277-3 | G | 2737 | 123290 | 5688 | .1736 | 159 |
| 09 04 | STATE TRACT 277-3 | G | 83764 | 462467 | 3472.8 | .1736 | -16 |
| 10 04 | STATE TRACT 71-1 | G | 2049 | 107546 | 4960 | .4336 | 728 |
| 10 04 | STATE TRACT 71-1 | G | 1608 | 77126 | 3558 | .4336 | 100 |
| 09 04 | STATE TRACT 95-1 | G | 2793 | 15407 | 952 | .4336 | 61 |
| 10 04 | STATE TRACT 95-1 | G | 2829 | 18043 | 1173 | .4336 | -22 |
| 10 04 | STATE TRACT 95-1 | G | 5041 | 18275 | 1591 | .4336 | 73 |
| 10 04 | STATE TRACT 95-1 | G | 5140 | 22651 | 1552 | .4336 | 91 |
| 10 04 | STATE TRACT 95-1 | G | | -10027 | | .4336 | -40 |
| 10 04 | STATE TRACT 95-1 | G | | 33213 | 2388 | .4336 | 134 |

CONDOR DRILLING COMPANY

PRODUCTION & SALES REPORT

REVENUE RECEIVED AND EXPENSES PAID THRU:11/30/04

| DATE | WELL | OIL/GAS | BBL/MCF | GROSS | TAX | NET REV INT | OWNERS NET VALUE |
|---|---|---|---|---|---|---|---|
| 11 04 | STATE TRACT 95-1 | G | 5267 | 34031 | 2450 | .4336 | 137 |
| 09 04 | STERLING GU 1-3 | G | 50955 | 324303 | 24357 | .2033 | 610 |
| 10 04 | STERLING GU 1-3 | G | 46157 | 252270 | 19101 | .2033 | 478 |
| 09 04 | STERLING GU 1-3 | G | 272 | 1413 | 446 | .2033 | 195 |
| 10 04 | STERLING GU 1-3 | G | 43812 | 259356 | 14616 | .2033 | 195 |
| 11 04 | STERLING GU 1-3 | G | 2176 | 13406 | 5286 | .2033 | 225 |
| 11 04 | STERLING GU 1-3 | G | 1875 | 1149515 | 4235 | .2033 | 225 |
| 11 04 | STERLING GU 1-3 | G | 182 | 92071 | 5975 | .5332 | 283 |
| 09 04 | KATHERINE SUE 1-11 | G | 9027 | 50027 | 5326 | .5332 | 210 |
| 10 04 | KATHERINE SUE 1-11 | G | 9212 | 45040 | 4659 | .5332 | 208 |
| 10 04 | KATHERINE SUE 1-11 | G | 4487 | 43464 | 4487 | .5332 | 14 |
| 11 04 | TUCKER 3-18 | G | 7930 | 9859 | 672 | .1626 | 37 |
| 10 04 | TUCKER 3-18 | G | 2498 | 9859 | 710 | .3420 | 39 |
| 09 04 | UNIVERSITY 22 1-5 | G | 2201 | 8745 | 629 | .3420 | 28 |
