STORCH AMINI & MUNVES PC
Two Grand Central Tower, 25th Floor
140 East 45th Street
New York, New York 10017
Tel (212) 490-4100
Steven G. Storch (SS-5241)
Kathleen E. Wright (KW-5439)
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

IRA NATHEL and SHELDON NATHEL,                           :

                         Plaintiffs,                     :

            -against-                                    :    07 CIV. 10956

RICHARD SIEGAL, GEORGE COLEMAN, ROBERT A. :
TREVISANI,  PAUL HOWARD, HARVEY JOSEPHSON,
RICHARD S. GURALNICK, SCHAIN LEIFER           :
GURALNICK , BISTATE OIL MANAGEMENT
CORPORATION, SS&T HOLDING CO., LLC,           :
PALACE EXPLORATION   COMPANY, TAH
DRILLING CO., INC., TAQ DRILLING CO., INC., and :
OIL AND GAS TITLE HOLDING CORPORATION
                                                         :
                         Defendants.                     :
------------------------------------------------------------------------x


**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF
THEIR CROSS-MOTION TO FILE A SECOND AMENDED COMPLAINT**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................iii

ARGUMENT ........................................................................................................................1

POINT I    The Cross-Motion to File the SAC Should be Granted as Against the
Siegel Defendants ..............................................................................................1

    A.    The Section 10(b) Claim is Sufficient ........................................................1

        1. The SAC Pleads Loss Causation ..........................................................1

        2. The SAC Sufficiently Alleges Scienter ..............................................4

        3. The SAC Pleads Reasonable Reliance ................................................5

    B.    The Section 10(b) Claim Cannot be Dismissed on Statute of
Limitations Grounds .....................................................................................7

    C.    The State Claims Cannot be Dismissed .......................................................9

    D.    The Declaratory Judgment Claim is Valid ...................................................9

    E.    The Seventh and Tenth Claims Must be Upheld ........................................11

POINT II    The Cross-Motion to File the SAC Should be Granted as Against
Defendant Josephson ........................................................................................11

    A.    The Claim Against Josephson Complies with Rule 9(b) ............................11

        1. The SAC Adequately Alleges Scienter Against Josephson .................13

        2. The SAC Alleges Damages, Reliance and Loss Causation .................15

POINT III    The SAC States Valid Claims Against Coleman and Trevisani ..........................16

    A.    Aiding and Abetting the Siegal Defendants' Common Law Fraud ............16

        1. The SAC Properly Alleges Actual Knowledge ..................................17

        2. The SAC Properly Alleges Substantial Assistance ............................21

B.     The Fifth and Sixth Claims for Breach of Contract Against Coleman and Trevisani are Sufficient .................................................................... 24

C.     The Eighth and Ninth Claims for Breach of Fiduciary Duty Against Coleman and Trevisani are Sufficient .................................................... 26

POINT IV   The SAC Pleads a Valid Claim Against the Guralnick Defendants ......................... 28

CONCLUSION .................................................................................................................. 30

## TABLE OF AUTHORITIES

**Cases**                                                                      **Page**

484 Associates, L.P. v. Moy,
    2007 WL 683999 at *3 (S.D.N.Y. March 5, 2007) ........................................................ 6

ABF Capital Management v. Askin Capital Mgmt.,
    957 F. Supp. 1308 (S.D.N.Y. 1997) .................................................................................. 22

Alpert v. Haimes
    64 Misc. 2d 608, 315 N.Y.S.2d 332 (Sup. Ct., Queens Co. 1970) .......................................... 25

Armstrong v. McAlpin,
    699 F.2d 79 (2d Cir. 1983) ............................................................................................ 22

Associated Indemnity Corp. v. Fairchild Industries, Inc.,
    961 F.2d 32, 35 (2d Cir. 1992) ................................................................................. 10, 28

Bangkok Crafts Corp. v. Capitolo Di San Pietro In Vaticano
    2007 WL 1687044 at *5 (S.D.N.Y. June 11, 2007) ................................................. 6, 13, 19

Barbarian Rugby Wear, Inc. v. PRL USA Holdings, Inc.,
    2006 WL 2089926 at *3 (S.D.N.Y. 2006) ........................................................................ 10

Bernshteyn v. Feldman,
    2006 WL 2516514 (S.D.N.Y. 2006) ................................................................................ 29

Blumberg v. Altman,
    15 Misc.3d 1140(A), 2007 WL 1519067 at * 2 (Sup. Ct., N.Y. Co. May 25, 2007) ................. 2

Briarpatch Ltd. v. Phoenix Pictures, Inc.,
    373 F.3d 296, 308 (2d Cir. 2004) .................................................................................... 27

Brown v. Earthbound Sports USA, Inc.,
    481 F.3d 901, 918 (6th Cir. 2007) ................................................................................ 14

Cromer Finance Ltd. v. Berger
    137 F. Supp.2d 452, 470 (S.D.N.Y. 2001) ...................................................................... 23

Cuccolo v. Lipsky Goodkin & Co.,
    826 F. Supp. 763 (S.D.N.Y. 1993) ............................................................................. 29, 30

Dovitz v. Rare Medium Group, Inc.,
    2003 WL1057426 at *3 (S.D.N.Y. March 10, 2003) ............................................................ 7

Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.,
    343 F.3d 189 (2d Cir. 2003) ..................................................................16

Filler v. Hanvit Bank,
    339 F.Supp.2d 553 (2d Cir. 2005) ..........................................................18

Fraternity Fund Lt. v. Beacon Hill Asset Management LLC,
    376 F. Supp.2d 385, 403 fn. 108 (S.D.N.Y. 2005) ...................4, 16, 21, 23

Harris v. Finch, Pruyn & Co.
    2008 WL 2064972 at *4 (N.D.N.Y. May 13, 2008)..................................13

Hirsch v. Arthur Anderson & Co.
    72 F.3d 1085 (2d Cir. (Conn.) 1995) ......................................................21

Hunt v. Enzo Biochem, Inc.,
    530 F.Supp.2d 580, 592 (S.D.N.Y. 2008) .................................................9

In re Aegon N.V. Sec. Litig.
    2004 WL 1415973 (S.D.N.Y. June 23, 2004) ...........................................5

In re AIG Advisor Group Sec. Litig.,
    06 CV 1625, 2007 WL 1213395 at * 10 (E.D.N.Y. Apr. 25, 2007)...........3

In re Converium Holding AG Sec. Litig.
    04 Civ. 7897, 2007 WL 2684069 at *3 (S.D.N.Y. Sept. 14, 2007)...............4, 14, 16

In re Openwave Systems Sec. Litig.,
    07 Civ. 1309, 2007 WL 3224584 at *10 (S.D.N.Y. Oct. 31, 2007) ...................4, 14

In re Pronetlink Sec. Litig.,
    403 F. Supp.2d 330, 334 (S.D.N.Y. 2005). ...............................................7

In re Top Tankers, Inc. Sec. Litig.
    528 F. Supp.2d 408, 413 (S.D.N.Y. 2007) ..........................................5, 14

In re Yukos Oil Co. Sec. Litig.,
    2006 WL 3026024 *12 (S.D.N.Y. Oct. 25, 2006).....................................21

Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.,
    475 F. Supp. 2d 456 (S.D.N.Y. 2007) .....................................................25

J.P. Morgan Chase Bank v. Winnick
    406 F.Supp.2d 247, 254 (S.D.N.Y. 2005) .................................17, 19, 22

iv

Joffee v. Lehman Bros., Inc.,
  2005 WL 1492101 at *6 (S.D.N.Y. June 23, 2005) ................................................. 7

Joyce v. Bobcat Oil & Gas, Inc.,
  2008 WL 919724 (M. D. Pa. Apr. 3, 2008)............................................................. 3

Kalin v. Xanboo, Inc.,
  526 F. Supp.2d 392, 401 (S.D.N.Y. 2007) ........................................................ 12, 13

Kramer v. W10X/515 Real Estate Limited Partnership,
  44 A.D.3d 457, 460, 844 N.Y.S.2d 18, 21 (1st Dep't. 2007)................................. 27

Lanzi v. Brooks
  54 A.D.2d 1057, 388 N.Y.S.2d 946 (3d Dep't. 1976).......................................... 20

Lapin v. Goldman Sachs Group, Inc.,
  506 F. Supp.2d 221, 234 (S.D.N.Y. 2006) ......................................................... 7, 9

McCoy v. Goldberg
  883 F. Supp. 927, 939 (S.D.N.Y. 1995) ............................................................. 15