| 10 04 | UNIVERSITY 22 1-5 | G | 186 | 8435 | 517 | .5149 | 41 |
| 10 04 | UNIVERSITY 22 1-5 | G | 185 | 8745 | 648 | .5149 | 48 |
| 11 04 | UNIVERSITY 22 1-5 | G | 0 | 540 | 159 | .5149 | 3 |
| 10 04 | UNIVERSITY 35 1-5 | G | 193 | 10060 | 464 | .5420 | 52 |
| 11 04 | UNIVERSITY 35 1-5 | G | 176 | 8516 | 393 | .5420 | 44 |
| 09 04 | VALDERAS-2 | G | 12489 | 72751 | 7962 | .0748 | 46 |
| 10 04 | WESNER 7-31 | G | 10760 | 52637 | 8249 | .0748 | 33 |
| 11 04 | WESNER 7-31 | G | 1110 | 5742 | 705 | .0748 | 35 |
| 09 04 | WEST 1-3 | G | 81321 | 60818 | 14381 | .1879 | 126 |
| 10 04 | WEST 1-3 | G | 10964 | 60818 | 13446 | .1879 | 93 |
| 11 04 | WEST 1-3 | G | 186 | 58585 | 11446 | .1879 | 11 |
| 10 04 | WEST 1-2 | G | 10456 | 79792 | 10751 | .1454 | 190 |
| 11 04 | WEST 1-2 | G | 186 | 8915 | 642 | .1454 | 12 |
| 09 04 | WEST 1-3 | G | 59536 | 328162 | 8292 | .2726 | -23 |
| 10 04 | WEST 1-3 | G | 57937 | 329162 | 23542 | .2726 | 901 |
| 11 04 | WEST 1-3 | G | 5467 | 17794 | 23542 | .2726 | 725 |
| 10 04 | WEST 1-3 | G | 57703 | 328896 | 60441 | .2726 | 732 |
| 11 04 | WEST 1-3 | G | 5356 | 20749 | 20280 | .2022 | 529 |
| 11 04 | H. YTURRIA 4-6 | G | 4316 | 201491 | 20280 | .2022 | 389 |
| 10 04 | H. YTURRIA 4-6 | G | 143559 | 822233 | 63771 | .1747 | 1241 |
| 10 04 | H. YTURRIA 4-6 | G | 136625 | 663956 | 49883 | .1747 | 1711 |
| 10 04 | H. YTURRIA 4-6 | G | 806 | 35720 | 1648 | .1747 | 60 |
| 09 04 | H. YTURRIA 4-7 | G | 13008 | 20198 | 603 | .1747 | 21 |
| 09 04 | H. YTURRIA 4-7 | G | 603 | 427 | 932 | .1747 | 389 |
| 11 04 | H. YTURRIA 4-7 | G | 427 | 20198 | 550 | .2096 | -1 |
| 09 04 | H. YTURRIA 4-7 | G | 116993 | 660624 | 50300 | .2096 | 1296 |
| 09 04 | H. YTURRIA 4-7 | G | 115596 | 552122 | 41940 | .2096 | 1082 |
| 09 04 | H. YTURRIA 4-7 | G | 631 | 27977 | 1291 | .2096 | 82 |
| 10 04 | H. YTURRIA 4-7 | G | 109783 | 630801 | 47383 | .2096 | 1223 |