Montoya v. Mamma.com Inc.,
  2006 WL 770573 at *5 (S.D.N.Y. Mar. 28, 2006)............................................... 14

Nat'l Westminster Bank U.S.A. v. Weksel
  124 A.D.2d 144, 511 N.Y.S.2d 626 (1st Dep't. 1987)..................................... 18, 22

Novak v. Kaskas
  216 F.3d 300 (2d Cir. 2000) ........................................................................... 13, 14

Ryan v. Hunton & Williams
  2000 WL 1375265 (E.D.N.Y., Sept. 20, 2000) ................................................... 19

Seippel v. Jenkens & Gilchrist, P.C.,
  341 F. Supp.2d 363, 371, 383 (S.D.N.Y. 2004) ....................................... 10, 28, 29

Shields v. Citytrust Bancorp, Inc.
  25 F.3d 1124 (2d Cir. 1994) ............................................................................... 5

Speir v. Erber
  1992 WL 230254 (S.D.N.Y. Sept. 1, 1992) ........................................................ 13

Stamelman v. Fleishman-Hillard, Inc.
  2003 WL 21782645 at *7 (S.D.N.Y. July 31, 2003)............................................. 6

Superintendent of Ins. of State of New York v. Spira,
   289 A.D.2d 173, 736 N.Y.S.2d 1 (1st Dep't. 2001) ................................................. 22

Tellabs, Inc. v. Makor Issues & Rights, Ltd.
   127 S.Ct. 2499 (June 2007) .................................................................. 13, 14

VTech Holdings Ltd. v. Pricewaterhouse Coopers, LLP
   348 F.Supp.2d 255 (S.D.N.Y. 2004) ........................................................ 18, 21

## Statutes

28 U.S.C. § 2201 ....................................................................................... 9

28 U.S.C. § 1367(a) .................................................................................. 28

N.Y. Partnership Law §§ 40-45 ................................................................ 25

Martin Act, N.Y. Gen. Bus. L. § 352-c (1)(c) (2003) ................................ 26

Plaintiffs Ira Nathel and Sheldon Nathel ("Plaintiffs") submit this reply memorandum of law in further support of their cross-motion to amend the First Amended Complaint ("Complaint") and file the proposed Second Amended Complaint ("SAC"), and in further opposition to the defendants' motion to dismiss the Complaint. Defendants' opposition to the filing of the SAC is meritless.  Defendants disregard not only established pleading standards, but the very allegations of the SAC itself which give rise to all the requisite elements of the claims alleged. Because the proposed SAC is not futile, the motion to amend should be granted.

## ARGUMENT

### POINT I

### THE CROSS-MOTION TO FILE THE SAC
### SHOULD BE GRANTED AS AGAINST THE SIEGEL DEFENDANTS

**A.**     **The Section 10(b) Claim is Sufficient**

The Siegal Defendants contend that the federal securities fraud claim is insufficiently pleaded because it purportedly fails to allege loss causation, scienter and reasonable reliance.  As seen below, these objections are meritless.[1]

**1.    The SAC Pleads Loss Causation**

In their memorandum of law in support of the cross-motion, based upon the allegations of the SAC, Plaintiffs demonstrated that the subject of the Siegal defendants' investment proposals and other misrepresentations and the failure to disclose the truth – that the wells were dry or abandoned, that they had been drilled before Plaintiffs invested, that the intangible drilling costs ("IDC") would not be allowable, that drill sites were not assigned to specific partnerships, that

---

[1]    The Siegel Defendants raise an additional ground, which, however, has no pertinence to the actual securities fraud claim alleged in the SAC. They argue that any claim against them for failure to purchase securities, based upon the fraudulent scheme to withhold distributions from Plaintiffs on the false promise to purchase securities, cannot be an independent basis for a claim under the securities laws. Plaintiffs do not assert such a claim, and thus, Point V of the Siegal Defendants' memorandum of law (dealing with the "in connection with" element) should be disregarded.

wells promoted to give off revenue could not pay off interest on the notes, that distributions would be withheld not to buy securities as represented but to provide cash for the Siegal defendants, and that the managing partners would not select drilling sites or otherwise manage the partnerships – caused the economic harm to the Plaintiffs, i.e., the total loss of their investments and the probability of penalties incurred through the loss of the promised tax deductions as advised by the IRS.

The Siegal Defendants, however, contend that Plaintiffs have not sufficiently alleged loss causation because the Plaintiffs have supposedly "withdrawn any claim for damages based upon lost tax deductions." (Siegal Defs. Mem. p. 9). This argument is without merit. Even though Plaintiffs in their SAC do not seek to recover the lost tax deductions themselves – which concededly cannot be items of damage – nevertheless, Plaintiffs do seek damages as a result of the probable disallowance of tax deductions. Those damages are the probable penalties which will be assessed. Blumberg v. Altman, 15 Misc.3d 1140(A), 2007 WL 1519067 at * 2 (Sup. Ct., N.Y. Co. May 25, 2007) (damages sufficiently plead where plaintiff incurred penalties for underpaying tax). Therefore, any penalties incurred are the direct result of the disallowance of tax deductions due to the Siegals defendants' conduct which is the subject of the alleged misrepresentations and omissions.

Equally misguided is the Siegal defendants' other argument that there is no loss causation pleaded with respect to Plaintiffs' loss of their investments in the three partnerships, Indian Village, Condor and Hurricane. In this instance, the Siegal Defendants simply ignore the well pleaded allegations. Plaintiffs allege that their investment in Indian Village was $336,000 "which has virtually all been lost." (65).[2] The Condor investment of $572,000 (74), and Hurricane of $1,665,200 (81), also have "virtually all been lost." Id. These damages were

---

[2]    Numbers in parentheses refer to the paragraphs in the SAC.

caused by the lack of revenues derived from the wells which were dry or capped (which was concealed from Plaintiffs) and which were not assigned to the particular partnerships (also concealed from Plaintiffs). Plaintiffs also were deprived of any distributions which were withheld supposedly to purchase non-existent securities – contrary to what the Siegal Defendants had initially represented to Plaintiffs. As the court stated in In re AIG Advisor Group Sec. Litig., 06 CV 1625, 2007 WL 1213395 at * 10 (E.D.N.Y. Apr. 25, 2007): "Proper pleading of that causal link [for loss causation] requires alleging 'that the subject of the fraudulent statement or omission was the cause of the actual loss suffered.'"

Here, the subject of the fraudulent misstatements and omissions was that Plaintiffs would be afforded "a substantial active tax loss'" (42(c)); the Partnership can "expect an average annual cash flow of approximately 10-15%" (42(d)) which will continue for 10-12 years (42(e)); the drill sites "will be carefully chosen by the Managing Partner" (42(e)) who will operate the business of the partnerships (52); and the partnerships would buy marketable securities for each partner with withheld distributions (49). Plaintiffs' damages ensued because of the falsity of each of these omissions and misrepresentations: the drill sites could not be the basis for a IDC tax deduction because they were already drilled and abandoned and because they were not assigned to the specific partnership; for the same reason, oil and gas revenues could never pay back the investments; the Plaintiffs lost distributions they were entitled to by the scheme to withhold alleged distributions from the partners on the false promise that securities were being purchased, and the so-called managing partners did not – as falsely represented – select any drill sites or even participate in management:  Siegal and Howard managed the partnerships and caused their downfall and resulting damage to Plaintiffs (¶ 46).

These allegations of causation are more than adequate. Defendants' primary reliance on Joyce v. Bobcat Oil & Gas, Inc., 2008 WL 919724 (M. D. Pa. Apr. 3, 2008) is wholly misplaced.

The complaint there merely alleged vaguely that plaintiff's investment was worth less than he paid and so the court found no loss causation. Here, Plaintiffs expressly allege that they lost their entire investments due to the very factors encompassed by the fraud. To the extent that the Siegal Defendants contend that the loss was caused by other factors, "'the chain of causation . . . is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.'" Fraternity Fund Lt. v. Beacon Hill Asset Management LLC, 376 F. Supp.2d 385, 403 fn. 108 (S.D.N.Y. 2005)(citation omitted). See In re Converium Holding AG Sec. Litig., 04 Civ. 7897, 2007 WL 2684069 at *3 (S.D.N.Y. Sept. 14, 2007) (same).