## CONDOR DRILLING COMPANY
### PRODUCTION & SALES REPORT
REVENUE RECEIVED AND EXPENSES PAID THRU 11/30/04

| DATE | WELL | OIL GAS | BBL MCF | GROSS | TAX | NET REV INT | OWNERS NET VALUE |
|---|---|---|---|---|---|---|---|
| 10 04 | H. YTURRIA 4-7 | 0 | 647 | 13172 | 1530 | .2096 | 66 |
| 11 04 | H. YTURRIA 4-7 | 0 | 609 | 28817 | 1329 | .2096 | 58 |
| 10 04 | H. YTURRIA 4-9 | 0 | 6099 | 35044 | 2632 | .1747 | 57 |
| 11 04 | H. YTURRIA 4-9 | 0 | 24 | 1240 | 57 | .1747 | 2 |
| 11 04 | H. YTURRIA 4-9 | 0 | 358 | 16956 | 782 | .1747 | 26 |

VENTURE EXPENSES: TAX -17175    OWNERS NET VALUE 58731

NET REVENUE AVAILABLE FOR DISTRIBUTION: 75906

---

## ESTATE OIL COMPANY
### EXPENSES FOR CONDOR DRILLING COMPANY

| WELL | PAYEE | PERIOD | TYPE | AMOUNT |
|---|---|---|---|---|
| AARON 1-22 | ZINKE & TRUMBO, INC. | 09/04 | LOE | 96.47 |
| AARON 1-22 | ZINKE & TRUMBO, INC. | 10/04 | LOE | 80.38 |
| AARON 1-22 | ZINKE & TRUMBO, INC. | 11/04 | LOE | 98.01 |
| ALLEN 1-34 | ZINKE & TRUMBO, INC. | 09/04 | LOE | 17.98 |
| ALLEN 1-34 | ZINKE & TRUMBO, INC. | 10/04 | LOE | 5.32 |
| ALLEN 1-34 | ZINKE & TRUMBO, INC. | 11/04 | LOE | -1.36 |
| ARCS 15-9-18-1W4 | ZINKE & TRUMBO CANADA CORP. | 09/04 | LOE | 290.56 |
| ARCS 15-9-18-1W4 | ZINKE & TRUMBO CANADA CORP. | 10/04 | LOE | 400.82 |
| ARCS 15-9-18-1W4 | ZINKE & TRUMBO CANADA CORP. | 11/04 | LOE | 29.23 |
| ARCS 15-9-18-1W4 | ZINKE & TRUMBO CANADA CORP. | 10/04 | LOE | 4.77 |
| ARCS 15-9-18-1W4 | ZINKE & TRUMBO CANADA CORP. | 11/04 | LOE | 22.54 |
| BAILEY MIN PTRSHP 2B | ZINKE & TRUMBO CANADA CORP. | 10/04 | LOE | 12.77 |
| BERKMAN 15-2-2 | ZINKE & TRUMBO, INC. | 11/04 | LOE | 16.43 |
| BERKMAN 15-2-2 | DIVERSIFIED OPERATING CO. | 09/04 | LOE | .92 |
| BERKMAN 15-2-2 | DIVERSIFIED OPERATING CO. | 10/04 | LOE | 3.85 |
| BERKMAN 15-2-2 | DIVERSIFIED OPERATING CO. | 11/04 | LOE | 50.46 |
| BRAZEAU 1-32-47-14W5 | ZINKE & TRUMBO CANADA CORP. | 09/04 | LOE | -4.81 |
| BRAZEAU 1-32-47-14W5 | ZINKE & TRUMBO CANADA CORP. | 10/04 | LOE | 33.47 |