## 2. The SAC Sufficiently Alleges Scienter

The Siegal Defendants rely once more on their erroneous assumption that the case no longer involves tax-related allegations in attempting to argue fraud by hindsight and that the SAC supposedly pleads only that Defendants' predictions did not come true. And again, these Defendants simply ignore the operative allegations of the SAC. Most significantly, they ignore that Siegal and Howard had access to internal documents which contradicted their public statements to the Plaintiffs, more than adequately giving rise to an inference of scienter. See In re Openwave Systems Sec. Litig., 07 Civ. 1309, 2007 WL 3224584 at *10 (S.D.N.Y. Oct. 31, 2007) (scienter includes allegations that defendants "knew facts or had access to information suggesting that their public statements were not accurate").

Here, the SAC alleges that Siegal, and Howard, had access to drilling reports for each partnership that showed that before Plaintiffs invested, a certain number of wells (specified in the SAC) were dry or abandoned or that drilling had already taken place. Siegal also knew that the sites had not been assigned to specific partnerships. Therefore, the Siegal Defendants knew at the time they induced Plaintiffs to invest that Plaintiffs would not be entitled to the IDC and would be susceptible to disallowance and penalties, and also that Plaintiffs would not recover oil

and gas proceeds.  Siegal was also aware, as Plaintiffs were not, of litigation on prior notes

which had not been paid through oil and gas revenues, contrary to their representations to

Plaintiffs, and that even seemingly productive wells were non-productive after several years.

Siegal also knew at the time of the inducement that it was he – not the so-called managing

partners as represented – who actually managed the partnerships, chose the drill sites and caused

the investors not to receive proceeds.  By representing that there were managing partners, he was

falsely giving Plaintiffs the impression of partnership independence and separate fiduciary duties

to the partners, whereas the truth was that the partnerships were controlled and run by Siegal and

there was no independence.

The cases cited by the Siegal Defendants are inapposite and do not support them.  Shields

v. Citytrust Bancorp, Inc., 25 F.3d 1124 (2d Cir. 1994) involved predictions and In re Aegon

N.V. Sec. Litig., 2004 WL 1415973 (S.D.N.Y. June 23, 2004) involved fraud by hindsight where

no facts were alleged to show that defendants concealed information.  Here, to the contrary, the

Siegal Defendants had access to records contradicting their public statements to Plaintiffs.

Because of Siegal and Howard's central roles in the fraud, and because of the inside

information they had while they were making false representations, the inference of scienter is

cogent.  Indeed, there are no plausible opposing inferences.  Accordingly, for the purposes of this

motion to dismiss, the SAC sufficiently pleads scienter.  In re Top Tankers, Inc. Sec. Litig., 528

F. Supp.2d 408, 413 (S.D.N.Y. 2007).

### 3.  The SAC Pleads Reasonable Reliance

Once again, the Siegal Defendants' argument is based on an erroneous misreading of the

SAC.  They contend that the SAC alleges misrepresentations of either predictions or guarantees

of expected returns and that because oil and gas deals are risky, Plaintiffs did not reasonably rely.

As noted above in great detail, however, and as clearly set forth in the SAC, the

5

misrepresentations and omissions were of present facts and were not predictions or guarantees of payment.  Plaintiffs do not complain that they were unaware of the risks inherent in an investment of oil and gas or that they were guaranteed returns; rather they complain that the Seigal Defendants knew in advance that Plaintiffs could not take the promised tax deductions or even recover any oil and gas proceeds, much less recover their investment.  Risk implies the possibility of succeeding; here, there was no such possibility.  Therefore, all of the Siegel Defendants' cases concerning the lack of reasonable reliance on promised returns from oil and gas investments or other investments are completely irrelevant.  (Siegal Defs. Mem. pp. 14, 15).

On the other hand, Plaintiffs sufficiently allege reasonable reliance based on the actual allegations of the SAC. (54, 102). They allege that they, and through their agent, Richard Byllot, relied upon the false representations and omissions made by the Siegal Defendants and their accountant-advisor, defendant Harvey Josephson. (Id.).  As the court stated in Bangkok Crafts Corp. v. Capitolo Di San Pietro In Vaticano, 2007 WL 1687044 at *5 (S.D.N.Y. June 11, 2007), "a plaintiff suing for fraud need only allege that he relied on the misrepresentations made by the defendant to overcome a motion to dismiss 'since the reasonableness of his reliance implicates factual issues whose resolution would be inappropriate at this early stage.'"  See Stamelman v. Fleishman-Hillard, Inc., 2003 WL 21782645 at *7 (S.D.N.Y. July 31, 2003) (whether reliance is reasonable "is intensely fact-specific and generally considered inappropriate for determination on a motion to dismiss.")

Indeed, a court will only grant a motion to dismiss for lack of reasonable reliance "if Plaintiff had actual notice of the falsity of the misrepresentations or indisputable access to information that would have revealed the truth with minimal diligence." 484 Associates, L.P. v. Moy, 2007 WL 683999 at *3 (S.D.N.Y. March 5, 2007).  Here, the Siegal Defendants do not and cannot point to any actual notice by Plaintiffs of the falsity of the representations that Plaintiffs

6

might be able to take tax deductions and recover revenues. Nor can they point to any information which would have revealed the falsity of the Siegal Defendants' representations and omissions. For example, Plaintiffs did not have access to drilling records. The pleading is plainly sufficient. Dovitz v. Rare Medium Group, Inc., 2003 WL1057426 at *3 (S.D.N.Y. March 10, 2003) (in the absence of documents directly contradicting representations, plaintiffs satisfy the "element of reliance simply by pleading it").

**B.    The Section 10(b) Claim Cannot be Dismissed on
        Statute of Limitations Grounds**

The Siegal Defendants argue that the SAC should be dismissed on the grounds that as a matter of law the Plaintiffs were on notice of the fraud within two years of the filing of the action in December 2005. The SAC does not, however, on its face show that the claim is time-barred.

"In the statute of limitations context, a Rule 12(b)(6) dismissal is appropriate only if the complaint, on its face, clearly shows that the claim is time-barred." Joffee v. Lehman Bros., Inc., 2005 WL 1492101 at *6 (S.D.N.Y. June 23, 2005) ("defendant seeking dismissal on the grounds that plaintiff had inquiry notice of the claim and that the statute of limitations has run bears an 'extraordinary' burden"). The "'existence of fraud must be a probability not a possibility,' and 'whether a plaintiff had sufficient facts to place it on inquiry notice is often inappropriate for resolution on a motion to dismiss.'" In re Pronetlink Sec. Litig., 403 F. Supp.2d 330, 334 (S.D.N.Y. 2005). Moreover, as the court stated in Lapin v. Goldman Sachs Group, Inc., 506 F. Supp.2d 221, 234 (S.D.N.Y. 2006):

> [O]n a motion to dismiss, 'unless Defendants can produce uncontroverted evidence that irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent scheme, they cannot satisfy the heavy burden of establishing inquiry notice as a matter of law.'

The Siegal Defendants have failed to satisfy their burden. First, as they did with their other contentions, they deliberately misstate and manipulate the allegations to fit their argument.

They erroneously contend that the fraud is that the dates on the partnership agreements were not the dates Plaintiffs invested, and since the dates were known to the Plaintiffs, they were aware of the fraud on the dates they invested. This argument makes no sense. The relevance of the dates on which Plaintiffs invested relates to the amount of the tax deductions they would have been entitled to (had they been valid). The SAC does not allege any fraud regarding the dates. At most, it alleges that Siegal's tax accountant, defendant Guralnick, committed malpractice in the K-1's by improperly allocating tax benefits based on the date of the partnership agreements instead of the date Plaintiffs invested. So this argument has no effect whatsoever on any limitations issue.[3]

Next, the Siegal Defendants argue that Plaintiffs were on notice of fraud because the SAC alleges that one aspect of the fraud was that the Siegal Defendants falsely represented that they would pay distributions out of oil and gas revenues, not from other sources, and that more than two years prior to filing suit, the Nathels received a distribution report for the Condor partnership indicating that an "advance" was made to them. The problem with this argument, however, is that Defendants do not show irrefutably that Plaintiffs knew what the "advance" consisted of; at most, Plaintiffs allege that the advances were from "unknown sources." (76).  In any event, the Siegal Defendants only point out this "advance" in January, 2005 in the Condor partnership, years after Plaintiffs invested in all three of the partnerships at issue, including

---

[3]  In a footnote (Mem. p. 18 n.7), the Siegal Defendants argue that Plaintiffs were partners in the partnerships as of the date of their agreement to become partners no matter when they invested and, incredibly, although consistently, they say that Plaintiffs have failed to allege when they invested.  In fact, the SAC expressly alleges the date when Plaintiffs invested in each of the partnerships, how much they invested and the date on the partnership agreement. (54). The Siegal Defendants are wrong about the date when Plaintiffs became partners because they fail to read the subscription agreements which the defendants actually submit on their motion. The subscription agreements provide that the partnership agreements, which are dated months before the Plaintiffs actually invested under the subscription agreements, "may be deemed for all purposes as the execution of the Partnership Agreement by the undersigned to the same extent and effect as if the undersigned has signed the Partnership Agreement on the date of the acceptance of this subscription by you." (Declaration of Scott Himes, attorneys for defendants Coleman, Trevisani, Ex.1 (Indian Village Subscription Agreement), ¶ 5).  In other words, the relevant date for both the subscription document and the partnership agreement is the date that the Plaintiffs actually invested under the subscription agreement.