| BRAZEAU 1-32-47-14W5 | ZINKE & TRUMBO CANADA CORP. | 11/04 | LOE | 10.47 |
| BROUSSARD HEBERT D-1 | ZINKE & TRUMBO, INC. | 09/04 | LOE | 157.09 |
| BROUSSARD HEBERT D-1 | ZINKE & TRUMBO, INC. | 10/04 | LOE | 27.90 |
| BROUSSARD HEBERT D-1 | ZINKE & TRUMBO, INC. | 11/04 | LOE | 3.84 |
| BV-1 SWD BLOCK 5 | RICH & CARTMILL | 10/04 | LOE | 6.67 |
| BV-1 SWD BLOCK 5 | RICH & CARTMILL | 11/04 | LOE | 5.92 |
| CADWELL 1-22 | ZINKE & TRUMBO, INC. | 09/04 | LOE | 1.13 |
| CADWELL 1-22 | ZINKE & TRUMBO, INC. | 11/04 | LOE | 16.22 |
| CAGLE LAND TRUST-1 | RICH & CARTMILL | 10/04 | LOE | .43 |
| CAGLE LAND TRUST-1 | RICH & CARTMILL | 11/04 | LOE | 16.21 |
| CARLTON PREVOST-1 | CREST RESOURCES INC. | 09/04 | LOE | 24.46 |
| CARLTON PREVOST-1 | CREST RESOURCES INC. | 10/04 | LOE | 13.63 |
| CARLTON PREVOST-1 | CREST RESOURCES INC. | 11/04 | LOE | 11.72 |
| CHAPMAN 38-3 | CABOT OIL & GAS CORP. | 09/04 | LOE | 2.39 |
| CHAPMAN 38-3 | CABOT OIL & GAS CORP. | 10/04 | LOE | 10.69 |
| CHAPMAN 38-3 | CABOT OIL & GAS CORP. | 11/04 | LOE | 1.68 |
| ALLAR CLARSON 1-207 | ZINKE & TRUMBO, INC. | 09/04 | LOE | -11.68 |
| ALLAR CLARSON 1-207 | ZINKE & TRUMBO, INC. | 10/04 | LOE | .10 |
| ALLAR CLARSON 1-207 | ZINKE & TRUMBO, INC. | 11/04 | LOE | -.32 |
| ALLAR CLARSON 1-207 | ZINKE & TRUMBO, INC. | 11/04 | LOE | -.32 |
| CROWLEY 1-35 | RICH & CARTMILL | 09/04 | LOE | .17 |
| CROWLEY 1-35 | RICH & CARTMILL | 10/04 | LOE | 17.28 |
| CROWLEY 1-35 | RICH & CARTMILL | 11/04 | LOE | 10.63 |
| DAVIS 26-3 | RICH & CARTMILL | | LOE | |
| DANES 1-8 | BLACK STONE ENERGY COMPANY | | LOE | |
| DJ-1 | BLACK STONE ENERGY COMPANY | 08/04 | LOE | |
| DJ-1 | BLACK STONE ENERGY COMPANY | 11/04 | LOE | |
| DUNN SOUTH-1 | CHESAPEAKE OPERATING INC. | 09/04 | LOE | |
| DUNN SOUTH-1 | CHESAPEAKE OPERATING INC. | 09/04 | LOE | |
| DUNN SOUTH-1 | CHESAPEAKE OPERATING INC. | 09/04 | LOE | |
| DUNN SOUTH-1 | CHESAPEAKE OPERATING INC. | 10/04 | LOE | |
| G. FILES 2-10 | CREST RESOURCES INC. | 09/04 | LOE | |
| G. FILES 2-10 | CREST RESOURCES INC. | 10/04 | LOE | |