Indian Village and Hurricane, and point to no other documents relating to those other two partnerships.

The issue as to inquiry notice is fact-specific and accordingly, the "Second Circuit has been 'decidedly reluctant to foreclose such claims as untimely absent a manifest indication that plaintiffs 'could have learned' the facts underpinning their allegations' before the end of the limitations period.'" Lapin. 506 F. Supp.2d at 234.[4]

## C.    The State Claims Cannot be Dismissed

Because the securities fraud claim is sufficiently stated against the Siegal Defendants, the common law fraud claim must be upheld. See Hunt v. Enzo Biochem, Inc., 530 F.Supp.2d 580, 592 (S.D.N.Y. 2008).

## D.    The Declaratory Judgment Claim is Valid

The Siegal Defendants contend that the Eleventh Claim for Relief brought under 28 U.S.C. § 2201, The Declaratory Judgment Act, is deficient because there is no independent basis of federal jurisdiction and because Plaintiffs have not yet been assessed penalties. Defendants are wrong. They are elevating form over substance and, as usual, misstate the allegations of the complaint.

First, the basis for subject matter jurisdiction for the Declaratory Judgment claim is not supplemental jurisdiction, as urged by the defendants. Rather, it is the same as the First Claim for Relief against these defendants: federal question jurisdiction under the federal securities laws. As alleged in the SAC, the "likelihood that Plaintiffs will incur penalties as a result of the defendants' wrongdoing, renders the Siegal Defendants liable for the penalties Plaintiffs may incur in the future with respect to all three Partnerships." (175). The wrongdoing alleged is fraud in the sale of securities under the federal securities laws. Therefore, contrary to the Siegal

---

[4]    The Siegal Defendants somehow claim that Plaintiffs' stated reliance on defendant Josephson is no longer viable since "tax advice is no longer the issue." (Siegal Mem. p. 20 n.10). As demonstrated above, this assumption is completely erroneous and made up; Plaintiffs still allege damages based upon misrepresentations and omissions relating to the tax penalties which flow from the disallowance of tax benefits.

Defendants' argument, there is an independent basis for federal jurisdiction. See Barbarian Rugby Wear, Inc. v. PRL USA Holdings, Inc., 2006 WL 2089926 at *3 (S.D.N.Y. 2006) (independent jurisdictional basis found where underlying claim was brought under the federal trademark act).

Nor is the Declaratory Judgment claim deficient because no penalties have as yet been assessed. As the Second Circuit stated in Associated Indemnity Corp. v. Fairchild Industries, Inc., 961 F.2d 32, 35 (2d Cir. 1992): "That the liability may be contingent does not necessarily defeat jurisdiction of a declaratory judgment action." Thus, contrary to the Siegal Defendants' contentions, the case of Seippel v. Jenkens & Gilchrist, P.C., 341 F. Supp.2d 363, 371, 383 (S.D.N.Y. 2004) is right on point. The court there specifically focused on tax penalties that were not yet assessed by the authorities as a result of ongoing audits. The court noted that the Seippels "have alleged a practical likelihood that these contingencies will occur" and that if their valid claim of fraud is proven, the defendants will be liable for those damages. Id. at 383.

Here, Plaintiffs allege that the Partnerships at issue are in fact "currently subject to audit and the IRS has indicated that the IDC tax deductions will likely be disallowed and penalties imposed." (174). As in Seippel, the contingencies will likely occur and if Plaintiffs prove their claim of fraud, the Siegal Defendants will be liable for penalties as damages. In point of fact, the New York State Taxing Authorities have already disallowed the deductions taken by the Plaintiffs for the Siegal partnerships and imposed penalties. (See Declaration of Ira Nathel, dated July 24, 2008, submitted herewith in support of the cross-motion and in opposition to the motion to dismiss). Therefore, "those damages which remain contingent – penalties . . . that may be assessed in the future, and professional fees that may be incurred – are the appropriate subject of the [Plaintiffs'] claim for declaratory relief." Seippel at 371.

E.     **The Seventh and Tenth Claims must be Upheld**

The Siegel Defendants assert that the Seventh Claim against them for tortious interference with contractual relations in procuring the breaches of the partnership agreements by the managing partners Coleman and Trevisani must be dismissed for the reasons set forth by those managing partner defendants. They make similar contentions regarding the Tenth claim for aiding and abetting the managing partners' breach of fiduciary duty. Since the Siegel Defendants make no claim that the SAC does not properly allege claims against them, and since the underlying claims against the managing partners are sufficient, as seen below, the Seventh and Tenth claims against the Siegel Defendants must be upheld.

## POINT II

### THE CROSS-MOTION TO FILE THE SAC
### SHOULD BE GRANTED AS AGAINST DEFENDANT JOSEPHSON

Defendant Josephson's objections to the proposed SAC are similarly without merit. First, he contends that the pleading fails to comply with FRCP 9(b). Then he claims that the pleading insufficiently alleges scienter, damages and loss causation. As seen herein, the proposed SAC is sufficient.

A.     **The Claim Against Josephson Complies with Rule 9(b)**

In essence, Josephson claims that the SAC fails to specify the fraudulent statements and the particulars of where and when the statements were made. The only way that Josephson can make that argument is to completely disregard the allegations of the SAC. Thus, Plaintiffs allege that Josephson represented to the Plaintiffs and Byllot, among other things, that they should invest in the partnerships because "he was very familiar with the Siegal partnership investment vehicles" and that "Siegal and Howard knew what they were doing" (34, 115); that the Plaintiffs would get tax deductions (32); that "oil and gas revenues paid down the notes (35); that similar

notes in similar partnerships had never been exercised (35); that he "vouched" for the

partnerships (36); that Congress had "approved such IDC tax deductions (36); and that it was

possible for Plaintiffs to "receive a return of their investment from oil and gas" (115). Plaintiffs

allege that Josephson's statements were false in that he gave assurances without any

investigation of whether the wells were legitimate or whether other investors had been sued on

the notes or had received oil and gas revenues or whether the partnerships had been registered

with the IRS as valid tax shelters. In fact, the wells were not legitimate as they had already been

drilled and/or were dry and had not been assigned to the partnerships and could not be the basis

for valid tax deductions; other investors had been sued on the notes; and the investors could not

be paid their investments from oil and gas revenues. (31-50).

    As to the particulars of the fraudulent statements, Plaintiffs allege that Josephson first

made the representations in July 2001 at a monthly company meeting with the Plaintiffs when he

first brought the partnerships to the Plaintiffs to invest in instead of paying their estimated taxes

at year end. (32). It was also Josephson who put the Plaintiffs and Byllot in direct contact with

Siegal and Howard at that time. (38). Josephson attended these monthly meetings at Plaintiffs'

offices. (30). It is further alleged that with respect to the partnership at issue, Indian Village,

Josephson made the same representations in June 2003 at a meeting at Plaintiffs' offices. (40).

    Under the applicable authorities, and contrary to Josephson's contention, the statements

are sufficiently specified, as are the dates and places of their making. As to the contents of the

statements, "[a]lthough the SAC does not provide direct quotations, it sufficiently specified the

content of the fraudulent statements such that [defendant] can identify the statements alleged to

be misleading." Kalin v. Xanboo, Inc., 526 F. Supp.2d 392, 401 (S.D.N.Y. 2007) (securities

fraud pleading upheld under Rule 9(b)). As for the time and place, "'Rule 9(b) does not require

that a complaint plead fraud with the detail of a desk calendar or a street map. Nor should the

word 'particularity' be used as a talisman to dismiss any but a finely detailed fraud allegation brought in a federal court.'" Bangkok Crafts Corp., 2006 WL 1997628 at * 5. Thus, where statements are alleged to be made over an extended period of time, "the requirement that a plaintiff identify the exact time and date of those statements is relaxed." Harris v. Finch, Pruyn & Co., 2008 WL 2064972 at *4 (N.D.N.Y. May 13, 2008). Moreover, identifying the date as a period of several months during which the statements were made or identifying the location of a meeting as being at the offices of a defendant is also sufficient. Kalin, at 401 ("circumstances are sufficiently well-defined to identify the event"). The case of Speir v. Erber, 1992 WL 230254 (S.D.N.Y. Sept. 1, 1992), the only case relied on by Josephson, does not compel a different result since, aside from the fact that it is dated, not followed by recent cases, and indeed, contrary to the current authorities, the allegations of fraud there were unduly conclusory. Accordingly, Rule 9(b) is satisfied.