| BISTATE OIL COMPANY WELL | EXPENSES FOR CONDOR DRILLING COMPANY PAYEE | PERIOD | TYPE | AMOUNT |
|---|---|---|---|---|
| G. FILES 2-10 | CREST RESOURCES INC. | 11/04 | LOE | 8.80 |
| FLOWERS 1-37 | ZINKE & TRUMBO, INC. | 05/04 | LOE | 14.63 |
| FLOWERS 1-37 | ZINKE & TRUMBO, INC. | 10/04 | LOE | 40.01 |
| FLOWERS 1-37 | ZINKE & TRUMBO, INC. | 11/04 | LOE | 17.51 |
| FOXTHON 2-1H | ZINKE & TRUMBO, INC. | 10/04 | LOE | 13.09 |
| FOXTHON 2-1H | ZINKE & CARTMILL | 11/04 | LOE | 50.05 |
| FOXTHON 2-1H | ZINKE & TRUMBO, INC. | 11/04 | LOE | 26.00 |
| FOXTHON 2-1H | ZINKE & TRUMBO, INC. | 10/04 | LOE | 13.38 |
| FRANK 35-7 | DIVERSIFIED OPERATING CO. | 08/04 | LOE | 20.10 |
| FRANK 35-7 | DIVERSIFIED OPERATING CO. | 11/04 | LOE | 5.09 |
| FRANK 35-7 | DIVERSIFIED OPERATING CO. | 11/04 | LOE | 5.96 |
| FRANK 35-7 | RICH & CARTMILL | 11/04 | LOE | 5.44 |
| PARGMANN FRIEDA-1 | RICH & CARTMILL | 10/04 | LOE | 23.01 |
| LOIS I | BTA OIL PRODUCERS | 10/04 | LOE | 40.41 |
| HAWTHORNE LAND 49-1 | BTA OIL PRODUCERS | 09/04 | LOE | 11.26 |
| HAWTHORNE LAND 49-1 | ZINKE & TRUMBO, INC. | 10/04 | LOE | 3.32 |
| HEINZ 12-17H2 | ZINKE & TRUMBO, INC. | 11/04 | LOE | 42.75 |
| HEINZ 12-17H2 | ZINKE & TRUMBO, INC. | 11/04 | LOE | 22.10 |
| HEINZ 12-17H2 | ZINKE & TRUMBO, INC. | 09/04 | LOE | 31.78 |
| HEINZ 12-17H2 | ZINKE & CARTMILL | 11/04 | LOE | 519.71 |
| HILD 1-21 | CARRIZO OIL & GAS, INC. | 01/04 | LOE | -25.00 |
| HILD 1-21 | CARRIZO OIL & GAS, INC. | 10/04 | LOE | 3.97 |
| HILD 1-21 | ZINKE & TRUMBO, INC. | 11/04 | LOE | 1.98 |
| HILD 1-21 | ZINKE & TRUMBO, INC. | 10/04 | LOE | 2.96 |
| HORSE THIEF-1 | AXIS EXPLORATION LLC | 09/04 | LOE | 1.03 |
| HORSE THIEF-1 | AXIS EXPLORATION LLC | 10/04 | LOE | 1.01 |
| HORSE THIEF-1 | AXIS EXPLORATION LLC | 11/04 | LOE | 1.01 |
| HORSE THIEF-1 | AXIS EXPLORATION LLC | 09/04 | LOE | 1.98 |
| HUDGENS 1-23 | ZINKE & TRUMBO, INC. | 10/04 | LOE | 10.22 |
| HUDGENS 1-23 | ZINKE & TRUMBO, INC. | 11/04 | LOE | 10.22 |
| HUDGENS 1-23 | ZINKE & TRUMBO, INC. | 09/04 | LOE | 24.35 |
| HUDGENS 1-23 | ZINKE & CARTMILL | 11/04 | LOE | 17.97 |
| JACOBS 8-22 | ZINKE & TRUMBO, INC. | 10/04 | LOE | 1.97 |
| JACOBS 8-22 | ZINKE & TRUMBO, INC. | 10/04 | LOE | 5.19 |
| KERMIT 1-13H2 | ZINKE & TRUMBO, INC. | 11/04 | LOE | 5.19 |
| KERMIT 1-13H2 | ZINKE & CARTMILL | 09/04 | LOE | 10.24 |
| KERMIT 1-13H2 | RICH & CARTMILL | 11/04 | LOE | 10.22 |
| KERMIT 1-13H2 | ZINKE & TRUMBO, INC. | 11/04 | LOE | 13.40 |
| LEGRAND 1-10 | ZINKE & TRUMBO, INC. | 10/04 | LOE | 1.98 |
| LEGRAND 1-10 | ZINKE & CARTMILL | 09/04 | LOE | 1.98 |
| LINDVIG 44-11 | BILL BARRETT CORPORATION | 11/04 | LOE | 4.33 |
| LINDVIG 44-11 | BILL BARRETT CORPORATION | 10/04 | LOE | 3.26 |
| LINDVIG 44-11 | BILL BARRETT CORPORATION | 11/04 | LOE | 3.52 |
| LINDVIG 44-11 | PALACE OPERATING COMPANY | 11/04 | LOE | 50.01 |
| LILEE 6-1 | CHESAPEAKE OPERATING INC. | 10/04 | LOE | 76.38 |
| LILEE 6-1 | CHESAPEAKE OPERATING INC. | 09/04 | LOE | 15.22 |
| LILEE 6-1 | CHESAPEAKE OPERATING INC. | 10/04 | LOE | 5.37 |
| LOVELESS 1-11 | CHESAPEAKE OPERATING INC. | 11/04 | LOE | -33.47 |
| LOVELESS 1-11 | CHESAPEAKE OPERATING INC. | 11/04 | LOE | 13.47 |
| LOVELESS 1-11 | CHESAPEAKE OPERATING INC. | 10/04 | LOE | 18.18 |
| LOVELESS 1-11 | CHESAPEAKE OPERATING INC. | 11/04 | LOE | 7.25 |