### 1.    The SAC Adequately Alleges Scienter Against Josephson

Josephson's argument proceeds on an erroneous assumption: that the case of Novak v. Kaskas, 216 F.3d 300 (2d Cir. 2000), upon which Plaintiffs rely, is somehow inapplicable because it is pre-PSLRA and pre-Tellabs (Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S.Ct. 2499 (June 2007) and the standard for scienter there does not apply to Josephson. Josephson is wrong on all counts.

Novak, in which the Second Circuit set the standards for scienter under securities fraud, was not pre-PSLRA. Indeed, the Second Circuit analyzed the PSLRA in conjunction with the preexisting standards, and concluded that the enactment of the PSLRA "did not change the basic pleading standard for scienter in this circuit." Novak, at 310. Therefore, Novak is still the law in this circuit. The Tellabs case, decided in June, 2007, did not make Novak inapplicable either; it simply required that the court take into consideration, in determining whether the pleading

alleges an inference of scienter under Novak, plausible opposing inferences. If the inferences are tied, the complaint will not be dismissed. See, e.g., In re Top Tankers, 528 F. Supp.2d at 414-15. See In re Openwave, 2007 WL 3224584.

Finally, Josephson is wrong in asserting that one of the types of scienter allegations under Novak – that the defendants "failed to check information that they had a duty to monitor" – does not apply to him. Post PSLRA and post-Tellabs cases still apply the standards for pleading in Novak. E.g., In re Converium, 2007 WL 2684069 at *2 (citing Novak in determining that scienter was properly pleaded under Tellabs). Moreover, other cases in addition to Novak approve that standard. E.g., Montoya v. Mamma.com Inc., 2006 WL 770573 at *5 (S.D.N.Y. Mar. 28, 2006) (to plead recklessness, plaintiff can allege that "defendants 'failed to check information they had a duty to monitor'"). As demonstrated in Plaintiffs' moving memorandum of law in support of the cross-motion, Josephson encouraged his clients, Plaintiffs, to invest in the partnerships which he vouched for as valid, knowing that Plaintffs and Byllot had no experience in investing, and representing that they would be able to take legitimate tax deductions and have no real liability on notes, nor did he investigate whether the so-called managing partners were in fact acting as such or whether prior investors had been sued on their notes. As in Brown v. Earthbound Sports USA, Inc., 481 F.3d 901, 918 (6th Cir. 2007), Josephson encouraged Plaintiffs "to invest in a program, the details of which he knew virtually nothing." Josephson's reckless scienter is sufficiently pleaded. See In re Converium, 2007 WL 2684069 at *3 (in determining the inference of scienter on a motion to dismiss, "at this stage of the litigation, a court may not 'weigh the evidence that might be presented at trial.'")

2.    **The SAC Alleges Damages, Reliance and Loss Causation**

Josephson contends that the SAC fails to allege any loss or any loss occasioned by

Josephson, and that Plaintiffs could not have relied on Josephson.  The allegations of the SAC,

however, reflect a different scenario, as noted above.

Plaintiffs allege that they lost their entire investment in Indian Village, which Josephson

encouraged Plaintiffs to invest in and made misrepresentations about, and are subject to penalties

as a result of the disallowance of the tax deductions.  For Josephson to assert that no damages

have been pled is nonsensical.

Josephson's loss causation argument fares no better.  The fact that the Indian Village

investment was not entered in to until 2003, and Josephson first made his representations in

2001, is irrelevant since the SAC alleges that he repeated his statements in June 2003 when

Plaintiffs invested in Indian Village pursuant to his recommendations and the damages did not

occur until after that.  The fact that Plaintiffs, acting in some respects through Byllott, relied on

both Josephson and the Siegal Defendants does not exculpate Josephson.  As the court noted in

McCoy v. Goldberg, 883 F. Supp. 927, 939 (S.D.N.Y. 1995), there need be no independent

causation requirement where more than one defendant is alleged to have caused damages, even if

the tortfeasors are independent.

Josephson also contends that the partnership agreement negates reliance because it states

that only the managing partners offered the investment, that Plaintiffs had the opportunity to

obtain information about the investment, and that plaintiffs assumed the risks of the investment.

Josephson, however, points to no merger agreements or disclaimers in the offering documents,

because there were none.  Statements like these do not preclude fraud claims nor negate reliance

on investment advisers who defraud their clients into investing.  Plaintiffs are not alleging that

they were defrauded into believing that the investment had no risk – rather, with respect to

Josephson, that he knew he was fabricating when he vouched for the Siegal Defendants and the tax deductibility of the investments.  The case cited by Josephson, <u>Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.</u>, 343 F.3d 189 (2d Cir. 2003) does not help him because there, the plaintiffs were ultra sophisticated so could not be said to have relied on oral representations that contradicted the written ones.  Here, Josephson knew that the Plaintiffs and Byllot had no experience whatsoever in investing in oil and gas deals and were relying on him to vouch for the Seigal Defendants.  Moreover, as the court in <u>Converium</u> stated, quoting <u>Emergent Capital</u>, causation "'is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.'" 2007 WL 2684069 at *3.

## POINT III

### THE SAC STATES VALID CLAIMS
### AGAINST COLEMAN AND TREVISANI

**A.    Aiding and Abetting The Siegal Defendants' Common Law Fraud**

     To state a claim for aiding and abetting common law fraud in New York, a plaintiff must allege (1) the existence of a fraud; (2) defendants' actual knowledge of the fraud; and (3) substantial assistance to advance commission of the fraud.  <u>Fraternity Fund Ltd</u>, 479 F.Supp.2d at 360.  With respect to the first element, Coleman and Trevisani rely entirely on their co-defendants' arguments to show that the SAC fails to state a claim against Siegal for common law fraud.  This reliance is misplaced because, as shown above, Plaintiffs have properly alleged common law fraud. Coleman and Trevisani's own arguments are that the claim fails because Plaintiffs have not adequately alleged the second two elements.  (CT Mem. at 3-10).[5]  They are wrong.

---

[5]  "CT Mem." shall refer to Coleman and Trevisani's memorandum of law in support of the motion to dismiss and in opposition to Plaintiff's cross-motion to amend.

1.    **The SAC Properly Alleges Actual Knowledge**

Coleman and Trevisani argue at great length that the SAC only alleges "constructive" knowledge of the common law fraud, not actual knowledge, because it does not allege that Coleman and Trevisani were aware of all of the underlying fraudulent representations made by their co-defendants. (CT Mem. at 4-5). They also argue that actual knowledge is not pleaded on the basis of allegations that "they were managing partners who theoretically had access to partnership documents." (Id. at 7). These assertions ignore the actual allegations in the SAC itself.

The SAC clearly alleges that Coleman and Trevisani, by signing the Partnership Agreements, knew that they were being falsely held out to Plaintiffs as having the expertise to, and in fact would, manage the partnerships in all the aspects provided for in the Partnership Agreements, including selecting appropriate drill sites. A cursory reading of Section 6 to the Partnership Agreements shows the extent of the expertise they were purported to have in order to meet their obligations to manage the partnerships and their purported total control over all the activities of the partnerships. (Himes Dec. Submitted on behalf of CT, Exs. 7-8, Section 6). As the SAC alleges, Coleman and Trevisani knew, but Plaintiffs did not, that they had no such expertise, and would not be managing the Partnerships which Siegal actually controlled. Nevertheless, they permitted their names be used by Siegal. Thus, the SAC properly alleges that Coleman and Trevisani had actual knowledge that the Siegal Defendants were falsely misrepresenting to the partners their oil and gas drilling expertise and management roles in the partnerships. (52, 53, 105, 107, 124, 125,156).[6] This is more than sufficient to allege actual knowledge of fraud. See J.P. Morgan Chase Bank v. Winnick, 406 F.Supp.2d 247, 254

---

[6] These allegations expressly undercut Coleman and Trevisani's argument, buried in a footnote unsupported by any authority, that the SAC's allegations of misrepresented expertise and management of the affairs of the Partnerships are too devoid of facts to plead the requisite knowledge of fraud. (CT Mem. at 7 n. 4).