| BISTATE OIL COMPANY WELL | EXPENSES FOR CONDOR DRILLING COMPANY PAYEE | PERIOD | TYPE | AMOUNT |
|---|---|---|---|---|
| MAHLER 3-13B | CREST RESOURCES INC. | 09/04 | LOE | 1.39 |
| MAHLER 3-13B | CREST RESOURCES INC. | 10/04 | LOE | 1.39 |
| MAHLER 3-13B | CREST RESOURCES INC. | 11/04 | LOE | 4.54 |
| MILLER 2-10 | ZINKE & TRUMBO, INC. | 10/04 | LOE | 17.09 |
| MILLER 2-10 | ZINKE & TRUMBO, INC. | 11/04 | LOE | 19.78 |
| MILLER 2-10 | ZINKE & TRUMBO, INC. | 10/04 | LOE | 12.85 |
| MOORE 1-33 | ZINKE & TRUMBO, INC. | 11/04 | LOE | 1.10 |
| MOORE 1-33 | ZINKE & TRUMBO, INC. | 10/04 | LOE | 1.15 |
| MOORE 1-33 | ZINKE & CARTMILL | 11/04 | LOE | 1.15 |
| SUE MORRELL-1 | ZINKE & TRUMBO, INC. | 10/04 | LOE | 1.60 |
| SUE MORRELL-1 | ZINKE & TRUMBO, INC. | 10/04 | LOE | 21.85 |
| MM ENERGY INC. | ZINKE & TRUMBO, INC. | 10/04 | LOE | 17.72 |
| NYGARD 1-19H | ZINKE & TRUMBO, INC. | 10/04 | LOE | 13.77 |
| NYGARD 1-19H | ZINKE & TRUMBO, INC. | 10/04 | LOE | 18.07 |
| NYGARD 1-19H | CARRIZO OIL & GAS, INC. | 10/04 | LOE | .17 |
| CCSD 107444A-3 EI 277 | ENERGY PARTNERS LTD. | 11/04 | LOE | .17 |
| CCSD 107444A-3 EI 277 | ENERGY PARTNERS LTD. | 10/04 | LOE | 3.44 |
| CCSD 107444A-3 EI 277 | ENERGY PARTNERS LTD. | 10/04 | LOE | 1.95 |
| CCSD 107444A-3 EI 277 | ENERGY PARTNERS LTD. | 10/04 | LOE | 1.95 |
| CCSD 107444A-3 EI 277 | ENERGY PARTNERS LTD. | 11/04 | LOE | 7.50 |
| CCSD 26901-1 EI 277 | ENERGY PARTNERS LTD. | 10/04 | LOE | 10.54 |
| N PADRE ISLAND A-11 | ENERGY PARTNERS LTD. | 11/04 | LOE | 3.89 |
| LAVERNE PEARCE-1 | PALACE OPERATING COMPANY | 10/04 | LOE | 50.21 |
| FEMBINA 16-30-48-8 | NEWFIELD EXPLORATION COMP. | 10/04 | LOE | 13.77 |
| FEMBINA 16-30-48-8 | CARRIZO OIL & GAS, INC. | 11/04 | LOE | 3.02 |
| FEMBINA 16-30-48-8 | ZINKE & TRUMBO CANADA CORP. | 10/04 | LOE | 1.27 |
| FEMBINA 16-30-48-8 | ZINKE & TRUMBO CANADA CORP. | 10/04 | LOE | 32.29 |
| FEMBINA 16-30-48-8 | ZINKE & TRUMBO CANADA CORP. | 11/04 | LOE | 11.20 |
| FITZER 1-2 | RICH & CARTMILL | 11/04 | LOE | 9.56 |
| PRICE-1 | ZINKE & TRUMBO CANADA CORP. | 10/04 | LOE | 11.51 |
| PRICE-1 | RICH & CARTMILL | 11/04 | LOE | 42.75 |
| PRICE-1 | RICH & CARTMILL | 11/04 | LOE | 69.09 |
| PRICE-1 | RICH & CARTMILL | 11/04 | LOE | 13.98 |
| REDWON 1-35A | RICH & CARTMILL | 09/04 | LOE | 11.61 |
| REDWON 1-35A | ZINKE & TRUMBO, INC. | 11/04 | LOE | 17.46 |
| RUTH 1-23 | ZINKE & TRUMBO, INC. | 10/04 | LOE | 41.39 |
| RUTH 1-23 | ZINKE & TRUMBO, INC. | 11/04 | LOE | 41.39 |
| RUTH 1-23 | RICH & CARTMILL | 11/04 | LOE | 11.51 |
| SCHILLA 1-21RE | RICH & CARTMILL | 11/04 | LOE | 8.43 |
| SCHILLA 1-21RE | RICH & CARTMILL | 11/04 | LOE | 2.19 |
| SCHILLA 1-21RE | RICH & CARTMILL | 11/04 | LOE | 2.19 |
| SHEPHERD 1-26 | BLUEGRASS ENERGY, INC. | 10/04 | LOE | 57.32 |
| SIMPSON CANYON 1045 | BLUEGRASS ENERGY, INC. | 10/04 | LOE | 17.86 |
| SIMPSON CANYON 1045 | BLUEGRASS ENERGY, INC. | 09/04 | LOE | 46.39 |
| SIMPSON CANYON 1045 | BLUEGRASS ENERGY, INC. | 11/04 | LOE | 3.60 |
| SIMPSON CANYON 2079 | BLUEGRASS ENERGY, INC. | 10/04 | LOE | 445.24 |
| SIMPSON CANYON 1-76 | BLUEGRASS ENERGY, INC. | 09/04 | LOE | 159.43 |