(S.D.N.Y. 2005) (receipt of emails sufficient to give rise to an inference of actual knowledge of fraudulent purpose of transactions.)

Accordingly, the cases cited by Coleman and Trevisani are inapposite. For instance, in Filler v. Hanvit Bank, 339 F.Supp.2d 553 (2d Cir. 2005), cited solely for the general proposition that constructive knowledge is insufficient to state an aiding and abetting claim, the court found that the plaintiffs' allegations did demonstrate that the defendants aided and abetted a fraud but – unlike here – not the primary fraud complained of in the case. Id. at 557-8. In VTech Holdings Ltd. v. Pricewaterhouse Coopers, LLP, 348 F.Supp.2d 255 (S.D.N.Y. 2004), allegations that auditors knew of false certifications made by a client alleged only constructive knowledge because the defendants did not create, nor did they execute the certifications. This is not the case here. Plaintiffs do not merely allege that Coleman and Trevisani "should have known" of the underlying fraud because they had access to Partnership documents. The SAC expressly alleges that Coleman and Trevisani, as signatories to the Partnership Agreements, actually knew those documents held them out fraudulently not only as having the expertise to manage the Partnerships but also that they would manage them and perform the substantial tasks set forth in the documents and that those documents would be provided to Plaintiffs. Accordingly, Coleman and Trevisani's assertion that Plaintiffs are unable to allege the documents they signed were used to perpetrate a fraud is simply wrong.[7]

Coleman and Trevisani also argue that the allegations of actual knowledge fail because the SAC acknowledges that almost all of the misrepresentations do not relate to Coleman and Trevisani "and would not be within their knowledge." (CT Mem. at 4). Contrary to their

---

[7]  Coleman and Trevisani's reliance on two other cases, culled from VTech, is similarly unavailing given the express allegations in the SAC. In Nat'l Westminster Bank U.S.A. v. Weksel, 124 A.D.2d 144, 511 N.Y.S.2d 626 (1st Dep't. 1987), the plaintiffs merely alleged that a law firm had actual knowledge of a client's underlying fraud simply because it had access to its clients's papers. Id. at 149-50, 511 N.Y.S.2d at 630. Similarly, in Ryan v. Hunton & Williams, 2000 WL 1375265 (E.D.N.Y., Sept. 20, 2000), the defendant bank's suspicion that its customer was using accounts for fraudulent purposes was merely constructive knowledge. Id. at *8-9.

assertions, unsupported by any authority, a claim for aiding and abetting fraud does not require allegations of knowledge of all the misrepresentations made to the Plaintiffs.  It is sufficient to allege that they knew a fraud was being perpetrated.  See J.P. Morgan Chase Bank, 406 F.Supp.2d at 254, (for aiding and abetting claim allegations of three emails received by defendant sufficient to allege actual knowledge of massive underlying fraud).  The allegations in the SAC more than meet this requirement.  (52, 53, 105, 107, 124, 125, 156).

Coleman and Trevisani also attempt to support their argument with assertions that Plaintiffs could not have justifiably relied on the misrepresentations of their expertise.  They base this argument on Plaintiffs' allegation that they learned, after they were alerted to the probability of fraud though contact from the IRS, that Coleman is a camp counselor and Trevisani is an attorney. (85-94).  Based on this information, the SAC alleges that Coleman and Trevisani were falsely represented to have expertise they did not have.  However, Coleman and Trevisani cannot point to a single allegation in the SAC that would show that there were any red flags that would have alerted Plaintiffs to question the Siegal Defendants' representations.  Furthermore, "reasonable reliance entails a duty to investigate the legitimacy of an investment opportunity where 'plaintiff was placed on guard or practically faced with the facts.'"  Bangkok Crafts Corp., 2007 WL 1687044 *5 (citation omitted).  No such circumstances existed here and, in any event, a plaintiff need only allege reliance for purposes of this motion to dismiss "since the reasonableness of his reliance implicates factual issues whose resolution would be inappropriate at this early stage."  Id. (citation omitted).

As the SAC alleges, Plaintiffs had no expertise in oil and gas investments and relied on, among other things, the Siegal Defendants' representations that they had been in the oil and gas drilling investment business for decades. (26, 28).  They also relied on their trusted advisor, Josephson, who encouraged them to invest "based on the strength of his familiarity with the

19

investments" and vouched for Siegal and the partnerships. (34, 36).  The Investment Proposals represented that Managing Partners would carefully select drilling sites. (42).  The Partnership Agreements set out a host of detailed partnership management tasks to be undertaken solely by the Managing Partners.  (Himes Dec. Exs. 7-9 at Section 6).  All of these alleged facts militate against Plaintiffs being put on notice to suspect that the seasoned Siegal Defendants would chose Managing Partners who could not – and would not – perform the Managing Partners' obligations, or that individuals lacking the necessary expertise would take on the contractual liability to do so.  Thus, Plaintiffs allege justifiable reliance on the false representations of Coleman and Trevisani's expertise.

Coleman and Trevisani's reliance on Lanzi v. Brooks, 54 A.D.2d 1057, 388 N.Y.S.2d 946 (3d Dep't. 1976) is inexplicable.  In that case, the fraud claim was dismissed because the complaint itself showed that the purported misrepresentations were not untrue.  The only other purported misrepresentation was of a future promise without any corresponding allegation that the promise was made without intent to honor it.  Id. at 1058.

Coleman and Trevisani also rely on a misreading of the SAC and the documents they submit, to assert that the Subscription Agreements negate the allegations of lack of expertise by exculpating the Managing Partners from liability "with respect to the selection of such [drilling] properties for the Partnership . . . ."  (CT Mem. at 6).  The sections of the Subscription Agreement to which the managing partners refer, however, are totally irrelevant because they assume that Coleman and Trevisani have actually performed as managing partners.  That is not the gist of the SAC.  To the contrary, the SAC alleges that Coleman and Trevisani knowingly did not perform any of the services required of them.  In fact, the SAC alleges that their liability springs from their misrepresentation that they could, and would, perform the obligations of the Managing Partners, including carefully choosing suitable drilling sites. (42, 52, 53).  The SAC

specifically alleges that Siegal, in fact, managed the Partnerships – not Coleman and Trevisani.

(156). Moreover, Section 6.04 of each of the Partnership Agreements expressly states that a

Managing Partner can only not be liable if he acts in good faith for acts

> [p]erformed or *omitted* by said Managing Partner in *good faith* and
> in a manner reasonably believed to be within the scope of the
> authority granted to him by this Agreement and *in the best
> interests of the Partnership, unless said Managing Partner has
> been guilty of gross negligence or willful misconduct.*

(Himes Decl. Exhibits 7-9, Sections 6.04) (emphasis added). This exculpatory provision has no

pertinence to acts of aiding and abetting fraud. Accordingly, there is no contradiction between

the allegations in the SAC and the Subscription Agreements.

None of the authorities cited by Coleman and Trevisani support them. For example,

VTech Holdings Ltd., 348 F.Supp.2d 255, involved the issue of oral representations being

contradicted by written ones. That issue does not exist here. In re Yukos Oil Co. Sec. Litig.,

2006 WL 3026024 *12 (S.D.N.Y. Oct. 25, 2006) does not even relate to a purported

contradiction between documentary evidence and the allegations in the complaint. Similarly,

Hirsch v. Arthur Anderson & Co., 72 F.3d 1085 (2d Cir. (Conn.) 1995) merely dismissed a

complaint brought by a trustee in bankruptcy for lack of standing. Accordingly, all of Coleman

and Trevisani's arguments that the SAC fails to allege actual knowledge fail.

**2.    The SAC Properly Alleges Substantial Assistance**

Under New York law, on a claim of aiding and abetting fraud, "[s]ubstantial assistance

occurs when a defendant affirmatively assists, helps conceal, or fails to act when required to do

so, thereby enabling the fraud…to occur." Fraternity Fund Ltd., 479 F.Supp.2d at 370 (citation

omitted). Contrary to Coleman and Trevisani's assertions, the SAC alleges facts that

demonstrate that they affirmatively and substantially assisted the Siegal Defendants to perpetrate

their common law fraud against Plaintiffs. The SAC expressly alleges that they executed

Partnership documents they knew would be given to Plaintiffs which falsely represented their expertise and role in the Partnerships' business. (52, 53, 122, 127).  Thus, Coleman and Trevisani cannot avoid the overwhelming inference that they assisted in the dissemination to Plaintiffs of materials containing fraudulent misrepresentations regarding their expertise and role in the Partnerships and their business.  Moreover, in addition to express allegations in the SAC, these statements also belie Coleman and Trevisani's assertions that the SAC only alleges that they "passively 'allowed' themselves to be held out as oil and gas experts."  They did not merely stand by – they signed the Partnership Agreements that misrepresented their expertise, and then acted in accordance with their misrepresentations.