## BISTATE OIL COMPANY — EXPENSES FOR CONDOR DRILLING COMPANY

| WELL | PAYEE | PERIOD | TYPE | AMOUNT |
|---|---|---|---|---|
| SIMPSON CANYON 1-79 | BLUEGRASS ENERGY, INC. | 09/04 | LOE | 2.71 |
| SIMPSON CANYON 1-79 | BLUEGRASS ENERGY, INC. | 10/04 | LOE | 3.65 |
| SIMPSON 1-22 | AXIS EXPLORATION LLC | 09/04 | LOE | 1.04 |
| SIMPSON 1-22 | AXIS EXPLORATION LLC | 10/04 | LOE | 1.11 |
| SIMPSON 1-22 | AXIS EXPLORATION LLC | 11/04 | LOE | 1.15 |
| SIXMILE DRAW 1-6 | BLUEGRASS ENERGY, INC. | 09/04 | LOE | 2.47 |
| STATE LEASE 17453-1 | PALACE OPERATING COMPANY | 09/04 | LOE | 42.34 |
| STATE LEASE 17453-1 | YONA EXPL & PROD. COMPANY | 09/04 | LOE | .22 |
| STATE LEASE 17453-1 | ZINKE & TRUMBO, INC. | 09/04 | LOE | .71 |
| STATE LEASE 17453-1 | ZINKE & TRUMBO, INC. | 09/04 | LOE | .22 |
| STATE LEASE 17453-1 | PALACE OPERATING COMPANY | 11/04 | LOE | 67.32 |
| STATE LEASE 17453-1 | RICH & CARIMILL | 11/04 | LOE | 21.32 |
| STATE LEASE 17453-1 | CABOT OIL & GAS CORP. | 11/04 | LOE | 11.24 |
| STATE TRACT 277-2 | CABOT OIL & GAS CORP. | 10/04 | LOE | 2.71 |
| STATE TRACT 277-2 | ZINKE & TRUMBO, INC. | 09/04 | LOE | 4.86 |
| STATE TRACT 277-2 | CABOT OIL & GAS CORP. | 10/04 | LOE | 2.40 |
| STATE TRACT 277-3 | RICH & CARIMILL | 11/04 | LOE | 26.13 |
| STATE TRACT 277-3 | CABOT OIL & GAS CORP. | 09/04 | LOE | .01 |
| STATE TRACT 277-3 | CABOT OIL & GAS CORP. | 10/04 | LOE | 18.09 |
| STATE TRACT 277-3 | ZINKE & TRUMBO, INC. | 09/04 | LOE | 4.65 |
| STATE TRACT 312-1 | PALACE OPERATING COMPANY | 11/04 | LOE | 6.27 |
| STATE TRACT 312-1 | CABOT OIL & GAS CORP. | 10/04 | LOE | 19.03 |
| STATE TRACT 57-1 | RICH & CARIMILL | 11/04 | LOE | 6.22 |
| STATE TRACT 57-1 | RICH & CARIMILL | 11/04 | LOE | 11.96 |
| STERLING GU 1-3 | STERLING EXPL. & PROD. COMP. | 10/04 | LOE | 101.55 |
| STERLING GU 1-3 | CARRIZO OIL & GAS, INC. | 10/04 | LOE | 31.59 |
| STERLING GU 1-3 | CARRIZO OIL & GAS, INC. | 10/04 | LOE | 35.35 |
| STATE TRACT 71-1 | STERLING EXPL. & PROD. COMP. | 11/04 | LOE | 3.35 |
| STATE TRACT 71-1 | STERLING EXPL. & PROD. COMP. | 11/04 | LOE | 31.17 |
| STATE TRACT 95-1 | STERLING EXPL. & PROD. COMP. | 09/04 | LOE | 35.55 |
| STATE TRACT 95-1 | CHESAPEAKE OPERATING INC. | 09/04 | LOE | 31.74 |
| STERLING GU 1-3 | CHESAPEAKE OPERATING INC. | 09/04 | LOE | 23.53 |
| KATHERINE SUB 1-11 | CHESAPEAKE OPERATING INC. | 09/04 | LOE | 18.95 |
| KATHERINE SUB 1-11 | CHESAPEAKE OPERATING INC. | 09/04 | LOE | -18.95 |
| KATHERINE SUB 1-11 | CHESAPEAKE OPERATING INC. | 10/04 | LOE | 8.33 |
| KATHERINE SUB 1-11 | CHESAPEAKE OPERATING INC. | 11/04 | LOE | 23.53 |
| LEROY TAYLOR-1 | CREST RESOURCES INC. | 10/04 | LOE | 26.65 |
| TUCKER 3-18 | CREST RESOURCES INC. | 09/04 | LOE | 5.56 |
| TUCKER 3-18 | CREST RESOURCES INC. | 09/04 | LOE | 3.16 |
| TUCKER 3-18 | RICH & CARIMILL | 11/04 | LOE | 6.34 |
| TUCKER 3-18 | ZINKE & TRUMBO, INC. | 11/04 | LOE | 14.05 |
| UNIVERSITY 22 1-5 | ZINKE & TRUMBO, INC. | 11/04 | LOE | 13.27 |
| UNIVERSITY 22 1-5 | RICH & CARIMILL | 11/04 | LOE | 2.78 |
| UNIVERSITY 22 1-5 | ZINKE & TRUMBO, INC. | 10/04 | LOE | 45.53 |
| UNIVERSITY 22 1-5 | ZINKE & TRUMBO, INC. | 09/04 | LOE | 35.41 |
| UNIVERSITY 35 1-5 | ZINKE & TRUMBO, INC. | 10/04 | LOE | 37.47 |
| UNIVERSITY 35 1-5 | ZINKE & TRUMBO, INC. | 11/04 | LOE | 15.00 |
| UNIVERSITY 35 1-5 | ZINKE & TRUMBO, INC. | 10/04 | LOE | 20.05 |
| VALDERAS-2 | ZINKE & TRUMBO, INC. | 09/04 | LOE | 15.00 |
| VALDERAS-2 | DENmER PETROLEUM CORP. | 11/04 | LOE | 3.67 |