Furthermore, in circumstance such as here, where the SAC alleges "a highly interdependent scheme" from which the Siegal Defendants and the Managing Partners benefitted from the common law fraudulent activity, "allegations that a defendant actively assisted and facilitated the fraudulent scheme itself, as opposed to assisting in the preparations of the documents themselves, are sufficient."  ABF Capital Management v. Askin Capital Mgmt., 957 F. Supp. 1308, 1328-9 (S.D.N.Y. 1997) (motion to dismiss claim of aiding and abetting common law fraud denied.)

The cases they cite are not only inapplicable, they have no relevance to the allegations here.  (CT Mem. at 10).  The quotation from Armstrong v. McAlpin, 699 F.2d 79 (2d Cir. 1983) pertains solely to a claim of aiding and abetting "churning" in violation of federal securities law – not the claim here.  In JP Morgan Chase Bank, 406 F. Supp. 2d at 258-9, the language quoted by Coleman and Trevisani arose in the context of the court sustaining an aiding and abetting claim.  Superintendent of Ins. of State of New York v. Spira, 289 A.D.2d 173, 736 N.Y.S.2d 1 (1st Dep't. 2001), involved an appeal of a grant of summary judgment – not a motion to dismiss.  Finally, in Nat'l Westminster Bank, 124 A.D.2d 144, 148, 511 N.Y.S.2d 626, (1st

Dep't. 1987), there were no allegations of any interaction between the plaintiff and defendant, let alone a contractual agreement as here, so the only conclusion to be drawn was that the defendants did nothing.

Their execution of the Partnership Agreements, which they knew Plaintiffs would sign, demonstrates that Coleman and Trevisani knew their expertise and role in the Partnerships were being misrepresented to Plaintiffs – knowledge which contradicts Coleman and Trevisani's contention that the SAC does not sufficiently allege that they aided and abetted the fraud supposedly because it does not allege that "they had any dealings with Plaintiffs at the time." The elements of a claim of aiding and abetting fraud do not require direct "dealings" and Coleman and Trevisani offer no support for their erroneous proposition.

The SAC meets the requirement to plead causation and substantial assistance by alleging that Plaintiffs received and relied upon the documents containing the misrepresentations and that Coleman and Trevisani assisted in promoting those misrepresentations. See Fraternity Fund, 479 F.Supp.2d at 370. In Fraternity, the court sustained the aiding and abetting claims against a defendant who, knowing a document might contain phony values, acceded to the perpetrator's request to send it out over defendant's letterhead.

The SAC also alleges that Coleman and Trevisani's acts and omissions proximately caused the harm. See Cromer Finance Ltd. v. Berger, 137 F. Supp.2d 452, 470 (S.D.N.Y. 2001) (substantial assistance requires allegation that aiding and abetting proximately caused the harm). By affirmatively promoting the misrepresentation of their expertise and role in the Partnership Agreements and knowingly permitting the Siegal Defendants to hold them out as experts in oil and gas investments, it was reasonably foreseeable that Coleman and Trevisani's actions and omissions would cause harm to Plaintiffs. If Coleman and Trevisani had the required expertise and had managed the Partnerships with that expertise, there might have been a possibility for

23

Plaintiffs to recover any substantial portion of their investment from oil and gas proceeds. Instead, as the SAC alleges, there was no possibility of any such recovery. Coleman and Trevisani's misrepresentations with respect to the withholding of distributions and the purchasing of marketable securities, resulted in further damage.

**B.     The Fifth and Sixth Claims for Breach of
        Contract Against Coleman and Trevisani Are Sufficient**

The SAC alleges that Coleman and Trevisani breached Sections 6 and 11 of the Partnership Agreements by withholding properly distributable funds, failing to purchase securities with the distributions withheld and failing to keep proper books and records.[8]   Section 6 categorically places all obligations related to the business of the Partnerships exclusively in the hands of the Managing Partners the scope of whose "power and authority shall encompass all matters in any way connected with [the Partnership's] business or incidental thereto. . ." including the obligation to make distributions to the partners.  (See e.g. Himes Dec. Ex. 7, §§ 6.01, 6.01(m)).

Coleman and Trevisani, however, completely disregard and misstate the well-pleaded allegations of the SAC and baldly contend that no breaches are pleaded. First, they argue that they cannot be charged with wrongfully withholding distributions, because supposedly the obligation to make distributions belongs to the Partnerships and not the Managing Partners under Section 5.03 of the Partnership Agreements.  They are wrong. Section 5.03 merely addresses the expenses and reserves to be taken into account before the Managing Partner makes a distribution. In fact, Section 5.03 confirms the clear obligation in Section 6.01(m) that the Managing Partner

---

[8]    Coleman and Trevisani's argument that the contract claims fail because the SAC alleges that obligation to make distributions arises from related agreements is simply wrong. (CT Mem. at 12-13). The related agreements merely state an accord with the Managing Partners' decisions, within their sole power, as to how the distributions should be made after a certain time. (68, 77, 132, 145).

alone has "to distribute Partnership income at such times as, and to the extent that, the Managing Partner determines there is sufficient cash on hand for Partnership distributions."

To support their tortured argument, Coleman and Trevisani turn Alpert v. Haimes, 64 Misc. 2d 608, 315 N.Y.S.2d 332 (Sup. Ct., Queens Co. 1970) on its head. In that case the issue was whether limited partners could bring an action for an accounting – not breach of contract – in their individual capacities, rather than derivatively. Nowhere does the case state that a partner cannot sue a Managing Partner for failing to meet an obligation he expressly assumed to each individual partner in a written agreement. They also misstate Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd., 475 F. Supp. 2d 456, 461-62 (S.D.N.Y. 2007). There, the breach of contract claim was dismissed because the sections of the partnership agreement purportedly breached – unlike those at issue here – imposed no individual duties at all on the defendant who signed it. Id. at 461. Moreover, although dismissing the contract claim, the court found that "the conduct alleged, if proved, would establish breaches by [defendant] of fiduciary duties he acknowledged by signing the [partnership agreement] as well, perhaps, as other bases of liability." Id. at 462.

New York Partnership Law, which Coleman and Trevisani also invoke, makes no reference to breach of contract claims and expressly provides that partners are free to make any agreement between them that is not illegal or against public policy. (N.Y. Partnership Law §§ 40-45). Furthermore, their reliance on an exculpatory clause in Section 6 is also misplaced. The clause does not absolve them of liability for breaching the Partnership Agreement and knowingly failing to meet their obligations as alleged in the SAC.

Finally, contrary to Coleman and Trevisani's assertion, complicated accounting is not required here to determine Plaintiffs' damages. Accordingly, the breach of contract claim falls squarely within the exception to the general rule requiring an accounting before a partner can

bring an action at law. (Pls. Mem. at 30). No complex calculations would be required to arrive

at the "correct" distributions since they would apply only to the Plaintiffs and no other partner.

Moreover, SAC does not allege that the distributions withheld from Plaintiffs were of

"unspecified amounts." (CT Opp. at 15). The amounts withheld – and thus Plaintiffs' damages

– can be determined from the distribution checks issued by Bistate which reflected the

withholding as "transfer for the purchase of securities."[9] (58, 68, 137).

## C.    The Eighth and Ninth Claims for Breach of Fiduciary Duty Against Coleman and Trevisani Are Sufficient

Coleman and Trevisani erroneously argue that the SAC fails to state a claim for breach of

fiduciary duty, in the Eighth and Ninth Claims respectively, because the claim is pre-empted by

the Martin Act. They recite the unsurprising proposition that claims for breach of duty (or

negligence) in the purchase or sale of securities are covered by the Martin Act, N.Y. Gen. Bus.

L. § 352-c (1)(c) (2003), and only the attorney general may bring such claims. (CT. Mem. at

16). However, there is no claim against these defendants for breach of duty in the purchase and

sale of securities. The Martin Act does not pre-empt claims arising, as here, from a Managing

Partner's breach of trust by failing to make distributions and diverting those funds purportedly

earmarked to purchase marketable securities. Coleman and Trevisani try to stretch the

allegations in the SAC to insinuate a claim "based on a securities transaction" by generally

referring to "certain co-defendants" and "securities transactions." The securities violations

alleged in the SAC are against the Siegal Defendants, not Coleman and Trevisani. They ignore

that the only claim against Colemani and Trevisani relating to the purchase and sale of securities

is the Fourth Claim for aiding and abetting common law fraud – based upon their fraudulently

---

[9]   Coleman and Trevisani also wrongly assert that Plaintiffs have no standing to allege that they failed to maintain adequate books and records because only a harm to the Partnerships is supposedly alleged (CT Opp. at 15 n. 9). The SAC clearly alleges that the Managing Partners' failure to maintain adequate books and records caused a harm to Plaintiffs as the Partnership's records would not reflect where their withheld distributions had been diverted. (138, 140).

being held out as expert managing partners – which is not pre-empted by the Martin Act.