## BISTATE OIL COMPANY — EXPENSES FOR CONDOR DRILLING COMPANY

| WELL | PAYEE | PERIOD | TYPE | AMOUNT |
|---|---|---|---|---|
| VALDERAS-2 | DENmER PETROLEUM CORP. | 11/04 | LOE | 7.83 |
| WATERFALL, FED'L 1-35 | ZINKE & TRUMBO, INC. | 10/04 | LOE | 10.84 |
| WATERFALL, FED'L 1-35 | ZINKE & TRUMBO, INC. | 10/04 | LOE | 2.29 |
| WESNER 7-31 | AXIS EXPLORATION LLC | 10/04 | LOE | 3.03 |
| WESNER 7-31 | AXIS EXPLORATION LLC | 10/04 | LOE | 2.47 |
| WESNER 7-31 | ZINKE & TRUMBO, INC. | 09/04 | LOE | 4.18 |
| WEST 1-2 | ZINKE & TRUMBO, INC. | 09/04 | LOE | 3.83 |
| WEST 1-2 | ZINKE & TRUMBO, INC. | 09/04 | LOE | 3.76 |
| WEST 1-3 | ZINKE & TRUMBO, INC. | 10/04 | LOE | 3.14 |
| WEST 1-3 | ZINKE & TRUMBO, INC. | 09/04 | LOE | 1.86 |
| WEST 1-3 | ZINKE & TRUMBO, INC. | 10/04 | LOE | 2.40 |
| WEST 1-3 | RICH & CARIMILL | 11/04 | LOE | 1.89 |
| WILLIAMS INC.-1 | ZINKE & TRUMBO, INC. | 11/04 | LOE | 20.57 |
| H. YTURRIA 4-6 | ZINKE & TRUMBO, INC. | 11/04 | LOE | 5.80 |
| H. YTURRIA 4-6 | CODY ENERGY LLC | 11/04 | LOE | 14.65 |
| H. YTURRIA 4-5 | CODY ENERGY LLC | 09/04 | LOE | 13.82 |
| H. YTURRIA 4-5 | CODY ENERGY LLC | 11/04 | LOE | 133.18 |
| H. YTURRIA 4-7 | CODY ENERGY LLC | 10/04 | LOE | 21.51 |
| H. YTURRIA 4-7 | CODY ENERGY LLC | 11/04 | LOE | 15.02 |
| H. YTURRIA 4-9 | CODY ENERGY LLC | 12/04 | LOE | 133.86 |
| H. YTURRIA 4-9 | CODY ENERGY LLC | 09/04 | LOE | 9.54 |
| H. YTURRIA 4-9 | CODY ENERGY LLC | 10/04 | LOE | 12.93 |
| H. YTURRIA 4-9 | CODY ENERGY LLC | 11/04 | LOE | 92.08 |
| LEASE OPERATING EXPENSE | | | | 6124.61 |
| ACCOUNTING FEE | | | | 700.00 |
| ADVANCE | | | | -23000.00 |
| | | | | -17175.39 |