<u>Kramer v. W10X/515 Real Estate Limited Partnership</u>, 44 A.D.3d 457, 460, 844 N.Y.S.2d 18, 21

(1st Dep't. 2007) ("the Martin Act does not bar plaintiffs' cause of action for common law

fraud").

      Defendants' distortion of the allegations, designed to infer that Coleman and Trevisani's

bad faith diversion of distributions somehow involved the purchase or sale of securities, is

disingenuous at best.  In fact, the paragraphs cited by Coleman and Trevisani that actually

mention them expressly state that the Plaintiffs' claim of breach of duty is based on their

withholding of distributions and the diversion of those funds to the Siegal companies instead of

their intended use.  (48, 68, 69, 77, 78, 84, 100, 105).  The Siegal Defendants' initial

misrepresentation to Plaintiffs regarding the withholding of distributions is an entirely different

claim from that against Coleman and Trevisani.  None of the cases cited have any relevance to

the claims alleged here; rather they all stand for boilerplate propositions which are inapplicable

and not in dispute.

      Finally, Coleman and Trevisani argue that even if the breach of fiduciary duty claim is

not based upon the purchase and sale of securities, it cannot be adjudicated as it does not arise

from the "same case or controversy."  This argument is intellectually dishonest and wrong.  For

the purposes of supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a): "[a] state law claim

forms part of the same controversy if it and the federal claim 'derive from a common nucleus of

operative fact.'  This is so even if the state law claim is asserted against a party different from the

one named in the federal claim." <u>Briarpatch Ltd. v. Phoenix Pictures, Inc.</u>, 373 F.3d 296, 308

(2d Cir. 2004) (citations omitted) (district court had power to hear breach of fiduciary duty

claims even though they did not fall within copyright jurisdiction).  Coleman and Trevisani have

not – and cannot – offer any support for the fiduciary duty claims alleged in the SAC being too

27

attenuated to be adjudicated in this action. They arise from the same facts and circumstances that give rise to all of the claims in the SAC and thus are sufficient under 28 U.S.C. § 1367(a).

### POINT IV

### THE SAC PLEADS A VALID CLAIM
### AGAINST THE GURALNICK DEFENDANTS

Plaintiffs' twelfth claim also seeks a declaratory judgment, pursuant to 28 U.S.C. § 2201, that Richard S. Guralnik and Schain Leifer Guralnik (the "Guralnick Defendants") are liable to Plaintiffs for damages caused by their accounting malpractice. (57,178-186).[10]

Contrary to the Guralnick Defendants' argument, Plaintiffs' allegation of damages is not speculative and Seippel, 341 F. Supp.2d at 371, 383, is directly applicable here. In that case, the Second Circuit addressed a claim for a declaratory judgment that the defendants were liable for tax penalties that had yet to be assessed and held that, because the plaintiffs had alleged there was a "practical likelihood" that the penalties would be assessed, the defendants would be liable for them if plaintiffs' prevailed. Id. In reaching its determination, the Seippel court relied on Associated Indemnity Corp., 961 F.2d 32, for the general principle, based on a long line of cited authorities, that a liability being contingent does not defeat jurisdiction over a declaratory judgment action. "Rather, courts should focus on "the practical likelihood that these contingencies will occur. . ." Id. at 35 (citations omitted). Thus, contrary to the Guralnick Defendants' contention, Seippel's reliance on Associated Indemnity Corp. for this long established principal was appropriate. The fact that Associated Indemnity Corp. addressed insurance coverage and Seippel addressed tax penalties does not undercut the applicability of the principal to either case or to Plaintiffs' here. Accordingly, the Guralnick Defendants'

---

[10]   As fully set forth above, the SAC properly invokes federal jurisdiction over this action pursuant to Section 10(b)(5), and therefore has supplemental jurisdiction over the declaratory judgment claims. (Point I(3)(D)). Accordingly, the Guralnick Defendants' argument that the claim is not justiciable is wrong. (Guralnick Mem. at 12-13.)

unsupported assertion that <u>Seippel</u> has not been followed in any subsequent decision is simply irrelevant.

Thus, as in <u>Seippel</u>, the SAC properly alleges the "practical likelihood" of damages. The Hurricane Partnership is under audit and the IDC tax deductions relating to the Partnership will likely be disallowed and penalties assessed. (174). As stated in the accompanying Declaration of Ira Nathel, New York State has already disallowed the IDC tax deductions and assessed penalties. Consequently, the cases cited by the Guralnick Defendants addressing speculative damages are inapposite. In fact, <u>Cuccolo v. Lipsky Goodkin & Co.</u>, 826 F. Supp. 763 (S.D.N.Y. 1993) supports Plaintiffs' position stating that: "[s]imply because the extent of damages is not ascertainable at a specific time is not fatal to maintaining an action for malpractice." <u>Id.</u> at 772 fn. 10. Furthermore, <u>Bernshteyn v. Feldman</u>, 2006 WL 2516514 (S.D.N.Y. 2006) did not involve a declaratory judgment claim and so is not applicable.

Moreover, contrary to the Guralnick Defendants' contention of lack of causation, the SAC properly alleges that while the principal damages alleged by Plaintiffs will result from the disallowance of the IDC by the taxing authorities, a portion of those damages was caused directly by their negligently prepared K-1s. As the SAC alleges, as professional accountants, they should have known that, in preparing the K-1s, they could not allocate the IDC to Plaintiffs for sites drilled before they acquired their interest in Hurricane.[11] Because of the erroneous allocation in the K-1s, the Guralnick Defendants are directly responsible for Plaintiffs taking a larger tax deduction for the Hurricane Partnership's IDC than they were entitled to in 2004.

---

[11] The Guralnik Defendants' argument that they were obligated by 26 C.F.R. 1.704-1(b)(2)(iv)(c) to allocate the IDC to Plaintiffs based on their percentage interest as of the date of the Partnership Agreement—as opposed to the date they actually invested -- is contrary to tax law and in any event, as they appear to acknowledge, is an issue that cannot be determined on a motion to dismiss. Nevertheless, this position is completely contradicted by the Subscription Agreement itself (submitted here by the defendants), which specifically states that Plaintiffs became partners in Hurricane as of the date they executed the Subscription Agreement—the date of their investment, December 9, 2004—not August 1, 2004, the date on the Partnership Agreement. (<u>See</u> Himes Dec. submitted in support of Coleman and Trevisani opposition, Exhibit 7, ¶ 5). This is consistent the Internal Revenue Code 760(d).

Accordingly, to the extent penalties will be assessed on the amount of the underpayment,

Plaintiffs will likely be assessed even greater penalties for the greater underpayment caused

directly by the erroneous K1s.  The Guralnick Defendants' negligence directly caused the excess

deduction which will draw the additional penalties.  Therefore, the Guralnick Defendants are

liable for the increase in penalties and the costs and fees incurred to defend the audits as well.

(SAC 184-5).[12]  Accordingly, the claim against the Guralnick Defendants properly alleges

damages and causation and is ripe for a declaratory judgment.

## CONCLUSION

For all the reasons set forth above and in Plaintiffs' prior submissions, it is respectfully

submitted that Plaintiffs' cross-motion to amend be granted and defendants' motions to dismiss

be denied in their entirety.  In the event the Court determines that the Second Amended

Complaint is deficient in some respect, Plaintiffs request leave to replead.

Dated: New York, New York
      July 30, 2008

STORCH AMINI & MUNVES PC

Steven G. Storch (SS-5241)
Kathleen E. Wright (KW-5439)
140 East 45th Street, 25th Floor
New York, New York 10017
Tel (212) 490-4100
Attorneys for Plaintiffs

---

[12]  Their argument that Plaintiffs may negotiate an abatement of the penalties (Guralnick Mem. at 9 fn. 5) also raises an issue of fact that cannot be decided on a motion to dismiss.  In Cuccolo, 826 F. Supp. 763, which they cite, the court addressed this argument and, in denying judgment, stated that a determination of the issue required discovery. Id. at 772.